# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| THE CHAMBERLAIN GROUP LLC, § § § *Plaintiff*, § § v. § CIVIL ACTION NO. 2:21-CV-00084-JRG § OVERHEAD DOOR CORPORATION, GMI § HOLDINGS INC., § § § *Defendants*. § | |

## ORDER

Before the Court is the Motion for Sanctions ("Motion for Sanctions") filed by Plaintiff The Chamberlain Group ("Chamberlain"). (Dkt. No. 348). In the Motion for Sanctions, Chamberlain requests that the Court impose sanctions on Defendants Overhead Door Corporation and GMI Holdings Inc. (collectively, "Defendants") stemming from an alleged late disclosure of a "new product" sold by Defendants. (*See, e.g.*, Dkt. No. 348 at 1). The Court held a hearing on the Motion for Sanctions on March 25, 2022 (the "March 25th Hearing") where counsel for both parties presented argument to the Court. (Dkt. No. 383). Having considered the Motion for Sanctions, the argument presented at the March 25th Hearing, and related briefing, including Chamberlain's Notice of Supplemental Facts Regarding Fees and Costs (Dkt. No. 373) and Defendants' Response (Dkt. No. 385), the Court finds that the Motion for Sanctions should be and hereby is **GRANTED** as explained herein.

I.   BACKGROUND

   A.  Procedural History

Chamberlain filed its Complaint on March 10, 2021, alleging infringement by Defendants of U.S. Patent Nos. 8,587,404 (the "'404 Patent"); 9,644,416 (the "'416 Patent"); 7,852,212 (the "'212 Patent"); and 8,144,011 (the "'011 Patent") (collectively, the "Asserted Patents"). (Dkt. No. 1). Chamberlain accused certain garage door openers (the "Accused Products") sold by Defendants of infringement. (Dkt. No. 164 at 1).

Fact discovery closed on November 1, 2021. (Dkt. No. 101). Chamberlain's expert, Dr. Villaseñor, served an expert report on infringement of the '404 Patent on November 4, 2021. (Dkt. No. 348 at 7). Defendants' corresponding expert, Dr. Leeb, responded with his noninfringement report as to the '404 Patent on November 25, 2021. (*Id.*). Defendants filed their Motion for Summary Judgment of Non-Infringement of the '404 Patent (the "'404 MSJ") on December 9, 2021, and the Court heard arguments regarding the same at the pretrial conference held on February 14, 2022. (*Id.*). The Court, based on those arguments, granted summary judgment as to all asserted claims of the '404 Patent except for Claim 11. (Dkt. No. 331).

   B.  The '404 Patent

The '404 Patent teaches selectively providing a notification that a movable barrier (*e.g.*, a garage door) is about to move. (Dkt. No. 164 at 1). Since this decision may depend on where the signal to open or close the garage door originated from—*i.e.*, whether the operation is "attended" or "unattended"—the '404 Patent further teaches providing a notification for unattended closes (*e.g.*, where the command comes from a user closing the door using her smart phone out of sight of the barrier) while not providing a notification for attended closes (*e.g.*, where the command comes from a "clicker" typically kept in a car). (*Id.*). Each asserted claim, either expressly or in view of the Court's Claim Construction Order, requires "determining" whether to close a movable

barrier in combination with operating an "imminent motion notification" (*i.e.*, an alarm), based on some aspect of a transmitted signal. (*Id.* at 2–3). The Accused Products can be operated by a wall console, a radio frequency ("RF") remote, or a mobile device application. (*Id.* at 3–4). The overhead unit of the Accused Products contains a motor and motor control circuit board (together, the garage door opener, or "GDO") and an integrated door control module (the "iDCM") (*Id.*).

### C. '404 Motion for Summary Judgment

In connection with its '404 MSJ, Defendants argued that the GDO and the iDCM are separate and independent—both structurally and functionally—and thus the Accused Products do not contain a *single* "processor" which performs all the functions recited in the claims of the '404 Patent. (*See* Dkt. No. 164 at 6 n.3 ("[T]he GDO and iDCM are separate printed circuit boards and function independently.")). Defendants represented that all the Accused Products are configured and operate in this manner, as depicted below. (*Id.* at 8–9).



The Court granted the '404 MSJ with respect to Claims 4, 6–9, and 16–20 of the '404 Patent, finding Chamberlain had failed to identify a factual dispute as to whether the Accused Products make any determination regarding whether to alarm or not alarm in combination with opening the garage door. (Dkt. No. 331 at 3). The Court denied the '404 MSJ with respect to Claim

11, however, finding that Chamberlain's infringement theory presented a genuine issue of material fact appropriately decided by a jury. (*Id*.). Specifically, the Court found that Claim 11's recitation of "processor"—which was not construed by the Court and was governed by its plain and ordinary meaning—created a material question of fact as to whether some processing or logic in the head unit of the Accused Products performs the "determining" step. (Dkt. No. 322 at 107:5–108:5). As a result of its ruling, the Court instructed the parties that, of the claims asserted in the '404 Patent, only Claim 11 would be tried to the jury. (*Id*. at 107:25–108:5).

### D. Jury Trial and Motion for Sanctions

A jury trial commenced on March 7, 2022. (Dkt. No. 349). The evening before, on March 6, 2022, counsel for Defendants emailed Chamberlain and the Court the following:

> In connection with preparing a witness for trial who arrived in Marshall today, we learned for the first time that Overhead Door introduced a new garage door opener model, and beginning sometime in December 2021 shipped several thousand units of this model. This was the first time this information was communicated to Latham & Watkins, Scheef & Stone or Carter Arnett. We do not have any detailed technical information about this product, but understand that it operates in the same way as the products at issue in this case, **except that the GDO processor and iDCM processor (separate processors) exist on the same mechanical board**.

(Dkt. No. 348-1 at 1) (emphasis added). Chamberlain filed the Motion for Sanctions a few hours after receiving this information. (Dkt. Nos. 348, 348-1). In the Motion for Sanctions, Chamberlain argued that Defendants' "willful concealment of evidence until less than 24 hours before jury selection irreparably change[d] the landscape of this case," and sought an order 1) finding infringement of the '404 Patent; 2) setting a Show Cause Hearing; and 3) allowing Chamberlain to explain Defendants' litigation misconduct to the jury. (*Id*. at 3).

The Court held a conference with the parties shortly before jury selection the following morning to discuss the Motion for Sanctions and the appropriate course forward. (*See* 3/7/2022 Minute Entry). The Court informed the parties that it intended to carry the Motion for Sanctions

4

until after completion of the jury trial. The Court also instructed the parties not to refer in any way to the newly disclosed "single board" products before the jury. Instead, the trial would be limited to the previously disclosed Accused Products—all of which use a separate board for the GDO and iDCM components.

### E. Fees and Costs

Pursuant to this Court's instruction at the March 25th Hearing, Chamberlain submitted its fees and costs incurred in connection with the trial and trial preparation from January 1, 2022 through March 11, 2022. (Dkt. No. 373) (the "Notice"). In the Notice, Chamberlain submitted invoices from its experts, Dr. Villaseñor and Mr. Britven, as well as the fees and expenses for the legal services of Fish & Richardson P.C. ("Fish & Richardson"). (*Id*. at 1–2). According to Chamberlain, the total cost incurred during that time was $2,247,157.47. (*Id*. at 1). Chamberlain represents that it entered into a fixed fee agreement with Fish & Richardson for the time period beginning on January 1, 2022 and extending through March 11, 2022 in which the total amount of fees due to Fish & Richardson was $1,700,000. (*Id*. at 2). Chamberlain also represents that "at least half of Chamberlain's fees were incurred specifically as a result of work relating to the '404 Patent" and thus Chamberlain requests half of its total fees, or $1,134,578.74, as a sanction. (*Id*. at 3).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 37(b)(2) authorizes sanctions for "fail[ing] to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A) ("If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey . . . an order under Rule 26(f) . . . , the court where the action is pending may issue further just orders."). The Court "has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990). The most severe sanctions

typically require a finding of bad faith or willful misconduct. (*Id.* at 1021). "'Bad faith' is characterized by conduct that is either intentional or in reckless disregard of a party's obligation to comply with the protective order." 6 MOORE'S FEDERAL PRACTICE, § 26.108 (3d ed.). In addition, "the court must order the disobedient party, the attorney advising that party, or both, to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(c).

The Court also possesses inherent authority to impose sanctions "in order to control the litigation before it." *Positive Software Sols. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 703 (5th Cir.1990), *aff'd sub nom., Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)). The Court may use its inherent authority to sanction conduct that is "in direct defiance of the sanctioning court" or constitutes "disobedience to the orders of the Judiciary." (*Id.* (quoting *Chambers*, 501 U.S. at 44; *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F.2d 791, 794 (5th Cir. 1993))). Inherent authority sanctions may be issued "only if essential to preserve the authority of the court." (*Id.* (quoting *Natural Gas Pipeline Co., of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996))).

### III.   THE PARTIES' ARGUMENTS

#### A. Chamberlain's Argument

Chamberlain argues that the existence and eleventh-hour disclosure of the "single board" products—where the "GDO processor and iDCM processor … exist on the same mechanical board"—extinguishes Defendants' sole non-infringement defense to the '404 Patent, and materially prejudices Chamberlain in several ways. (Dkt. No. 348 at 1) (quoting Dkt. No. 348-1 at 1, Email from Defendants' counsel to the Court on March 6, 2022). First, Chamberlain claims

6

prejudice from its inability to properly counter Defendants' defense to Chamberlain's doctrine of equivalents theory ("DOE") as to the '404 Patent. (*Id*. at 2). Defendants sought to exclude Chamberlain's DOE theory by arguing, in part, that the separate board configuration found in the Accused Products is not substantially equivalent to the "processor" element recited in the claims. (Dkt. No. 150 at 9; Dkt. No. 322 at 121:13–16). Chamberlain asserts that Defendants' failure to disclose the unaccused single board products prevented it from investigating and rebutting these arguments—both during pre-trial and at trial. (Dkt. No. 348 at 12). Chamberlain alleges that Defendants' revelation the day before trial confirms that the single board products "operate[] in the same way" as the two-board products"—bolstering Chamberlain's DOE position. (*Id*.) (quoting Dkt. No. 348-1 at 1).

Second, Chamberlain contends that the centerpiece of Defendants' non-infringement defense with respect to the '404 Patent has been that the Accused Products "do not infringe because they incorporate two separate processing boards, the iDCM board and the GDO board." (*Id*. at 3). Chamberlain points to numerous statements in Defendants' experts' reports, Dr. Leeb and Mr. Baer, where those experts distinguished the Accused Products by relying on the physical separation of the GDO from the iDCM. (*Id*.). Likewise, Defendants relied on this physical separation in its '404 MSJ, ultimately defeating the infringement claims as to all asserted claims except for Claim 11. (*Id*. at 1). Chamberlain also identifies repeated statements during trial where Defendants' counsel argued no infringement of Claim 11 based on the accused two-board configuration. (Dkt. No. 366 at 9).

Chamberlain further contends that it attempted to—but was obstructed from—discovering the single board products during discovery. Chamberlain asked Overhead Door's president and Rule 30(b)(6) witness, Michael Kridel, whether "Overhead Door made any changes to the accused

7

products after learning about Chamberlain's patents at issue in this case." (Dkt. No. 348-2 at 111:24–112:2). Mr. Kridel answered, "[n]ot to the best of my knowledge." (*Id*.). Chamberlain also provided LeRoy Krupke, an Overhead Door and Rule 30(b)(6) witness, with a list of Accused Products and asked Mr. Krupke whether "there [are] other residential Overhead Door garage door or gate operators that are able to selectively activate an imminent motion notification alert." (Dkt. No. 348-3 at 74:25–75:10). Mr. Krupke answered, "[t]here are none other that I can see. So I believe that's a complete list." (*Id*.). In addition, Chamberlain identifies multiple interrogatories it sent to Defendants seeking:

- May 18, 2021 (ROG No. 1): Identification of products "used since March 10, 2015 that [are] capable of Connecting a Movable Barrier Operator to a Peripheral Alarm." (Dkt. No. 366-5 at 7).
- May 18, 2021 (ROG No. 3): "[H]ow each Accused Product[1] is able to determine whether to Close a Movable Barrier in Combination with Operating a Moving-Barrier Imminent Motion Notification." (*Id*. at 10).
- Aug. 23, 2021 (ROG No. 5): Description of how the accused products "do not infringe." (Dkt. No. 366-6 at 6).
- Aug. 23, 2021 (ROG No. 9): Description of the "design [and] development" of the accused products. (Dkt. No. 366-7 at 11).
- Sep. 28, 2021 (ROG No. 26): Description of how Chamberlain's infringement contentions were not representative. (Dkt. No. 366-8 at 6).
- Sep. 28, 2021 (ROG No. 29): Description of how the source code implemented the accused features. (*Id*. at 12).

Chamberlain contends that "[i]n response to each of these interrogatories, [Defendants] provided information about the two-board products, but never said a word about the single board products or cited any of the documents that it now points to in its opposition." (Dkt. No. 366 at 6).

---

[1] In its P.R. 3-1 and 3-2 Disclosures, Chamberlain listed a set of specific products accused of infringing the '404 Patent but stated that "[m]ore complete information about the Accused Products in the table above is in the possession of Defendants and is expected to be obtained through discovery. Any product or service that operates in materially the same manner are included within the scope of the Accused Products, regardless [of] whether listed above." (Dkt. No. 348-6 at 3–4).

### B. Defendants' Response

Defendants respond that Chamberlain "kn[ew], or should have known," of the existence of Defendants' single board design because Defendants' "production included **hundreds** of design and development documents relating to" the single board design. (Dkt. No. 364 at 1) (emphasis in original). Defendants further argue that "***every one*** of [their] 30(b)(6) and fact witnesses were custodians or authors of such materials," and Defendants "also produced source code related to the single board design, with comments that identified the code as relating to the 'combo board.'" (*Id*.). Yet, Defendants contend, Chamberlain failed to ask any of Defendants' deponents about the "combo board," related documents, or the related source code, and Chamberlain's experts failed to address the single board design. (*Id*.).

Defendants describe that they began developing the single board design in late 2019, "which included the separate WiFi DCM [also called the iDCM] circuitry on the same board as the separate GDO circuitry." (*Id*. at 2). Defendants state that "[b]ecause of semiconductor part shortages, the planned release of the combo board into select models was delayed until spring of 2022." (*Id*.). However, due to a shortage in circuit boards from a supplier, Defendants incorporated the single board design in a limited number of garage door operator models and sold such models ahead of the planned release schedule. (*Id*.).[2] Defendants state that they discovered the sales of the single board products in connection with witness preparation for Mr. Steven Janas, Vice President of Sales at The Genie Company (a division of Overhead Door) on the eve of trial and disclosed the same to Chamberlain and the Court merely "out of an abundance of caution." (*Id*. at 2–3).

As to production of documents and other information relating to the single board design, Defendants submit that they made their source code available for inspection on June 18, 2021, and

---

[2] The accompanying declaration of Mr. Kridel reveals that Defendants sold 11 different models incorporating the combo board, with those sales totaling 18,349 units. (Dkt. No. 364-2 at 2).

Chamberlain began reviewing such source code on July 12, 2021. (*Id*. at 3–4). The phrase "combo board" appears in the comments of such source code, and Defendants represent that "[a] simple search for 'combo board' yields 37 hits." (*Id*. at 3). Defendants further represent that "[b]etween July 12, 2021 and November 4, 2021 (the deadline for opening expert reports), Chamberlain's source code expert reviewed Overhead Door's source code ***eighteen times***." (*Id*. at 4) (emphasis in original).

Defendants also contend that numerous documents produced during discovery reference the single board design. For example, Defendants identify a document from Chamberlain's list of pre-admitted exhibits (PTX-0768) which lists the "Combo Board" as a "New Product" for launch in February 2021 and explains that the single board design "[e]liminates [the] need for separate PCB and Wi-Fi boards." (Dkt. No. 364 at 5) (citing Dkt. No. 364-10 at 3). All told, Defendants argue that "at least ***1,220 documents*** were produced to CGI during discovery that use the terms "combo board" or "single board." (Dkt. No. 364 at 6) (emphasis in original). Defendants argue that despite the production of documents and source code related to the single board, "counsel for Chamberlain did not pose a ***single question*** about the combo/single board to any of [Defendants'] fact or expert witnesses. (*Id*. at 7). Defendants contend that their witnesses, on the other hand, provided statements that were technically true in response to the questions that Chamberlain did ask. (*Id*.) (citing testimony of Mr. Kridel and Mr. Krupke).

Finally, Defendants contend that the single board product does not "extinguish" any of its non-infringement defenses presented at the recent jury trial because it relied on two independent defenses, each of which is presumed to be supported by record evidence. (*Id*. at 9). Defendants additionally argue that "the existence of the combo board has nothing to do with the jury's

invalidity findings" and that "*[n]othing* could 'counterbalance' the sheer volume of damaging testimony" presented at trial regarding invalidity. (Dkt. No. 369 at 10) (emphasis in original).

Further, in response to Chamberlain's Notice regarding fees and costs, Defendants contend that Chamberlain is "not entitled to sanctions because [Defendants] produced source code and design and development documents for its combo board project, which were easily searchable and clearly labeled with the project name and description." (Dkt. No. 385 at 1). Defendants also argue that Chamberlain was not prejudiced by any "purported lack of notice" regarding the single board design because "neither of [Defendants'] noninfringement defenses for the '404 patent depended on the use of two separate boards." (*Id*. at 2). Finally, Defendants assert that Chamberlain's requested fee amount is "unreasonable" because the accounting of fees and costs provided by Chamberlain was not "particularized" or sufficiently detailed, and because Chamberlain did not show that the work was "caused" by any failure by Defendants to comply with a discovery order. (*Id*. at 2–4).

## IV.   ANALYSIS

Defendants maintained throughout the development of this case, and during trial, that the products implementing the GDO and iDCM on separate boards represented the entire universe of products relevant to the '404 Patent. Chamberlain attempted to identify non-accused products through various interrogatories and depositions, however Defendants and/or their witnesses failed to come forward with relevant information during discovery. Defendants' primary response as to why their 30(b)(6) witnesses—who Defendants acknowledge are each "custodians or authors" of materials relevant to the single board design (Dkt. No. 364 at 4)—failed to disclose information regarding the single board design is that Chamberlain failed to ask them the right questions. (*See* Dkt. No. 364 at 11) (Defendants arguing that Chamberlain failed to ask any of Defendants' witnesses "'point blank' for an identification of any products like the new combo board product").

Despite Defendants' counsel's immediate reaction to the "night-before-trial-revelation" that the single board design was sold commercially, which was to immediately disclose such information to Chamberlain and the Court, Defendants now attempt to dodge any responsibility for the failure to disclose such products. In fact, Defendants seek to place the blame squarely on Chamberlain for failing to parse an alleged 1,220 documents and related source code, even though many of these documents and source code merely reference, in passing, a "combo board" without any context to disclose what that phrase means. Chamberlain cannot be (and is not) expected to innately know the intricacies of Defendants' documents and internal vernacular. Chamberlain did ask Defendants' 30(b)(6) witnesses—who Defendants acknowledge are each "custodians or authors" of materials relevant to the single board design (Dkt. No. 364 at 1)—about the existence of other, unaccused products, and those witnesses failed to disclose relevant information. At the very least, Defendants' counsel should have identified documents and information relating to the single board in response to Chamberlain's various interrogatories seeking technical information surrounding the Accused Products. Defendants' attempts to split hairs and rely on technicalities with deposition questions and interrogatories fails to acknowledge Defendants' responsibility to participate in a fair and fulsome discovery process. Defendants bore an affirmative duty during discovery to disclose relevant information—which duty they breached—to Chamberlain's direct detriment.[3]

The Court is persuaded that the recent jury trial would have turned out differently had Chamberlain been able to develop testimony and argument regarding the single board design and commercialization of the same. Chamberlain was prevented from attacking Defendants' non-infringement defenses because it was unaware of the single board products until the eve of trial.

---

[3] The Court does not find that Defendants' counsel engaged in any intentional or malicious withholding of information. However, the facts suggest that the same conclusion does not apply to Overhead Door and GMI.

Faced with an incomplete record and imminent jury selection, and not wanting to make a premature decision based on such incomplete information, the Court prohibited any reference to the single board products during trial. Chamberlain was precluded from exploring the technical functionality of the single board products and developing the same through its experts' reports.

This limitation equally crippled Chamberlain's ability to respond to Defendants' motion for summary judgment of non-infringement, as well as to put on its own infringement case with respect to literal and DOE infringement. Not only was Chamberlain unable to accuse over 18,000 single board sales (through 11 distinct models) of infringing the '404 Patent, but the mere existence of the single board products—combined with Defendants' argument that those products "operate[] in the same way as the products at issue in this case" (Dkt. No. 348-1 at 1)—is probative of Chamberlain's excluded DOE argument that the accused two-board design is substantially equivalent to the single board design. (*See also* Dkt. No. 364-1 ¶ 5, Declaration of Brent Rauscher, engineer at Overhead Door, stating that the source code for the single board operates materially the same way as the two-board configuration). Chamberlain, however, was unable to present such testimony and argument to the jury—both affirmatively and through cross-examination—and the Court finds such visited significant prejudice upon Chamberlain as to all the issues surrounding the '404 Patent and as to the validity of the '011 Patent.

Specifically, without the evidence of the single board (a/k/a combo board) in hand, Chamberlain was unable to fully challenge the testimony of Defendants' 30(b)(6) witness Mr. Krupke,[4] expert witness Dr. Leeb,[5] and, indeed, the testimony of all of Defendants' witnesses.

---

[4] For example, Mr. Krupke further testified in his deposition that there were "no other products that [he was] aware of" with respect to '011 Patent, in addition to the '404 Patent. (Dkt. No. 348-3 at 75:11–20).

[5] Additionally, Dr. Leeb heavily relied on the placement of the GDO and iDCM on separate boards to highlight that the Accused Products do not practice the determining step of the '404 Patent and lack a processor given their placement on "separate systems inside [the] product[s]." (Dkt. No. 379 at 258:15–20, 278:19–22, 279:20–22, 290:2–6, 301:10–302:4).

Accordingly, Defendants' failure to disclose the single board products prevented Chamberlain from attacking the credibility of Defendants' witnesses, which effectively bolstered their testimony related to issues that extended beyond infringement of the '404 Patent. For example, Defendants' expert Dr. Leeb "discuss[ed] the invalidity of the '404 Patent" at trial. (Dkt. No. 379 at 252:8–13, 253:8–15, 303:11–316:25 ("[C]laim 11 of the '404 Patent, which is what we're talking about here, is invalid because it was obvious."), Dkt. No. 381 at 7:19–25:1 (opining that Claim 11 of the '404 Patent is obvious over the Promax Genie operator manual and the UL 325 specification)). Defendants relied on Dr. Leeb to testify as to both infringement and invalidity of the '404 Patent, yet rendered Chamberlain unable to impeach the lengthy portion of Dr. Leeb's testimony which stressed the importance of the separate board design. Given Chamberlain's continuing inability to challenge the credibility of Defendants' witnesses on both infringement and invalidity, the Court finds that the failure to disclose the single board products casts a pall over all the testimony at trial—including testimony that touched on issues related to invalidity of the '404 and the '011 Patents.

In light of such prejudice, the Court is persuaded that Chamberlain's requested costs and fees are reasonable. It was clear at trial that the '404 Patent was the focus of more than half of the evidence. Moreover, the Court is of the opinion that Defendants' eleventh-hour disclosure of a new product hindered Chamberlain's case largely as to the '404 Patent, as well Chamberlain's ability to challenge the credibility of witnesses who testified as to both the '404 Patent and other issues, such as the invalidity of the '404 and '011 Patents. Defendants challenge Chamberlain's request for fees and argue that Chamberlain has failed to submit invoices with enough detail and specificity for the Court to accurately determine which fees were related to work on the '404 Patent. (Dkt. No. 385 at 3). Specifically, Defendants note that Chamberlain provides invoices from

experts who opined on *all* patents-in-suit and invoices for monthly lawyer's fees that lack information relating to what work was being done. (*Id.*). However, Defendants' challenge to Chamberlain's request for fifty percent of its fees from January 1, 2022 until March 11, 2022 is unpersuasive given the overwhelming role that the '404 Patent played at trial and the pervasive prejudice related to witness credibility that infected other issues in the case. Thus, the Court finds it reasonable to award Chamberlain fifty percent of the fees that it incurred in preparing for trial and the pre-trial conference, which took place on February 14–15, 2022. (Dkt. No. 314; Dkt. No. 316).

## V. CONCLUSION

Based on the foregoing, the Court finds that a new trial is warranted on all issues related to the '404 Patent and as to invalidity of Claim 1 of the '011 Patent. Accordingly, the '404 MSJ and verdict against Chamberlain in this case (Dkt. No. 353) is **VACATED** as to the '404 Patent (as to both infringement and invalidity) and as to invalidity of Claim 1 of the '011 Patent. Additionally, the Court's Order Memorializing Defendants' Motion for Summary Judgment (Dkt. No. 331) is **VACATED** with respect to claims 4, 6–9, and 16–20 of the '404 Patent. Chamberlain is permitted to re-try all its previously asserted claims stemming from the '404 Patent and not just Claim 11. The Court does not vacate the verdict except as specified herein, and the verdict remains intact in all other respects.[6] The parties are **ORDERED** to meet and confer and within fourteen days from this date and submit a jointly proposed docket control order providing for a new trial and re-opened discovery, and revised expert witness reports as to both infringement and invalidity of Claims 4, 6–9, and 16–20 of the '404 Patent and validity as to Claim 1 of the '011 Patent. After such jointly

---

[6] To be clear—the jury's finding of no infringement as to Claim 13 of the '416 Patent and Claim 1 of the '011 Patent remains undisturbed hereby. Invalidity as to both Claim 11 of the '404 Patent and Claim 1 of the '011 Patent are vacated, as is the finding of no infringement of Claim 11 of the '404 Patent.

submitted docket control order, the Court will resolve any areas of dispute and enter a resulting order to structure such new trial. Finally, it is **ORDERED** that Defendants pay Chamberlain $1,134,578.74 in fees and costs, *instanter*.

**So ORDERED and SIGNED this 30th day of March, 2022.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE