IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., et al., | ( CAUSE NO. 2:21-CV-084-JRG ) |
| | ( |
| Plaintiffs, | ) |
| | ( |
| vs. | ) |
| | ( |
| OVERHEAD DOOR CORPORATION, | ) |
| et al., | ( MARSHALL, TEXAS ) JANUARY 26, 2023 |
| Defendants. | ( 8:30 A.M. |

_____

VOLUME 4

_____

TRIAL ON THE MERITS


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFFS:    FISH & RICHARDSON PC, DC
1000 MAINE AVENUE, SW
SUITE 1000
WASHINGTON, DC  20024
(202) 783-5070
BY: MR. RUFFIN CORDELL

FISH & RICHARDSON PC - HOUSTON
1221 McKINNEY ST., SUITE 2800
HOUSTON, TEXAS  77010
(713) 654-5300
BY:  MR. BENJAMIN ELACQUA
     MS. BAILEY BENEDICT
     MS. KATHRYN QUISENBERRY

FISH & RICHARDSON, PC - AUSTIN
111 CONGRESS AVENUE, SUITE 810
AUSTIN, TEXAS  78701-4061
(512) 472-5070
BY:  MS. BETTY CHEN

FISH & RICHARDSON, PC -
NEW YORK
7 TIMES SQUARE, 20TH FLOOR
NEW YORK, NEW YORK  10036
(212) 765-2305
BY:  MR. SCOTT FLANZ

GILLAM & SMITH, LLP
303 SOUTH WASHINGTON AVENUE
MARSHALL, TEXAS  75670
(903) 934-8450
BY:  MS. MELISSA SMITH

FOR THE DEFENDANTS:    LATHAM & WATKINS LLP - CHICAGO
330 N. WABASH AVE., SUITE 2800
CHICAGO, ILLINOIS  60611
(312) 862-2000
BY:  MR. DAVID CALLAHAN

CARTER ARNETT, PLLC
8150 N. CENTRAL EXPRESSWAY
SUITE 500
DALLAS, TEXAS  75206
(214) 550-8188

LATHAM & WATKINS, LLP -
SAN FRANCISCO
505 MONTGOMERY STREET
SUITE 2000
SAN FRANCISCO, CA 94111-2562
(415) 395-8033
BY:  MR. BLAKE DAVIS

LATHAM & WATKINS, LLP -
COSTA MESA
650 Town CENTER DR. SUITE 2000
COSTA MESA, CA 92626
(714) 540-1235
BY:  MR. BRADLEY HYDE

LATHAM & WATKINS, LLP -
MENLO PARK
140 SCOTT DRIVE
MENLO PARK, CA 94025-1008
(650) 470-4851
BY:  MR. GIRI PATHMANABAN

LATHAM & WATKINS, LLP - D.C.
555 ELEVENTH STREET, NW
SUITE 1000
WASHINGTON, D.C. 20004
(202) 637-2200
BY:  MS. SUSAN TULL
     MS. REBECCA NEUBAUER

SCHEEF & STONE, LLP - MARSHALL
P.O. BOX 1556
MARSHALL, TEXAS  75671
(903) 938-8900
BY:  MR. MICHAEL SMITH

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
                       MARSHALL, TEXAS  75670
                       (903) 923-8546

# <u>INDEX</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| STEVEN LEEB, Ph.D. | |
| Direct By MR. PATHMANABAN | 7 |
| Cross By MR. CORDELL | 22 |
| Redirect By MR. PATHMANABAN | 109 |
| MICHAEL TATE | |
| Direct By MS. TULL | 112 |
| Cross By MS. SMITH | 145 |
| Redirect By MS. TULL | 181 |
| GREGORY MATIAS | |
| Direct By BY DEPOSITION | 185 |
| JOHN VILLASENOR | |
| Direct By MS. CHEN | 189 |
| Cross By MR. CALLAHAN | 197 |
| Redirect By MS. CHEN | 208 |
| THOMAS BRITVEN | |
| Direct By MS. SMITH | 209 |
| Cross By MS. TULL | 218 |

THE COURT: Be seated, please.

Are the parties prepared to read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MR. SMITH: Yes, Your Honor.

THE COURT: Please proceed.

MS. QUISENBERRY: Good morning, Your Honor.

THE COURT: Good morning.

MS. QUISENBERRY: Plaintiffs move into evidence JTX 0005.1, JTX 0005.2, JTX 0005.3, JTX 0005.4, JTX 0005.5, JTX 0005.6, JTX 0005.7, JTX 0005.12, JTX 0010, JTX 0013, JTX 0014, JTX 0015, JTX 0059, PTX 0032, and PTX 0038.

THE COURT: All right. Is there any objection from Defendants to that rendition by Plaintiff?

MR. SMITH: Your Honor, we do have one objection to 14. I believe Ms. Tull will handle that, and then we will have our own list separately.

THE COURT: Let's go ahead and get your list first in case there's an objection there.

MR. SMITH: Your Honor, Defendants move into evidence used yesterday DTX 34, 57, 113, 335, 948, 955, 1083, and JTX 41, 42, 47, 49, 58, 60, 61, and 65.

THE COURT: All right. Is there objection to Defendants' rendition, Ms. Quisenberry?

MS. QUISENBERRY: No, Your Honor.

THE COURT: All right. Let me hear about the matter that Defendants object to as heard by Plaintiff.

MS. QUISENBERRY: Excuse me, Your Honor. I think I can actually clear that up. That was read into the record as a mistake, and we'll withdraw JTX 0014.

THE COURT: Does that resolve the issue from Defendants' standpoint, Mr. Smith?

MR. SMITH: Yes, it does, Your Honor.

THE COURT: All right.

MS. QUISENBERRY: Thank you, Your Honor.

THE COURT: Thank you, counsel.

Do we have Doctor Leeb in the courtroom?

Do you want to return to the witness stand, please, sir? I remind you you remain under oath.

And, Mr. Pathmanaban, if you want to go to the podium and prepare to continue with your direct examination.

MR. PATHMANABAN: Thank you, Your Honor.

THE COURT: Once the witness is seated, Mr. Latham, if you'd bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT: Good morning, members of the jury. Good to see you again. Welcome back. Please have a seat.

We'll continue with the Defendants' direct examination of Dr. Steven Leeb.

Mr. Pathmanaban, you may continue.

MR. PATHMANABAN: Thank you, Your Honor.

STEVEN LEEB, Ph.D., PREVIOUSLY SWORN,

testified further under oath as follows:

DIRECT EXAMINATION continued

BY MR. PATHMANABAN:

Q. Good morning, Doctor Leeb.

A. Good morning, sir.

Ladies and gentlemen.

MR. PATHMANABAN: Before we pick up, Mr. MacQueen, can you go to slide 27? Just one housekeeping -- the previous slide. Sorry, Mr. MacQueen, 26?

Q. (BY MR. PATHMANABAN) We talked about this slide yesterday. Right, Doctor Leeb?

A. Yes, sir.

Q. What is the JTX number for the Chamberlain source code on this slide?

A. It is JTX 0057.

Q. Thank you.

MR. PATHMANABAN: Go back, please.

Q. (BY MR. PATHMANABAN) Doctor Leeb, we were talking about the contributions that the DASMA subcommittee made to claim 20 of the '404 Patent. Right?

A. Yes, sir.

Q. And you were here when Mr. Laird testified?

A. Yes, sir.

Q. What did Mr. Laird have to say about the extent of his alleged invention? First of all, what did Mr. Laird have to say about the extent of his source code modifications in 2011?

A. Right. So the question was, The code was already in existence and you modified it, didn't you?

And the answer was, Extensively in 2000--remember that's before what we're talking about--minimally in 2007.

Q. So what does that tell you about his wealth of contribution to claim 20 of the '404 Patent compared to what DASMA subcommittee members made?

A. Well, in a world we already have existing garage door openers and the DASMA subcommittee work, I agree with him that the additions in the source code that are needed are minimal. Trivial might be a better way to say it.

Q. And --

THE COURT: Counsel, let me ask you to pull the microphone a little closer so we can hear you better.

MR. PATHMANABAN: Yes, Your Honor. Is that --

THE COURT: Thank you.

Q. (BY MR. PATHMANABAN) And what did he have to say about how much space his invention takes up in the code?

A. Well, you can see the answer for yourself--not a lot of space was the answer.

Q. Is the 2007 email that we saw, which is JTX 43, a single communication to Mr. Laird that would have enabled him to come

up with claim 20?

A. It is.

Q. So just one more time, who is the only named inventor of the '404 Patent?

A. Mr. Edward Laird.

Q. And did someone other than Mr. Laird contribute a significant portion of the invention of claim 20?

A. Yes, sir. The DASMA subcommittee.

Q. So were all the actual members of the '404 -- excuse me. Withdrawn.

So were all the actual inventors of the '404 Patent named on the patent as inventors?

A. No.

Q. And what is your understanding of the consequence of leaving off true inventors of even a single claim of the patent?

A. So if even a single claim doesn't have the correct inventor list, the whole patent is invalid, as I understand it.

Q. So what does that mean for the '404 Patent in a nutshell?

A. It's invalid.

Q. Shall we move on to your opinion about the '404 -- obviousness?

A. Yes, sir.

Q. What did Mr. Laird have to say about the problem solved

by his alleged invention?

A. He said that it reduced nuisance.

Q. And -- well, before we go to the next question?

MR. PATHMANABAN: Can we pull up JTX 43, please?

Q. (BY MR. PATHMANABAN) And, Doctor Leeb, this is the email where Mr. Laird is providing comments on the pending UL 325 unattended close standard. Right?

A. Correct, sir. This is the June 5th, 2007, email.

Q. Is there anywhere in this email that he commented that there was some nuisance problem with respect to the pending standard?

A. No, sir.

Q. Is there anywhere where he said this would cause nuisance or alarming not just with unattended but also with attended operations?

A. No, sir.

MR. PATHMANABAN: Let's go back to the top one. Thanks.

Q. (BY MR. PATHMANABAN) And here what did he also have to say about the concept of reducing nuisance in general?

A. I think what anyone would think, which is that reducing -- I'm reading, reducing nuisance is obvious.

Q. Do you agree with that?

A. Yes, sir.

Q. Now, this is, again, claim 20 compared with the email.

Right?

A. Yes, sir.

Q. And did the same provisions in the email make its way to the ultimate standard UL 325?

A. Yes, sir.

Q. And is that what we're seeing on the screen now?

A. Yes, sir. So this is the January 14th, 2009, actual release of the UL changes for unattended operation.

Q. And this is from JTX 44?

A. Correct, sir.

MR. PATHMANABAN: Can we pull up the trial transcript, day 1, page 153, please?

Q. (BY MR. PATHMANABAN) Doctor Leeb, you read the trial transcript from day one. You were not able to be here on that day. Correct?

A. Correct. But I read the transcript.

Q. Okay. And is this an excerpt from Mr. Cordell's opening?

A. Yes, sir.

Q. And Mr. Cordell told the jury that UL 325 doesn't tell you how to do it, it doesn't tell you when to do it, it doesn't tell you where to do it, meaning that's alarming. Right? Is that --

A. Yes, sir.

Q. Do you agree with that?

A. No, sir.

MR. PATHMANABAN: Let's go to UL 325, JTX 44.

Q. (BY MR. PATHMANABAN) And this is the unattended operation. Right?

A. Correct. So this is the insides of UL 325 that was released in January 2009.

MR. PATHMANABAN: And, Mr. MacQueen, can you blow up 32.5.3.1? Sorry. 3.2. I'm sorry.

THE COURT: Try to speak up, counsel.

MR. PATHMANABAN: I will, Your Honor.

Q. (BY MR. PATHMANABAN) Doctor Leeb, tell the jury what this says about what UL 325 discloses with respect to when to alarm.

A. Well, it tells you, I think it's pretty plain, the alarm shall signal for a minimum of five seconds before any unattended door movement. So it's telling you if you're operating the door and not in line of sight of it, that's when the alarm should sound.

Q. So does that tell you when to alarm?

A. Yes, sir.

MR. PATHMANABAN: And can we pull up the next paragraph, please, Mr. MacQueen? And if you can highlight the first sentence.

Q. (BY MR. PATHMANABAN) And what is this telling you, Doctor Leeb? Please explain.

A. Basically it's telling you where to alarm. In other

words, it's telling you the audible signal shall be heard within the confines of the garage -- of a garage.

MR. PATHMANABAN: And, Mr. MacQueen, if you can also pull up this -- the 32.5.3.3 and 32.5.3.4 together, and if you can highlight the visual alarm. Thank you.

Q. (BY MR. PATHMANABAN) What does this tell you?

A. It's telling you that for the visual alarm, that should also be visible within the confines of the garage.

Q. And together, do these two provisions tell you how to alarm?

A. Yes, sir. That also.

MR. PATHMANABAN: You can pull that down, please. If you can go back to the PowerPoint. Thanks.

Q. (BY MR. PATHMANABAN) Now, you left off determining from your highlighting in claim 20. Correct?

A. Yes, sir.

Q. And would using such a determining as required by claim 20 have been obvious, in your opinion?

A. Yes, sir.

Q. And can you briefly summarize why?

A. Sure. Basically if you're a person of ordinary skill and you've got UL 325 in front of you, it leaves you with three choices essentially for how to satisfy the standard, and I've listed them here:

You could sound an alarm all the time. So, in other

words, if you alarmed for both unattended and attended, UL doesn't require you to do that, but that would be fine; it would satisfy the UL provision. So this would be one option.

The second would be to sound an alarm for unattended closures which UL does require, and you could do that without the determination of whether or not to alarm based on the source. That's basically what Overhead Door does.

And you could also--this is the third option--sound an alarm for unattended door closures using a determination about the source.

Q. And so is that a small or finite number of courses?

A. It is a finite number of choices that a person of ordinary skill would understand and would result in things -- the person of ordinary skill would expect. They are not surprises.

Q. So given these number of choices, is picking one of these obvious or not?

A. Yes, sir.

Q. And briefly explain why, please.

A. Well, we assume that the person of ordinary skill has basic skill, is the way I would say it. These are not rocket science to come up with these three options once you've read UL 325.

So if the person of ordinary skill is going to understand that these are the three choices that they have available to

them, that they produce results that are -- have expected behavior, picking amongst the three things that a person of ordinary skill would understand to do is obvious. It's -- it's not inventive.

Q. So what is the ultimate conclusion about claim 20, Doctor Leeb, with respect to obviousness?

A. That the entire claim is obvious.

Q. Just quickly, what did Mr. Laird have to say about whether he invented the concept of distinguishing between different code formats?

A. That he didn't invent that.

Q. Was that known in the art?

A. It was.

Q. Okay. Can we move on to claim 4 now?

A. Sure.

Q. So what is the difference between claim 4 and claim 20, Doctor Leeb?

A. Well, they're essentially the same. The difference is this time the determination about whether or not to alarm is being made specifically based on a transmitter identification code, so that's some piece of information from the transmitter.

Q. And what does the '404 Patent itself have to say about these transmitter identification codes?

A. So the codes are what we sometimes call admitted prior

art. In other words, the '404 Patent says right in the introduction, we know about those.

Q. So was that well known at the time?

A. Yes, sir.

Q. And so would it have been -- would the determination of claim 4 have been obvious for similar reasons or same reasons you mentioned for claim 20?

A. For exactly the same reasons, it would have been obvious.

Q. Doctor Leeb, what are we looking at from JTX 62?

A. So JTX 62 is a manual for a ProMax garage door operator. That's a classic garage door operator from before the unattended door days -- operation days. So this is a classic garage door operator with local controls.

Q. What is the symbol UL mean there? Why is that there?

A. That's there because right on the cover of the manual, it's telling you that it complies with UL 325 at that time which is before unattended.

Q. Does this manual discuss local door closings?

A. Sure.

Q. And it doesn't say anything about an alarm. Right?

A. No.

Q. There were no unattended door closings at the time. Correct?

A. Correct.

Q. And we already talked about, it mentions UL?

A.    Correct.

Q.    So what would a person of skill in the art do on or before March 2009 in light of UL's unattended provision that came out in January 2009 given this manual?

A.    Well, given the manual, the most obvious thing to do once you've got UL now bringing in the possibility of unattended closures is to just add just what you need to satisfy that, which would be leave everything the way it is so it works like it used to, it doesn't do an alarm for locals, and then you would add for the unattended control an alarming function.

Q.    Doctor Leeb, is it your -- well, what did -- you were here for Mr. Fitzgibbon's testimony yesterday by deposition?

A.    Yes, sir.

Q.    What did he have to say about when Mr. Laird invented this '404 Patent?

A.    Well, his first answer was, I don't have it in my head. And then he said, "Again, what I would do is look at the patent and say it's around that time frame."  So, in other words, he's telling you the invention would have been around 2009 when it was filed.

Q.    Not 2007?

A.    Correct.

Q.    And this is JTX 18.  It's the source code that Mr. Laird testified about.  Right?

A.    Correct.

Q. Does his name appear anywhere on this source code?

A. No, sir.

Q. Does anyone else's name appear?

A. Yes, sir. Dilip Patel's.

Q. There was some suggestion that -- you were here for Mr. Rauscher's testimony?

A. Yes, sir.

Q. And he was asked about that he didn't put name on the lines of code that he wrote. Do you remember that?

A. It's not quite what he said. He said that they have a name system for tracking it. It just doesn't put the name in the file. It has a separate file for tracking it, is the way I heard what he said.

THE COURT: Doctor Leeb, it would be better if you waited for the lawyer to ask you what he did say when your answer is, That's not what he said.

THE WITNESS: My mistake, Your Honor.

THE COURT: Don't volunteer the rest of it unless he asks for it. Okay?

THE WITNESS: Understood, sir, yes.

THE COURT: Thank you.

Let's continue.

Q. (BY MR. PATHMANABAN) Did he say that the Overhead Door source code is maintained in a repository?

A. Yes, sir.

Q. Is there a difference between maintaining a source code in a repository versus someone's source code that is not in a repository in terms of identifying who wrote the code?

A. Probably.

Q. And what is -- can you briefly explain what that would be? Like, what is a repository? Why would it identify people who wrote the code?

A. Well, the repository, the way Mr. Rauscher described it, keeps track of who's making changes to the code and that's a perfectly reasonable way to keep track of who's touching the code and editing it.

Q. And is there anything comparable in this document, JTX 18, that keeps track of what changes Mr. Laird allegedly made?

A. No, sir.

Q. There was also some testimony about a prototype that he made in 2007. Do you remember that?

A. I do.

Q. And also he demonstrated something he called a reconstructed prototype that he made in 2022. Right?

A. Yes, sir.

MR. PATHMANABAN: Can we pull up trial transcript from day two, page 60, please?

Q. (BY MR. PATHMANABAN) So you remember --

MR. PATHMANABAN: Actually, can we go above this?

MR. CORDELL: Objection, Your Honor. I'm not sure

why we're publishing testimony from prior in the trial. There is no question pending. The witness hasn't professed a need to have his recollection refreshed. I'm just not sure what we are doing.

MR. PATHMANABAN: This is trial testimony.

THE COURT: I understand that. The objection is addressed to me. Would you like to respond to it?

MR. PATHMANABAN: Sorry, Your Honor. I was just publishing trial testimony that Mr. Laird gave in court to the jury.

MR. CORDELL: This is not closing arguments, Your Honor. If he has a question for the witness, that's fine. If the witness can't recall something, that might be a different matter.

THE COURT: You certainly can ask him if he remembers Mr. Laird's testimony. If he can't, then you might refresh him with the prior testimony. But just to show it without even asking if he remembers it probably is improper.

MR. PATHMANABAN: Okay, Your Honor.

THE COURT: Okay?

MR. PATHMANABAN: Understood.

THE COURT: Let's proceed on that basis.

MR. PATHMANABAN: Thank you, Your Honor.

Q. (BY MR. PATHMANABAN) Do you remember he was asked about the fact that the reconstructed prototype did not have a label

on it?

A.   Yes, sir.

Q.   And so, given that, is there any way anyone can find out when that machine, that GDO, was made?

A.   No, sir.  I'm not even sure it was a GDO.  It was pieces put together.

MR. PATHMANABAN:  Can we put back the PowerPoint, please, Mr. MacQueen?

Q.   (BY MR. PATHMANABAN)  So does that have -- does that demonstration and reconstructed prototype, does that have any probative value at all in determining whether Mr. Laird actually came up with this invention in 2007?

A.   Not to me.

Q.   Have you seen any agendas or meeting minutes about the alleged demonstration he gave in 2007?

A.   No, sir.

Q.   And just to put a bow on it, we saw the email was from June 5th, 2007.  Right?

A.   The email with Mr. Laird's comments about the impending UL standard, yes.

Q.   And Chamberlain -- is it your understanding that Chamberlain alleges Mr. Laird conceived of his invention as of June 7, 2007?

A.   Correct, sir.

Q.   And that's two days after he received the email?

A.    Correct, sir.

Q.    And the '404 Patent was filed in 2009?

A.    Correct, sir.

Q.    Is there any evidence you have seen in this case about any work, a shred of work, Mr. Laird did the rest of 2007?

A.    No, sir.

Q.    The rest of the entire 2008?

A.    No, sir.

Q.    Right up to filing of the patent in 2009?

A.    Up to the filing, no, sir.

        MR. PATHMANABAN:  Pass the witness, Your Honor.

        THE COURT:  All right.  Cross examination by the Plaintiff.

    Counsel, you have leave to distribute any binders.

        MR. CORDELL:  Your Honor, may I set up the demonstration as well?

        THE COURT:  Yes, you may.  You may proceed, counsel.

        MR. CORDELL:  Thank you, Your Honor.  My apologies for the delay.

        THE COURT:  It's your time.

                    CROSS EXAMINATION

BY MR. CORDELL:

Q.    Good morning, Doctor Leeb.

A.    Good morning, sir.

Q.    You weren't here with the jury for opening statements.

Right, Doctor Leeb?

A.   I read the transcript.  I wasn't here in person.

Q.   So when did you arrive at the trial?

A.   Tuesday morning.

Q.   But you believe this case to be important.  Correct?

A.   Very much so, sir.

Q.   So you missed Mr. Laird's testimony on Monday.  Correct?

A.   I read the transcript, sir.

Q.   That wasn't my question.  You missed Mr. Laird's --

THE COURT:  Wait a minute.  If the witness is non-responsive, raise it with the Court.  Don't tell him it's not your question.

And, Doctor Leeb, answer the question.  You know -- you know how to answer the question.  Please do so.

All right.  Let's proceed.

MR. CORDELL:  Thank you, Your Honor.

Q.   (BY MR. CORDELL)  You weren't here Monday afternoon for Mr. Laird's testimony.  Correct?

A.   In person, no, sir.

Q.   You didn't see him sit in that witness stand and testify.  Correct?

A.   No, sir.

Q.   You can't tell this jury what his demeanor was like.  Correct?

A.   No, sir.

Q.   You can't tell this jury whether he seemed earnest or not.  Correct?

A.   No, sir.

Q.   You teach students.  That's your main job.  Right?

A.   Yes, sir.

Q.   You are a professor at a university.  Correct?

A.   Correct.

Q.   And at your university, they frown on students looking at other students' papers.

A.   Yes, sir.

Q.   Might get kicked out for that.  Right?

A.   Yes, sir.

Q.   And you teach your students that if they rely on somebody else's work, they're supposed to give them credit in their paper.  Right?

A.   Yes, sir.

Q.   They cite their sources.  Correct?

A.   Yes, sir.

Q.   Don't want to be accused of plagiarism.  Correct?

A.   Correct.

Q.   And you're aware that Mr. Rauscher, Overhead's lead software engineer, wrote a technical document describing the accused products in this case.  Right?

A.   Yes, sir.

Q.   That's JTX 4.

MR. CORDELL: Can I have that up on the screen?

Q. (BY MR. CORDELL) And on the second page, he cites the '404 Patent as a reference document. Correct?

A. Correct.

Q. Were you in the courtroom for Mr. Rauscher's testimony?

A. Yes, sir.

Q. Did you hear him say that management made him -- made him do it?

A. Could you refresh my memory, sir?

Q. Sure. Do you recall --

MR. CORDELL: I don't know if we have the trial transcripts in the binder, Your Honor. May I show the witness Mr. Rauscher's testimony?

THE COURT: See if you have it in the binder. Since the witness asked you to refresh his recollection, if you have it, I don't have a problem with you using it.

MR. CORDELL: Excuse me, Your Honor. Your Honor, may I publish it for the witness since he asked for it?

THE COURT: Yes.

MR. CORDELL: Can I have volume 2 of the trial transcript, page 162, lines 2 through 15?

MR. PATHMANABAN: Your Honor, I object. It's in his binder.

THE COURT: He's welcome to look at it in his binder or on the screen. The witness asked to be refreshed, and I'm

going to allow counsel to do that.

THE WITNESS: May I read it, sir?

Q. (BY MR. CORDELL) Yes, please.

A. Thank you. Thank you, sir. Go ahead.

Q. So, Doctor Leeb, does that refresh your recollection that Mr. Rauscher said management asked him to list the '404 document in his technical specification?

A. Yes, sir.

Q. Before that day in trial, had you ever heard Mr. Rauscher say that management asked him to put that patent into his document?

A. I can't remember.

Q. He was deposed several times in this case. Are you aware of that?

A. Yes, sir.

Q. And you've read Mr. Rauscher's depositions. Yes?

A. I have.

Q. You've read all the testimony that he's given in this case. Right?

A. Yes, sir.

Q. And you can't recall a single time where he told us that management asked him to list the '404 document. Fair?

A. I don't know one way or the other.

Q. Okay. Now, this case is about garage door openers. Correct?

A.    Yes, sir.

Q.    And you have a garage door opener, don't you, Doctor Leeb?

A.    I do, sir.

Q.    In fact, it's a Chamberlain garage door opener.  Right?

A.    It is, indeed.

Q.    Okay.  And you're a paid expert in this case.  Right?

A.    Yes, sir.

Q.    And you're offering opinions on behalf of Overhead Door.  Right?

A.    Yes, sir.

Q.    You were hired by the Overhead Door lawyers.  Correct?

A.    Yes, sir.

Q.    And how much are they paying you per hour for your work?

A.    $650 an hour.

Q.    And you've done hundreds and hundreds of hours of work in this case.  Right?

A.    I haven't tallied it up, but I'd say that's accurate, yes, sir.

Q.    Well, as of last March, you said you had done 300 to 350 hours.  Is that right?

A.    Not precisely.  I said that was a guess.

Q.    Okay.  And since then, you've done another couple of hundred hours of work.  Right?

A.    As a guess, yes, sir.

Q.   So if we do the math, you've been paid over a half a million dollars for your work in this case.  Right?

A.   You're quicker with the math than I am.  If that's the hours times the rate, I believe you.

Q.   Okay.  You wouldn't notice if you'd been paid a half million dollars, sir?

A.   No, I'd notice.

Q.   Now, we've also talked a lot about source code in this case.  Right?

A.   Yes, sir.

Q.   And you've reviewed the source code in this case for the Overhead products.  Right?

A.   Yes, sir.

Q.   And you also reviewed some of the source code for Mr. Laird's, in JTX 18, invention.  Right?

A.   I'm not sure, sir.  Can you remind me JTX 18?

Q.   That's Mr. Laird's source code, remember, from June of 2007?

A.   Thank you, sir.  That's what I was looking for.

Q.   Okay.  And you've looked at some of the source code. Correct?

A.   All of it.

Q.   Well, you -- you actually don't read the source code yourself.  Correct?

A.   No, sir.

Q. In fact, you rely on a source code reader to help you. Right?

A. Not precisely, sir.

Q. Well, there's a fellow by the name of Nikolaus Baer. Right?

A. Yes, sir.

Q. And it's Nikolaus Baer that has helped you, for example, look at the Overhead Door product source code. Right?

A. Yes, sir.

Q. And Mr. Rauscher is more familiar with the Overhead Door source code than you are. Fair?

A. Probably so, yes, sir.

Q. And you would say that Mr. Laird is more familiar with his source code than you are. Correct?

A. I'm not sure.

Q. Well, Doctor Leeb, you told us that you spent a non-zero amount of time reviewing Mr. Laird's 2007 source code. Right?

A. Yes, sir.

Q. So when your -- when your wife calls you and asks you how long it's going to be before you get home, you tell her, it's going to take a non-zero amount of time to get home?

A. No. She usually wants a more specific answer than that, sir.

Q. And you couldn't tell us how much time you actually spent reviewing Mr. Laird's code. Correct?

A.    Not an exact number, no, sir.

Q.    Well, and Mr. Laird's code is written in assembly language.  Right?

A.    Correct.

Q.    And you needed a reference manual to try to figure out how to read the assembly language.  Correct?

A.    Absolutely.

Q.    You used a data sheet because you couldn't figure out how to read Mr. Laird's 2007 source code.  Correct?

A.    No, sir.

Q.    Tell me what the processor was that Mr. Laird's 2007 source code was written for.

A.    It's a PIC microcontroller.

Q.    Which one?

A.    I don't -- I wouldn't do the number from my head.

Q.    And it turns out that assembly language is written for each specific microprocessor.  Fair?

A.    Not quite.

Q.    Well, we have things like the 8080 microprocessor.  Right?

A.    Well, yes, sir.

Q.    And that's the one you and I learned as undergraduates.  Right?

A.    Something like that.

Q.    And that carried on to some of the other Intel

microprocessors. Right?

A. In one form or another, yes, sir.

Q. But then when we go to a different company like Microchip, you have to learn a different kind of source code. Right?

A. Yes, sir.

Q. So you needed some reference materials so that you could try to understand Mr. Laird's source code. Correct?

A. Not quite, sir.

Q. Well, you told us that having that reference manual and these fellows to help you and everything else gave you a sort of understanding of Mr. Laird's source code. Correct?

A. I assume you're quoting from my deposition, sir. Maybe you should refresh my memory.

Q. Well, first, can you answer the question?

A. No, sir. I don't quite remember using the word sort of, but I might have.

Q. Okay. Well, let's look at your deposition. If you can look at your July 11, '22, deposition at page 75, lines 11 through 14.

A. Can you help me, sir? The binders are a little confusing. Like, where would I look, volume 1 or 2?

Q. That is in volume --

A. I think it's volume 1.

Q. I think so, too.

A.   And then which date deposition was it, please, sir, or which tab?

Q.   It's July 11, '22.

A.   Would that be Leeb 2022 depo?

Q.   Yes.  That's the tab.

A.   Thank you, sir.  And would you direct me where you want me to look?

Q.   At page 75, lines 11 through 14.

A.   75, lines -- say again, sir?

Q.   Line 11 through 14.

A.   Just a moment, sir.

THE COURT:  Let him know when you've reviewed that and refreshed your recollection.

THE WITNESS:  Yes, sir.

Got it.  Could I have the question again, sir?

THE COURT:  Just a minute, Doctor Laird [sic].  The lawyers run the examination here.  You don't tell him what you need and when you need it.  You respond to his questions.

It's a fundamental rule that the witnesses are a responsive mode and the lawyers, whether it's for the plaintiff or for the defendant, determine what to ask and what not to ask.  So let the lawyer decide what to ask you.  Don't tell him what you need or when you need it.  Okay?

THE WITNESS:  Understood, sir.

THE COURT:  This is not the first time you've

testified in this court, is it?

THE WITNESS:  Correct, sir.

THE COURT:  You understand the rules, don't you?

THE WITNESS:  I'm trying very hard, yes, sir.

THE COURT:  You understand what I expect of witnesses?

THE WITNESS:  I hope so, sir.

THE COURT:  Okay.  Remember, you're here to respond to his questions in a way that addresses the question asked.  That's all I ask of you.  Okay?

THE WITNESS:  Yes, sir.

THE COURT:  All right, counsel.  Let's proceed.

Q.   (BY MR. CORDELL)  Having done your review, Doctor Leeb, do you feel that you have an understanding of how the 2007 Laird source code works?

A.   "Sort of."

Q.   Thank you.  Now, you've served as a patent expert for a number of cases.  Correct?

A.   Yes, sir.

Q.   For a number of years now.  Right?

A.   Yes, sir.

Q.   But you've never worked on a lawsuit involving a garage door opener.  Correct?

A.   Just this one.

Q.   You've never remembered reviewing any patents relating to

garage door openers before this lawsuit.  Correct?

A.    Correct.

Q.    You don't recall -- well, as a -- as a professor, you do consulting work for -- for companies from time to time.  Correct?

A.    Correct.

Q.    You don't ever recall consulting for a garage door company before this case.  Correct?

A.    Correct.

Q.    Okay.  You've never been asked to evaluate what customers might like or dislike in a garage door openers.  Fair?

A.    Not quite.

Q.    Well, you told this jury a moment ago you've never consulted in the garage door industry.  Right?

A.    Correct.

Q.    Okay.  You've never had to balance garage door opener design concerns with what a consumer might want.  Fair?

A.    Correct.

Q.    You've never designed a garage door opener.  Correct?

A.    Not a residential one, no.

        MR. CORDELL:  Let's look at DDX 4.8.

Q.    (BY MR. CORDELL)  Now, Doctor Leeb, this is one of the demonstratives you showed the jury.  Right?

A.    It is.

Q.    And what you did is you took figure 4 and you annotated

it, in your words. Right?

A. That's correct, sir.

Q. Okay. But you added a little blue man. Right?

A. Blue person, yes, sir.

Q. And you -- you changed the technology of the drawing. Right?

A. No, sir.

Q. You added a switch where the switch isn't in the actual drawing. Right?

A. No, sir.

Q. Well, let's -- let's see if we can compare. Your annotated version of figure 4 --

MR. CORDELL: Can I have the regular figure 4 from the actual patent? Can you blow up figure 4? Thank you.

Q. (BY MR. CORDELL) There's no little man in figure 4. Right?

A. Correct, sir.

Q. There's no switch in figure 4 where you put one in the drawing. Correct?

A. No, sir.

Q. In fact, figure 4 shows two pathways, one that leads to box 420 and one that leads to box 430. Right?

A. Yes, sir.

Q. And the signal coming out of box 410 goes down both pathways. Right?

A.   No, sir.

Q.   Now, you told us a lot about trains in this case.  Right?

A.   Sort of, sir, yes.

Q.   It wasn't just sort of.  We heard a lot about trains.
Right?

A.   As an analogy, yes, sir.

Q.   This case is not about trains at all.  Correct?

A.   Except as an analogy.

Q.   Well, more than that, sir.  This jury isn't going to be
asked to decide about how to route trains.  Right?

A.   True.

Q.   This case is about movable barrier units, movable barrier
operators.  Right?

A.   In part, yes, sir.

Q.   So we use the word movable barrier operator, garage door
opener, or head unit, those all mean the same thing.  Right?

A.   Could I have that question again slowly, please, sir.

Q.   Sure.  We use movable barrier operator and garage door
opener to mean the same thing.  Right?

A.   Sometimes.

Q.   And we use garage door opener and head unit to mean the
same thing.  Right?

A.   Sometimes.

Q.   And what we're talking about when we say head unit is
this --

A.   I can't see, sir.

MR. CORDELL:  Could he stand, Your Honor?

THE COURT:  You're going to direct him to the demonstrative?

MR. CORDELL:  I am, yes.

THE COURT:  Yes.  If you need to stand to see it, you are perfectly welcome to stand to see that, Doctor Leeb.

THE WITNESS:  Thank you, sir.  Just a moment, please.  Okay, sir.  Go ahead.

Q.   (BY MR. CORDELL)  When we're talking about a head unit, we're talking about the black-and-white sort of oval box that's on the chair.  Correct?

A.   Most likely, yes, sir.

Q.   Well, isn't that what you call it?

A.   I might say that, yes, sir.

THE COURT:  If you will, return to your seat, please.

THE WITNESS:  Yes, sir.

THE COURT:  If he uses the demonstrative again, you can do the same thing.

THE WITNESS:  Thank you, sir.

THE COURT:  All right, counsel.  Let's continue.

MR. CORDELL:  Thank you, Your Honor.

Q.   (BY MR. CORDELL)  Now, you spent a lot of time in your direct with trains and -- and marked up figures.  Is that

fair?

A.   Sure.

Q.   And you know that figures cannot be infringed.  Right?

A.   I believe that's correct, sir.

Q.   You know that marked-up cartoons of trains cannot be infringed.  Right?

A.   I think that's correct, sir.

Q.   What we must do in this case is look at the patent claims.  Correct?

A.   Correct, sir.

Q.   This jury is going to be asked, does Overhead Door infringe claims 4 and 20.  Correct?

A.   Correct, sir.

Q.   You happen to know who Judge Rich was?

A.   I'm afraid not.  I need any memory refreshed if I -- if I --

Q.   You ever heard the phrase "the name of the game is the claim"?

A.   I might have heard that, yes, sir.

Q.   So it's important that we all stay focused on what's really relevant in this case and that is the claims.  Correct?

A.   Amen.  Yes, sir.

Q.   Okay.

        MR. CORDELL:  So let's have claim 20 put up on the screen.

Q.   (BY MR. CORDELL)  Now, you're very familiar with this claim.  Right?

A.   I'd say so, yes, sir.

Q.   So what we're talking about here is a method of operating a transmitter.  Correct?

A.   Yes, sir.

Q.   And that transmitter could either be a cell phone or a -- or an RF clicker.  Fair?

A.   No, sir.  I'm not sure about that.

Q.   Okay.  Well, we'll come back to that.

     And then it talks about for use with a movable barrier operator.  Right?

A.   Yes, sir.

Q.   And that's a garage door opener.  Right?

A.   Yes, sir.

Q.   And it has to be with a movable barrier imminent notification.  That's an alarm.  Right?

A.   Imminent motion notification.  Yes, sir.

Q.   And that is an alarm.  Correct?

A.   Yes, sir.

Q.   And the movable barrier operator has to be configured to receive communications from a transmitter.  Right?

A.   Yes, sir.

Q.   And that transmitter could be the RF clicker I'm holding in my hand.  Right?

A.   I suppose, yes, sir.

Q.   It could also be the cell phone with a properly configured app like the Aladdin app.  Correct?

A.   No, sir.

Q.   You're saying that a properly configured cell phone with the Aladdin app is not a transmitter in your view.

A.   Not a transmitter of this claim.

Q.   All right.  We'll come back to that.

And has to operate the movable barrier operator in response to receipt of a communication.  You with me?

A.   Yes, sir.

Q.   That means that the transmitter has to be able to send the communication that opens and closes the door.  Right?

A.   Yes, sir.

Q.   And then we have to get into the meat of the method, the method of operating a transmitter comprising.  Right?

A.   Yes, sir.

Q.   And it's receive a first user input.  Right?

A.   Yes, sir.

Q.   And that means it's got to get a communication from the transmitter of some kind.  Right?

A.   Just a moment, please, sir.  Could I have that question again, sir?

Q.   Let me rephrase it.  So receiving a first user input means the transmitter has to get a -- a button pressed from a

user. Right?

A. There we are. Yes, sir.

Q. Okay. And then it has to send, in response to receiving that button press, a first communication configured to trigger the movable barrier operator. Right?

A. Yes, sir.

Q. And it's got to trigger the movable barrier operator to do something very specific. Right?

A. Yes, sir.

Q. It's got to close the movable barrier in combination with operating the moving barrier imminent motion notification. Right?

A. With the Court's claim construction in mind, yes, sir.

Q. That means it's got to close the -- the barrier or the garage door and alarm at the same time. Right?

A. No, sir.

Q. You don't see that it says, close the movable barrier in combination with operating the moving barrier imminent motion notification?

A. I see that, sir.

Q. And that means close the door in combination with the alarm. Right? It doesn't tell us whether we alarm before or after, but we have to do them both. Right?

A. I don't agree, sir.

Q. Okay. We'll come back to that, too.

And the triggering of the door and the alarm has to be based on the first communication and its method of communication. Right?

A. Not quite, sir.

Q. Did I read that incorrectly, sir?

A. Something's missing, yes, sir.

Q. Okay. Well, I guess we'll come back to that, too. But then we have to focus on the method of communication. Right?

A. That's the next words, yes, sir.

Q. And the patent gives us a list of four choices for the method of communication. Right?

A. Yes, sir.

Q. It has to include either a transmission method identification code. Right?

A. Yes, sir.

Q. Or a code format. Right?

A. Yes, sir.

Q. Or a signal frequency. Right?

A. Yes, sir.

Q. Or a signal modulation. Right?

A. Yes, sir.

Q. And one of those four has to be used to trigger the movable barrier operator. Correct?

A. Excuse me, sir. There's more, but yes, sir.

Q. Well, and it has to move the movable barrier. That's the

garage door. Right?

A. Yes, sir.

Q. And it has to do that in combination with operating the moving barrier imminent motion notification. And that's the alarm. Right?

A. Yes, sir.

Q. Okay. Now, we just went through the whole claim a word at a time almost. Right?

A. Yes, sir.

Q. There are no trains here. Right, Doctor Leeb?

A. True.

Q. You didn't see any little blue men in this claim. Right?

A. Not quite, sir. I don't agree with that.

Q. Well, you're not trying to distract this jury by suggesting that this claim applies to trains or little blue men. Right?

A. I'm not trying to distract the jury.

Q. But it's not just trains and little blue men, Doctor Leeb. You spent hours yesterday looking through the circuitry for microprocessors. Right?

A. I'd like you to remind me what you're referring to specifically, sir.

Q. You don't recall having your graphics guy put his cursor over the microprocessor on --

MR. CORDELL: Can I have TDX 4.19, please?

THE WITNESS:  I recall that, sir.

MR. CORDELL:  Can I have 4.20, perhaps?  There we go.

Q.   (BY MR. CORDELL)  Do you recall showing the jury where the microprocessor was on this circuit board?

A.   Two microprocessors, yes, sir.

Q.   But, Doctor Leeb, there is no microprocessor in claim 20. Right?

A.   Correct, sir.

Q.   So you weren't trying to distract the jury by spending all that time looking at microprocessors, were you?

A.    No, sir.

Q.   You pointed to -- we spent a lot of time talking about one circuit board or two circuit boards.  Right?

A.   I'm not exactly sure what you're referring to, sir.

MR. CORDELL:  Well, can I have DDX 4-18?  Actually can we go to 17, please?  There we go.

Q.   (BY MR. CORDELL)  Do you recall, Doctor Leeb, taking this jury through the idea that the iDCM has one circuit board and the GDO has another circuit board, and then later you put them together so there were just one circuit board?

A.    Not quite my statements, but yes, sir, we had a discussion like that.

Q.   Well, we spent -- we spent a half an hour on circuit boards yesterday.  Right?

A.   I'll take your word on the time.

Q.   But, Doctor Leeb, we just went through this claim.  It doesn't say a thing about circuit boards.  Right?

A.   Not the exact word 'circuit board'.

Q.   Do you need to look at it again?  I can put it back up.

A.   No, sir.  The word 'circuit board' is not in the claim.

Q.   You also took the jury through antennas.  Right?

A.   Loosely stated, sir, but yes.

Q.   But you identified individual antennas on the circuit boards.  Right?

A.   Yes, sir.

Q.   But this claim doesn't say anything about antennas.  Right?

A.   I'm not sure I agree.

Q.   Well, do you need to see the claim again?

A.   No, sir.

Q.   Okay.  It says that -- that there is a command issued.  Right?

A.   Well, let's pull out the claim again, sir.

        MR. CORDELL:  Okay.  Can I have claim 20 back?

Q.   (BY MR. CORDELL)  Can you see it now, Doctor Leeb?

A.   Yes, sir.

Q.   No antennas in this claim.  Right?

A.   Just a moment, please, sir.  The word 'antenna' is not in the claim.

Q. More than that, sir, it just says there's a communication. We don't know how it's actually transmitted. Right?

A. I think I disagree.

Q. Well, it could be one antenna, it could be 50 antennas. We just don't know. Right?

A. I think I disagree.

Q. Well, the claim doesn't tell us whether it's one antenna or two antennas or no antennas; it just says communication. Correct?

A. It says other things also, sir.

Q. While we're on antennas, you -- you -- you suggested yesterday that these antennas can only pick up one frequency. Is that right?

A. Not sure I used that phrase. It's a narrow range.

Q. Well, I mean an antenna is just a piece of metal. It's a conductor. Right?

A. In part.

Q. And it receives whatever signals are flying around in the air, they'll induce a current in that conductor. Right?

A. Not necessarily.

Q. This isn't an Gaussian sphere or anything like that. Right?

A. I would not expect so, no, sir.

Q. Okay. Now, you also showed us, went on and on about

unplugging wires. Right?

A. Again, sir, loose -- I prefer you direct me to what you're talking about.

Q. Sure.

MR. CORDELL: DDX 4.21, please. We may have a version issue. Could you try 4.22? There we go.

Q. (BY MR. CORDELL) So you used DDX 4.21, perhaps it was 4.22, that showed you could unplug wires on the circuit board. Right?

A. Yes, sir.

Q. But this claim says nothing about plugging or unplugging wires. Right?

A. Yes, sir. That's correct, sir.

Q. So having the jury going to look for microprocessors was -- it's kind of a distraction from what they really have to do. Right?

A. I disagree.

Q. Well, you told me that the claim says nothing about microprocessors. Right, sir?

A. The word 'microprocessor' is not in the claim, yes, sir.

Q. And looking for circuit boards, that's kind of a distraction, too. Right?

A. No, sir.

Q. And unplugging wires, that's kind of a distraction. Right?

A.    Definitely not.

Q.    And, in fact, the only time you actually addressed the claim, Doctor Leeb, during your testimony yesterday was at slide DDX 4.11.

          MR. CORDELL:  Can I have that?  I'm sorry.  4.13.  There we go.

Q.    (BY MR. CORDELL)  Do you recall this, Doctor Leeb?

A.    Yes, sir.

Q.    And what the law tells us to do is we're supposed to compare the claim as construed by His Honor to the actual accused device.  Right?

A.    For purposes of non-infringement analysis, yes, sir.

Q.    Well, or infringement analysis.  You can say it.  It's okay.

A.    Sure.

Q.    And the accused device in this system is the garage door opener I have in the well of the courtroom.  That's an example.  Right?

A.    I don't know the provenance of what's in the well, sir.

Q.    I'll represent to you it's an Overhead Door garage door opener.  That's the accused product in this case.  Right?

A.    Not every Overhead Door garage door opener is accused, and I don't know the provenance even if it is nominally an Overhead Door.

Q.    Well, then let me just ask you, Doctor Leeb:  What are

the accused products in this case?

A. They are the WiFi Overhead Door operators.

Q. Okay. So if we assume that the one in the well of the courtroom is a WiFi-enabled Overhead Door operator, you agree with me that is the accused product in this case. Right?

A. If it hasn't been tampered with, yes, sir.

Q. And the law says we're supposed to compare the properly construed patent claim to the accused product. Right?

A. Could I have that again slowly, sir.

Q. The law tells us -- your lawyers have told you what the patent law is. Right?

A. I think so, yes, sir.

Q. You went on and on at the beginning of your reports about all the patent law stuff they told you. Right?

A. Correct, sir.

Q. And your job, your number one job on infringement, is to compare the properly construed patent claim to the accused product. Correct?

A. Correct.

Q. That's not what you did. Right?

A. I disagree.

Q. Well, what you did in front of this jury is to compare the patent claim to a couple of train cartoons. Right?

A. In part, sir.

Q. Well, that's what you presented in court yesterday, sir.

Correct?

A.   Among many other things, yes, sir.

Q.   And when you did the comparison, I want to make sure that I have this right, you highlighted in yellow the part you thought was different between the patent claim and whatever form of the accused product you were using.  Right?

A.   I'm not sure I understood that question, sir.

Q.   Well, what's the meaning of the yellow in this diagram, DDX 4.13?

A.   The yellow is the limitation of claim 20 that I think is not found in the accused Overhead Door products.

Q.   So for everything that you didn't highlight in white, you didn't -- you didn't deny that that part of the claim exists in the accused Overhead Door product.  Correct?

A.   Just a moment, please, sir.  That's correct, sir.

Q.   So, you know, a few minutes ago when you, for example, told me that, you know, the -- the RF clicker I'm holding in my hand is not a transmitter, you didn't say that when it came time to do your infringement analysis.  Right?

A.   I don't remember the discussion that way, sir.

Q.   So you admit that the RF clicker I'm holding in my hand that says Genie on it, that is a transmitter for the purposes of the '404 Patent claim.  Right?

A.   No, sir.

Q.   And the cell phone with the properly configured Aladdin

app on it, that is a transmitter for the purposes of the '404 Patent claim. Right?

A. No, sir.

Q. Well, let's look at your prior testimony, Doctor Leeb. Turn with me to the March 2022 transcript at page 49:23 through 53.

A. I'm sorry. March 2022 transcript.

Q. Yes. Volume 4.

A. Hold on, okay. Volume 4. And page number, sir.

Q. Page 49?

A. Just a moment, please, sir.

        THE COURT: Nobody's going to rush you, Doctor Leeb.

        THE WITNESS: Thank you, sir.

    And where, sir?

Q. (BY MR. CORDELL) Line 23 through 50, line 3.

A. I see. Just a moment, please, sir.

    Thank you, sir. Go ahead.

Q. Does that refresh your recollection about whether the clicker and the properly configured cell phone are, in fact, transmitters, sir?

A. Transmitters, yes.

Q. So you agree that the clicker I'm holding in my hand, the Genie branded RF clicker, that's a transmitter. Right?

A. Yes, sir.

Q. And the properly configured cell phone with a properly

installed app, that is a transmitter. Right?

A. Yes, sir.

MR. CORDELL: And if we can go back to DDX 4.13.

Q. (BY MR. CORDELL) You didn't highlight in yellow the transmitter here. Right?

A. Correct, sir.

Q. In your words, that was not missing from the accused Overhead system. Right?

A. Can you refresh my memory on my words, sir?

Q. That's what you said just four or five minutes ago. You don't recall?

A. No, I do recall, sir, but you asked me if it was -- well --

THE COURT: Restate the question, counsel.

Q. (BY MR. CORDELL) What you have highlighted in yellow on DDX 4.13 is what you believe constitute the missing limitations from the accused Overhead Door products. Right?

A. Yes, sir.

Q. And the transmitter is not highlighted. Correct?

A. Correct, sir.

Q. So at least for this purpose you didn't deny that the accused Overhead Door product includes a transmitter. Fair?

A. No, sir.

Q. You didn't deny that the accused Overhead Door product includes an -- a movable barrier operator. Correct?

A.   Could I have that question again slowly, please, sir?

Q.   You did not deny that the accused Overhead Door products constitute a movable barrier operator.  Correct?

A.   Correct.

Q.   You didn't deny that the Overhead Door movable barrier operator is configured to receive communications from a transmitter.  Correct?

A.   Correct.

Q.   You did not deny that the Overhead Door movable barrier operator is configured to operate a movable barrier operator in response to receipt of communications.  Correct?

A.   Not quite, sir.

Q.   Did I read that incorrectly, sir?

A.   Yes.

Q.   Okay.  Maybe I should try again.  You didn't deny that the Overhead Door movable barrier operator is configured to operate the movable barrier operator in response to receipt of communications -- of the communications.

A.   Thank you, sir.  And I think I did.

Q.   Okay.  Meaning you did not deny.

A.   No, meaning I did deny.

Q.   Okay.  Well, you didn't highlight operating the movable barrier operator in response to receipt of the communications in your slide.  Correct?

A.   Of the communications, and correct.

Q. Okay. You didn't deny that the accused Overhead Door movable barrier operator transmitter receives a first user input. Correct?

A. Could I have that again slowly, please, sir?

THE COURT: Ladies and gentlemen, I need to take up a matter outside of your presence. I'm going to ask you to retire to the jury room for just a minute. This won't take very long. If you'll simply close and leave your notebooks in your chairs, follow all my instructions, including not to discuss the case, and I'll have you back in here very shortly.

(Whereupon, the jury left the courtroom.)

THE COURT: Be seated, please.

Doctor Leeb, the jury's out of the room, and I need to have a serious discussion with you.

THE WITNESS: Yes, sir.

THE COURT: Many times during this cross examination you've told counsel, could I have that again slowly, please. Counsel's not talking fast. He's not talking any faster than the counsel that examined you on direct.

Also, you have had inordinate pauses between the questions asked and your responses. When asked to refresh six lines of deposition testimony, I timed you and it took over a minute for you to read six lines--two short questions and one word answers.

You understand this is a timed trial. You understand

that we're at the end of the parties' time. You understand that the lawyers are trying to get as much done as they can within the time that's left. I am very suspicious, sir, that you are intentionally stalling for strategic purposes to help your side of the case who's paying you the kind of money that you've already testified to.

If I am further persuaded that you're doing that, I will sanction you and I will sanction the Defendants. I am not trying to rush you to give an answer that you're not ready to give, but you testified in the first trial and you did not testify like this. And I cannot -- I cannot honestly believe that there is not some effort on your part to run the clock out here.

I want you to take the time you need, but I do not want you in any way to intentionally waste time or consume more time than's necessary.

Again, you understand where we are in this process and you understand the limitations on the parties imposed by the Court, and any effort by any party or any witness for any party to strategically manipulate that, will be viewed with a great deal of displeasure by the Court.

I'm not accusing you of anything, but I'm very suspicious and I want to put you on notice that I'm watching. All right?

THE WITNESS: Yes, sir. My word I'm not doing that.

THE COURT: Well, let's proceed and see if we can't

keep that in mind.

THE WITNESS:  Understood, sir.

THE COURT:  All right.  Mr. Latham, bring the jury back in, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Thank you, ladies and gentlemen of the jury.  I appreciate your cooperation.  I'm sorry for the interruption.

Counsel, please continue with your cross examination.

MR. CORDELL:  Thank you, Your Honor.

Can I have DDX 4.13?  Thank you.

Q.   (BY MR. CORDELL)  So one of the elements you did not identify, you didn't highlight, was that the Overhead Door transmitter receives a first user input.  Right?  That's not highlighted.  Correct?

A.   No, sir.  That question didn't make sense.

Q.   Okay.  So do you see the part of the claim that says receiving a first user input?

A.   Yes, sir.

Q.   You did not highlight that.  Correct?

A.   Correct.

Q.   You didn't deny that the Overhead Door transmitter receives a first user input like a finger press.  Right?

A.   Correct.

Q.   An example of -- of a user input might also be when a

user presses the Aladdin door close button on their phone. Right?

A.   Yes, sir.

Q.   And you don't deny that, in response to the user input, the OHD transmitter sends out a first communication.  Right?

A.   I'm sorry, sir.  I need that question again.

Q.   Sure.  So you see at the top of claim 20[a], it says, sending in response to receiving the first user input a first communication.  You didn't highlight that.  Right?

A.   20[b].  Right, sir.

Q.   Yes.

A.   I did not highlight that.

Q.   You added these -- these labels like 20 preamble, 20[a], and 20[b].  Is that right?

A.   I asked them to be labeled this way, yes, sir.

Q.   I didn't know if 20[b] was the yellow part or the full box?

A.   The full box.

Q.   But you did not highlight that sending in response to receiving the first user input a first communication.  Fair?

A.   Correct.

Q.   And you agree that the OHD transmitter does send a first communication in response to receiving the first user input. Right?

A.   I'm sorry.  I need -- I need that again.

Q.   Okay.  You agree that the accused Overhead Door transmitter sends, in response to receiving a finger press, a first communication.  Right?

A.   No, sir.

Q.   Okay.  You're saying that when I press the Genie button, it's not sending any communication at all.

A.   No, sir.

Q.   Okay.  You're just -- you just don't like calling it a first communication?

A.   Correct, sir.

Q.   Okay.  So let me try it this way.  You admit that the Overhead Door transmitters send a communication of some kind when it receives a user input.

A.   Yes, sir.

Q.   Okay.  Now, the Court construed this claim to require a determination.  Right?

A.   Yes, sir.

Q.   Actually this claim says determining operation of the moving-barrier imminent motion notification.

A.   Correct, sir.

Q.   And you heard Mr. Rauscher testify that the accused Overhead Door system does a whole bunch of determinations. Right?

A.   Not quite, sir, but sort of.

Q.   Well, do you recall this when Mr. Elacqua took Mr.

Rauscher through a whole bunch of the source code and had Mr. Rauscher identify determination after determination after determination?

A.   I recall when they had that conversation.

Q.   Okay.  And you don't dispute that what's listed up on the flip chart are determinations.  Right?

A.   Not necessarily, sir.

Q.   You think you know better than Mr. Rauscher?

A.   Not necessarily, sir.

Q.   Okay.  Well, is making sure that an incoming message from a transmitter is valid and authentic, is that a determination?

A.   I wouldn't use that word.

Q.   And making sure that a message from a cell phone in JSON format and making sure it's a valid JSON format you say is not a determination?

A.   I wouldn't use that word.

Q.   Well, would it help for me to show you Mr. Rauscher's testimony?

A.   Sure.

     MR. CORDELL:  So can I have Mr. Rauscher's testimony at page 136?  Well, it's actually in your binder.

     Or should I publish it, Your Honor?

     THE COURT:  You asked him if it would help to see it.  He said, sure.  So you may show it to him.

     MR. CORDELL:  Okay.

THE COURT: He could have said, no, I don't need to see it, but he agreed that you should show it to him, so show it to him.

MR. CORDELL: All right. So at page 136, lines 20 through 23.

THE WITNESS: I'm sorry, sir. I need to know which -- which transcript. There's volume 3 and volume 4.

THE COURT: Can you not see it on the screen, Doctor Leeb?

THE WITNESS: Oh, I'm sorry. Now I can, yes, sir.

THE COURT: Let's just use the screen.

MR. CORDELL: Okay.

Q.   (BY MR. CORDELL)  And do you see, in fact, that Mr. Rauscher talked about there being at least one valid and authentic WiFi signal being a determination verifying it being a determination?

A.   I see that, yes, sir.

Q.   Okay. And you don't dispute Mr. Rauscher's testimony on that. Right?

A.   No, sir.

Q.   Okay. And in your deposition, sir -- well, let me show you one more just to make sure. Page 142 at lines 11 through 15.

And you agree with me, sir, that the garage door opener that we're talking about receives the communication in a valid

JSON format and determines that what it has received is valid. Correct? Answer, Correct.

Do you recall that, sir?

A. Yes, sir.

Q. And you have no basis to dispute Mr. Rauscher's sworn testimony. Right?

A. No, sir.

Q. And, in fact, the first thing that the garage door opener does when it gets one of these JSON messages is to validate that it's in the correct format. Right?

A. One of the first things.

Q. The cell phone generates WiFi messages. Is that right?

A. Imprecisely stated, sir.

Q. Let me try it again. The cell phone sends messages that go over the WiFi network. Fair?

A. Possibly, sir.

Q. Well, and the message that I'm talking about are the messages between the Aladdin application and the Overhead Door garage door opener. Those travel over the WiFi network. Right?

A. In part.

Q. Okay. And if a WiFi message is received by the Overhead Door garage door opener, that means that it was sent in the correct modulation format. Correct?

A. I need that again, sir.

Q. If a WiFi message is received by the Overhead Door garage door opener, that means it was sent in the correct modulation format. Right?

A. Yes, sir.

Q. If a WiFi message is received, that also means that it was sent to the correct IP address of the garage door opener. Right?

A. Of the garage door opener, yes, sir.

Q. The garage door opener is given an address just like we all have a street address for the post office. Right?

A. Basically, yes, sir.

Q. And so when the phone sends out a message, if it doesn't put the right IP address in, the garage door opener won't pick it up. Right?

A. That's not quite correct.

Q. Well, it won't make it to the garage door opener. Right?

A. That's not quite correct.

Q. Well, try one more time. If the cell phone sends out a WiFi message with the wrong IP address, it will not open or close or alarm or not alarm anything in the garage door opener. Right?

A. No way to answer that.

Q. Okay. So it's your testimony that it might be that if I put the wrong IP address in my transmission from the cell phone, the garage door opener still might open or close?

A.   No, sir.

Q.   There's no way it will.  Right?

A.   I'm not sure I'm following you.

Q.   You don't like the word 'determination'.  Right, Doctor Leeb?

A.   It's a perfectly fine word, sir.

Q.   Well, you believe the word 'determination' causes confusion.  Right?

A.   No, sir.

Q.   Well, can I have his March 2022 transcript at page 59, lines 13 through 14?

THE COURT:  You can't publish it.  You can refresh his recollection of a prior inconsistent statement if you can show it to be that.

MR. CORDELL:  Thank you, Your Honor.

Q.   (BY MR. CORDELL)  Do you recall your prior testimony about determination risking confusion?

A.   Could you refresh me, sir?

Q.   Sure.

MR. CORDELL:  Can I have the March 2022 transcript at page 59, line --

THE WITNESS:  Wait, wait, wait.  Just a moment, please.

THE COURT:  Don't publish the matter.  Refer him to where it is in the notebook, and he can read it.  Then you can

ask the same question again. If there's an inconsistency between then and now, then you can ask leave to publish it to the jury.

MR. CORDELL: Thank you, Your Honor.

Q. (BY MR. CORDELL) It's in volume 1 of your binder, Doctor Leeb, and it's called transcript volume 4.

A. Transcript volume 4, did you say, sir?

Q. Yes.

A. Okay. I've got that.

Q. Okay. Turn to page 59.

A. Just a moment, please, sir.

Q. Start at line 8.

A. Just a moment, please, sir.

THE COURT: Again, Doctor Leeb, nobody's going to rush you. You're going to have plenty of time. You don't have to ask -- ask to wait every time.

THE WITNESS: Yes, sir.

THE COURT: Just look at it.

THE WITNESS: Okay, sir.

Q. (BY MR. CORDELL) Does that refresh your recollection as to your opinion of the word 'determination'?

A. Not precisely, sir.

Q. Okay. But the fact is you think the word 'determination' risks confusion. Right?

A. No, sir.

MR. CORDELL: Your Honor, may I publish?

THE COURT: You may.

MR. CORDELL: Okay. Beginning at line 8.

Question: "And you have heard him testify that, in fact, after the system receives a WiFi command to close, it goes through a whole series of determinations before it does anything. Correct?"

Answer: "I don't think he used the word 'determinations', but it goes through a series of checks."

Question: "Well, you don't like the word 'determination'."

Answer: "Risks confusion."

That was your testimony. Correct, sir.

A. Absolutely.

Q. And you gave that testimony under oath. Right?

A. Absolutely.

Q. And you agree that when a communication comes in, it does go through a whole series of checks before the door is allowed to move or not move. Right?

A. Could you be more specific, sir?

Q. Sure. When a transmitter in the Overhead Door system -- and I'll be specific. When an Aladdin app on a cell phone sends a door close message to the Overhead Door garage door opener, the system goes through a whole series of checks before it decides to move the door. Fair?

A.   Imprecisely stated, but fair enough.

Q.   You don't like calling those checks determinations. Right?

A.   Correct, sir.

Q.   Okay.  But the fact is, if the checks fail, the door doesn't move.  Right?

A.   Correct, sir.

Q.   And if all the checks pass, the door does move.  Right?

A.   It should, yes, sir.

Q.   Okay.  And in the case of the cell phone, if all the checks pass, the door moves after an alarm goes off.  Right?

A.   Correct, sir.

Q.   So let's turn to claim 4 quickly.

          MR. CORDELL:  Can I have claim 4 of the '404 Patent?

Q.   (BY MR. CORDELL)  Now, claim 20 only asks about closing the door with an alarm.  Right?  Let me rephrase that.  Claim 20 only deals with the case where the door is closed with an alarm.  Correct?

A.   Not precisely, sir.

          MR. CORDELL:  Well, can I have claim 20 again?

Q.   (BY MR. CORDELL)  Do you see -- you can re-read claim 20, Doctor Leeb.  And can you verify that what we're talking about in claim 20 is moving the movable barrier with the alarm?

A.   You've paraphrased, but that's in the claim, yes, sir.

Q.   What is not in claim 20 is moving the barrier without an

alarm. Right?

A. Not precisely, sir.

Q. Well, in fact, it says, in combination with operating the moving barrier imminent motion notification. Right?

A. Just a moment, please, sir. Yes, sir.

Q. Now, when we go to claim 4, we go to country and western. Right?

A. I'm not following you, sir. I'm sorry.

Q. Well, we have both closing the door with the alarm and closing the door without the alarm. Right?

A. Let's see what you're talking about, sir.

MR. CORDELL: Can I have the entirety of claim 4, please? There we go.

Q. (BY MR. CORDELL) So do you see down in the second box, to determine whether to close the movable barrier in combination with operating a moving-barrier imminent motion notification. That means moving the door with an alarm. Right?

A. Just a moment, please, sir. In combination with operating a moving-imminent motion notification, did I hear you correctly.

Q. Yes.

A. Yes, it does.

Q. And then the last clause says, the movable barrier operator configured to determine whether to close the movable

barrier without operating the moving-barrier imminent motion notification. Right?

A. The highlighting helps. Yes, sir. Thank you.

Q. And that means moving the door without an alarm. Right?

A. Yes, sir.

Q. Okay. And for the accused systems, what we're talking about is an input from the RF clicker to move the door without an alarm. Right?

A. With this claim language? No, sir.

Q. Well, okay. Let's -- let's try it this way. Mr. Rauscher testified that when a user presses the clicker, then the Overhead Door garage door closes without an alarm. Correct?

A. I'm not sure those were his exact words, but that's the idea, yes, sir.

Q. And Mr. Rauscher testified that when a user presses the RF clicker, it sends a message to the Overhead Door head unit. Right?

A. I'd prefer to see Mr. Rauscher's testimony that you're referring to, but generally yes, sir.

MR. CORDELL: Can I have --

Q. (BY MR. CORDELL) Can you look in volume 2 of Mr. Rauscher's testimony?

A. Can you help me, sir? I've got volume 3 and 4.

THE COURT: Counsel, he asked to see it. If you

want to publish it, you can.

MR. CORDELL:  Thank you.

Can I have Rauscher's trial transcript from a couple of days ago at page 145, lines 9 through 15.

Q.   (BY MR. CORDELL)  Does that refresh your recollection, Doctor Leeb?

A.   Yes, sir.

Q.   Okay.  So the way it works in the accused systems is the user presses the RF clicker and it generates a message to the Overhead Door head unit.  Right?

A.   If we're talking about this, it's not saying that.

Q.   Is that a true statement?  I'm just doing background.

A.   So I'm not looking at this.  Let me have that question again, please?

Q.   The way this works is the user presses the clicker and it generates a message to the Overhead Door head unit.  Right?

A.   Loosely stated, but I think that's reasonable.

Q.   And the Overhead Door head unit, when it gets it, the first thing it does is it checks to make sure that that communication is valid and authentic.  Right?

A.   One of the first things.

Q.   And that checking to see whether the message is valid and authentic, that is a determination.  Correct?

A.   I wouldn't use that word.

MR. CORDELL:  Well, can I have Mr. Rauscher's

testimony back?

Q. (BY MR. CORDELL) Do you see that's what Mr. Rauscher said two days ago? Right?

A. And validation, yep, also, yes, sir.

Q. That's the old valid and authentic determination. Right?

A. Probably, yes, sir.

Q. But you say that's not a determination?

A. I wouldn't use that word, is what I said.

Q. Okay. But, again, you don't know better than Mr. Rauscher. Right?

A. About some things, I might.

Q. Okay.

THE COURT: Counsel, we've been in here an hour and a half since we started. We're going to take a short recess. I understand this cross examination has some additional time left.

So, ladies and gentlemen of the jury, if you'll simply close your notebooks, leave them where they are in your chairs, follow all my instructions, we'll try to keep this relatively short.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT: Be seated, please.

Counsel, for your information, the Plaintiff has exactly 2 hours and 30 minutes of trial time remaining. The Defendant

has exactly 1 hour and 26 minutes of trial time remaining.

I'd like to see Mr. Cordell and Mr. Callahan in chambers during the recess.

And with that, the Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Mr. Cordell, are you prepared to continue with your cross examination?

MR. CORDELL:  I am, Your Honor.

THE COURT:  Then let's bring in the jury, please, Mr. Latham.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen. Please have a seat.

Counsel, you may continue with your cross examination.

MR. CORDELL:  Thank you, Your Honor.

May I have DDX 4.14?

Q.   (BY MR. CORDELL)  All right.  Doctor Leeb, before the break, we were talking about claim 4.  Do you recall that?

A.   Claim what, sir?

Q.   Claim 4.

A.   Yes, sir.

Q.   Okay.  And this is -- this DDX 4.14.  That's your infringement slide for claim 4.  Right?  Or non-infringement?

A.   Non-infringement slide, yes, sir.

Q. And, once again, you've highlighted in yellow the things you think are missing from the Overhead Door system out of claim 4. Right?

A. Yes, sir.

Q. Okay. So the first yellow in what you've labeled as box 4[b], that's pretty close to what we just did in claim 20. Would you agree with that?

A. I suppose, sir.

Q. I mean, I guess the difference is that, instead of the four signal characteristics, we're only talking about the transmitter identification code. Is that fair?

A. Yes, sir.

Q. Okay. So I'd like to focus on 4[c], the last limitation, and this is one you say is missing in the Overhead Door products. Right?

A. Yes, sir.

Q. And the idea is that the movable barrier operator, that's the garage door opener -- Right?

A. Yes, sir.

Q. -- has to be configured to determine whether to close the movable barrier. That's the garage door. Right?

A. Yes, sir.

Q. Without operating the moving-barrier imminent motion notification. That's the alarm. Right?

A. Yes, sir.

Q.   Based at least in part of the transmitter identification code.  Right?

A.   Yes, sir.

Q.   And for the accused Overhead Door products, the closing of the door without the alarm comes from the RF clicker.  Correct?

A.   Yes, sir.

Q.   And when a user presses the RF clicker, the RF clicker sends out an RF, or radio frequency, communication.  Right?

A.   Yes, sir.

Q.   And the Overhead Door garage door opener product receives that communication.  Right?

A.   Hopefully, yes, sir.

Q.   And the Overhead Door head unit then validates and authenticates the communication.  Right?

A.   Yes, sir.

Q.   And Mr. Rauscher told us that that is a determination.  Right?

A.   Can you refresh me on that, sir?

Q.   Sure.  It's at volume 2, lines 145:9 through 15.

A.   Hold on, please, sir.  I have a volume 3 and volume 4.

Q.   I apologize, Doctor Leeb.  So if you look in binder No. 2, 2023, trial volume 2?

A.   Hold on, please, sir.  I'm trying -- March 2022, volume 2?

Q.   Yes.  No, no.  I'm sorry.  It's 2023 trial.  This is two days ago.

A.   I'm sorry.  Hold it.

Q.   Volume 2 is second day of trial.

A.   Got it.

Q.   So page 145, lines 9 through 15.

A.   145, lines 9 through 15.  Got it.

Q.   Now, does that refresh your recollection that the Overhead Door head unit validates and authenticates an RF message when it's received?

A.   Yes, sir.

Q.   And that is a determination.  Correct?

A.   Mr. Rauscher used that word.

Q.   Okay.  Mr. Rauscher also told us that there is a determination for the rolling code that's used in the RF clicker to head unit communication.  Right?

A.   First part of that again, please, sir?

Q.   Sure.  So when a user presses the RF clicker, it sends out a message that includes a rolling code.  Correct?

A.   Yes, sir.

Q.   And when the head unit receives that rolling code, it validates that rolling code.  Right?

A.   Decodes and validates, yes, sir.

Q.   And that's important.  That's the way we keep thieves from traveling around opening people's garage doors.  Right?

A.   In part, yes, sir.

Q.   Okay.  And Mr. Rauscher told us that that validation of the rolling code, that's another determination.  Correct?

A.   Can you point me to that, sir?

Q.   Sure.  The same volume, same document, page 146, lines 3 through 10.

A.   Got it.

Q.   And do you agree that Mr. Rauscher told us that the validation of the rolling code is another determination?

A.   Yes.

Q.   Okay.  You were here for Mr. Rauscher's testimony. Right?

A.   Yes, sir.

Q.   Mr. Rauscher -- well, when the user presses the RF clicker, it also sends out a message in a specific Intellicode format.  Correct?

A.   Depending on the clicker, yes, sir.

Q.   Okay.  And in the case when it does send out a message in an Intellicode format, the Overhead Door head unit verifies that the Intellicode format is correct.  Right?

A.   Yes, sir.

Q.   And that is another determination that the system makes. Correct?

A.   I wouldn't say that.

Q.   Well, Mr. Rauscher said that.  Right?

A.   Do you want to show me?

Q.   Sure.  Same document, same -- in fact, it's the same page, 146, lines 18 through 22.

A.   Got it.

Q.   And you agree that Mr. Rauscher told us that verifying the Intellicode format was a determination.  Right?

A.   Yes.

Q.   Okay.  Now, you've been clear about your opinion that you don't think the accused Overhead Door products make determinations.  Is that right?

A.   Not in the sense of the asserted claims.

Q.   And that really is -- that's the core of your non-infringement opinion.  Right?

A.   Yes, sir.

Q.   But you agree with me that Mr. Rauscher knows his system very, very well.  Correct?

A.   Sure.

Q.   Okay.  Now, the determinations that Mr. Rauscher pointed to are made in the head unit of the Overhead Door product.  Correct?

A.   Yes, sir.

Q.   And those determinations are made by various components within the Overhead Door head unit.  Correct?

A.   Fair enough.

Q.   You can't point to any part of claims 4 or 20 that

requires a particular configuration of circuit boards.
Correct?

A.   Of circuit boards?  No, sir.

Q.   You can't point to any part of claims 4 or 20 that
require a certain number of antennas.  Right?

A.   That's fair.

Q.   You don't -- you can't point to any part of claims 4 or
20 that point to a specific configuration of microprocessors.
Right?

A.   Almost correct, sir.

Q.   Okay.  Well, we went through that and microprocessor is
not in the claim.  Right?

A.   That I agree with.

Q.   And the name of the game is the claim.  Right?

A.   Yes, sir.

Q.   Okay.  So I've got -- I've got a demonstrative in the
courtroom.  You're familiar with this.  Yes?

A.   No, sir, not at all.  Except for today, I've never seen
it before.

Q.   Do you need to look at it?

A.   Not necessarily.  I don't know what you're going to ask
me.

Q.   Okay.  Well, I will represent it's a Genie 3155D
operator.  Does that look right?

A.   It could be, sir.

Q. Okay. And when I press the clicker, it's going to send a message to this --

A. Are you going to do that, sir? I'm going to stand.

Q. Yes.

A. Okay. Hold on, please.

MR. CORDELL: Is that okay, Your Honor?

THE COURT: That's fine.

Q. (BY MR. CORDELL) All right. So when I press the clicker -- well, I should probably have set that up. What's happening here when the little traveler is moving down the bar?

A. If it were connected, the door would be closing.

Q. Okay. So as the bar moves toward the jury, the door is closing?

A. If it's connected, yes, sir.

Q. And when the little traveler moves back, is the door opening?

A. Yes, sir.

Q. Okay. So when I press the clicker, it sends a message to the head unit and the traveler closes the door. Right?

A. Yes, sir.

Q. And when I press the clicker, it does not alarm. Correct?

A. Correct.

Q. Now, I have Ms. Chen's cell phone, and she gave me her pass code.

A.   Cool.

Q.   And I'm going to put it on the elmo.  I bet she changes her pass code when I give it back.

Now, if I press the Aladdin connect app, it opens up the app.  Do you see that?

A.   Oh, no, sir.  I'm sorry.  Should I go back here?  I see it now.  Yes, sir.

Q.   And you see the button that says press to open door?

A.   Yes, sir.

Q.   So if I press that, will the door open?

A.   We'll find out.

Q.   Well, actually, let me close it using the clicker.  So it's closed now right.

A.   Yes, sir.

Q.   Let me open it with the clicker.  So when I open it with the clicker, no alarm.  Right?

A.   Correct.

Q.   And when I press the button on the Aladdin connect, it will close the door.  Right?

A.   We'll see.

Q.   But this time, it alarmed for five seconds.  Correct?

A.   Correct.

Q.   Just like the standard tells us to.  Right?

A.   Correct.

Q.   And if I open it again, it will do the same thing.

Right?

A.   In reverse.

Q.   And yet it's your testimony -- you can go back, yes.
Thank you, Doctor.

You say this system makes no determinations at all.
Right?

A.   In the '404 sense, correct.

Q.   It's not determining whether the signal is coming from a
clicker or a cell phone.  Right?

A.   Correct.

Q.   And yet somehow, somehow, the system alarms when I send a
message from a cell phone in a JSON format in the proper
frequency with the right codes and does not alarm when I press
the RF clicker with the proper rolling codes.  Right?

A.   Correct.

Q.   So you're not suggesting this is a coincidence that it
alarms when I use the cell phone and not when I use the
clicker.  Correct?

A.   Correct.

Q.   There's not -- there's not some little blue man in there
deciding whether to alarm or not.  Right?

A.   Exactly.  There's not a little blue man in there.

Q.   No little blue man in the courtroom.  Right?

A.   Only on the slides.

Q.   The reality is, sir, that the system must do some kind of

determination to know whether the communication is coming from a clicker or from a cell phone. Correct?

A. No, sir.

Q. In your testimony, it's just a complete coincidence that the system is able to alarm when I use the cell phone and not alarm when I use a clicker. Fair?

A. No, sir.

Q. Okay.

MR. CORDELL: Your Honor, I'm through with it, but I'll leave it to avoid --

THE COURT: Let's leave it for now.

MR. CORDELL: Thank you.

Q. (BY MR. CORDELL) So let's -- let's go back to Dr. Laird -- I mean, Mr. Laird's code. Again, you said you spent some non-zero time reviewing Mr. Laird's source code?

A. Yes, sir.

Q. And you're not familiar with the assembly language that Mr. Laird used. Right?

A. No, sir.

Q. And you would normally use a reference manual to -- to understand that kind of code. Right?

A. Definitely.

Q. And you didn't have a reference manual for the 2007 Laird source code. Correct?

A. I don't think that's correct.

Q. But you had a data sheet. Do you recall that?

A. Yes, sir.

Q. You didn't show us a reference manual. Correct?

A. It's in the data sheet.

Q. Okay. So you just used the data sheet rather than a manual for the code?

A. The data sheet is a manual.

Q. Okay. The data sheet's a couple of pages long. Right?

A. No, sir.

Q. Okay. But what we can agree on is that you just sort of had an understanding of Mr. Laird's source code. Right?

A. Not precisely, sir.

MR. CORDELL: Can I have JTX 18?

Q. (BY MR. CORDELL) One thing you do understand, Doctor Leeb, is that in the upper right-hand corner where it says TTC.ASM and then a date and a time, that signifies the last time that this program was compiled. Correct?

A. No, sir. I have heard that, but I -- I couldn't represent that.

Q. Okay. You understand that compilers will automatically date and time the source code that they compile. Right?

A. No, sir. Generally not in my experience.

Q. Okay. But you've never used this particular kind of source code. Correct?

A. I have.

Q. Well, remind me what the processor is that Mr. Laird used?

A. It's a Microchip PIC processor.

Q. Okay. And you don't remember which one?

A. I wouldn't produce the part number from memory, no, sir.

Q. Okay. And you in your testimony, you -- you remarked that Mr. Laird hadn't put his name into the code. Right?

A. Yes, sir.

Q. Do you often put your name into work you're doing on your own desk before you turn it over to anybody else?

A. Always if I'm modifying someone else's code with their name in it.

Q. You were here for the testimony of Mr. Rauscher. Right?

A. Yes, sir.

Q. And you heard him say that it would be silly to put your name into your own code. Right?

A. Not precisely. Yes, he said that, but there was more.

Q. Okay. And you heard Mr. Laird testify that he kept the code in a repository that only he had access to. Right?

A. I heard that, yes, sir.

Q. Well, actually were you here on Monday?

A. I read the transcript.

Q. Okay. Now, when we got to inventorship, I think you said that you didn't believe Mr. Laird was the real inventor. Is that right?

A.   Not precisely.

Q.   Okay.  Well, you said that there should be 20 more inventors or something like that?

A.   No, sir.

Q.   Well, in your expert report, you gave us the names of 20 people that you thought were inventors.  I'm sorry, 13 people.  Is that right?

A.   There we go.  Yes, sir.

Q.   Okay.  And who were those people?

A.   Well, in the interest of not trying to delay, I would want to see the report.  But it's like LeRoy Krupke, Mr. Nixa, Mr. Murray, and there are others.  I'm sorry.  I'm not going to be able to produce all the names from memory.

Q.   Sure.  Rush Akin was one of them.

A.   Well, I'd ask you -- I don't want to delay things, sir, but I would ask you to put it up.

Q.   Well, let me -- let me just have you look at it, if you can.

A.   Please.

Q.   It's in your expert report of June 23rd, '22?

A.   Which binder, sir?

Q.   That one is in binder number one.  It's the last document.

A.   Binder number one, and it's the last tab, did you say?

Q.   Yes.  Paragraph 529.

A.   Hold on, please, sir.  Just a minute, please, sir.  Got it.

Q.   Okay.  So you see Rush Akin listed there?

A.   Hold on, please, sir.  Yes.

Q.   What was Mr. Akin's contribution to the invention of the '404 Patent?

A.   He was a member of the DASMA subcommittee.

Q.   Okay.  But that wasn't my question.  What -- what did he contribute to the '404 Patent?

THE COURT:  Mr. Cordell --

MR. CORDELL:  Sorry, Your Honor.

THE COURT:  -- I'll tell you again.  If you think the witness is non-responsive to your question, don't tell him, that's not the question I asked.  You raise it with me.  Okay?

MR. CORDELL:  Thank you.  My apologies.

THE COURT:  All right.  Let's proceed.

Q.   (BY MR. CORDELL)  What was Mr. Akin's contribution to the '404 Patent?

A.   He was part of the discussions at the subcommittee where the unattended alarming was developed.

Q.   So it's your opinion that if Mr. Elacqua thinks of a new invention and we're talking about it, that makes us all inventors.  Is that right?

A.   Possibly.

Q.   Well, but the law says you need to tell this jury what the contributions were of the people you say were inventors. You understand that.  Right?

A.   Incomplete, sir.

Q.   Did Mr. Akin invent the transmitter or suggest the transmitter here?

A.   I don't know.

Q.   Did Mr. Akin suggest using the -- sending a first message?

A.   I don't know.

Q.   In fact, you don't know what any of these people actually contributed to what you say was the invention of the '404 Patent.  Correct?

A.   Specific parts, that's correct, yes, sir.

Q.   Now, you heard Mr. Krupke say that he didn't think he was an inventor.  Right?

A.   I think he said that.

Q.   Were you here for Mr. Krupke's testimony?

A.   Yes, sir.

Q.   Okay.  We know for a fact Mr. Krupke didn't work with Mr. Laird on the source code.  Right?

A.   Yes, sir.

Q.   Okay.  Now, you showed us a bunch of slides from DASMA and the UL working group.  Do you remember that?

A.   Generally, yes, sir.

Q.   I believe 'you've never been to a DASMA meeting.  Right?

A.   Correct.

Q.   You don't know what was actually discussed beyond reading the emails.  Right?

A.   And the meeting minutes.

Q.   Thank you.  You've read the documents and then you're representing to this jury what happened there.  Right?

A.   How I think a person of ordinary skill would see it, yes, sir.

Q.   Well, more that than that, sir.  You represented a bunch of facts that you said happened at these meetings.  Right?

A.   I'd ask you to show me what we're talking about.

Q.   Okay.

        MR. CORDELL:  Well, can I have DDX 4.39?  I believe 4.40?  Would you believe 4.38?  There we go.

   For the record, Your Honor, I think we have numbering issue.  I hope it doesn't become a problem later, but the demonstratives are not part of the record so it shouldn't be.

        THE COURT:  Is this the correct slide you want to use?

        MR. CORDELL:  It is, Your Honor.  It is.

        THE COURT:  Then let's go ahead.

        MR. CORDELL:  Okay.

Q.   (BY MR. CORDELL)  So if I understood your testimony correctly, Doctor Leeb, you said that this 2005 DASMA

subcommittee somehow got translated -- the subcommittee notes got translated into a -- a draft standard.  Is that right?

A.   The meeting minutes, yes, sir, became a UL working group draft standard.

Q.   But what you didn't comment about is the fact that the meeting and the minutes happened in May of 2005 and then this draft was in June of 2007, over two years later.  Right?

A.   Compound question, sir.  Could you break that up?

Q.   Well, you're not disputing the dates.  Right?

A.   No.

Q.   And you didn't tell the jury that there had been over a two-year lapse here.  Right?

A.   There's not a lapse.

Q.   Okay.  You're -- you're disputing that there was two years between these two communications?

A.   No, sir.

Q.   Okay.  The fact is you have no idea what happened between 2005 and 2007 to make the transition you suggested to this jury.  Correct?

A.   I disagree.

Q.   You looked at this DASMA subcommittee meeting and you said that the top part refers to unattended close.  Right?

A.   The top part of the -- not the date and the committee.  The top part of the text, yes, sir.

Q.   The top box.  Thank you.

Q. And then you told the jury that the bottom box relates to attended close. Right?

A. Yes, sir, to a person of ordinary skill.

Q. Well, let's look at that. So the bottom box says, "If, during unattended operation," that's clearly not attended. Right?

A. Wait. I'm looking for -- oh, you're on the non-highlighted part. Go ahead. Yes, sir.

Q. "-- door travel is halted due to an attended input or input from entrapment protection devices, the door should return to the fully open position."

What that means, sir, is that someone is doing remote operation and something happens in the garage that they can't see. Right?

A. Yes, sir.

Q. Either the door gets caught on a box that slipped into its way. Right?

A. Possibly, yes, sir.

Q. Or someone is in the garage and dad is closing it and mom says, no, no, no, and she goes and hits the button because she wants it to stop. Right?

A. Correct, sir.

Q. But we're talking about unattended operation here. Right?

A. It's mixed operation, no.

Q.   And then it says, one or more attempt at unattended operation should be permitted.  We'll let dad try one more time.  Right?

A.   Yes, sir.

Q.   But it's unattended.  He's downtown.  Right?

A.   I suppose so, sir.

Q.   And then it says, if the second attempt doesn't work, then we're just going stop and we're not going to let dad do this anymore.  Right?

A.   Yes, sir.

Q.   So we're talking about the conditions under which -- we're going to let dad keep trying to close the door in an unattended operation.  Right?

A.   And its interaction with attended input.

Q.   And you read this and you say, wow, the standard was talking about whether to alarm or not in an attended case.  Right?

A.   Yes, sir.

Q.   The bottom box here, the whole problem is that every time dad presses the button, the alarm is going off.  Right?

A.   That might be the first thing that happens, yes, sir.

Q.   And it happens every time.  Every time the door is moved in this bottom box, the alarm is going off.  Correct?

A.   No, sir.

Q.   Well, we just went through them.  The first time he does

Q. it, the alarm goes off. Right?

A. The remote operation.

Q. Yes.

A. It should, yes, sir.

Q. Yeah. Dad is remote. Let's just start with that. The first time he does it, the alarm goes off. Right?

A. It should, yes, sir.

Q. And the second time he tries, the alarm goes off. Right?

A. It should, yes, sir.

Q. And then all this says is we're only letting you try twice and that's it.

A. No, there's a little more than that, sir.

Q. Well, it says the door will then open and stay open. Right?

A. And an attended input should be required to operate the door.

Q. Okay. But that didn't say anything about whether it's alarmed or not. It just means somebody is going to have to go look at the garage and see what the problem is. Right?

A. No, sir.

Q. Well, okay. We'll let the jury -- let me -- let me ask you this, sir. So when it says an attended input should be required to operate the door, does it say one way or the other whether that's alarmed or not alarmed?

A. To a person of ordinary skill it does.

Q.   You read some magic words here that suggest that to you. Is that it?

A.   Just as the Chamberlain engineers did in the next part of the slide.

Q.   Well, because you equate these two using whatever knowledge you think you have about what was happening within DASMA.  Right?

A.   I have a hard time following that, but I -- I think so.

Q.   Okay.  Let's look -- you just showed us a couple of bullets out of this 2005 DASMA subcommittee.  Let me -- let me have the real exhibit.  You cited JTX 59.  Right?

A.   Yes, sir.

Q.   Let's look at the actual bullets.

        MR. CORDELL:  Can I have the second page?  Mr. Lucero, to the extent you can, can you blow up 1 through 8?

Q.   (BY MR. CORDELL)  So if we look at each of these, you looked through these to see which ones were unattended and attended.  Is that right?

A.   I read them all, sir.

Q.   Okay.  And it tells us that this is a procedure for set-up of the operator.  Right?  That's No. 1?

A.   That's No. 1.

Q.   And they want a two-step process to enable remote unattended operation.  Right?

A.   Could be an option.

Q. And we're told we've got to have an audible and visual alarm. Right?

A. That's the next bullet, yes, sir.

Q. And then it talks about entrapment devices, we don't want anybody to be stuck in the garage. Right?

A. Correct.

Q. But that doesn't say anything about alarming or not alarming. Right?

A. Correct.

Q. And then it says, unattended door motion should be cancelable. We want someone who's trapped in the garage or about to be trapped in the garage to make it stop. Right?

A. Correct.

Q. It doesn't say anything about alarming. It just says, we want people to be able to make it stop. Right?

A. Correct.

Q. Bullet 6 is the one you focused on, and it says, well, you know, if there's a problem, we'll let dad try one more time and then we're going to stop, we're not going to let him do it anymore. Right?

A. It's a paraphrase, but sure.

Q. And then 7 says, "Individual manufacturers should specify whether their operators/devices are designed for remote, unattended operation with a fully open door and/or a stopped, partially open door." Right?

A.   Yes, sir.

Q.   DASMA said, you manufacturers need to go back and you decide how you're going to make your own operators.  Right?

A.   Yes, sir.

Q.   They said, you're going to go back and you're going to figure out the how; we're going to just tell you the what. Right?

A.   Partly, sir.

Q.   And you didn't show this paragraph to the jury.  Correct?

A.   That's correct.

Q.   Okay.

A.   Paragraph 7, you mean?

Q.   Yes.  All right.

          MR. CORDELL:  Let's look at one more.  Can I have DTX 34?  Well, before that, can I have DDX 4.35?

Q.   (BY MR. CORDELL)  So here, Doctor Leeb, in the lower left-hand corner, you tell the jury that DASMA started discussing alerting and remoting and not alerting for local closes.  Right?

A.   Yes, sir.

Q.   And you kind of made that sound like you were quoting from something.  Is that right?

A.   I don't know, sir.  I'm not following that question.

Q.   Okay.  Well, so let's look at the documents you were referring to, DTX 34.  And this is one of the emails you

relied on. Right?

A. I'm sure I've seen it, but I relied on for what, sir? Like if you could refresh me where we are. I didn't rely on it or cite it on the calendar slide you just showed, the timeline.

Q. You don't recall that this was a document you relied on, sir?

A. It's a document I relied on. There were many.

Q. Well, the one thing we can say about this one is that this had to do with new legislation, a bill that was passed in Texas, number 1252. Right?

A. Can you point me to where you're looking, sir?

Q. Yes.

MR. CORDELL: Can we scroll down? A bit more. A bit more. Keep scrolling, please. You got to go all the way to the bottom.

Let's just take this down. Thank you.

So let's look at DTX 948. And I'm sorry. Can we start with DTX 4.36. Okay. So 4.36 -- I'm sorry, the next slide. And one more. And one more. My apologies. One more.

Can we try 4.35? There we go.

Q. (BY MR. CORDELL) So the January 2006 email talks about unattended operation and a meeting they had with Joel Hawk. Do you recall that?

A. It mentions that, yes, sir. I mean, I don't have to

recall it. I can read it.

Q. Okay. And you referenced that they were having technical debates at the DASMA subcommittee. Is that fair?

A. I'm not sure I'd use that word, sir.

Q. Okay. Well, it turns out that what they were debating in all these committees were things like how loud the alarm should be. Right?

A. Among other things, yes, sir.

Q. And how long the alarm should go on for. Right?

A. Among other things.

Q. And whether the lights should flash with the alarm or not flash with the alarm. Right?

A. Among other things.

Q. So let's go into one of these documents.

MR. CORDELL: Let's go to DTX 948. And, Mr. Lucero, can you blow up the bullet points at the bottom, 1 through 3?

Q. (BY MR. CORDELL) So you're familiar with this document. Right, Doctor Leeb?

A. I haven't memorized it, sir. I've seen it before, but we're picking a piece of it out and I'm struggling to remember all of it, but go ahead.

Q. You know -- you can recognize that one of the things they were talking about is how loud to make the sound, what is the appropriate level of audible. Right?

A. I believe that's correct, yes, sir.

Q.   And then they asked what is the appropriate frequency. That's not a signal frequency, that's the tone of the alarm. Right?

A.   Yes, sir.

Q.   Should it be a high tone, a low tone, that kind of thing. Right?  Is that right?

A.   I think so, yes, sir.

Q.   And then they said, well, what do we do with partially opened doors?  You know, we got to figure out whether we are going to allow partially open or not.  Right?

A.   It says that, yes, sir.

Q.   And then they said, what about the speed of the door? Should it move fast or slow, that kind of thing?  Right?

A.   It says that, yes, bullet 3.

Q.   There is nothing in here about how to determine whether or not a message is in a format to indicate to an alarm. Right?

A.   Those words aren't in here.

Q.   It doesn't talk about the method of communication at all. Right?

A.   Not in this email.

Q.   It doesn't reference a transmitter and its capabilities. Right?

A.   Not in this email.

Q.   It doesn't talk about the source of communications.

Right?

A. Not explicitly in this email --

Q. Okay.

A. -- or in this -- this quote.

Q. So let's talk about the standard. Now, UL 325 is a safety standard for the operation of doors, gates, and they call them louvers. Those are the coverings for a window? Is that right?

A. I think they also use louvers for the metal doors that come down over, like, businesses at night.

Q. Okay. You weren't aware of the standard before this case. Right?

A. I'm not sure about that.

Q. Well, you certainly didn't know about it when it came out. Right?

A. I would say that's correct.

Q. And all we -- according to Mr. Krupke, all we need to know is that one page of the standard. Right?

A. I'm sorry. Do you want -- could you refresh me on what you're talking about?

Q. Sure. If you could look at volume 2 of the trial transcript at 137 --

A. Just a moment, please. Volume 2. Did you say 137, sir?

Q. I said 137, line 8 through line 11. This is from Tuesday.

A.   Hmmm.

Q.   I'm sorry, Doctor Leeb.  I've steered you wrong.  It's from -- it's a transcript from March of 2022.

A.   Okay.  So I could use help again.  Which binder?

Q.   Yes.  It's in binder one, and I've steered you wrong again.  It's in binder two.

A.   Okay.

Q.   My apologies.

A.   And which tab, sir?

Q.   It's from tab 9, I think?  It says March 2022 transcript.

A.   And which volume?

Q.   Volume 2.

A.   Okay, sir.  Which page?

Q.   137, lines 8 through 11.

A.   Okay.  Thank you, sir.

Q.   All right.  Does that refresh your recollection that all this jury needs to know about UL 325 is contained on one page?

A.   It refreshes my recollection that that was the discussion with Mr. Krupke.

Q.   And that was his testimony, that all the jury needs to see is one page.  Right?

A.   That is the testimony, yes, sir.

Q.   Okay.  And that page is on JTX 44 at page 85.

MR. CORDELL:  Can I have that?

Q.   (BY MR. CORDELL)  This is the page.  Right, sir?

A.   It doesn't say that in the transcript, but I think that's what was being talked about.  Probably also it's really -- there's a little piece of it on the previous page also.

Q.   Well, I can show you the previous page if that's helpful.

MR. CORDELL:  Can I have --

THE WITNESS:  It might be.  I don't know what your question will be.

Q.   (BY MR. CORDELL)  Well, my question is, does the jury need to look at anything in the standard other than section 32.5.1?

A.   I think there might be helpful stuff elsewhere as well.

Q.   Well, you haven't identified anything else.  Right?

A.   Yes, I have.

Q.   Okay.  I'll leave that for your counsel.

UL 325 has very simple requirements.  Correct?

A.   I wouldn't put a value judgment on it, simple or hard.

Q.   Okay.

MR. CORDELL:  Can I have JTX 44 again back at page 85?  There we go.

Q.   (BY MR. CORDELL)  So this has been the focus of anybody that's talked about UL 325.  Right?

A.   No, sir, I'm not sure I'd agree with that.

Q.   Okay.  UL 325 requires an alarm that has a certain volume and has the flash and it has to be for five seconds' duration.  Right?

A. There's more, but yeah, and it's for unattended operation. But, yes, sir, I mean, you've paraphrased that generally.

Q. It doesn't say anything about attended operation here. Correct?

A. Hold on. I don't think I agree.

Q. It doesn't tell us -- we don't have any electrical schematics here. Right?

A. Agreed.

Q. It doesn't tell us that you can't alarm for attended operation. Correct?

A. It's not required.

Q. Okay. And it certainly doesn't require that you not alarm for attended operation. Right?

A. It's not required.

Q. You said a few moments ago or this morning that a system that always alarms any time the door moves would be compliant with UL 325. Right?

A. Correct.

Q. UL 325, the standard doesn't say anything about using a transmitter code -- transmitter ID code for any purpose. Correct?

A. Not precisely, sir.

Q. Well, not at all. You don't find transmitter identification code anywhere in UL 325. Correct?

A.   Not precisely, sir.

Q.   You don't dispute that transmitter identification code does not appear in the UL 325 document.  Correct, sir?

A.   If you mean a search for transmitter identification code, I haven't done it, but I think that might -- that would fail. You might not find those black-and-white words.

Q.   Look at your deposition, sir, of July 11, 2022.

A.   Hold on, please, sir.  Which binder?

Q.   That's in the first binder, tab 3.

A.   I think I've got it.

Q.   All right.  Page 138, lines 10 through 13.

A.   Hold on, please, sir.  Exactly.  Okay.  Go ahead, sir.

Q.   Okay.  You don't dispute that the words 'transmitter identification code' do not appear in the document.  Correct?

A.   Quote, transmitter identification, quote, unquote, correct.

Q.   UL 325 standard doesn't say anything about using a code format for any purpose.  Right?

A.   I'm not sure I agree.

Q.   UL 325 standard doesn't say anything about using a signal frequency for any purpose.  Correct?

A.   I disagree.

Q.   There's no use of a determination in 32.5.  Right?

A.   I believe that's correct.

Q.   And Mr. Rauscher told us that UL 325 doesn't have

anything to do with determinations.  Right?

A.    Well, do we -- we could pull up his testimony.

Q.    Okay.

MR. CORDELL:  Can I have Mr. Rauscher's testimony from Tuesday at 131, lines 15 through 17?

THE WITNESS:  I've got it.  Thank you, sir.

Q.    (BY MR. CORDELL)  Okay.  And you agree that UL 325 doesn't tell us anything about determinations.  Correct?

A.    Yes, sir.

Q.    And it is your opinion that there are many ways to implement UL 325.  Correct?

A.    Yes, sir.

Q.    You don't have to use Chamberlain's technology in order to comply with UL 325.  Right?

A.    Absolutely.

Q.    You could satisfy UL 325 by putting a motion detector in the unit to see if anybody was around.  Right?

A.    I don't know.

Q.    You might be able to use GPS technology to determine whether the garage was attended or unattended.  Correct?

A.    I don't know, sir.

Q.    The patent says you need to use transmitter identification codes to arbitrate whether or not to alarm when you get a code.  Right?

A.    Loosely stated and for one of the claims, but yes, sir.

Q.   Okay.  You don't have to use identification codes to trigger the door to close with an alarm.  Right?

A.   In general, sir, or in the claim with the identification codes?

Q.   Well, in general.  It's not mandatory -- it's not the only way to implement a UL 325 system is to use transmitter codes.  Correct?

A.   Agreed.

Q.   Mr. Rauscher told us that the UL tells us what to do, not how to do it.  Right?

A.   Do you want to bring up his testimony?

Q.   Sure.  It's Tuesday, volume 2 --

A.   Hold on.  Hold on.

          THE COURT:  In the interest of time, why don't you just put it on the screen.  It will be a lot quicker --

          MR. CORDELL:  Thank you, Your Honor.

          THE COURT:  -- since he asked to see it.

          MR. CORDELL:  Page 128, line 22 through 129:5.

Q.   (BY MR. CORDELL)  Question:  "You understand, sir, that there's nothing at all in the UL standard that tells you how to implement.  Correct?"

     Answer:  "Implement what?"

     "Implement the standard.  Isn't that true?"

     Answer:  "It directs the requirements that are necessary for a product to comply.

"But isn't it true, sir, that there's nothing that tells you how to implement the requirements?  Correct?"

Answer:  "It doesn't instruct how, yes."

You recall that.  Right?

A.    Yes, sir.

Q.    Okay.  Now, Doctor Leeb, were you here in the courtroom when Mr. Buescher, Overhead Door's lead hardware engineer, testified?

A.    Yes, sir.

Q.    Do you recall him testifying that he regularly looks at Chamberlain's products to ascertain their hardware architecture?

A.    Can we bring up his testimony, sir?

MR. CORDELL:  Sure.  Can I have yesterday's transcript at page 8, line 16 through 22?

THE WITNESS:  Where are you, sir?

MR. CORDELL:  I am -- I need trial 2023, volume 3, page 8, line 16 through 22.  I'll put it on the elmo.

Q.    (BY MR. CORDELL)  Okay.  So do you see, Doctor Leeb, Mr. Buescher testified -- well, he was asked, "When you were designing the hardware for the combo board, for example, were you also looking at Chamberlain's products?"

THE COURT:  Can you slow down a little bit when you read, Mr. Cordell?

MR. CORDELL:  I'm sorry, Your Honor.

Q.    (BY MR. CORDELL)  "I regularly look at Chamberlain's products.

"And so what types of things do you look at when you're looking at Chamberlain's products?"

Answer, "I look at what I can ascertain of their hardware architecture, for example, from examining the board.

"Anything else?

"I look for things that they may be doing in a more cost effective way than we do."

Do you recall that, sir?

A.    Yes, sir.

Q.    And he also admitted that he reviews Chamberlain's patents.  Do you recall that?

A.    I'd ask you to show me the testimony, but at a high level, sure.

Q.    At line 9, "And in the context of analyzing Chamberlain's products, you were asked about your team buying Chamberlain's products.  Do you recall that?"

Answer, "Yes."

A.    Yes, sir.

Q.    And then down below he says --

THE COURT:  Just a minute.  Did I hear a device play music or sound?  Somebody got a phone that went off?

MR. RAUSCHER:  Yes, Your Honor.  I deeply apologize.

THE COURT:  All right.  Mr. Barnet, if you'll take

the cell phone and remove it from the courtroom.  He can pick it up when court's not in session.

MR. RAUSCHER:  Can I leave with it?

THE COURT:  You may leave with it or you may send it out, but it's not going to stay in the courtroom.

MR. RAUSCHER:  I'll leave.

THE COURT:  That's fine.

Let's continue, counsel.

Q.   (BY MR. CORDELL)  Question:  "And you were also asked about analyzing Chamberlain's products.  Have you also reviewed Chamberlain's patents?"

And the answer was, "Yes."

Do you recall that?

A.   Yes, sir.

Q.   And that's the head guy of Overhead Door's hardware design.  Right?

A.   Yes, sir.

Q.   And then do you recall Mr. Krupke, Overhead Door's corporate representative, admit that he does or when he was with the company he did testing of Chamberlain's products?  Do you recall that?

A.   At a high level, yes, sir.

Q.   Do you recall that he said he studied Chamberlain's products?  Right?

A.   Well, if you want me to say exactly what he said, I'd

like to see the testimony. That idea was expressed, yes.

Q. Well, let me just ask you this. And do you recall that Mr. Krupke admitted that he, too, became aware of the '404 Patent back in 2014?

A. I don't remember the year, sir, but I do remember that he was aware of it.

Q. And you certainly recall Mr. Rauscher, the chief software engineer, when he said that he studied Chamberlain's patents. Right?

A. Yes, sir.

Q. And he put it into that software specification that we've all seen. Right?

A. Yes, sir.

Q. So we have the head of hardware engineering, the head of software engineering, and the man who used to be the head of the whole outfit, all studying Chamberlain's products and patents. Right?

A. I'm not sure the preamble characterization of their positions was correct, sir, but the back I think was.

Q. Thank you.

MR. CORDELL: Your Honor, I pass the witness.

THE COURT: All right. Is there redirect, Mr. Pathmanaban?

MR. PATHMANABAN: Very briefly, Your Honor.

THE COURT: All right. Proceed with redirect.

MR. PATHMANABAN: Mr. MacQueen, can you pull up JTX 44 and page 22, please?

REDIRECT EXAMINATION

BY MR. PATHMANABAN:

Q. Doctor Leeb, you were asked -- counsel for Chamberlain asked you questions about one page in the UL standard.

A. Yes, sir.

Q. And is this also, this page 22 from JTX 44, is this also something you relied on your opinions?

A. Yes, sir.

Q. And what does it say specifically with respect to wired and wireless control?

A. It's defining them. So, in other words, UL 325 has the concept of both a wired like a button control and a wireless control like a clicker or other things like a -- it says, radio waves, for example, or infrared beams.

Q. So what does that tell you in terms of whether these are transmitters or transmission methods and whatnot?

A. That there's an open -- a lot of different kinds of transmitters for UL 325.

Q. That are disclosed in UL 325?

A. Absolutely.

Q. Counsel asked you questions about some determinations that Mr. Rauscher testified to.

A. Yes, sir.

Q.    You said you wouldn't use that word because it risks confusion.  Is that what you said?

A.    That is.

Q.    Can you explain, please, why do you think it risks confusion?

A.    Sure.  Because the determination at issue here is the determination of the '404 Patent claims, which is a very specific determination to determine whether or not to alarm based on the source of a signal or something about the source of the signal.  Using the word 'determination' for other things, like safety checks, is why I said it, quote, risks confusion.

Q.    Okay.  And counsel showed you this flip chart -- Right?

A.    Yes, sir.

Q.    -- that was created during Mr. Rauscher's testimony?

A.    Correct, sir.

Q.    He said these are all determinations of various kinds for validation and authentication.  Right?  Or -- or whether it's safe to move the door?

A.    I wasn't clear Mr. Rauscher used the word 'determinations' every time, but that was the gist of the conversation between Mr. Elacqua, I think, and Mr. Rauscher.

Q.    Okay.  Taking Mr. Rauscher at his word, are any of these so-called determinations, do any of them have anything to do with the claims of the '404 Patent in this case?

A.    No, sir.

MR. PATHMANABAN:  Pass the witness, Your Honor.

THE COURT:  Additional cross examination?

MR. CORDELL:  No, Your Honor.  Thank you.

THE COURT:  All right.  Doctor Leeb, you may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  You're welcome.

MS. TULL:  Your Honor, may we ask that the demonstrative be removed for the next witness?

THE COURT:  We'll do it when we break for lunch unless there's some compelling reason to do it now.  We'll save the time and keep moving.

Call your next witness, Defendants.

MS. TULL:  Your Honor, we call Mr. Michael Tate to the stand.

THE COURT:  All right.  Mr. Tate, if you'll come forward and be sworn.

MS. TULL:  And may I have permission to distribute binders and approach as needed?

THE COURT:  Yes.

MS. TULL:  Thank you.

THE COURT:  Just raise your right hand from there.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Just come around and have a seat here at

the witness stand.

Ms. Tull, you may proceed with direct examination.

MS. TULL:  Thank you.

MICHAEL TATE, SWORN,

testified under oath as follows:

DIRECT EXAMINATION

BY MS. TULL:

Q.   Good morning, Mr. Tate.

A.   Good morning.

Q.   Could you please introduce yourself to the jury?

A.   Sure.  My name is Mike Tate, and I'm a vice president at a consulting firm by the name of Charles River Associates.

Q.   Have you prepared expert opinions in this case?

A.   I have, yes.

Q.   At a high level, what do your opinions relate to?

A.   So at a high level, they relate to the damages issues in this case.

Q.   And have you prepared any materials to accompany your testimony today?

A.   I have.

Q.   What are they?

A.   I have a series of slides that I'll use throughout my testimony that will help explain some of the concepts that I'm talking about.

Q.   Are those the slides that we see on the screen now?

A.   They are.

Q.   Have you provided opinions related to damages before?

A.   I have.

Q.   And how many times?

A.   So at this stage in my career, I've probably prepared in excess of 200 patent infringement damage evaluations.

Q.   How many times have you testified in court before?

A.   So today marks the 36th time that I've either testified in court or at an arbitration proceeding.

Q.   And where do you work now, Mr. Tate?

A.   So, as I mentioned, I am a vice president at an economic consulting firm by the name of Charles River Associates.

Q.   And what is Charles River Associates?

A.   So CRA is a -- a consulting firm that focuses on, among other types of consulting projects, projects involving patents, and -- and we perform that work in the context of valuing patents, in other words, how much are they worth, helping clients license their patents, as well as determining damages in cases like this.

And so most of the work that I do involves patents and economic issues surrounding patents.

THE COURT:  Mr. Tate, would you move the microphone a little?

THE WITNESS:  This way?

THE COURT:  That way when you turn to the jury,

we'll get the amplification.  And if you could slow down a little bit with your answers, it would be helpful.

THE WITNESS:  Sure.  Understood.

THE COURT:  Thank you.

Please continue, counsel.

Q.  (BY MS. TULL)  How long have you worked at Charles River Associates?

A.  So I've been at Charles River now approximately 18 years, a little bit over 18 years.

Q.  What did you do before working there?

A.  So prior to CRA, I worked at several other consulting firms, including A.T. Kearney, which is a management consulting firm, and the accounting firm of Pricewaterhouse. And I was at those firms collectively for about 17 years.

Q.  And could you please tell the jury about your education?

A.  Sure.  I have a Bachelor of Business Administration degree in finance from the University of Houston.  On graduating from U of H, I enrolled at the Krannert School of Management at Purdue University where I received what's called a master of science in industrial administration degree.  And that's similar to a master of business administration degree.

MS. TULL:  Your Honor, at this time we proffer Mr. Michael Tate as an expert in the calculation and analysis of patent damages.

THE COURT:  Is there objection?

MS. SMITH: No objection, Your Honor.

THE COURT: Then, without objection, the Court will recognize this witness as an expert in those fields.

Please continue with your direct examination.

Q. (BY MS. TULL) Mr. Tate, is the company that you work for, CRA, are they being compensated for your time in this case?

A. They are.

Q. And what is that rate of compensation?

A. They charge $795 per hour.

Q. Does your compensation depend in any way on the outcome of this case?

A. No.

Q. Mr. Tate, to be clear, are you saying that the jury has to award damages?

A. No.

Q. Why not?

A. So in cases like this, Mr. Britven and myself as damages experts, in order to do our work, we have to assume that the patents are valid and infringed. If the patents are found to be either invalid or not infringed, there would be no damage.

Q. And what did you consider in performing your analysis?

A. So I considered lots of information that I had available to me. Both parties produced information in this case, and I had a chance to review and analyze that information. I have a

slide which highlights some of the high-level areas of things that I reviewed.

They include Chamberlain accounting and financial documents as well as Overhead Door financial and accounting documents, including JTX 55.1 through 55.8.

I also reviewed the expert reports of the Chamberlain expert witnesses that you've seen so far at this trial.

I had data relating to the usage of the '404 Patent, including JTX 53 and 63.

I reviewed various license agreements that are relevant to the damages analyses in this case, including JTX 9 and 10.

I also reviewed many, if not all, of the deposition transcripts that were taken in the case, as well as I was here throughout the trial thus far and heard the trial testimony.

I had discussions with Doctor Leeb, as well as a review of his expert reports.

And then, lastly, I had discussions with various Overhead Door personnel.

Q. Okay. You mentioned that you were here for the trial testimony. Were you here for Mr. Britven's testimony?

A. I was, yes.

Q. Do you agree with Mr. Britven's damages opinions?

A. So we have many areas of agreement, but we have a disagreement on whether or not lost profits are appropriate in this case. In my opinion, lost profits are not appropriate.

Q.   And in your opinion, Mr. Tate, what is the correct amount of damages if the patent is found to be valid and infringed?

A.   So if the patent is found to be valid and infringed, in my opinion, damages should be based on what's called a reasonable royalty, and the reasonable royalty dollar amount is $2.6 million.

Q.   Focusing first on lost profits, why do you disagree with Mr. Britven's opinions with respect to lost profits?

A.   So if we can go to the next slide or several slides. There we go.

So what I have on this slide is what's called the *Panduit* factors, and I think Mr. Britven in his testimony called this the test for lost profits.  And so in order for a claim of lost profits to be appropriate in a case like this, you have to meet each of these tests.  And in my view, Mr. Britven has not adequately met all of the *Panduit* factors.

Q.   And, in particular, what *Panduit* factors do you disagree with?

A.   So there are a number of the factors.  They include manufacturing capacity to meet the demand, they include the absence of acceptable non-infringing substitutes, as well as the quantification of lost profits and the appropriateness of lost profits.

Q.   Starting with manufacturing capacity, why do you disagree with Mr. Britven's opinions with respect to manufacturing

capacity?

A.   Sure.  So we've heard some testimony about the challenges that Chamberlain had as a result of the COVID-19 pandemic. Beginning in about March of 2020, the pandemic caused supply disruptions, inventory disruptions, and shortages, and it's my view that that challenge and those issues extended beyond the 2020 period into 2021 and into 2022.

In addition, as it relates to capacity, not only do you have to prove as a damages expert that the patent owner had capacity to manufacture the additional product, but you also have to prove that the suppliers of raw materials and component parts had capacity to provide additional supplies and -- and components in order to make any additional claimed lost sales.  And I believe Mr. Britven has not adequately addressed that.

Q.   Were you present in court when Ms. Alexander testified that Chamberlain lost around 18 to $30 million from their plant shutdown in 2020 due to COVID?

A.   I was.

Q.   Do you know who at Chamberlain received that information, who it was reported to?

A.   I do.

Q.   Who is that?

A.   So a number of people, and -- and one was the president of the company, Jeff Meredith.  Secondly, the board of

directors of -- of Chamberlain Group received information relating to those losses.

Q. Did you see any evidence of manufacturing or supply issues at Chamberlain, the follow-on effects from the pandemic, after 2020?

A. I did.

Q. Looking first at JTX 71, what is this document?

A. So this is an internal Chamberlain email. It's dated April 8th, 2021.

Q. And how does this relate to your opinion on manufacturing capacity?

A. So if we can go to the next slide, please.

So what I've highlighted here is -- is chamberlain is stating that its business at Lowe's, that's a retailer, is shrinking due to the competitive placement caused by the COVID-19 shutdown. And then Chamberlain estimates that loss to potentially be $18 million during 2021.

Q. Now, outside of what Ms. Alexander testified about, did the board continue to receive updates about inventory and back order issues? And by the board, I mean the board of directors. Did they continue to receive updates regarding inventory, back order, and supply issues past 2020?

A. They did, yes.

Q. Looking at JTX 73, what is that document?

A. So this is a Chamberlain Group presentation to the board

of directors, and this particular presentation to the board was dated June 24th, 2021.

Q. And what does slide 22 tell the board?

A. So this is an excerpt presented to -- to the board, and what this slide relates to are the status of various open orders of products. And the graph that you see on the slide measures open orders from April of 2020 on the left-hand side of the graph, through June of 2021 on the right-hand side of the graph.

And if we can focus on the very top portion where we see the orange-colored line or -- or row, that reflects out-of-stock product. And so, in other words, product that was ordered but could not be fulfilled.

And in June of 2021, that out-of-stock product was represented to the board to be $9.3 million.

Q. And looking at JTX 74, what is this document?

A. So this is a similar document to what we just looked at, but this is a Chamberlain Group board of directors presentation, dated September 9th, 2021, so about two months after the last presentation that we just looked at.

Q. And what information is being conveyed in slide 24?

A. Yes. So this graph is -- is very similar to what we just looked at except now they've updated it and it extends through August of 2021. And here again, reflecting on the very top line, the orange-colored row on the -- on the graph, that

represents, again, out-of-stock product, and we see in August of 2021 there was $10.9 million of out-of-stock product.

Q. Now, with what we've looked at on -- from the June 2021 presentation to the board of directors and the September 2021 presentation to the board of directors, how does that information relate to your understanding of Chamberlain's ability to meet demand?

A. Well, these are products, the out-of-stock products, that were ordered by a customer, but Chamberlain was unable to fulfill those particular orders at the particular time that they were ordered.

Q. And what is the relationship between the number of products that Chamberlain could not fulfill going from June to September?

A. So the number has increased by about $1.6 million from June to December.

Q. And looking at slide 77 from the September 9th, 2021, presentation, JTX 74, what information is being conveyed to the board of directors here?

A. Yeah. So what this particular slide represents is it's talking about some of the components that go into the Chamberlain products. This particular slide relates to the electronic componentry. So we've seen a lot of pictures throughout the trial here, and -- and you can sense that there's a lot of electronic components in these products.

And so this particular slide is talking about those components and the shortages that were being experienced by Chamberlain with respect to those products. In particular, it's talking about long lead times. So you can see at the very bottom of the slide or third bullet point of the slide, normally there's an 8- to 12-week lead time, but post COVID the lead time, per the top bullet, was 8 months to over 14 months for these products. So the lead time has elongated significantly.

In addition to that, if we focus on the second bullet, you can see that there were shortages of -- of these products and that these shortages as being reported to the board were going to extend through 2022.

Q. And in your review of materials in this case, did you see evidence of shortages extending through 2022?

A. I did, yes.

Q. And what evidence is that?

A. So as part of the work that I did in this case, I -- I reviewed and analyzed some of the distributor and retailer information in the marketplace of the Chamberlain products. And what I found was some of those retailers in as late as late 2021 into 2022 were facing out-of-stock orders where they had to divert product from the Chamberlain product which they couldn't get to other competitors' products.

And then I also found that many of the retailers that I

reviewed had statements on their website that if you went to the website and tried to order a Chamberlain product, they notified the customer that, due to nationwide shortages, there might be a slowness in getting the product or significant delays in getting the product.

MS. TULL: And, Mr. MacQueen, if we could take the presentation down for the moment, please. Thank you.

(BY MS. TULL) Mr. Tate, you heard Mr. Britven's testimony about an October of 2021 statement by Chamberlain. Correct?

A. I did, yes.

Q. And, in particular, Chamberlain stated that, supply issues due to COVID-19 over the last 12 to 18 months have hit the GDO and GO industry hard and are continuing to do so.

Are you familiar with that statement?

A. I am. That's something that I relied upon in doing my work, yes.

Q. And when Chamberlain is referring to the GDO and GO industry, how does that relate to Chamberlain?

A. Yes. So, you know, we heard Ms. Alexander on Monday testify that Chamberlain's current market share of the entire industry is about 65 percent. Based on my work, during the whole damages period, their market share was in excess of 70 percent.

And so when you see reference to the industry,

Chamberlain is really the vast majority of -- of the garage door opener industry.

Q. And so how does Chamberlain's statement that supply chain issues have hit the garage door opener industry hard and are continuing to do so, how does that statement in October of 2021 impact your opinion on manufacturing capacity?

A. Well, it tells me that Chamberlain was impacted by supply chain bottlenecks and -- and supply shortages because they are a vast majority of the industry and it's a statement that they made.

Q. Now, you were also present in court when Mr. Britven said that he wasn't seeking lost profits from March of 2020 to December of 2020. You were here for that, Mr. Tate?

A. I was, yes.

Q. Does that solve the problem?

A. No. It goes part of the way, but I think that these issues, as I mentioned, continued beyond 2020 into 2021 and into 2022. And so making the adjustment only in 2020 I don't think goes far enough. I think you need to go beyond that into 2022 and -- I'm sorry, 2021 and 2022.

Q. Based on the evidence that you reviewed, did Chamberlain prove that it had the manufacturing capacity to meet demand?

A. In my opinion, no.

Q. Did you consider Mr. Britven's other opinions regarding lost profits?

A.   I did, yes.

MS. TULL:   And if I could have the slides back up, please.   Thank you.

Q.   (BY MS. TULL)   And, in particular, I'd like to focus in on the discussion for demand for the features of the claimed invention.   Okay?

A.   Okay.

Q.   What is the patented feature of the '404 Patent?

A.   Yes.   So from -- from my perspective, my understanding is it's one way to comply with the UL 325 standard that we've heard about, and that is, it allows for the garage door operator to sound an alarm when the door is closed remotely.

Q.   And to be clear, just simply opening and closing your garage door with a Smartphone, that is not the patented invention of the '404 Patent.   Correct?

A.   That's my understanding, yes.

Q.   Turning to JTX 7, what is this document?

A.   So this is an Overhead Door internal document.   It relates to Overhead Door's connected platform products, and it's dated June of 2021.   And it's PTX 7.

Q.   And -- JTX 7.   Is that correct?

A.   I'm sorry.   JTX 7, yes.

Q.   And with respect to page 3 of JTX 7, what is shown here?

A.   So what -- what this shows, it's a survey that was performed on behalf of Overhead Door, and it shows per the

survey the ranking, customer ranking, of the most important GDO features.

Q. And what are the top two features that the customers identified?

A. So is reliable and has a long life.

Q. Do those have anything to do with the patented invention of the '404?

A. My understanding is they do not.

Q. And where does have a Smartphone app rank?

A. So I believe there are 11 features that were mentioned here, and has a Smartphone app ranked 10th of 11. So at the bottom of the surveyed features.

Q. I'd like to turn your attention now to JTX 54. What is this document?

A. So this is a piece of marketing literature. It's a Genie piece of marketing literature, and it happens to relate to the product that's called the Silent Max Connect, Model 3053. And that particular model is actually the largest selling model of all the accused products in this case.

Q. And the next slide has a number of call-outs from page 2 of this document. What is shown -- what is shown in these excerpts?

A. So in this particular marketing literature, these are the features that Overhead Door or Genie highlight with respect to this particular model.

Q. And in the left-hand column, we see standard features regarding door safety sensors and monitoring and diagnostic technology. Do you see those?

A. I do, yes.

Q. Do those have anything to do with the '404 Patent?

A. It's my understanding they do not.

Q. And the middle column that starts, the identification of special features--the DC motor, the motor warranty, the SmartSet programming, the ultra quiet operation--do those have anything to do with the '404 Patent?

A. My understanding is they do not.

Q. What is the ultra quiet operation that Overhead Door advertises?

A. Yeah. So we see here reference to ultra quiet operation. It's on the very bottom of the middle column. What that refers to is the steel-reinforced belt-drive system paired with a quiet DC motor which offers minimal noise.

And so when you see quiet or ultra quiet, that references the drive, that's the thing the door moves back and forth on, as well as the motor itself.

Q. And in the right-hand column, do auto seek dual frequency, preprogrammed remotes, or easy installation, do those have anything to do with the '404 Patent?

A. My understanding is they do not.

Q. And the last feature, Aladdin connect Smartphone

connectivity, how, if at all, does that relate to the claimed invention of the '404 Patent?

A. So Smartphone connectivity, and we've heard a lot about in this case, it's a very broad feature set. It has a lot of functionality in it. And so you can see here it relates to opening and closing the door. It allows you to, you know, monitor the door. It allows you to schedule an opening of the door so if you have a child that's coming home from school, you can open the door at a certain period of time and let the child in. If you have a delivery coming in, you can do the same thing. There is some video capability associated with -- with that, and there's also you can look at the history of the door.

Now, as it relates to the '404 Patent, it is not specifically highlighted here, nor is the UL 325 compliance. And so this doesn't specifically highlight or market that functionality.

Q. I'd like to switch gears and talk about non-infringing alternatives. Mr. Tate, in your opinion, has Chamberlain met its burden with respect to non-infringing alternatives?

A. No.

Q. And you were here for Mr. Britven's testimony regarding non-infringing alternatives. Correct?

A. I was, yes.

Q. Why do you disagree with Mr. Britven's analysis regarding

non-infringing alternatives?

A. Yeah. So when a damages expert prepares or -- or attempts to prepare a claim for lost profits, one of the things we have to do is what's called reconstruct the marketplace.

So what does that mean? It means that we have to take Overhead Door and they can't use the alleged technology, the '404 Patent. And then we have to ask yourselves, well, what would Overhead Door have done had they not had use, alleged use, of that technology? And so we determine what they would have done in that reconstructed marketplace.

And in this case, Mr. Britven has assumed in his analyses that Overhead Door would essentially exit the WiFi GDO marketplace. So, in other words, 30 percent of their sales, they would let those go to a competitor.

In fact, in my reconstructed market, I believe Overhead Door had alternatives that they would have employed in order to maintain their sales and -- and their position in the marketplace. So I believe he's inappropriately reconstructed the marketplace.

Q. And so to be clear for those of us that aren't financial analysts, is it your understanding that Overhead Door would not just walk away from the 30 percent share of the WiFi garage door operator market?

A. Yes.

Q.   Now, did you identify any acceptable non-infringing alternatives?

A.   I did, yes.

Q.   What's the first non-infringing alternative that you considered?

A.   Yeah.  So the first alternative that would be an option to some of Overhead Door's customers would be the non-WiFi GDO.

Q.   And in the reconstructed market that you discussed, would some of the Overhead Door customers we're talking about, would they have purchased a non-WiFi GDO?

A.   Yeah, they would potentially have -- have purchased a non-WiFi GDO.  It would have been available to them to purchase if they chose to do that, yes.

Q.   And why do you believe that this would be an acceptable alternative?

A.   So in order to -- to look at that issue, I prepared an analyses of various Overhead Door financial and accounting information.  And so the first thing that I did is I wanted to determine how many total sales of both WiFi-capable and non-WiFi GDOs did Overhead Door sell during the damages period.  And that's what you see reflected on this slide by the orange bar.

Q.   And what did you do next?

A.   So next I wanted to see of those sales, of this total

sales, how many were WiFi-capable products. And based on the results of my financial analyses, I determined that about 29 percent of the total GDOs that Overhead Door sold during this period were WiFi-capable. And so, said another way, 71 percent were not.

Q. And what was your next step?

A. So next I wanted to understand how many of the users or purchasers of the WiFi-capable GDOs actually connected on their cell phone with the Aladdin connect app. And, remember, unless you connect with that app, you can't use the WiFi capability.

And so based on my analyses, I determined that of the purchasers of WiFi-capable GDOs, about 23 percent of those purchasers actually connected with the app during the damages period. So, in other words, about one out of four of those WiFi-capable purchasers actually connected with the app; or, said another way, three out of four did not.

Q. How does the fact that three out of four purchasers of the WiFi GDOs, that three out of four of those individuals chose not to connect to the app, how does that relate to your opinion on non-infringing alternatives?

A. Well, I think this is a point that I think Mr. Britven and I agree on this point. There are certain customers that don't prioritize WiFi capability, even if they purchase the WiFi GDO. And so it's this pool of customers, the 75 percent,

that could potentially choose a non-WiFi GDO in this reconstructed market.

Q.   Now, did you consider any non-infringing alternatives that did include WiFi?

A.   I did, yes.

Q.   And I think the jury has heard about it a couple of times now, but are you familiar with a stipulation between the parties that the '404 Patent is not the only way to comply with the UL 325 standard?

A.   I am familiar with it, yes.

Q.   And how did that impact your understanding of available non-infringing alternatives?

A.   Well, what this -- what this stipulation says is that there's other ways to -- to accomplish the UL 325 standard without using the technology in the '404 Patent.  So, by definition, that means there are alternative ways to accomplish UL 325.

Q.   And did you identify an acceptable alternative?

A.   I did, yes.

Q.   What is that?

A.   So the alternative would be to sound an alarm for both attended and unattended closures.

Q.   And is it your understanding that that is a non-infringing alternative?

A.   That is my understanding, yes.

Q.    And did you hear Mr. Britven confirm that understanding?

A.    He did, yes.

Q.    And would that technology -- would Overhead Door have had the hardware and the software, would that technology have been available to Overhead Door to implement in their products going back to 2017?

A.    That's my understanding, yes.

Q.    Now, how does the alternative that you propose, how does that differ from the current products?

A.    Yeah.  So remember the demonstration--I think it was with Doctor Leeb; I think it's still out there--the demonstration that took place, and when the button was pressed on the app for both the opening and the closing, the Overhead Door product beeped.  It sounded an alarm.

So Overhead Door's actual product beeps for both unattended opening and unattended close.  Remember it's only the close unattended beep that's the UL 325 compliance, but it also beeps for a time for the unattended open.

Q.    How does this relate to the alternative you're proposing?

A.    So the alternative that's being proposed is the unattended open alarm that would move down to the attended close alarm.  So the actual product beeps twice, and the alternative I'm proposing would beep twice.

Q.    And why do you believe that would be an acceptable alternative to Overhead Door's customers?

A. So, first, with the exception of that change, the products are identical. What was actually sold and the alternative I'm suggesting, they would work in the same fashion.

Secondly, there were 1.3 million units of the accused product sold. Those products beeped twice, both for the unattended opening and close. The alternative I'm proposing would beep twice. And so because it was acceptable with two beeps in the real world, the alternative reconstructed world with two beeps, in my view, would also be acceptable.

Q. Would Overhead Door have had to change any other features or functionalities in its products, the features that we saw listed in the survey, for example?

A. No. It would work exactly the same way.

Q. Okay. Mr. Tate, do you have any other evidence that supports your conclusion that this is an acceptable alternative?

A. I do, yes.

Q. What is that?

A. So there was another manufacturer, and I think we heard reference to this at some point during the last couple of days, called Ryobi. And Ryobi actually manufactured a product that beeped both for attended closing and unattended closing.

Q. What evidence do you have that this would be an acceptable alternative?

A.   So based on some analysis I did, I determined that Ryobi actually sold over 62,000 units of this product in a single year.  And so, in my view, 62,000 customers purchased the product and they believed the product was acceptable sounding an alarm in this fashion.

Secondly, the product was purchased by a single retailer, the Home Depot, and Home Depot put this product on the shelf right next to the Chamberlain products that are at issue here, and some of the Overhead Door products that aren't at issue here but they were also on the shelf.  And Home Depot obviously believed that that product was acceptable; otherwise, it wouldn't have put it on its shelf.

And then, importantly, Chamberlain believed the product was a commercial success and acceptable, and they deemed it to be a competitive threat to some of the very same products that you see at issue in this case.

Q.   Now, Mr. Tate, you heard Mr. Britven questioned yesterday as to did he believe consumers had spoken as to what they thought of the Ryobi product?  Do you recall that question?

A.   I do.

Q.   And do you recall his answer?

A.   He said that he believed because it was off the market, it wasn't available, that it wasn't a success.

Q.   Do you agree with that?

A.   No.

Q. Why not?

A. Well, the reason the product is not currently on the market has nothing to do with the alarm sounding or the acceptability of the product; it has to do with a competitive -- competitor forcing it off the market.

Q. And so, in your opinion, was the Ryobi product commercially successful?

A. Yes, it was acceptable and successful for the year period of time it was on the market, yes.

Q. And is the fact that it's no longer for sale, does that have anything to do with the beeping of the alarm during attended closure?

A. Absolutely not.

Q. Now, Mr. Tate, given everything that we've discussed, what is your opinion with respect to lost profits?

A. So based on Chamberlain's capacity challenges, based on the numerous functionalities and attributes that drive the sale of the overall GDOs, and based on the alternatives that Overhead Door had available to it, I believe lost profits are not appropriate in this case.

Q. And to be clear, if the jury finds that lost profits are not appropriate, how much money should be awarded for lost profits?

A. Well, zero dollars would be awarded for lost profits in that event.

Q.   And, in your opinion, what is the appropriate type of damages that should be awarded in this case then?

A.   So I believe that the damages, if warranted, should be measured based on what's called a reasonable royalty.

Q.   And how is a royalty calculated?

A.   So when we think about a royalty, we think about a formula, and we think about royalty base times a royalty rate gives you the royalty dollar amount.  So base times rate gives you dollar amount.

Q.   And do you agree with Mr. Britven regarding the royalty base in this case?

A.   Yes.  He and I are in agreement with respect to the number of units that would be in the royalty base.  We agree on that issue.

Q.   Do you agree with Mr. Britven with respect to the royalty rate?

A.   No.  We have a slightly different royalty rate.  You'll see in a moment my opinion is $2 per GDO, and Mr. Britven, as you heard yesterday, his opinion is $7 per GDO.

Q.   How do you calculate a royalty rate in a patent damages case?

A.   So when we look at a royalty rate, we construct what's called a hypothetical negotiation.  And it's called hypothetical because it didn't happen in the real world.

And so in this instance we have Chamberlain and Overhead

Door, they would sit down at the table, if there were the table in front of us here, and they begin to negotiate. They would do various analyses, including an analysis of what's called the market approach; they would look at what's called the income approach; and then they would look at various factors of the *Georgia-Pacific* framework that you heard Mr. Britven discuss yesterday.

And at the end of that negotiation, the outcome would be a royalty amount or rate for use of the '404 Patent.

Q. Okay. And Mr. Britven talked yesterday, I believe, about a comparable license approach and a second approach where he figured out the profits for the patent. Are those the same frameworks that you applied?

A. Yes. So this is another area of agreement with respect to Mr. Britven and I. We both used a very similar, if not the same, framework to determine what a royalty rate was in this case.

Q. Turning first to the license approach or the market approach that you mentioned, where do you agree with Mr. Britven?

A. So we have a number of areas of agreement. We both agree that the appropriate license agreement to rely upon for this particular approach is an agreement that was entered in November of 2015 between Chamberlain and a company called Nortek.

We both agree, in addition to that, that the starting point royalty rate, which is reflected in this agreement, is 4 percent of the sales price.

And then we both agree that the comparable patented technology that's licensed in this agreement is the '977 Patent.

Q.   Where do you disagree with Mr. Britven?

A.   So the major area of disagreement is Mr. Britven believes that the '404 Patent, which is the patent at issue in this case, is more valuable than the '977 Patent, which is the subject of the license agreement that we're looking at between Chamberlain and Nortek.

On the other hand, based on my discussions with Doctor Leeb, I understand it's Doctor Leeb's view that the '404 Patent is actually less valuable than the '977 Patent, and so that's where Mr. Britven and I disagree with respect to this particular analysis.

Q.   And how did that disagreement impact your conclusions regarding the appropriate royalty based on this evaluation?

A.   Sure.  So what I did in my -- the result of my analysis of this particular comparable license approach is rather than discount the royalty rate--in other words, reduce it to reflect my discussion with Doctor Leeb--I left it at the stated rate within the agreement.  So I left it at 4 percent of the purchase price.  And so the result of my calculation

was somewhere around $5 or $6 per unit as it relates to this particular analysis.

Now, Mr. Britven increased the stated rate in the agreement to reflect what his view is of the patent relative to the '977 Patent, and his result is between $8 and $12 per unit as a result of his analysis of this particular approach.

Q.   And to be clear, were the documents that you relied on JTX 55.5, 10, and 63?

A.   Yes.

Q.   Turning next to the second approach that you mentioned, can you explain to the jury how you figure out the profits you can attribute to a patent?

A.   Yes.  So what we start out with is the profits generated from the sale of the entire GDO with WiFi capability, so that's our starting point here.  And once we figure that out, then we need to make various adjustments.

Q.   And what's the first adjustment that you make?

A.   So if we go to the next slide.

So as we've heard throughout the trial, there are lots of things that sell these products, and what we want to do in this step is we want to isolate the profit attributable to the WiFi componentry, because WiFi, the WiFi area as a whole, is where this technology resides.  And so the first thing we want to do is isolate the WiFi profitability.

Q.   And once you do that, what next?

A.   So next, as I mentioned in a prior slide, some individuals use the technology of WiFi and some don't.  And so we want to make a deduction for what I call--and I think Mr. Britven agrees with this--extent of use.  And so we isolate the profit associated with the users of WiFi technology.

Q.   And after that, what next?

A.   So the next step, if we go to the next slide, now that we have the WiFi technology profitability, we have users who use that technology.  Even within that pool of profits, there are lots of different functionalities that are represented in that pool of profits.  And so we need to rid or exclude that pool of profit with everything except for the '404 Patent.  And once we do that, we've -- we've determined how much profit is attributable to the patents-in-suit.

Q.   And where do you and Mr. Britven disagree with respect to this approach?

A.   Yeah.  So we disagree -- you see that I made essentially two deductions--one for extent of use and one for value attributable to the patent.  Mr. Britven in his analysis made one deduction.  So I made two, he made one.  And that's our primary difference.

Q.   And how did that difference impact the royalty rates you arrived at?

A.   Yes.  So the range that I determined based on this

analyses was something slightly less than $1 to about $4 at the upper end.

Mr. Britven, on the other hand, he came out about $5 to $8 based on his analyses of this approach.

Q. And for the record, were the documents that you relied upon JTX 55.3, .4, JTX 12, and JTX 63?

A. Yes, that's correct.

Q. Now, once you had performed these analyses, what was your next step?

A. So the next step is similar to what Mr. Britven did yesterday. He referred to the 15 *Georgia-Pacific* factors. So I analyzed those factors, and then the outcome of all these analyses was $2 per WiFi GDO.

So remember our table out front, remember the parties at both sides of the table, they did the analyses, and they -- they hand-shook at a $2 per GDO rate. That's the outcome of the negotiation.

Q. And once you arrived at the royalty rate, what did you do with it?

A. So next I -- I quantified the dollar amount of the reasonable royalty.

Q. And how did you do that?

A. Remember our formula, royalty base times royalty rate equals royalty amount. And so in this case, the royalty base is about 1.3 million units. Mr. Britven and I both agree on

that number.  I multiplied that base times a royalty rate of $2, and the reasonable royalty dollar amount that results from that is $2.6 million.

Q.   And, Mr. Tate, what is the appropriate amount of damages that should be awarded in this case if the claims are found valid and infringed?

A.   So the damages should be based on a reasonable royalty of $2.6 million.

Q.   And do you believe that Chamberlain met its burden with respect to proving damages?

A.   I do not believe they met their burden with respect to lost profits.

Q.   Thank you.  Nothing further.

MS. TULL:  I pass the witness, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're right at the noon hour.  We're going to break for lunch at this point.  We'll reconvene, and when we do after lunch, we'll take up the Plaintiff's cross examination of Mr. Tate.

If you'll take your notebooks with you to the jury room, lunch should be there waiting for you.  Please follow my instructions, including not to discuss the case with each other, and we'll be back -- we'll try to make this about a 30- to 40-minute break.

The jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

THE COURT: Counsel, at this juncture, according to my records, the Plaintiff has an hour and 39 minutes of remaining trial time, the Defendants have 39 minutes of remaining trial time.

Are there any issues that need to be raised with the Court before we recess for lunch?

MR. ELACQUA: Nothing from Chamberlain, Your Honor.

MR. CALLAHAN: Nothing from Overhead Door, Your Honor.

THE COURT: I'll see you after lunch.

Court stands in recess.

(Lunch recess.)

THE COURT: Be seated, please.

Ms. Smith, are you ready to cross examine the witness?

MS. SMITH: I am, Your Honor.

THE COURT: All right. Do we have binders to distribute?

MS. SMITH: I believe we do.

THE COURT: Let's get that done.

Mr. Tate, as you understand, you remain under oath.

THE WITNESS: I do, yes, Your Honor.

THE COURT: And you may go to the podium, Ms. Smith, and prepare.

MS. SMITH: May I flip this chart over?

THE COURT: Please do.

Are there two volumes or is it one volume?  They both say cross examination of Michael Tate.

MR. ELACQUA:  I think there must be two, Your Honor.  There's only one volume.

THE WITNESS:  These are identical?  Are these identical, Ben -- Mr. Elacqua?

THE COURT:  Better too many than too few, I guess.

All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen.  Please have a seat.

We'll proceed with cross examination of Mr. Tate, the Defendants' damages expert, by Ms. Smith on behalf of the Plaintiff.

You may proceed, Ms. Smith.

MS. SMITH:  May it please the Court, Your Honor.

CROSS EXAMINATION

BY MS. SMITH:

Q.  Good afternoon, Mr. Tate.

A.  Good afternoon.

Q.  My name is Melissa Smith, and I represent Chamberlain.  It's nice to meet you.

A.  Nice to meet you as well.

Q.  Now, I heard you tell your counsel that you and Mr. Britven agree -- have many areas of agreement.  Did I hear

that correctly?

A.   We do, yes.

Q.   One thing you can agree upon is that Overhead Door and Chamberlain are head-to-head competitors in the WiFi GDO marketplace.  Correct?

A.   That's correct, yes.

          MS. SMITH:  And if I could see PDX, Mr. Lucero, 5-37.  Thank you, sir.

Q.   (BY MS. SMITH)  Now, Mr. Tate, the formula I have up on the screen is something you are familiar with.  Correct?

A.   I've seen this exhibit before, yes.

Q.   Okay.  That's Mr. Britven's calculation of lost profits.  Correct?

A.   That's correct.

Q.   Okay.  Now, here, while you dispute that lost profits are an appropriate remedy, you can agree that Mr. Britven used the right formula for calculating lost profits.  Correct?

A.   I would generally agree with that, yes.

Q.   Okay.  And you don't disagree with Mr. Britven's math.  Correct?

A.   I haven't verified the math, but I assume Mr. Britven can do math correctly, yes.

Q.   I appreciate that.  Thank you.

     Now, you also agree with Mr. Britven's calculation of Chamberlain's average sale price of WiFi GDOs.  Correct?

A.   I think we're in general disagreement.  There may be a slight difference in our analysis, but generally yes.

Q.   Okay.  And you agree with Mr. Britven's calculation of Chamberlain's incremental profit margin, do you not?

A.   Yes, I think we're in agreement with respect to -- to that particular margin, yes.

Q.   You and Mr. Britven agree on the -- on the number of accused units in this case.  Correct?

A.   That's correct.

Q.   Okay.  So you and Mr. Britven, you agree on all these things and all these numbers, except you disagree on how many of the accused units are actually lost Chamberlain sales.  Correct?

A.   I think that's partially correct.  I think it would be more appropriate to say we disagree on certain of the *Panduit* factors, which leads to the appropriateness or inappropriateness of -- of lost profits.

Q.   But you don't agree with Mr. Britven that the lost unit sales are approximately 900,000, do you?

A.   I do not agree with that, no.

Q.   Okay.  But if the jury determines that there are at least some, at least some, lost sales, even if it's not Mr. Britven's 900,000 number, you have no alternate number, do you?

A.   I have not put forward an alternative lost profits

number.

Q.   Okay.  Now, you also agree with Mr. Britven's math that approximately 900,000 lost unit sales results in approximately $64 million in lost profits for those units.  Correct?

A.   Again, I haven't verified his math, but I would assume he can add and multiply numbers correctly.

Q.   Well, you're not a CPA, are you, sir?

A.   I'm not a CPA, no.

Q.   And Mr. Britven is a CPA.  Correct?

A.   I believe that's what he said yesterday, yes.

Q.   I'm sorry, sir.

A.   I'm done.

Q.   You know some CPAs?

A.   I do know some CPAs, yes.

Q.   Fair to say, those folks know how to do math?

A.   CPAs generally know how to do math.  Yes, I would assume that.

Q.   Now, another area of agreement between you and Mr. Britven is that sales of accessories follow sales of GDOs.  Correct?

A.   I would agree at some point in the lifetime of a GDO, there would be some accessory sales.

Q.   Okay.

        MS. SMITH:  If we could see PDX -- oh, it's already up for me.  Thank you.

Q. (BY MS. SMITH) So if the jury agrees with Mr. Britven that there are 900,000 units of lost sales, and I know you don't agree.

A. Agreed.

Q. But if the jury agrees with Mr. Britven, the resulting lost profits would be about $80 million. Is that math correct?

A. If the jury were to agree with Mr. Britven's position, yes.

Q. And if the jury decides that there's even one lost unit sale, you haven't presented any alternative lost profits calculation for them to consider in determining the appropriate damages number. Correct?

A. That's correct. I have not put forward an alternative lost profits calculation.

Q. Okay.

MS. SMITH: Now, Mr. Lucero, if I could see DDX 5.6. And if you can pull that up along with PTX 5-12, please, if you can. And it was PTX 5-12. There we go.

Q. (BY MS. SMITH) All right. On the left-hand side of the screen, Mr. Tate, we see the lost profits factors you talked about with your counsel. Correct?

A. These are the factors that we went through, yes.

Q. And then on the right-hand side, do you recognize those factors as those that we heard Mr. Britven talk about when he

testified? Correct?

A. Yes, this was a slide Mr. Britven used, yes.

Q. Okay. Now, you're missing a few things on your slide, are you not?

A. I'm not sure what you mean.

Q. All right. Well, if we look at manufacturing capacity to meet the demand, that's not the whole story, is it?

A. You mean the full factor relating to capacity? Is that what you're asking?

Q. Yes, sir.

A. So the full factor includes both manufacturing and -- and marketing capacity.

Q. So here you left off the marketing part. Correct?

A. Correct.

Q. Let's talk about the non-infringing substitutes factor. You'd agree that there are actually two separate ways to satisfy that factor. Correct?

A. I'm not sure what you mean by two separate ways.

Q. Well, there's the market approach, and we heard a little bit of that from Mr. Britven, and then there is the no acceptable non-infringing alternatives approach. Correct?

A. I don't believe it's an either/or sort of analysis. You can certainly under certain circumstances do a market approach, but I don't believe it's an either/or type of analysis.

Q.   You understand Mr. Britven has applied the market share approach.  Correct?

A.   I do, yes.

Q.   And you would agree that the market share approach in some circumstances is absolutely a proper way to analyze the lost profit factors.  Correct, sir?

A.   Yes.  Under certain circumstances, if the circumstances are appropriate, that would be a proper way to look at it.

Q.   Now, you agree with Mr. Britven that from 2017 to 2022, Chamberlain made about 83.4 percent of the sales of WiFi GDOs in the United States.  Correct?

A.   I believe that that's a correct figure.  Without going back and looking at some of the reports, I believe generally that's correct, yes.

Q.   And you haven't provided an alternative number for Chamberlain's sales of WiFi GDOs, have you?

A.   You mean for their market share?

Q.   Correct.

A.   I have not.

Q.   All right.  So, Mr. Tate, let's say that a customer's decided they're going to go out and they're going to buy one of these accused Genie WiFi GDOs.  Do you have that in your head?

A.   Yes.

Q.   All right.  Except in this but-for world they can't.

A.   Okay.

Q.   Is your testimony, knowing about that Chamberlain has an 83.4 percent of the marketplace, is your testimony that not one customer in that situation, instead of buying Genie because they can't, would buy a Chamberlain garage door opener?

A.   I don't know about one.  My analysis and my view on this is that lost profits are not appropriate for the various reasons I discussed.  And as a result of specifically the alternatives they had available, I believe they would maintain their position in the market.

But I don't know about one sale.  I mean, I can't -- you know, that's in the extreme.  I looked at the entire population customer segment in doing my analysis.

Q.   So you might agree that because Chamberlain sells 89.3 [sic] percent of WiFi GDOs, that it's possible that if a customer couldn't buy a Genie, they'd buy a Chamberlain. You'd agree with that, wouldn't you?

A.   You know, I really -- again, if you're talking about just one sale, I don't know.  I mean, I presented my belief with respect to the alternative at issue here, and I offered one of the alternatives was a WiFi alternative.  And I believe that they would maintain their position in the marketplace with that alternative.

But if we're just talking about one sale, I mean, I

really didn't focus on that one sale that you're referring to in your hypothetical. I looked at the entire market segment.

Q.   So you just don't know, is your answer, sir?

A.   I mean, it's a hard thing to answer, quite frankly.

Q.   It's a difficult thing to imagine a scenario where Chamberlain is sitting there with 80-plus percent of the market, somebody can't buy a Genie and they might buy a Chamberlain product?

A.   Well, they can buy a Genie, though, in the reconstructed marketplace. So that's what my view is with that alternative that I presented, the WiFi where it sounds twice, both for closures of unattended nature and attended nature, that that would satisfy market demand. And as a result, Overhead Door would maintain its position.

MS. SMITH:   I'll object to the responsiveness, Your Honor.

THE COURT:   I'll sustain that.

The question was, is it a difficult thing to imagine. The answer was not, yes, it's difficult, or no, it's not difficult.

So I'll sustain the objection as non-responsive. You can either reassert the question, counsel, or you can move on. It's your decision.

MS. SMITH:   I think I'll move on, Your Honor. Thank you.

Q.   (BY MS. SMITH)  Now, Mr. Tate, you'd agree a non-infringing alternative must be commercially acceptable. Correct?

A.   I would, yes.

Q.   And you agree a product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages.

A.   If the customer wants those advantages, I would agree with that.

Q.   Okay.  So a non-infringing alternative under this analysis, it must have the same features and benefits of the patented product.  Correct?

A.   As it relates to the specific customer that we're analyzing, I would agree with that.  It has to have the same benefits that that customer uses.  That's the way I look at the issue.

Q.   It has to have the same features and benefits--correct?--of the patented product.

A.   For some of the customers, I would agree with that to the extent those customers desire and demand those features.  But for others, that may not be the case.

Q.   Mr. Tate, let's take a look at your March '22 testimony at page 214, please.

     Sir, it's in the notebook.

A.    Okay.  Is it the March '22, you said, the transcript?

Q.    Yes, sir.  At page 214, line 24, sir.  And I just want you to read that to yourself, please, to refresh your recollection.

A.    Okay.  I've read that.

Q.    Okay.  Mr. Tate, you'd agree with Mr. Britven that under this analysis, it has to have the same features and benefits of the patented product.  Correct?

A.    I would generally agree with that for -- for most of the customer base, yes.

Q.    So correct.

A.    Correct.

Q.    Now, one of your proposed non-infringing alternatives is a WiFi GDO that alarms and delays for both attended and unattended closes.  Correct?

A.    That is correct, yes.

Q.    And we've heard a little bit about that in the courtroom. We've been calling it the Ryobi system.  Have you heard that testimony?

A.    It's been referred to as the Ryobi system.  So, yes, I've heard that, yes.

Q.    If I said Ryobi system, you'd know what I'm talking about?

A.    I would know what you mean, yes.

Q.    Now, do you agree that the alarm and the flashing lights

and the five-second delay associated with the Ryobi system is annoying?

A.   You know, I think annoying is subjective, and so I wouldn't agree with that necessarily, no.

Q.   Okay.

MS. SMITH:  Mr. Lucero --

We have a demonstrative that may make a little bit of racket, Your Honor.

Can you pull that demonstrative up for me, Mr. Lucero? Can we play it, sir?

(Unidentified demonstrative played in open court.)

Q.   (BY MS. SMITH)  So, Mr. Tate, your testimony -- you're under oath today.  Correct?

A.   I am.

Q.   And your testimony under oath is that that is not annoying.  Did I get that right?

A.   I mean, annoyance is subjective.  I mean, everybody in the room can hear the sound.  It might be annoying to some and not annoying to others.

Q.   Okay.  You have an understanding that it's annoying to the corporate reps for Overhead Door.  Correct?

A.   I'm not sure.  You mean the beeping sound?

Q.   Yes.  Do you have an understanding that the subjective belief of the corporate rep, the voice of Overhead Door, is that that beeping is annoying?

A.   I know there was some testimony about that.  I'm not sure it related to what you just showed me, but there was some testimony about that, yes.

Q.   Okay.

MS. SMITH:  Mr. Lucero, if we can see testimony from Mr. Krupke.  It's October of '21, and it's at line 153.  Thank you, sir.

Q.   (BY MS. SMITH)  Now, Mr. Tate, we see up here a question to Mr. Krupke, Do you agree with me that it would be annoying to the homeowners in relation to the beeping sound?  And he said, I think it would be very annoying.  That alarm to occur every time movement occurs would be a nuisance and unacceptable.

Do you agree or disagree with the corporate representative for Overhead Door?

A.   So I agree that if you sounded an alarm for all four movements on the door, that that might be annoying.

Q.   Okay.  All right.  We also heard a little bit from Mr. Krupke, if you recall, that imminent motion notification on every communication from a transmitter would not be commercially acceptable.  It wouldn't be a commercially-acceptable alternative.

Do you recall that testimony from Mr. Krupke?

A.   Ms. Smith, can you -- sorry, can you repeat that?  Sorry.

Q.   Of course.  I will actually put it up for you.

A.   That's fine, sure.

Q.   Okay.

MS. SMITH:  Mr. Lucero -- thank you.

MS. TULL:  Objection, Your Honor.  We object to this being published.

MS. SMITH:  He asked me to -- I'm happy to re-read it, Your Honor, if that's better for the witness.

THE COURT:  Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

THE COURT:  So is this for impeachment?

MS. SMITH:  No.

THE COURT:  What purpose is this for?

MS. SMITH:  I'm going to ask if he agrees or disagrees with the corporate rep's testimony.  It's not impeachment.

THE COURT:  What's your objection, Ms. Tull?

MS. TULL:  Well, it's not impeachment, Your Honor. And I think the witness simply didn't hear her question, and then counsel was going to publish the statement that she's questioning about.

THE COURT:  I understand.  But this is the second time she's put up Mr. Krupke's testimony, and you didn't object the first time.  But I'm interested -- this time I'm interested to know what the basis of your objection is.

MS. TULL:  Your Honor, it's not impeachment, and we don't believe it's appropriate to publish at this point unless and until it is impeachment.

MS. SMITH:  Your Honor, I don't -- I think you can put up testimony just as they have in the direct without it being impeachment.  I'm not trying to impeach anybody.  I'm just going to ask if he agrees or doesn't agree.

MS. TULL:  We didn't publish --

THE COURT:  Ms. Smith --

MS. SMITH:  Yes, sir.

THE COURT:  -- I think the better practice is for you to ask the witness if he will assume with you Mr. Krupke's position on behalf of Overhead Door is X, and if that's the case, does he disagree with Mr. Krupke's position.  I don't see any justification outside of impeachment publishing this before you even ask the question.

MS. SMITH:  Okay.

THE COURT:  Okay?

MS. SMITH:  And if he -- taking a step further, if he says, I have no recollection that of Mr. Krupke saying that?

THE COURT:  If he challenges whether Mr. Krupke says that or not, then I think that's a different matter.

MS. SMITH:  Do you want me to approach before I do that?  I'm just trying to stay within the lines here, Your

Honor.

THE COURT: If it's a clear disavowal or disagreement with the corporate representative, then I think you can publish the testimony. If you have any question about it, then ask to approach the bench and we'll discuss it.

MS. SMITH: Okay. Thank you.

THE COURT: Okay.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed, counsel.

MS. SMITH: Thank you, Your Honor.

Q. (BY MS. SMITH) Now, we have heard Mr. Krupke testify that the imminent motion notification on every communication from a transmitter would not be a commercially-acceptable alternative. Did you hear Mr. Krupke say that?

A. I've either heard him say that or I've read the testimony. I can't remember if he testified to that live or by some other form of testimony.

Q. And you don't agree with Mr. Krupke, do you?

A. I don't agree that it would not be commercially-acceptable if you only sounded it twice.

MS. SMITH: Your Honor -- excuse me.

THE COURT: Let him finish the answer.

MS. SMITH: Of course.

THE WITNESS: If you're talking about sounding it on

all communications, so all four communications, I would agree with him.

MS. SMITH: Your Honor, I move to strike everything after, I don't agree.

THE COURT: Well, his answer doesn't include -- okay. I'll sustain that.

I think "I don't agree" is responsive and answers the question. Anything beyond that in the witness' answer, I will strike.

Q. (BY MS. SMITH) Mr. Tate, do you agree that it would not be good for business for Overhead Door to annoy its customers?

A. I would agree with that, yes.

Q. Now, Mr. Krupke is a 33-year veteran of the industry, is he not?

A. I -- I believe that's correct, yes.

Q. And you disagree with him.

A. On which point?

Q. On the point we just spoke of, on the annoying beep.

A. Depending on how many beeps there are, I would disagree with him, yes, on that particular point.

Q. So you think you know better on that point about what customers who have already decided to pay extra money for WiFi would find to be an acceptable substitute, you know better than Mr. Krupke. Correct?

A. No, but I -- I had information available to me that would

allow me to -- to make an informed opinion on that. And so on that point I do disagree with him.

Q. Okay. Now, this Ryobi alternate that we've been talking about --

MS. SMITH: Mr. Lucero, can you pull up the Ryobi app, please? Thank you, sir.

Q. (BY MS. SMITH) Now, what you're suggesting to this jury is that this would be a -- a good option for Overhead Door's business to switch over to this Ryobi-type product. Correct? That's your non-infringing alternative?

A. Yeah. But just to make it clear, I'm not suggesting they would use the Ryobi app. I'm suggesting that they would implement in their own source code an unattended close, and sounding alarm, unattended close, and attended close. So I'm not suggesting they would use the Ryobi app.

Q. Of course not.

A. Sure.

Q. It would be -- it would be an Overhead Door app, sir. Correct?

A. That's correct, yes.

Q. And it would be an alarm, though, similar to Ryobi for unattended and attended close. Correct?

A. That's correct, yes.

Q. And up here we see some folks that use Ryobi ranking it, and we see they got a 1.4 out of five stars. Is that correct?

A.   Whatever this ranking is, that's what it says, yes.

Q.   And that just doesn't seem like a good idea, in my mind, for a company to switch to -- to something that's getting about 1.4 out of 5 stars.  Do you disagree?

A.   Well, again, I wouldn't -- I would agree with you if something has a 1.4 stars, but I think this refers to the app rather than the functionality that I'm talking about.

Q.   If you were going to go out to a restaurant and had 1 out of 5 stars, would you want to go?

A.   Probably not, but...

Q.   Now, it's also true that a non-infringing alternative must be commercially acceptable.  Correct?

A.   That's true, yes.

Q.   And you'd agree that a product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages.  Correct?

A.   If the customer wants the patented functionality, then I would agree that you'd need to have an alternative that had that same functionality, if that's what the customer wanted.

Q.   So a non-infringing alternative under this analysis, it has to have the same features and the same benefits of the patented product.  Correct?

A.   It has to have the patented functionality.

Q.   Do you agree that Overhead Door would not take all of its

WiFi-integrated operators off the market in favor of only offering a non-WiFi integrated solution?

A. I forgot how you phrased your question. Do I agree that they would or would not take their --

Q. They would not. Do you agree that they would not take all of their WiFi product off the market in favor of offering only a non-WiFi product?

A. I don't believe they would do that.

Q. Because you can't operate a non-WiFi GDO with a Smartphone, can you?

A. If it didn't have WiFi functionality, you could not do that. That's correct.

Q. You can't connect a non-WiFi GDO to your home security system?

A. I'm struggling with that because I think you can, but -- but you have to have WiFi capability.

Q. Correct. Now, you understand, again, that Mr. Krupke, the voice and the corporate rep of Overhead Door, actually testified that a non-WiFi alternative is not a commercially-acceptable alternative. Do you agree with that?

A. I believe that's correct, he did testify to that, and I would disagree to the extent that some customers would have purchased that in the reconstructed market.

MS. SMITH: Your Honor, I will move to strike after "I agree with that."

THE COURT: I'm just going to strike the answer and have you ask the question again.

Mr. Tate, she's not asking if you agree with her recital or not. She's giving you a recital, and then she's asking, do you agree with the substance of it. You don't have to confirm what she's told you is accurate or inaccurate.

THE WITNESS: Okay.

THE COURT: She's going to give it to you based on you assume that what she's telling you is correct.

THE WITNESS: Understood.

THE COURT: And then on that assumption, do you agree with the substance of it or do you disagree. And if we do it that way, we'll get a clear answer in the record.

THE WITNESS: Okay.

THE COURT: So I'm going to strike the prior answer. Ask the question again, Ms. Smith.

MS. SMITH: Yes, Your Honor.

Q.   (BY MS. SMITH)  Mr. Tate, Mr. Krupke -- let's assume Mr. Krupke has testified that a non-WiFi alternative is not a commercially-acceptable alternative. Do you agree or disagree with Mr. Krupke on that point?

A.   I mean, I think I disagree, not entirely but I disagree with at least certain customers would have the option to purchase non-WiFi products in the reconstructed market.

Q.   And so you disagree -- again, who knows more about the

garage door industry--you or Mr. Krupke?

A. Mr. Krupke would know more about the industry than myself. He's been involved in the industry for quite a long time.

MS. SMITH: Your Honor, may I approach counsel table to retrieve something, please?

THE COURT: Certainly.

MS. SMITH: Thank you.

THE COURT: I thought you were going to get a bottle of water. Go ahead, counsel.

Q. (BY MS. SMITH) All right, Mr. Tate. You recognize this box I have here?

A. I mean, I don't know that I recognize it. I see it's a Genie WiFi-enabled product box, but I can't read what's on the box.

Q. Have you ever seen it before, this box?

A. I don't know that I've seen that particular box. I may have seen pictures of it, but I'm not sure that I've seen that box.

MS. SMITH: Your Honor, may I approach the witness and hand him the box --

THE COURT: Hand it to the Court Security Officer. He'll give it to the witness.

Q. (BY MS. SMITH) All right, Mr. Tate. You get a good look at the box?

A.   Not really, but -- okay.  I see the box.

Q.   All right.  It advertises several features.  Correct?

A.   There are several features listed at various places on the box, yes.

Q.   What I'd like you to do is I'd like you to read the features that are most prominently displayed in the largest font on the box?

A.   Well, the name Genie up top.

Q.   And that's -- I asked for features, sir, please.

A.   I consider the brand name would be a feature of the product.

Q.   Okay.

A.   I see ultra quiet WiFi-enabled in the middle.  Do you want the largest only?  I think those two or three would be the largest, yes.

Q.   All right.  So the biggest font and the biggest features we see on that box are ultra quiet and WiFi-enabled.  Correct?

A.   That's correct, yes.

Q.   So those are the two features that Genie highlights most prominently on their packaging.  Correct?

A.   On this particular packaging, in addition to the Genie brand, that's correct.

Q.   Now, you spoke with your counsel about a theory that Genie customers don't want or don't use WiFi.  Do you remember that line of testimony?

A.   I think both.  We discussed a bit about both of those things.

Q.   Customers don't want WiFi and customers don't use WiFi.

A.   Correct.

Q.   All right.  If this is true, do you think the marketing department at Genie is -- they're failing miserably, aren't they?  They -- they have no idea what the customers want.

A.   I'm not sure what you mean by them.

Q.   Well, they're putting ultra quiet and WiFi in the biggest font they can on that box, but you're telling me customers don't want WiFi and customers don't need WiFi.

A.   Some customers don't want WiFi and -- and some customers don't use WiFi.  That's correct.

Q.   Mr. Tate, you said you hadn't seen that box before.  You wish somebody would have showed it to you before your testimony today?

A.   No.  I've seen similar packaging and similar pictures.

Q.   Okay.

        MS. SMITH:  And, Your Honor, he can put the box down now.

        THE COURT:  Just put it behind you or -- that's fine.

Q.   (BY MS. SMITH)  You said you'd seen similar -- similar boxes and pictures, so there's -- the prominently displayed WiFi and ultra quiet, that's not the only box that's on.

There's a lot more out there.  Right?

A.    There's other boxes.

Q.    Okay.  With that prominent language?

A.    I'm not sure about that.  There's other boxes.

Q.    All right.  I want to talk to you a little bit about the *Panduit* factor 3.  That's the marketing and manufacturing capability.

A.    Okay.

Q.    Are you familiar with that?

A.    Yes.

Q.    You agree that Chamberlain has the necessary marketing capability.  Correct?

A.    I do, yes.

Q.    Okay.

          MS. SMITH:  If we could see PDX 5-33.

Q.    (BY MS. SMITH)  All right.  Are you familiar with this slide from Mr. Britven's testimony?

A.    I saw this yesterday when he testified, yes.

Q.    Okay.  So directing your attention to the dark blue bars on the bottom, those represent Chamberlain's actual production of WiFi GDOs during these years, and you don't dispute these numbers, do you?

A.    I don't dispute those numbers, no.

Q.    And, now, from 2017 -- see the years down at the bottom?  From 2017 to 2018, Chamberlain actually increased its

production. Correct?

A. It depends what year you're looking at. Sometimes they increased it; sometimes they decreased it.

Q. Well, sir -- and I apologize. I'm looking at 2017 to 2018 on the left hand.

A. Oh, I'm sorry. Just that year.

Q. Yes, sir.

A. I apologize.

Q. Yes, sir.

A. They did, yes.

Q. Okay. And then moving on, from 2018 to 2019, Chamberlain's actual production, it went down a little. Do you see that?

A. It did, yes.

Q. Then moving on to 2019 to 2020, the actual production increased again a little bit.

A. Yeah, my eyes are bad, but it looks like there's a slight increase, yes.

Q. Slight. Okay. Thank you, sir. Then moving on from 2020 to 2021, the actual production went up even more. Correct?

A. It did increase between those two years, yes.

Q. Now, the light blue bars represent the -- the lost sales that we're talking about in this case. Now -- how much extra Chamberlain would have had to manufacture to cover the claimed lost sales. And you don't dispute those numbers, do you?

A.   I mean, based on what we talked about before, I do dispute the appropriateness of those numbers, but I don't dispute that that's in numbers that Mr. Britven is claiming as lost if that's what you're asking.

Q.   You're not challenging the data themselves, the numbers themselves.

A.   No, not -- not really, no.

Q.   Okay.  Now, we've talked a lot about Chamberlain's plant in Mexico shutting down during COVID today.  Correct?  And throughout trial actually.

A.   We've heard that on a number of occasions, yes.

MS. SMITH:  If I could see PTX 38.16, please.

Q.   (BY MS. SMITH)  Mr. Tate, do you know what Chamberlain's on-hand inventory of GDOs was on April 1st, 2020, right before the shutdown, right before the beginning of COVID?  And I'm going to help you a little bit here.

MS. SMITH:  Mr. Lucero, if you could highlight the top of April 1st, 2020, and then we go over to the 457,034.  Thank you, sir.

Q.   (BY MS. SMITH)  Mr. Tate, do you see those numbers on April 1st, 2020, the inventory was at about 457,000?

A.   I see that number, yes.

Q.   Do you have any reason to dispute that number?

A.   I don't as I sit here.  These aren't, you know, Overhead Door numbers, but I don't as I sit here.

Q.   Okay.  And inventory means you've got GDOs sitting around in a warehouse.  Correct?

A.   It could mean.  It could mean there's, you know, some finished product that's -- maybe has some assembly steps to go.  It just depends.  It's product that's in the pipeline.

Q.   Okay.  And Chamberlain's claimed lost sales for the entire year of 2019 is only 158,886.  Correct?  Did you hear that from Mr. Britven?

A.   I remotely recollect that, yes.

Q.   So isn't it true that just before COVID, just before that COVID slow-down, Chamberlain had enough existing inventory, GDOs, in the warehouse on hand to cover its claimed lost sales for the entirety of 2019, nearly -- nearly three times over.

          MS. SMITH:  If we could see that again, Mr. Lucero.  JTX 5.2.  And if I could highlight the integrated WiFi lost unit sales and the 158.

Q.   (BY MS. SMITH)  That was actually the number I asked you about previously, Mr. Tate, and I apologize.  I did not show you the spreadsheet.

     Does that help you to know that the claimed lost sales for the entire year of 2019 is 158,886?

A.   It does.  I think I answered affirmatively to your first question, but yes, it does.  Thank you.

Q.   I apologize.

     So isn't it true that just before the COVID shutdown,

Chamberlain had enough existing inventory on hand to cover its entire lost sales for the entirety of 2019 nearly three times over?

A. I mean, if you're just comparing those two numbers, I would agree with that. However, I don't know that you can leap to that conclusion from those two numbers.

Q. Now, it's actually true that you presented no evidence demonstrating that Chamberlain lacked the manufacturing capability to cover its lost sales before COVID. Correct?

A. I would agree in part and disagree in part with that.

Q. Well, have you -- have you brought evidence here demonstrating that Chamberlain lacked manufacturing capability?

A. I, again, would agree in part with that and -- and I did present some evidence on -- on that issue, I think, yes.

Q. Okay.

MS. SMITH: Well, let's go back to PDX 5-33. It's our capacity bar chart.

Q. (BY MS. SMITH) Now, in 2017, 2018, and 2019, you can see that the lost sales are only a small fraction of Chamberlain's total production. Correct?

A. I would -- I would agree with that, yes.

Q. Okay. And less than it looks like about 5 percent of what Chamberlain actually produced each year?

A. Yeah, just looking at these bars, I would -- yeah, that's

probably fairly close, yes.

Q. But it's your testimony today that Chamberlain didn't have the manufacturing capability to cover that extra less than five percent bump in production it needed to. Correct?

A. Well, if you're limiting it in your question to Chamberlain itself, I would agree that it looks like they had capacity in those years, but I would disagree --

Q. Thank you, sir.

A. -- with other areas.

Q. Now, you agree with Mr. Britven that Chamberlain does not claim any lost profits during the last three quarters of 2020. Correct?

A. He does not. That's correct.

Q. Okay. But you disagree that Chamberlain had the manufacturing capability to cover their claimed lost sales starting again in January '21 through the first quarter of '22. Is that correct?

A. That's where the disagreement resides, yes.

Q. Okay. And you believe that's, in part, due to global supply chain issues that we heard a little bit about before lunch. Correct?

A. That's one of the issues, yes.

Q. Okay. So with regard to that '20 to '21 through March of '22 time period, somehow Overhead Door managed to meet demand for the accused WiFi GDOs it sold. Correct?

A.   They were able to do that, yes.

Q.   Okay.  So Overhead Door is able to overcome all these global supply chain issues that you're testifying about.  Correct?

A.   They had challenges themselves as well, but they were able to meet the demand that they actually had.

Q.   Well, they did have challenges themselves because Overhead Door actually manufactures in Mexico.  Correct?

A.   That's one of the places they do manufacture, yes.

Q.   They make a whole lot of WiFi GDOs down there.  True?

A.   I don't know about a whole lot, but they do make a number of units of product down there, yes.

Q.   Well, it's true at present all of Overhead Door's WiFi GDOs are manufactured in Matamoros.  Correct?

A.   Currently, yes.

Q.   That's a lot.

A.   It's --

Q.   All of them.

A.   -- a number of units a year, yes.

Q.   Well, when I said they make a lot down there, they make them all down there, don't they?

A.   Today, yes.

Q.   And, in fact, Overhead Door's facility in Mexico was shut down as well due to COVID in 2020, wasn't it?

A.   I believe it was shut down for a short period of time,

about a week or so, I believe, if my recollection is correct.

Q. Okay. But just to be clear, it's your opinion that for the exact same set of sales, Overhead Door can overcome Mexican shutdowns and global supply chain issues, but Chamberlain, the most successful company in the WiFi GDO marketplace, cannot. Is that your testimony?

A. Based on the evidence that I've reviewed, yes.

MS. SMITH: Now, if we could pull up DX 5.8, please. Thank you, Mr. Lucero.

Q. (BY MS. SMITH) Now, you took a look at that picture with your -- with your counsel. You understand it talks about Chamberlain's continuing capacity problems. Correct?

A. You mean the title of the slide?

Q. Yes, sir.

A. Yes.

Q. And then you -- you made this slide along with your counsel. Correct?

A. I drafted the graphics folks to put it together, yes.

Q. Okay. Thank you, sir.

You understand Chamberlain makes commercial products? Do you have that understanding?

A. Yes, I do.

Q. And you understand they make ranch gates?

A. I do.

Q. And they make doors for police stations and fire houses

and all those things?

A.   I have that understanding, yes.

Q.   Okay.  And this document, you have no reason to dispute that this document covers all of Chamberlain's capacity -- all of Chamberlain's products and the capacity associated with those products.  Correct?

A.   It would, yes.

Q.   Now, Mr. Tate, you were asked about some email about Lowe's.  I think it's at JTX 7, sir?

          MS. SMITH:  Mr. Lucero.  Thank you.

Q.   (BY MS. SMITH)  So you recognize that email, Mr. Tate?

A.   I do.

Q.   Okay.  What did you conclude based on your review of this email?

A.   Well, this is just another data point highlighting that the issues with COVID and the loss of sales due to COVID continued beyond 2020, and this particular email discusses Lowe's as a particular customer, and they estimated that they would likely lose about $18 million in sales to Lowe's in 2021, they being Chamberlain.

Q.   Understood.  Now, what's the date on this email?

A.   This is April 8th, 2021.

Q.   Okay.  And so, as you said, somebody was sitting there in April of '21 and -- at Chamberlain and was thinking or estimating, your word, that the Lowe's business would shrink

by year end by about $18 million.  Is that correct?

A.    That's correct, yes.

Q.    Okay.

        MS. SMITH:  If I could see JTX 71.002.  Okay.  There we go.

Q.    (BY MS. SMITH)  So in early 2021, in April, this is an expectation about how things might turn out.  Correct?

A.    Yes.  Based on what they knew at the time about the Lowe's business, yes.

Q.    Okay.  But what this email doesn't tell us is what Chamberlain actually experienced or whether they actually experienced an $18 million decline in business with Lowe's in 2021.  Correct?

A.    That's correct.

Q.    Okay.  Do you know how things actually turned out?

A.    I do not as I sit here, no.

Q.    Did you -- before you testified to this jury that they were going to -- that this was proof that they were going to lose $18 million, did you even try to check that out?

A.    At one point in time I did, yes.

Q.    But you don't remember what you found now?

A.    I don't recollect.

Q.    Okay.

        MS. SMITH:  Let's look at JTX 74.001.

Q.    (BY MS. SMITH)  I think this is another document that you

discussed in your direct testimony. Correct?

A. It is, yes.

Q. What's the date on this presentation?

A. This is a board of directors presentation, dated September 9th, 2021.

Q. All right. So we're looking at about six months after -- after that expectation document you just referenced? Five?

A. Five or six months, yeah. I'm trying to do the math on the fly. But, yes, roughly.

Q. I'm not a CPA.

A. Roughly.

THE COURT: One at a time, please.

MS. SMITH: Sorry.

THE WITNESS: Sorry.

MS. SMITH: All right. Let's turn to page 49.

Q. (BY MS. SMITH) All right. What do we see here? We see Lowe's if you go four down from the top. Do you see that?

A. I do see that.

Q. All right. This is a board of directors meeting, so we're talking about actual results. Do you see that up on the left-hand side?

A. I do see that on the left -- left-hand side, yes.

Q. So this chart is showing actual results, not expected results, through July of '21. Correct?

A. At least through July, yes.

Q.   Okay.  And what we see here is that sales --

MS. SMITH:  If you could -- if you could highlight, Mr. Lucero, that 18.2.

Q.   (BY MS. SMITH)  What we see here is that sales at Lowe's actually increased by a little over 18 percent from 2020 to 2021.  Do you see that?

A.   Through July of 2021, that's correct, yes.

Q.   All right.

MS. SMITH:  All right.  Let's look at JTX 74.77, please, Mr. Lucero, at page -- okay.  We got it.

Q.   (BY MS. SMITH)  Now, your counsel also asked you a few questions about this document.  Do you recall that?

A.   I do, yes.

Q.   And, in particular, she highlighted language stating that shortages and price increases are likely to extend through 2022.  Correct?

A.   That's correct.

Q.   And it's your testimony again that these shortages and price increases only affect Chamberlain and not Overhead Doors.  Correct?

A.   No, I didn't say that.  I mean, I think it impacted the industry, it's likely.

Q.   Thank you, sir.

Now, sir, finishing up on the *Panduit* factors, you'd agree that there's a demand for the patented product.

Correct?

A. Yes. If you're referring to the product as a whole, I'd agree with that, yes.

Q. I am. Thank you, sir.

And as to factor 4, you agree that lost profits can be quantified in this case. Correct?

A. Well, the math, as we talked about -- you know, Mr. Britven can do math. I disagree, and I think it falls under factor 4 that lost profits are appropriate, but I would agree with the math component of it.

Q. All right. Thank you, sir.

MS. SMITH: Your Honor, I'll pass the witness.

THE COURT: All right. Is there redirect, Ms. Tull?

MS. TULL: Yes, Your Honor.

THE COURT: All right. Let's proceed with redirect.

REDIRECT EXAMINATION

BY MS. TULL:

Q. Mr. Tate, you were asked some questions about a box. I'm not going to ask you to pull it up, but I believe it's still up by you. Correct?

A. Yes.

Q. And there were two features that were on the box, ultra quiet and WiFi-enabled, in addition to the brand being a selling point itself. Is that right?

A. That's correct.

Q. Does ultra quiet operation have anything to do with the claimed invention of the '404 Patent as you understand it?

A. No.

Q. Does the '404 Patent claim a WiFi-enabled garage door operator? Is that the invention of the '404 Patent?

A. My understanding, it is not.

Q. And you had -- there was a demonstrative played through the Court's speakers with an alarm beeping. Do you recall that?

A. I do.

Q. Now, I'm talking into a microphone. Correct, sir?

A. You are.

Q. And the sound in the courtroom is amplified through speakers. Is that right?

A. It is loud, yes.

Q. So what we heard in the demonstrative was amplified by the speakers. Correct?

A. I believe so, yes.

Q. And you were in the courtroom when the actual Genie product was demonstrated earlier this morning. Correct, sir?

A. I was.

Q. And that is not what was just played now during your cross examination. Correct?

A. That's correct.

Q. Thank you.

MS. TULL: Nothing further. I pass the witness.

THE COURT: All right. Is there further cross examination?

MS. SMITH: No, Your Honor.

THE COURT: All right then. Mr. Tate, you may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're quite welcome, sir.

MS. TULL: May the witness be excused, Your Honor?

THE COURT: Barring any objection, you may be excused.

THE WITNESS: Thank you.

THE COURT: Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT: You're ready to rest your case in chief?

MR. CALLAHAN: We are, Your Honor.

THE COURT: What's Plaintiff's intention with regard to rebuttal?

MR. ELACQUA: We have brief rebuttal. It is about a four-minute video, and then we plan to call Doctor Villasenor which we expect to last shortly as well. And then we call Mr. Britven.

THE COURT: So you're going to have both live witnesses and a deposition on rebuttal.

MR. ELACQUA: Yes, Your Honor.

THE COURT: Okay. Thank you.

MR. CALLAHAN: And, Your Honor, I'll just say we rest our case.

THE COURT: Well, I'm going to ask you on the record.

MR. CALLAHAN: I understand, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT: Mr. Callahan, Defendants should call their next witness.

MR. CALLAHAN: Your Honor, Defendants rest their case at this time.

THE COURT: All right. Defendants having rested the Defendants' case in chief, do Plaintiffs elect to call rebuttal witnesses?

MR. ELACQUA: We do, Your Honor.

THE COURT: Call your first rebuttal witness, please, Mr. Elacqua.

MR. ELACQUA: Your Honor --

And welcome back, ladies and gentlemen.

Your Honor, Chamberlain calls Gregory Matias, who's the director of compliance and validation testing at Overhead Door. Total deposition time is 6 minutes and 17 seconds, 1 minute and 41 seconds attributable to Defendants and 4 minutes

and 36 seconds attributable to Chamberlain.

THE COURT:  All right.  Proceed with this rebuttal witness by deposition.

MR. ELACQUA:  Thank you, Your Honor.

GREGORY DANIEL MATIAS, BY SWORN VIDEOTAPED DEPOSITION,

Q.   Can you state your full name for the record, please?

A.   It's Gregory Daniel Matias.

Q.   And where -- where do you work, Mr. Matias?

A.   I work for the Genie company here in Mount Hope, Ohio.

Q.   What have your roles been since you've been at Genie Company?

A.   When I started with the Genie company, I was the compliance engineer and then transitioned to becoming the director of compliance and validation testing.

Q.   So the standards are not intended to be prescriptive. Right?

A.   Some standards are intended to be prescriptive.  Some standards aren't.  In this case, the standard is intentionally vague to the point where there are multiple options for meeting the requirement.

Q.   But if a manufacturer wanted to sound the alarm and flash the lights and cause the delay every time the garage door opener closed, they could do that and still be in compliance with UL 325.  Is that right?

A.   Yeah, if a manufacturer wanted to do the warning before

every motion of the operator, they could do that, or just the closing operation. There's nothing in -- nothing wrong with doing that and being compliant to UL 325.

Q. Does Genie share information about its designs with the UL standard technical panel?

A. That would not be typical. Genie does not share information about our designs with -- with almost anybody. And unless there were a really, really, really good reason for us to bring something maybe at a very high level, you know, design-wise, application-specific or, you know, something -- you know, an example of something, there would be no reason for us to -- to share any design-related information. Certainly nothing confidential with -- with the UL STP.

Q. Why not?

A. There's really no reason to. When we go in and talk about the standard, we're talking about a standard that can be applied to any garage door opener. If there's something specific, you know, we are doing that required input from the STP, it would just be a little bit out of place. The STP is not the place to do that.

Q. So I'll go back to that, but my question was, if Genie is developing a new product and that new product might relate to something that's going on in the standard technical panel, is Genie required to disclose that to the standards technical

panel if they're going through the design and development process?

A.   In that example, if we were just designing something and we wanted, you know, a change made to the standard to allow it or clarification to the standard to -- you know, for our own benefit, there would be no -- no, we would not be required or inclined to -- to disclose our design information to the STP. No, under that circumstance, no, that would not be an issue.

Q.   You said that there are some circumstances in which rules from UL applied to taking information from the standards technical panel back to, say, Genie.  Is that right?

A.   Yes, there are some rules there to be a member of the STP.

Q.   What are those rules?

A.   Like I said, I don't remember specifically what those rules are.  I haven't looked at them in, you know, almost 11 years.  They're basically around if you're, you know, not allowed to use the standards technical panel for competitive advantages.  Like if you -- you can't put something in the -- you can't request a change in the standard that would exclude other, you know, specific manufacturers from, you know, complying with the standard.

There are some technical rules like not being able to violate the NEC code or violate any other code.  So there -- it's -- you know, the standards portion of UL is accredited

through ANSI and it has rules it has to follow.  So the STP -- you know, those trickle down to the STP through that accreditation process.

So, yeah, like I said, I haven't looked at those rules in a very long time.  I would have to get a refresher on that before I could speak intelligently on it.

Q.   Would anything in those rules preclude you from relaying information about changes in the standards that would allow for new product development?

A.   The STP process is a public process.  Anyone can go and look at proposals to changes to the standard before they are voted on.  So any discussion you had around any proposed change to the standard would not be confidential or privileged or anything like that.

It's intentionally a public process so that anybody that wants to look at what's going on with a standard or changes to a standard, that's all -- that's all public record.  That's all accessible.  They actually encourage people to go and look and provide comment.

So using the information, you know, from a UL STP proposal for anything is -- is not -- would not be any kind of violation of the confidentiality or anything like that.

THE COURT:  Does that complete this witness by deposition?

MR. ELACQUA:  It does, Your Honor.

THE COURT: All right. Call your next rebuttal witness.

MS. CHEN: Your Honor, Chamberlain calls Dr. John Villasenor.

THE COURT: All right. Doctor Villasenor, please return to the witness stand. I remind you, sir, you remain under oath.

Please distribute your binders, Ms. Chen.

MS. CHEN: Thank you.

May I approach the witness?

THE COURT: You may.

MS. CHEN: May I proceed.

THE COURT: You may proceed, counsel.

MS. CHEN: May it please the Court.

JOHN VILLASENOR, Ph.D., PREVIOUSLY SWORN,
testified further under oath as follows:

DIRECT EXAMINATION

BY MS. CHEN:

Q. Doctor Villasenor, welcome back.

A. Thank you.

Q. So what are you here to testify about today?

A. So today I'm going to address the question of validity with respect to the '404 Patent and particularly claims 4 and 20.

Q. And on the topic of validity, what materials did you

consider?

A.   So I considered, of course, the '404 Patent itself as well as the file history, which is the correspondence with the Patent Office during the time it was under examination.

I considered Mr. Laird's testimony, his 2007 source code that I addressed yesterday, as well as the prototype.

I considered the testimony of the Overhead Door witnesses, the Court's claim constructions, and the alleged prior art.

Q.   And did you apply any particular legal standard in your analysis?

A.   Yes, I did.

Q.   And what was that?

A.   So, first of all, I've been informed, my understanding is, that an issued U.S. patent is presumed to be valid, and that if, for example, in this case Doctor Leeb wants to show that it's invalid, the burden to do that is clearly and convincing.

And I've been further informed that that means that it's evidence that produces in the mind of the person evaluating it a conviction that it is highly probable that the contentions being made are true.

Q.   And how does that standard relate to the standard for proving infringement?

A.   So to prove infringement, I've been informed that in this

case Chamberlain has to prove by a burden of preponderance of the evidence that OHD is infringing. So preponderance of the evidence is sort of like this (indicating) and clear and convincing is sort of like this (indicating). So two very different burdens of proof.

Q. So let's take a look at the timeline for the prosecution of the patent. How long did it take for the United States Patent and Trademark Office to examine the '404 Patent?

A. It was filed in March of 2009, late March, and it issued in November of 2013. So well over four years, roughly four-and-a-half years.

Q. And during this time frame of four years, did the United States Patent and Trademark Office consider prior art during its analysis?

A. Yes, it did.

Q. And what did it find?

A. Well, the Patent Office found that the patent application was deemed worthy of granting the '404 Patent.

Q. Okay. In terms of your invalidity opinion, what's your job? Are you offering any particular opinion or are you rebutting Doctor Leeb's opinion?

A. So with respect to the question of validity, my job is to consider the allegations made by Doctor Leeb with respect to this issue, and then to respond to those allegations with my own opinion.

Q. And what were the two opinions that Doctor Leeb provided with regard to invalidity today?

A. So he states -- it's his view that Mr. Laird is not the sole inventor of claims 4 and 20 of the '404 Patent, and then he also asserts that those two claims are obvious and, therefore, invalid on that basis.

Q. Okay. And let's start with the first one. Did Doctor Leeb show any of Mr. Laird's 2007 source code during his testimony?

A. During his testimony, I don't recall during his direct examination that he did.

Q. And do you remember Doctor Leeb testifying that he spent a non-zero time reviewing the code?

A. I do remember that, yes.

Q. And in your prior testimony yesterday, did you go through Mr. Laird's 2007 code and map each limitation and element of claims 4 and 20 to his code?

A. Yes, I did.

Q. And did Doctor Leeb go through the substance of Mr. Laird's code with that same analysis?

A. No, he did not.

Q. Okay. Did you hear Doctor Leeb testify that he does not believe there's any probative value at all to the reconstructed prototype demonstration?

A. I did hear that, yes.

Q.   And do you agree with that?

A.   I do not.

Q.   Why not?

A.   Well, I think it's another piece of information, evidence that corroborates what Mr. Laird was doing back in 2007.

Q.   And so on the first question of inventorship, what is your opinion as to whether Mr. Laird is the sole inventor of claims 4 and 20 of the '404 Patent?

A.   So my conclusion is that Mr. Laird is, indeed, the sole inventor of claims 4 and 20 of the '404 Patent.

Q.   Okay.  Let's take a look at the second question here, whether the '404 Patent was obvious.

So Doctor Leeb had pointed to certain testimony from Mr. Laird in the prior part that says reducing nuisance is obvious.  What did Mr. Laird actually say about the reduction of nuisance as claimed in the '404 Patent?

A.   So as shown here, he was asked whether the concept -- I'll read it.  "So the concept in your invention of reducing nuisance in the '404 Patent was obvious in June of 2007."

His response, "No."

So when asked in the specific context of this patent, his response was that it was not obvious.

Q.   And in what respect is reduction of nuisance at issue in this case?

A.   Well, it's relevant to the question of invalidity.

Q.   Okay.  Did you hear -- did you see Doctor Leeb testify about this slide?

A.   Yes.

Q.   And did you hear Doctor Leeb testify that this is not rocket science to come up with these three options?

A.   I did hear that, yes.

Q.   Now, sir, we heard your qualifications yesterday.  Right?

A.   Yes.

Q.   And you worked at NASA JPL?

A.   For several years, yes, I did.

Q.   So are you an actual rocket scientist?

A.   Well, I was working on spacecraft, so I guess I could maybe be a spacecraft scientist.  So perhaps that's close enough.

Q.   Well, would you agree with Doctor Leeb's statement that UL 325 leaves only these three options?

A.   I don't agree with that.

Q.   Why not?

A.   Well, because there's the sort of space of possible solutions that various ways that you could implement UL 325 is bigger than -- there are more options than what's shown here.

Q.   Okay.  Do you remember this slide from Doctor Leeb related to what he claimed to be a prior art, Pro Max?

A.   I do, yes.

Q. And did Doctor Leeb show any source code for Pro Max?

A. He did not.

Q. Did Doctor Leeb show the ladies and gentlemen of the jury any full pages of this operating manual?

A. Other than the front cover that you see on the left of this demonstrative, no.

Q. What do these screenshots show?

A. Well, in the upper right, it shows that if you press the remote control or the wall control, the door will move from open to close or close to open. And then on the lower right, it's a screenshot of the UL 325 logo and compliance statement.

Q. Anything else?

A. Well, the cover page. That's the cover of the document.

Q. And is that it?

A. FCC certified, convenience features, the picture of the head unit on there, effective January 1, 1993, for the UL compliance.

Q. Do you see the claims and inventions of Mr. Laird's patent in here?

A. I do not, no.

Q. And what is that effective date of UL 325?

A. Well, that's -- that's an effective date. So UL 325, just to make sure there's no confusion, UL 325 has been used as a term both to refer to the full standard as well as to the particular one-page piece of the standard related to

unattended operation.

So what this is referring to here on this demonstrative is -- is the UL 325 full standard as it existed in 1993. So, you know, a good--what is it?--16 years or so before the page was added with unattended operation. So this -- this UL 325 that's notated here does not address unattended operation.

Q.   Okay. On the infringement side when you testified, did you rely on JTX 35, the Genie operating manual?

A.   Yes. It's one of the things I -- I discussed.

Q.   Did you only look at the manual to say that OHD Genie products infringe?

A.   No, not at all. I did other things as well.

Q.   Such as what?

A.   Well, looking at the source code and looking at the documents, the internal OHD documents describing the product, looking at testimony, deposition testimony from OHD engineers, you know, among other things.

Q.   And how much time did Doctor Leeb spend on -- or testifying on this Pro Max manual?

A.   I -- just -- when he testified today, I think it was about one minute. I didn't time it exactly, but it was very -- it was very short.

Q.   Do you think the '404 Patent that was examined by the United States Patent and Trademark Office for four years should be rendered invalid in any way by these screenshots?

A.   I do not think that the '404 Patent claims should be rendered invalid by these screenshots.

Q.   And, in your opinion, has Doctor Leeb shown that the claims -- that claims 4 and 20 of the '404 Patent are invalid?

A.   No.  He has not shown that the claims 4 and 20 of the '404 Patent are invalid, in my opinion.

            MS. CHEN:  I'll pass the witness.

            THE COURT:  Cross examination by the Defendants?

            MR. CALLAHAN:  Yes, Your Honor.

            THE COURT:  Please proceed, Mr. Callahan.

            MR. CALLAHAN:  Can I hand some binders up to Your Honor and the witness, Your Honor?

            THE COURT:  That will be fine.

            MR. CALLAHAN:  Your Honor, may I approach?

            THE COURT:  You may.

     All right, counsel.  Please proceed with cross examination.

            MR. CALLAHAN:  Your Honor.

                        CROSS EXAMINATION

BY MR. CALLAHAN:

Q.   Doctor Villasenor, good afternoon.

A.   Good afternoon.

Q.   I want to get one thing clear, Doctor Villasenor.  With respect to the issue of obviousness, is it your opinion that Doctor Leeb has not proven obviousness by clear and convincing

evidence, or is it your opinion that the asserted claims of the '404 Patent are not obvious?

A. Both.

Q. Okay. You talked about the Patent Office looking at the -- or having the application for roughly four years before the '404 Patent issued. Is that correct?

A. That's about the right amount of time, yes.

Q. Is it also correct that during that period of time, the patent examiner or examiners did not -- that there's no evidence in the record that they considered the UL 325 standard as amended in 2009?

A. I'm not sure I agree with that. I think it might be actually mentioned in the patent.

Q. You think that if the ladies and gentlemen of the jury look at the patent, they will see mention of the UL 325 standard, Doctor Villasenor?

A. I said I don't recall.

Q. Okay. You don't know one way or another.

A. That's right. I know it's not cited in the references.

Q. Okay. So that was my next question. Thank you.

When Chamberlain went to get this patent, they disclosed certain pieces of prior art to the Patent Office. Right?

A. That's right.

Q. And that helps the Patent Office because it allows the Patent Office to understand what has gone before the invention

that they're claiming so they can figure out whether that invention is, among other things, obvious or not obvious. Right?

A. I think that's generally correct, yes.

Q. And Chamberlain, when it did that, did not provide to the Patent Office the revised UL 325 standard on unattended operation that had issued only weeks before they filed for the '404 Patent. Is that correct?

A. I think that's right.

Q. You would agree with me, Doctor Villasenor, that in general terms it is an obvious thing to do in this field to try and reduce nuisances, generally speaking.

A. I think it depends on context.

Q. Okay. So you can't say that as a general matter, you agree with Mr. Laird when he says reduction in nuisance is an obvious thing to do?

A. I think in general it's something that we're all motivated to do.

Q. That was my question. So I'll ask it again.

In general, do you agree with me that people working in this field are motivated to try to reduce nuisance of garage door operators?

A. I think in general there's a desire to make them so they are less -- less of a nuisance.

Q. Okay. You understand, Doctor Villasenor, that one of the

factual questions the jury gets to decide is whether the '404 Patent is valid or invalid. Right?

A. Yes.

Q. And one of the validity issues that the jury gets to decide is whether the '404 Patent is invalid for improper inventorship. Right?

A. That's one of the issues, yes.

Q. And a person can be an inventor on a patent even if they didn't make the same type or amount of contribution to the invention and even if they didn't contribute to the subject matter of each claim of the patent. Correct?

A. I think that's right, yes.

Q. So if the jury decides that someone other than Mr. Laird contributed a significant part of any claim of the '404 Patent, then the entire patent would be invalid. Is that right?

A. Well, I think it's not quite. I think it has to do with conception.

Q. So is that, no, you disagree with my -- the question as I stated it?

A. Well, you didn't use the word -- I disagree with it because it was phrased in a way I found ambiguous.

Q. Let me ask it again, and if you find it ambiguous, please say.

If the jury concludes that someone other than Mr. Laird

contributed a significant part of any claim of the '404 Patent, then the claims -- all the claims in the '404 Patent are invalid. Do you agree with that?

A. I don't believe that's an accurate description of conception.

Q. So you do agree, though, that the jury could decide that Mr. Laird was a part inventor, but that someone else was also a part inventor, and if they do so, with respect to even one claim, all of the claims of the patent are invalid. Right?

A. I'm not familiar with the law of one claim versus multiple claims, but I know that one question before the jury is whether or not Mr. Laird was the sole inventor.

Q. And my question is, if the jury finds that Mr. Laird and someone else should both be inventors, then all of the claims of the '404 Patent would be invalid. Correct?

A. And that's a legal question. I don't know the answer to that question.

Q. You were not told by your lawyers that that is what the law is when you were doing your work in this case? Is that right?

A. I can't say that, either. I may have been told that. I just, sitting here at the moment, don't remember that.

Q. Now, Mr. Laird -- I think you talked about this. In fact, I think it was just on a slide you put up now.

You looked at the reconstruction of the 2017 -- or 2007

prototype. Is that right?

A. Yes, that's right.

Q. And you understand that that is not -- that is -- is not the actual thing Mr. Laird claimed to have done in 2007. Right?

A. The question's unclear.

Q. Okay. The actual thing, the -- the thing that Mr. Laird says he did in 2007, that thing, that device, no longer exists. Right?

A. If you're talking about the device as distinct from the code, that's correct.

Q. That's what I said. So Mr. Laird was asked by his lawyers in 2022 to reconstruct what he says he did in 2007. That's your understanding. Right?

A. Yes.

Q. And I believe the testimony you put up from him is that he had found enough parts of the correct vintage to assemble the mechanical and circuit board. Right?

A. It was something to that effect. I don't remember his exact words.

Q. And you -- that means he went and got actual parts, garage door parts, from the 2007 vintage. So he said, the 2007 device doesn't exist; I'll go make that device out of what I say are 2007 parts. Is that right?

A. That's my understanding of that vintage, yes.

MR. CALLAHAN: Now, could we turn on the elmo, please? I'm going to see if I put this on right.

Q. (BY MR. CALLAHAN) So you recognize this, don't you, Doctor Villasenor?

A. Actually I -- I don't because I'm not used to seeing it -- I mean, obviously it looks like a close-up of a -- of a -- perhaps a garage door opener, but I haven't seen it from this view before.

Q. Is this the back side, the underside, of that -- of the reconstructed prototype that Mr. Laird showed you? Do you recognize that?

A. I don't -- I don't actually recognize the -- I mean, the particular pattern of the shapes on it. I mean, it looks plausible. But I didn't look at it so closely as to memorize what it looked like.

Q. All right. Let's try this. This is your slide, and that slide shows the alleged 2022 reconstructed prototype. Right?

A. The slide does show that, yes.

Q. And if we look over here, you see there is a place where labels are supposed to be. Right?

A. Yes.

Q. And I'll represent to you that this is a close-up picture of the thing that you just showed to the jury during your examination. Is that okay?

A. That's fine. I have no reason not to believe you there.

Q. And so this is that alleged 2007 reconstructed prototype that Mr. Laird showed to you. And as you can see and as you heard Mr. Laird testify, all of the identifying documentation has been stripped off of it. Right?

A. Yes.

Q. And that is, among other things, the documentation that would tell you when it was built. Right?

A. It might have, yeah. I don't know. I don't know exactly what was removed.

Q. And we don't know -- that's the point. We don't know what information was underneath here or what it said because Mr. Laird scraped it off. Right?

A. I don't fully agree with that.

Q. Well, did you hear him testify that he scraped it off?

A. I did hear him testify, yes.

Q. Okay. And so because he scraped off the sticker that says when it was manufactured, we can't now know when it was manufactured. Right?

A. That's not correct.

Q. Okay. You agree with me that Mr. Laird scraped off the sticker that shows when it was manufactured. Right?

A. That was his testimony, yes.

Q. And you agree that Mr. Laird didn't say there was some other way for us now to know when it was manufactured now that he scraped the sticker off. Right?

A.   I don't agree with that characterization.

Q.   Do you think Mr. Laird did tell us how one would or how he knows for sure this is from 2007?

A.   Yes.

Q.   Scraping the sticker off that's got the -- then why is it he would scrape off the sticker with the manufacturing date?

A.   I think what he explained was that he -- because it was assembled from -- piecemeal from multiple different parts, that if he left the serial number on it, it would actually be deceptive in the sense that it would purport to be something that it no longer was because it wasn't a whole unit.

So he -- what he said is that he scraped it off so that it wouldn't be deceptive in that manner.

Q.   Scraped off the serial number so it wouldn't be deceptive.  Is that your understanding?

A.   That was what I understood he -- his explanation for why he did that.

Q.   Okay.  Doctor Villasenor, we just talked about this as well where you, I think, criticized Doctor Leeb for saying the UL 325 only leaves you with three options.  Do you remember that?

A.   I do, yes.

MR. CALLAHAN:  Could you leave the elmo up if you could?  I may use it again.  Thank you.

Q.   (BY MR. CALLAHAN)  And in those -- all those expert

reports that we talked about, you had to include all the opinions that you had in this case so we would know what they are. Right?

A. At the time when I delivered those reports on those issues, that's right.

Q. And you just sat there and told the jury that Doctor Leeb is wrong, there aren't only three ways to do this, that there are many ways to do this. Right?

A. It depends what this is.

Q. Well, that there are many ways, you said -- criticized Doctor Leeb for saying that the UL 325 only leaves three options. Right?

A. As he presented those options, yes.

Q. And you say, you said up on the stand just now that there are many ways to comply with UL 325, not just the three shown by Doctor Leeb. Right?

A. Yes.

Q. Your expert reports don't contain any other specific way that one could comply with UL 325 besides what Doctor Leeb said. Right?

A. I'm not sure I'd agree with that.

Q. You didn't tell the jury just now about any particular additional way that UL 325 could be complied with, did you?

A. Not just this moment, that's right.

Q. Doctor Villasenor, I want to go back to Mrs. Kelkhoff, if

we could. You were here for her testimony. Right?

A. Yes, I was.

Q. And you are aware of the testimony and evidence that went around based on the discussions of the draft UL 325 standard at DASMA. Is that correct?

A. I'm aware of some of it; perhaps not all of it.

MS. CHEN: Objection. This is outside the scope. We didn't get into DASMA at all.

THE COURT: What's your response, Mr. Callahan?

MR. CALLAHAN: This goes to validity, Your Honor. They talked about inventorship and obviousness, and this is a rebuttal to that.

THE COURT: I'll overrule the objection.

Q. (BY MR. CALLAHAN) You would agree with me, in fact, Doctor Villasenor, that it is undisputed that DASMA and the UL task force were discussing modification of the UL 325 standard to require an imminent motion alert prior to such closes. Correct?

A. That's my understanding.

Q. And it is your opinion with respect to the DASMA bulletins that a person of ordinary skill in the art would not have had access to that information. Is that correct?

A. As I understood that standard to be applied, yes.

MR. CALLAHAN: Nothing further, Your Honor. I pass the witness.

THE COURT:  All right.  Is there redirect, Ms. Chen?

MS. CHEN:  Just briefly.

REDIRECT EXAMINATION

By Ms. Chen:

Q.   Doctor Villasenor, are there ways for a company to comply with UL 325 that would not infringe the '404 Patent?

A.   Yes.

Q.   And did Overhead Door use those other ways?

A.   No.

MS. CHEN:  No further questions.

THE COURT:  All right.  Is there further cross examination?

MR. CALLAHAN:  There is not, Your Honor.

THE COURT:  All right.  You may step down, Doctor Villasenor.

THE WITNESS:  Thank you.

THE COURT:  Plaintiff, call your next rebuttal witness.

MS. SMITH:  Chamberlain calls Mr. Thomas Britven.

THE COURT:  All right.  Mr. Britven, if you'll return to the witness stand, sir.  I'll remind you, too, you are still under oath.

MS. SMITH:  And, Your Honor, may Doctor Villasenor be released, please?

THE COURT:  He may be released.

Do we have binders here, Ms. Smith?

MS. SMITH: Yes, Your Honor.

THE COURT: Let's get them passed out.

MS. SMITH: May I approach, Your Honor?

THE COURT: You may.

All right, Ms. Smith. You may proceed with direct examination.

MS. SMITH: May it please the Court.

THOMAS BRITVEN, PREVIOUSLY SWORN, testified further under oath as follows:

DIRECT EXAMINATION

By Ms Smith:

Q. Welcome back to the stand, Mr. Britven.

A. Good afternoon.

Q. Why are you here a second time?

A. I wanted to rebut Mr. Tate's testimony and talk a little bit about lost profits, put some things in perspective.

Q. You said you wanted to respond to Mr. Tate. What exactly are you responding to?

A. I'm responding to his claim of no lost profits. My opinion is that lost profits are $81.4 million.

MS. SMITH: Ms. Brunson, may I switch to the Plaintiff's table on this? I'm not sure we're wired. Thank you so much.

Q. (BY MS. SMITH) I apologize for interrupting,

Mr. Britven.

Now, why don't you agree with Mr. Tate's opinion that there are no lost profits?

A.   So Mr. Tate and I agree on a number of things.  We even agree that we agree on a number of things, and that that overlap is such that Mr. Tate's numbers should at least be in the tens of millions of dollars, and that's what I want to talk about.

Q.   Okay.

MS. SMITH:  If we could look at slide 3.

Q.   (BY MS. SMITH)  Mr. Britven, how does this slide illustrate your point?

A.   This is a picture of the shelf at Lowe's, and there's only two types of garage door openers there--the Overhead Door garage door openers and the Chamberlain.  Those are the only two.  And so -- well, I'll just stop there.

Q.   Well, why does it matter that these are often the only two options on the shelf at Lowe's, for example?

A.   Well, that's really reflective of this overall market. These two players have 90 percent of the WiFi GDO marketplace, and if a consumer cannot buy that Overhead Door WiFi GDO, they're more likely than not going to walk out the door with a Chamberlain WiFi GDO.

Q.   Okay.  So when we're talking about consumers walking into Lowe's, are we talking about any consumer who walks into

Lowe's looking for a GDO?

A.   No, not at all.  We are talking about a specific consumer here, and that specific consumer already paid an extra $39 for the WiFi capability.

Q.   So what would those specific consumers have done if they couldn't have purchased the Overhead Door WiFi GDO that they bought?

A.   For that particular group of consumers, if they couldn't purchase that accused WiFi GDO, 89.3 percent of the time they would have purchased a Chamberlain WiFi GDO.

Q.   So if 89.3 percent of the time they're walking away with Chamberlain, what happens to the other 10 percent?

A.   The other 10 percent are not included in my lost profits analysis, and any other market participant can make those sales.

            MS. SMITH:  Now, Mr. Lucero, if we can see DDX 5.6, please.  Thank you, sir.  And if we could zoom in on the demand for the patented product, that's the second, third -- second.  Thank you.

Q.   (BY MS. SMITH)  When Mr. Tate first listed the factors -- you were here during Mr. Tate's testimony.  Correct?

A.   Yes.

Q.   Okay.  He showed you this slide.  Do you agree that this is the correct factor?

A.   Yes, that is the factor--demand for the patented product.

Q. Okay. And what did Mr. Tate have to say about the demand for the patented product?

A. We agree there's demand for the patented product.

Q. Okay.

MS. SMITH: Now, if I could see DDX 5.11, and if I could see that beside 5.6, please.

Q. (BY MS. SMITH) Mr. Britven, do you recognize DDX 5.11?

A. I do.

Q. And looking at it in relation to 5.6, what's the difference here?

A. This is not the factor--demand for the features of the claimed invention. I looked at that and Mr. Tate talked about that a lot, but that is not the test. The test is what he first showed, as I understand it--demand for the patented product.

MS. SMITH: Okay. Now, if we could bring up slide 5, please.

Q. (BY MS. SMITH) Mr. Britven, I want to direct your attention to factor 2. Can you remind the jury how that factor is satisfied?

A. Well, there is two ways to satisfy this particular factor. I did them both. Chamberlain passed both of them, and only one is required.

Q. And where does Mr. Tate land on this factor?

A. I believe Mr. Tate agrees with me in substance on the

Chamberlain's but-for market share.

Q. Okay. And why does it matter that there is some disagreement between you and Mr. Tate on this factor?

A. Well, he disagrees with me relative to the no acceptable, non-infringing alternatives, but it doesn't matter. As long as there is agreement in substance on Chamberlain's but-for market share, this factor is satisfied, and the fact that we disagree on the no acceptable, non-infringing alternatives doesn't impact the analysis or the outcome. We only need one of the two.

Q. Okay. And you mentioned that market share calculation. Did Mr. Tate dispute your market share calculation?

A. Not in his testimony, no.

Q. Okay. Did we see an alternative market share calculation from Mr. Tate today?

A. No.

MS. SMITH: Turning to PDX 34, it's our manufacturing capability timeline. Thank you, Mr. Lucero.

Q. (BY MS. SMITH) Mr. Britven, we've seen this timeline a couple of times in this trial?

A. Yes, we have.

Q. Remind the jurors what periods of time are broken out in this timeline.

A. Well, we have period 1, period 2, and period 3. Period 1 is pre-COVID, and then there's no claim for basically most of

2020, and then period 3 is beginning January 2021.

Q.   Now, focusing your attention on the period 1, did we hear any evidence or testimony from Mr. Tate or Overhead Door that Chamberlain did not have the manufacturing capability pre-COVID?

A.   No, not that I heard.

Q.   So what are the lost profits calculated for that first period?

A.   They are about $29 million.

MS. SMITH:  Now, if we could go, Mr. Lucero, to DDX 5.9, please.

Q.   (BY MS. SMITH)  You recognize that from my discussion with Mr. Tate, Mr. Britven?

A.   I do.

MS. SMITH:  Mr. Lucero, if you can highlight the portion of the graph through the end of 2020, please.  Thank you, sir.

Q.   (MS. SMITH)  Now, Mr. Britven, Mr. Tate identified this as showing the problems that COVID-19 caused.  Are you asking for any lost profits during that period?

A.   No, I'm not asking for any lost profits during that period of time.  I've excluded all those sales in that period from my analysis for lost profits.

Q.   And is this chart limited to GDOs?

A.   No.  This is a company-wide look, if you will.  It would

include multiple products that Chamberlain makes.

Q.   Okay.  Now, shifting your attention to about January '21 and after, what are the -- what's your calculation of lost profits from January '21 through March of '22?

A.   If we could go back to that timeline.

Q.   Of course.

A.   It's about 52-, 53 million.

Q.   And what's Mr. Tate have to say about that?

A.   Mr. Tate disputes the ability of Chamberlain to manufacture product in that period.  He claims there is an ongoing impact due to COVID.

Q.   So there was no dispute on this first period and -- correct?

A.   No dispute on the first period.

Q.   And the 2020 with the red circle, we're not claiming lost profits during that time.  Correct?

A.   There can't be any dispute there.  There's no claim.

Q.   So the only area of disputed capacity is during this last time period.  Did I have that right?

A.   That's correct.

Q.   Now, did Mr. Tate provide any alternate calculation for any of the three time periods?

A.   No, he has not.

Q.   So given everything we've talked about, what should Mr. Tate's lost profits opinion have been?

A.   Well, at a minimum it would be $29 million for this unimpacted pre-COVID period.  That's pretty straightforward. I think we, in essence, should agree on that.

Q.   So why is he insisting that there are no lost profits?

A.   Well, he's trying to hide behind this notion of alternatives.  But as I discussed, the alternatives don't change the outcome.  It's market share analysis or alternatives.

Q.   So what I'm hearing you say is that the lost profits really boil down to a single question for the jury.  Correct?

A.   I think that's correct.

Q.   And what is that?

A.   And that's whether or not for this time period Chamberlain had capacity to make those additional sales, and here, again, it's about five percent of what they were actually doing.  And keep in mind, there's a difference between capacity and capability.

Q.   Now, we've heard a lot about global supply shortages caused by the pandemic that affect Chamberlain and others. Correct?

A.   Yes.

Q.   Okay.  Does the requirement for manufacturing capacity, does that mean that a company must have a perfect record?

A.   No.  No company has a perfect record.

Q.   Would that be realistic, in your opinion?

A.   No.   There's going to be variations, there will be blips, there will be months where they have too much and months where they don't have enough, but they work it out.   That's business.

Q.   So what's the manufacturing capacity factor, what's it actually require?

A.   It requires that they have the capacity.   They don't even have to have the physical plant, but you need to believe that they, Chamberlain, could figure out how to make that extra 5 percent.   And as the largest manufacturer of GDOs in the world, they can figure it out.

Q.   Well, what evidence do you have that Chamberlain improved its manufacturing capacity during COVID and in that post-COVID period?

A.   We have evidence where they increased the capacity of the plant by making improvements, so they saw a need or an opportunity to make improvements to grow capacity, and that's what they did.

Q.   And so what's that mean for your lost profits opinion?

A.   For my lost profits opinion, they had not only capability, they could figure it out, but actual capacity. It's the largest facility in the world, and this is -- this factor is satisfied.

          MS. SMITH:   Mr. Lucero, if I could see slide 6, please.

Q. (BY MS. SMITH) Mr. Britven, can you refresh the jury on what your overall damages opinion is, please.

A. $84.2 million, and it's comprised of basically the three numbers up on the screen--lost profits for GDOs of 63.7 million, lost profits for keypads and remotes, 17.6, and a reasonable royalty of 2.8, for a total of $84.2 million.

Q. And, Mr. Britven, Mr. Tate didn't care to check your math, but should the jurors care to check your math, where could they find this when they deliberate?

A. They should go to JTX 0005.1.

Q. Thank you so much, Mr. Britven.

MS. SMITH: Your Honor, I'll pass the witness.

THE COURT: All right. Cross examination, Ms. Tull?

MS. TULL: Yes, Your Honor. May I distribute the binders?

THE COURT: Please do.

MS. TULL: May I approach, Your Honor?

THE COURT: You may.

<u>CROSS EXAMINATION</u>

By Ms. Tull: ?

Q. Mr. Britven --

A. Good afternoon.

Q. -- good afternoon.

MS. TULL: And may it please the Court. May I

proceed?

THE COURT: Please proceed.

MS. TULL: Thank you.

Q. (BY MS. TULL) Good afternoon, Mr. Britven. You understand that Chamberlain has the burden of proof of proving damages in this case. Correct?

A. That's correct.

Q. And that means that Chamberlain has to provide proof to support its damages claim.

A. That's right.

Q. And Chamberlain has to provide the sufficient amount of proof to prove that it's entitled to lost profits. Correct?

A. Yes.

Q. And Chamberlain has the burden of proof with respect to manufacturing capacity. Correct?

A. That's also correct.

Q. And you agree, sir, that Chamberlain had a backlog of products from 2017 through the present. Correct?

A. Yes. It's typical for companies to have backlog.

Q. And Chamberlain was no exception. They had a backlog of products from 2017 through the present. Correct, sir?

A. Yes.

Q. And, Mr. Britven, you also agree that if the jury disagrees with you and finds that you have not met your burden of proof with respect to lost profits, that a reasonable

royalty is the only award of damages that could be found in this case. Correct?

A. If they disagree with lost profits, yes, reasonable royalty is the appropriate measure.

Q. And if they disagree with your lost profits analysis and feel that you have not met your burden, what is the appropriate royalty in that case?

A. Under my analysis, it would be 9.1 million.

Q. And, Mr. Britven, if the jury finds that claims 4 and 20 of the '404 Patent are not infringed, what is the appropriate amount of damages in that instance?

A. Well, in that circumstance the jury would not get to damages. There would be no damage award.

Q. And if the jury finds that the claims are invalid for either of the reasons presented in court, what is the appropriate amount of damages in that case?

A. Well, I assumed that the patents are valid and infringed and that's the predicate to my work. If we don't get to damages, there's no damage award.

Q. Mr. Britven, if the jury finds the claims invalid, there is no damages award. Is that correct?

A. That is correct.

Q. Thank you.

MS. TULL: Nothing further. I pass the witness, Your Honor.

THE COURT: All right. Is there further direct, Ms. Smith?

MS. SMITH: No, Your Honor.

THE COURT: Then you may step down, Mr. Britven.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're quite welcome.

Plaintiff, call your next rebuttal witness.

MR. ELACQUA: No further witnesses, Your Honor. We rest the rebuttal case.

THE COURT: All right. Having rested your case in chief and your rebuttal case and Defendants having rested their case in chief, do both sides rest and close, subject to final instructions to the jury and closing arguments?

MR. ELACQUA: Yes, Your Honor.

MR. CALLAHAN: Yes, Your Honor.

THE COURT: All right. Thank you, counsel.

Ladies and gentlemen, that means you've now heard all the evidence in this case, and it's 2:35 in the afternoon. There are things I have to take up with counsel outside of your presence in preparation for me being in a position to give you my final instructions on the law and then proceed to hear closing arguments from the attorneys for the parties, after which I'll instruct you to retire and deliberate on your verdict.

That will take some time. You are not needed for that

process, and I'm about to excuse you for the rest of the day. I anticipate all those things will be finished and ready by first thing in the morning, and it is my plan to begin tomorrow morning with my final instructions to you followed by counsel's closing argument, and then, as we often say, put the case in your hands while you retire to deliberate.

So you have the rest of the day to yourselves. You probably have earned it, and I think that's a welcomed break for you-all. I appreciate everything you've done in paying attention during this trial.

So when you leave the jury box in just a minute, take your notebooks with you. Leave them on the table in the jury room. Please make plans to be back tomorrow morning at 8:30, and you can anticipate that we'll begin with my final instructions, counsels' closing arguments, and then I'll direct you to retire and deliberate on your verdict. You've heard all the evidence.

Now, let me remind you, again, we are getting close to the end of the process. It would be an absolute travesty if any of my earlier instructions were not observed such that it put at risk all the work that's gone into this trial. So let me one more time remind you, don't communicate in any way about anything related about this case with anyone, including the eight of yourselves. And also, please follow all the other instructions I've given you.

Enjoy the rest of the day, and you're excused until tomorrow morning at 8:30.

(Whereupon, the jury left the courtroom.)

THE COURT: Be seated, please.

Counsel, just for your information, the Plaintiff ended the presentation of evidence with 37 minutes remaining and the Defendant ended the presentation of evidence with 15 minutes remaining in allocated trial time.

It is 20 minutes until 3:00. My intention is to recess until 3:00, at which time I'll be back on the bench and I'll then proceed to take up and hear motions from either or both parties pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

After I've heard and ruled on your motions under Rule 50(a), I'll then conduct an informal charge conference in chambers where we'll review the latest updated iterations of the proposed final jury instructions and verdict form.

After that's complete and I've had an opportunity to absorb your input and factor that into the process, I will generate what I believe to be the appropriate and proper final jury instruction and verdict form, I'll furnish it to you with an opportunity to review it, and then I'll conduct a formal charge conference on the record, at which time either party may lodge such objections to those documents that they feel are appropriate, necessary, and in the interest of their

clients.

Are there questions at this point?

MR. ELACQUA: No questions from Chamberlain, Your Honor.

MR. CALLAHAN: No questions from Overhead Door, Your Honor.

THE COURT: All right. And as I mentioned earlier, counsel, in chambers, those of you that are going to participate in the presentation of closing arguments are not required to be here for the remainder of these items this afternoon. In fact, I welcome participation from any member of your trial team that's assigned these duties. But if there are other things to be done and counsel are not delegated to take up these matters with the Court, they are certainly not required to be here.

Can you enlighten me, counsel, as to who I might expect to present closing arguments tomorrow?

MR. ELACQUA: Mr. Cordell is going to present for Chamberlain, Your Honor.

THE COURT: All right. Both the first and final closing argument?

MR. ELACQUA: Yes, Your Honor.

THE COURT: Mr. Callahan?

MR. CALLAHAN: I will present closing argument for Overhead Door, Your Honor.

THE COURT: All right. And you're not going to share your time or split your time with anyone?

MR. CALLAHAN: No, Your Honor.

THE COURT: It will be you.

MR. CALLAHAN: Yes, Your Honor.

THE COURT: That will be simple enough.

All right. If there aren't any further questions, I'll be back at 3:00 and we'll proceed with motions under Rule 50(a).

Until then, the Court stands in recess.

(Brief recess.)

THE COURT: Be seated, please.

All right. The Court will proceed to hear motions from either party pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

As is the Court's typical practice, I will hear motions from both parties or both sides of the case, and as is often the reality of it, there are diametrically opposed motions from each side to the other and vice versa.

So what I would prefer to do and what is my usual practice, I'd like a spokesman for Plaintiff and a spokesperson for Defendants to go to the podium and outline for me substantively or topically what you intend to move on under Rule 50(a). Then if I find that there are mirror-image motions, I will probably have you present competing

simultaneous argument on them for purposes of efficiency.

So let's do it in this fashion. Let me ask Plaintiff first to go to the podium and identify for the Court what matters they intend to seek judgment as a matter of law on pursuant to Rule 50(a), if any.

MR. FLANZ: Good afternoon, Your Honor. Scott Flanz for the Plaintiff Chamberlain.

THE COURT: Go ahead, counsel.

MR. FLANZ: Chamberlain will be seeking judgment as a matter of law of no inequitable conduct, no anticipation of the '404 Patent, no derivation, no improper inventorship, no obviousness, conception of claims 4 and 20 as of June of 2007, Chamberlain's products practice the '404 Patent's asserted claims, representativeness for purposes of infringement of the combo board and two board products, and infringement of claims 4 and 20.

THE COURT: All right. Let me ask you this, counsel. I'm not aware that anticipation under § 102 is a live issue in this case. Why are you moving for judgment as a matter of law on it?

MR. FLANZ: During the -- the pretrial narrowing, Defendants listed UL 325 alone or in combination with the Genie operators as a basis for invalidity.

THE COURT: You believe there's been any evidence in this case that a single reference would invalidate?

MR. FLANZ: I do not and that would be the basis for the judgment as a matter of law.

THE COURT: Okay. With regard to your motion for judgment as a matter of law of no equitable conduct, inequitable conduct is an equitable defense obviously and is typically a bench issue and not a jury issue. Where the parties raise equitable defenses, those are usually taken up by the Court after the return of a verdict.

I guess my question to you, the rule is pretty clear under 50(a) that the matter under which you would seek judgment as a matter of law is a matter that would be presented to the jury. Why is inequitable conduct a matter that would be presented to the jury and is appropriate for treatment or handling under Rule 50(a)?

MR. FLANZ: Your Honor, the motion would be limited to -- that there was no evidence or testimony by Mr. Laird or any other evidence of specific intent to deceive the Patent Office as he was testifying here about his invention, and that's a necessary element for inequitable conduct.

THE COURT: Well, again, Rule 50(a) doesn't say you can seek judgment as a matter of law on an element of a theory or defense. It says on any matter and meaning the matter as a whole that would be submitted to the jury. I don't know how I can grant judgment as a matter of law on a single element of a claim or defense under the rule.

MR. FLANZ:  Yes, Your Honor.  I also believe that the other side did not raise this defense anymore, so that would be another basis for judgment as a matter of law.

THE COURT:  I'll tell you what let's do.  Let me make sure I have in my notes here what you want to go forward on, and then I'll hear from Defendant, and maybe that will clarify some of it for us.

MR. FLANZ:  Yes, sir.

THE COURT:  So, again, no inequitable conduct, no anticipation, no obviousness, no infringement -- excuse me.  Was it a double negative, no non-infringement?  What was your request on the infringement issue?

MR. FLANZ:  Judgment as a matter of law of infringement.

THE COURT:  Of infringement.  In the affirmative.  Okay.  And what else?  What did I miss?

MR. FLANZ:  No derivation, no improper inventorship.  Then just for clarity so we have no inequitable conduct, no anticipation, no derivation, no improper inventorship, no obviousness, conception as of June of 2007, did Chamberlain's products practice the patent -- the asserted claims, infringement, and representativeness of the combo board and the two-board products of each other for infringement purposes.

THE COURT:  All right.  Let me hear from Defendants.

MR. HYDE:  Good afternoon, Your Honor.  Bradley Hyde on behalf of Defendants.

THE COURT:  What's Defendants' request here and what's Defendants' position with regard to what's been identified from Plaintiff?

MR. HYDE:  Thank you, Your Honor.

Defendants intend to move for judgment as a matter of law of no infringement of claims 4 and 20 of the '404 Patent, no earlier priority date for claims 4 and 20 of the '404 Patent, invalidity of all claims of the '404 Patent for improper inventorship, invalidity of claims 4 and 20 of the '404 Patent for obviousness in view of UL 325, and also obviousness in view of UL 325 and Genie operators.

Defendants also intend to move for judgment as a matter of law for no willful infringement, no lost profits, and no entitlement for reasonable royalty.

THE COURT:  What's Defendants' position with regard to inequitable conduct?

MR. HYDE:  I think, Your Honor, we don't agree it's something that should be decided on JMOL.

THE COURT:  Is it a live issue in this case?

MR. HYDE:  I don't think it's a live issue in this case, Your Honor, because we chose not to assert it and push this just to conserve resources, Your Honor.  But I think that there was evidence presented in the case related to the

impropriety of Mr. Laird taking information and then not disclosing that to the Patent Office. And so we don't think that, because this wasn't an issue that the jury decided, that it should be now decided on JMOL.

THE COURT: Let me see if I follow you, counsel. As the Defendants in the case, it's been suggested that you have raised and believe to be a live defense in this action inequitable conduct before the Patent Office. Do the Defendants contend that the Plaintiffs engage or the inventor has engaged in inequitable conduct? Yes or no.

MR. HYDE: No, Your Honor. That was not a theory presented to the jury.

THE COURT: Okay. And it's not a live theory that you intend to present to the Court. Am I correct? I want to know if this is in or out.

MR. HYDE: That is correct, Your Honor.

THE COURT: Okay. Then inequitable conduct is not an issue before the Court now or post the verdict. Okay.

Let's see if we can get through these. Both sides obviously have moved in diametrically-opposed fashion with regard to the issue of infringement. Plaintiff's saying the Court should grant judgment as a matter of law that the asserted claims have been infringed, and Defendants saying that I should grant judgment as a matter of law that there is no infringement of the asserted claims.

Let me hear concurrent and opposing argument from the parties on that issue.

Let's begin with the Plaintiff, and then I'll hear from the Defendants.

MR. FLANZ:  Good afternoon, Your Honor.

THE COURT:  Go ahead, counsel.

MR. FLANZ:  Judgment as a matter of law should be granted as to infringement of claims 4 and 20.  The parties do not dispute the general operation of Overhead Door's products.  They're capable of receiving transmissions from both mobile phones, apps, and the RF clicker transmitters.  In response to the RF clicker transmitters, they close without alarming.  In response to mobile phone apps, they issue an alert and then close.

Doctor Villasenor performed a claim-by-claim infringement analysis relying on source code, which is JTX 0075, as well as product manuals, his own testing, and in-court demonstratives which demonstrated this operation.

Doctor Leeb conceded in his testimony that, in OHD's view, the only limitation not practiced by the accused products are the determination limitations.

JTX 004, which is an internal specification by Overhead Door, lists the '404 Patent showing that the '404 Patent and its determinations are relevant to the operation of their products.  Doctor Leeb testified that no determination was

made on a single isolated piece of hardware within the head units, but as Doctor Villasenor explained, the claims do not recite individual components.

Both Mr. Rauscher and Buescher testified that the operators make determinations like is it okay to move the door, and Doctor Villasenor analyzed that program, finding that it was a claim determination. Because only the determination limitations are disputed and because Overhead Door's witnesses admitted the relevant determinations are made, judgment as a matter of law of infringement is appropriate and should be granted.

THE COURT: All right. Let me hear argument from Defendants on this topic.

MR. HYDE: Thank you, Your Honor.

Chamberlain is not entitled to judgment as a matter of law that claims 4 and 20 of the '404 Patent are infringed and Defendants are in fact entitled to judgment as a matter of law that they do not infringe claims 4 and 20 of the '404 Patent because Chamberlain has not presented sufficient evidence for a reasonable jury to find that the accused products satisfy literally the determination limitations of claim 4 and 20.

For claim 20, the Court has construed the term operating the movable barrier imminent motion notification based on a first communication and its method of communication to mean determining operation of the movable barrier imminent

notification based on the first communication and its method of communication.

The parties and their expert agree that claims 4 and 20 require a movable barrier operator to determine whether to close the movable barrier operator with an alarm or to close it without an alarm.

Chamberlain's expert also testified that he agreed WiFi remote signals are proposed via pre-established WiFi communication pathways. Each of Overhead Door's fact witnesses confirmed that this WiFi communication pathways always result in an alarm before door movement.

Chamberlain's expert also agrees that RF or local communications are received via pre-established RF communication pathways. And, once again, each of Overhead Door's fact witnesses confirm that this local communication pathway never results in alarm before the door's movement.

Accordingly, the accused products do make the required determination whether to close the door with an alarm or close the door without an alarm.

Now, while Chamberlain's expert Doctor Villasenor opined that the determination limitations of claims 4 and 20 were met in the accused products by determinations of whether the communications are valid and determinations of whether it is safe to move the door, Mr. Laird, the inventor of the '404 Patent, testified that these standard validation and safety

checks are not what his invention claims.

Moreover, Defendants fact witnesses, Mr. Rauscher, Mr. Krupke, testified that the accused products do not make a determination whether to alarm or not.  This was further confirmed by the testimony of Defendants' expert, Doctor Leeb.

No determinations on the WiFi path plus no determinations on the (unintelligible) path is still zero determinations, Your Honor.

Defendants thus respectfully request that the Court deny Chamberlain's request for judgment as a matter of law and enter judgment as a matter of law that Defendants do not infringe claims 4 and 20 of the '404 Patent.

THE COURT:  All right.  Thank you, counsel.

Let's go next to the earlier priority date issue, conception as of June 2007 versus no earlier priority date. Let me hear from Plaintiff on this, please.

Go ahead, counsel.

MR. FLANZ:  Your Honor, sufficient supports judgment as a matter of law with respect to conception of claims 4 and 20 as of June 2007.

Mr. Laird testified at length regarding his conception of the '404 Patent invention and his reduction to practice at least as of that date by virtue of JTX 0018, the 2007 Laird code.

He testified that the top right corner of that document,

that date that was listed there was generated when he compiled the code, which he would do to enter and program into a product. He described that the source code is written so that it could be programmed onto a movable barrier operator system as is visible from the source code and is confirmed by Doctor Villasenor.

The source code also shows that that movable barrier operator would operate to close with an imminent motion notification when it was operated by one type of transmitter, whereas when it's operated with another type of transmitter, it would simply close, the determination which is required by the claims.

Further, Doctor Villasenor analyzed and showed that this determination was based on a transmitter identification code as required by claim 4, or a method of communication including signal frequency, modulation, transmitter method identification code or code format, all of which are required by claim 20.

As he testified, he demonstrated this at Chamberlain, and that demonstration is substantiated by contemporaneous meetings and emails that he discussed. PTX 53, PTX 54, PTX 72, all of these are independent corroboration, not him testifying. These are other documents. Just like the existence of his source code being stored in a separate folder, that is independent corroboration of his invention

story.

Now, Doctor Villasenor analyzed this evidence on a claim-by-claim basis before the jury and testified as to conception. And he also directed Mr. Laird and programming the Laird code onto an operator so that he could examine the Laird code did exactly what Mr. Laird said.

Now, Doctor Leeb's testimony that Mr. Laird did not conceive of the invention improperly isolates limitations of the claims, saying that if you zoom in small enough on particular language, then you won't be able to find invention.

Validity is assessed not by analyzing the words in a vacuum, but by analyzing the combination of claim elements as they are recited by the patented claims. For example, determination of whether to alert in combination with closing a movable barrier imminent motion notification based on a transmitter identification code and the other determinations that are in claims 4 and 20.

As a result of all of this evidence, judgment as a matter of law of conception as of June 2007 is warranted.

THE COURT: All right. Thank you, Mr. Flanz.

Let me hear from Defendants, please. What's your position, Mr. Hyde?

MR. HYDE: Thank you, Your Honor.

Our position is that Chamberlain is not entitled to judgment as a matter of law that claims 4 and 20 of the '404

Patent are entitled to a priority date earlier than March 24, 2009.

The Defendants are entitled to judgment as a matter of law that claims 4 and 20 of the '404 Patent are not entitled to a priority date earlier than March 24th, 2009.

I heard a lot about what Mr. Laird testified, Your Honor, and I heard a lot about evidence that he testified regarding meeting invites and notices and calendar invites, none of which mention anything about his design other than what he testifies they're supposed to mean.

I heard a lot about source code that did not have his name on it other than his testimony of what it was supposed to mean. I heard about a reconstructed prototype that doesn't exist anymore other than his testimony of what it means.

And an inventor's oral testimony alone is insufficient to prove prior invention under the law. A party seeking to prove prior invention also must provide evidence that corroborates any oral testimony, especially where the oral testimony comes from an interested witness and a witness testifying on behalf of an interested party.

An inventor's own unwitnessed documentation does not corroborate an inventor's testimony about inventive facts. Chamberlain failed to present any evidence beyond Mr. Laird's own testimony confirming June 2007 as when he invented the '404 Patent. No testimony or documents confirmed any

conception or reduction to practice of the alleged invention before 2007.

Furthermore, Mr. Laird testified that he did not recall doing anything with or describing his invention to anyone between 2007 and 2009, a two-year gap. The source code, as I said, did not have his name on it. The prototype could not be found.

Defendants, thus, respectfully request that the Court deny Chamberlain's request for judgment as a matter of law and enter judgment as a matter of law that claims 4 and 20 of the '404 Patent are not entitled to a priority date earlier than March 24th, 2009 filing date.

THE COURT: All right. Thank you, counsel.

Let me ask Defendants this. Mr. Hyde, if you can answer it, fine. If not, I'll hear from any of your co-counsel.

It seems to the Court that there is probably not a live anticipation defense in this case. Plaintiffs' counsel indicated that some of the drafting indicated one or more invalidating references and, therefore, they believe, out of an abundance of caution, that an anticipation defense may be lurking out here somewhere.

Just with regard to -- as with regard to the inequitable conduct, does Plaintiff contend that the asserted claims are invalid based on any kind of a § 102 theory or are your invalidity defenses limited to the inventorship issues and an

obviousness case?

MR. HYDE: We're not pushing §102, your Honor.

THE COURT: All right. You do not believe or you do not assert that the asserted claims are invalid based on anticipation then.

MR. HYDE: We do not, Your Honor.

THE COURT: All right. Then I'm not going to hear any argument on that issue.

It's clear that there are disputed positions before the Court with regard to §103 defense and obviousness. Let me hear the parties' competing motions for judgment as a matter of law on the issue of obviousness. And since it is the Defendants' issue, let me hear from the Defendants first on this, and then I'll hear a response from the Plaintiff.

MR. HYDE: Thank you, Your Honor.

Chamberlain -- excuse me. Defendants are entitled to judgment as a matter of law that claims 4 and 20 of the '404 Patent are invalid because Defendants presented sufficient evidence that no reasonable jury could find that claims 4 and 20 of the '404 Patent were not obvious, at least in view of UL 325 or in view of UL 325 and Genie operators, Your Honor.

Doctor Leeb testified that UL 325 unattended operation provisions published on January 14th, 2009, rendered obvious all limitations of claims 4 and 20. For example, UL 325 disclosed a movable barrier operator, the use of transmitters,

a movable barrier operator closing the movable barrier with an alarm for remote operation, and a movable barrier operator closing the movable barrier without an alarm for local operation.

Doctor Leeb further testified that the UL 325 unattended operation provisions required an alarm for remote closes leaving only three ways to comply:  alarming for all closures, alarming only for unattended closures without a determination, and alarming for unattended closures using a determination. Accordingly, the claims 4 and 20 method of using a determination is obvious in light of UL 325.

Further, Doctor Leeb, Mr. Krupke, and Mr. Laird all testified that using a transmitter identification code and distinguishing between code formats to make the determination was well-known in the art.

Mr. Laird also confirmed that he did not invent the concept of alarming for unattended operation or not alarming for attended operation.  When asked what his invention actually covered, Mr. Laird stated, it's just reduced nuisance.  Mr. Laird followed, however, with reducing nuisance is obvious.  Indeed, Mr. Laird confirmed that there was nothing new or novel about reducing nuisance.

Defendants, thus, respectfully request that the Court enter judgment as a matter of law that claims 4 and 20 of the '404 Patent are invalid as obvious in view of UL 325.

THE COURT: All right. Thank you.

Let me hear from Plaintiff in response.

MR. FLANZ: Your Honor, the '404 Patent should not be found to be obvious in light of UL 325 or UL 325 in combination with the Genie operator. Doctor Villasenor explained at length that the UL 325 is insufficient even with -- UL 325 is insufficient to render obvious the '404 Patent. For example, because the determination limitations, i.e., determining to close with an alert or determining to close without an alert, based on transmitter identification code or the source of the communication were not disclosed.

Opposing counsel mentioned that movable barrier operators or transmitters or closing with an alert or closing without an alert were in UL 325. It's true that UL 325 generally discussed closing with an alert. There's no discussion of what -- rules for closing without an alert, nor is there any discussion of particular types of remote transmitters.

Looking at UL 325 alone, as Doctor Villasenor testified to the jury and explained, would not be sufficient for someone to know how to determine this -- or someone to determine based on the source of the communication what to do, nor would they know which particular methods that are laid out in the '404 Patent they should use for determining the source of the communication.

Now, adding the Genie operator doesn't solve this

problem. As we saw during the cross examination of Doctor Leeb as well as the rebuttal of Doctor Villasenor, the Genie operator was an old product that was only operable using an RF clicker. There is no WiFi capability, there is no remote alert. The fact that it was UL certified does not render it obvious that it should be combined with the unattended remote portions, nor was there any analysis by Doctor Leeb about why it would be obvious to combine an old operator without any WiFi functionality with the unattended alert functionality in the UL 325 reference.

Objective indicia of non-oviousness further support the non-obviousness of the patent claims. Testimony of Messrs. Buescher, Rauscher, and Krupke show that Overhead Door's employees were examining Chamberlain's products and patents, including specifically the '404 Patent when making their own products. Copying isn't an objective indicia of non-obviousness.

And, in particular, JTX 0004, which is the combo board specification that we spent -- that was explained to the jury lists the '404 Patent. It was written by Mr. Rauscher, and it is listed as a reference document that he believes is relevant and should be known for others when they are building products in accordance with that. This direct evidence of copying of the '404 Patent in particular supports non-obviousness.

In light of the fact that none of these -- none of the

references that they have pointed to disclose or render obvious determining between multiple different types of transmitters and how to determine them and what to do in light of those different determinations, judgment as a matter of law of non-obviousness is appropriate and we -- the Court should deny their motion for judgment as a matter of law of obviousness.

THE COURT: All right. Thank you, counsel.

Let's next take up the competing positions of the parties under Rule 50(a) regarding the issue of improper inventorship. This is also a defensive matter raised by Overhead Door. I'll hear from them on this first.

MR. HYDE: Thank you, Your Honor.

The Defendants are entitled to judgment as a matter of law that all claims of the '404 Patent are invalid because Defendants presented sufficient evidence that no reasonable jury could find that all of the actual inventors of the '404 Patent were named on the patent as inventors.

Although Mr. Laird testified his invention reduced nuisance by only triggering an alarm for remote operation rather than all the time, Mr. Laird testified that he did not invent alarming for remote closes and not alarming for local closes.

Instead, documentary evidence and testimony from Ms. Kelkhoff, Chamberlain's regulatory lead, and Mr. Krupke,

Overhead Door's engineer, showed that the DASMA subcommittee came up with the idea of alarming for remote operation and continuing to not alarm for local operation. Ms. Kelkhoff communicated this idea to Chamberlain and to Mr. Laird. Mr. Laird received the DASMA committee's subcommittee idea before he alleges to have conceived his invention claimed in the '404 Patent.

Nor is there a question that the idea of alarming for unattended closes of GDOs and not alarming for attended closes is a significant portion of the '404 Patent's invention because the 2015 patent notice letter sent to Overhead Door citing the '404 Patent described it as, quote, "Relating to control of when to provide a warning prior to closing a garage door," end quote. And Mr. Laird confirmed that the remaining limitations of the patent were well-known in the prior art.

Defendants, thus, respectfully request that the Court enter judgment as a matter of law that all claims of the '404 Patent are invalid for improper inventorship and deny Plaintiff's countermotion on the same topic.

THE COURT: Thank you, counsel.

Let me hear a response from Plaintiff.

And I assume, Plaintiff, you'll incorporate into your argument your positions on no derivation as well.

MR. FLANZ: Your Honor, I'm happy to also address no derivation.

THE COURT: Please do.

MR. FLANZ: Beginning with no -- beginning with improper inventorship, as a preliminary matter during the -- prior to the trial, the parties limited their defenses and Defendants indicated that they were limiting their defenses to improper inventorship as to 4, 11, and 20. Defendants presented no evidence relating to inventorship of claim 11. They narrowed their case specifically to include claim 11, and Doctor Leeb did not utter the phrase 'claim 11' during his inventorship testimony, focusing all of his analysis on claims 4 and 20.

Now, with respect to claims 4, 11, and 20, which Defendants have challenged, Doctor Leeb identified 13 individuals as necessary to be named as inventors. However, he did not identify any particular contribution that any of the inventors have made. The Federal Circuit requires that each inventor make a significant contribution, more than just communicating well-known concepts; for example, *Dana-Farber Cancer v. Ono Pharmaceuticals*, 964 F.3d, 1365.

When asked on cross examination, Doctor Leeb could not identify what those contributions were at any level. In fact, the only evidence that Doctor Leeb was able to present as to contributions of those inventors were the meeting minutes that they ostensibly attended, but he had no evidence even that those 13 individuals were at all these meetings.

Neither Doctor Leeb nor Mr. Krupke testified that they had asked the people who they allege to be inventors whether they believe themselves to be inventors, whether their contribution to the patent was significant, what that contribution might be, or even whether they were inventors.

Now, on the other hand, Mr. Laird and Doctor Villasenor testified at length that Mr. Laird invented the patent, how he invented the patent, what his contribution was, and what the inventive aspects were.

With respect to derivation, Your Honor, respectfully, no evidence has been presented by Defendants that Mr. Laird derived the '404 Patent. Doctor Leeb failed to even use the word 'derive', 'deriving', 'derivation' in his testimony, or otherwise provide any analysis relating to derivation. No other witness discussed this topic.

Derivation requires prior conception by another and a single communication communicating that prior conception to the named inventor. Now, Doctor Leeb failed to identify during his testimony or explain what the single communication received by Mr. Laird was from the -- you know, an unnamed inventor that encompasses the entirety of the claimed invention. This is a required legal element to show derivation and they have missed it. For example, this is spelled out in *Gambro Lundia v. Baxter Healthcare*, 110 F.3d 1573.

The prior conception element has also shown not to be met when examined in light of the software functional software specification, JTX 0004. Now, that's an internal document written by Mr. Rauscher which lists the '404 Patent as a reference. The fact that OHD, who was present at many of these DASMA meetings and the UL task force meetings, still relied on the '404 Patent as opposed to the meeting notes that they're pointing -- that Overhead Door is pointing to as evidence that none of the DASMA or the UL communications were sufficient to constitute prior conception.

Doctor Villasenor and Mr. Laird's testimony, supported by JTX 0018, the 2007 Laird code, show that Mr. Laird conceived of the invention rather than deriving it for another.

As a result, the Court should grant Plaintiff's motion for judgment as a matter of law as to no improper inventorship and no derivation.

THE COURT: Thank you, counsel.

Does Defendant wish to make any particular added argument regarding the issue of derivation, or do you stand on what you previously submitted?

MR. DAVIS: Yes, Your Honor. This is Blake Davis for Overhead Door.

THE COURT: All right, Mr. Davis. Go ahead and let me hear your argument on the derivation issue.

MR. DAVIS: In this case Overhead Door also contends

that the '404 Patent is invalid because it would have been obvious to a person of ordinary skill in the art based on information derived from the DASMA and UL subcommittee.

Chamberlain's judgment for a matter of law as to derivation should be denied because the evidence adduced at trial demonstrated that communications of the conception of the invention were made to the named inventor Mr. Laird named on the '404 Patent which is relevant to whether the '404 Patent would have been obvious to a person of ordinary skill in the art at the time the invention was made.

For purposes of derivation as an obviousness defense, Overhead Door must show evidence that the claimed inventions would have been obvious in view of a communication from the DASMA and UL subcommittee.  The evidence at trial shows that such communication was made and received by Mr. Laird.

For example, on June 5th, 2007, the undisputed evidence shows that Mr. Laird received communications of a UL 325 draft unattended close provisions and commented on those drafts. The testimony at trial showed this was a significant part of the inventions claimed in the '404 Patent, as Mr. Laird testified that he purportedly conceived of the invention just two days after receiving that communication of the draft of the UL 325 unattended close provisions on June 5th, 2007.

THE COURT:  Thank you, Mr. Davis.

MR. FLANZ:  Your Honor, may I respond very briefly?

THE COURT: Very briefly.

MR. FLANZ: Your Honor, just one point.

Defendants are caught between a rock and a hard place here. On the one hand they argue improper inventorship that someone else invented this so it was new and novel, and on the other hand they say it was derived and everything else was obvious. So either they invented it and what was invented was new and novel or it was derived and everything was obvious. They can't have it both ways. It can't be both old and new.

THE COURT: All right. Thank you.

Let's turn to the issue of representativeness as to the dual board products and the combo board products. Let me hear from Plaintiff on this.

MS. TULL: Your Honor, I apologize. May I just add one note with respect to the defenses we just heard?

THE COURT: You know, I don't want to leave anybody out, Ms. Tull, but we don't have time for everybody in the room to add on.

MS. TULL: Just one sentence, Your Honor?

THE COURT: One sentence is fine.

MS. TULL: I would just like to be clear for the record that Defendants oppose Plaintiff's motion on the defenses for the same reasons that we addressed with respect to our motions with respect to obviousness, inventorship, and derivation as well, Your Honor.

THE COURT: The Court understands that, but it's no problem to explicitly put it in the record.

All right. Let me hear from Plaintiff on the dual board/combo board issue.

MR. FLANZ: Hopefully I'll try and be brief because I don't believe that there should be any dispute here. All witnesses agree that the combo board and two board products were identical with respect to claims of the '404 Patent. Mr. Rauscher testified about this. Doctor Leeb agreed, relying on Mr. Rauscher. Mr. Buescher testified about this as well.

Looking at the demonstratives that the witnesses put forward, they argue that they work identically with respect to the '404 Patent, and Doctor Villasenor agreed with this during his direct examination. And based on this, the parties have agreed that infringement of Overhead Door's products should be assessed in the verdict form as a whole rather than individually with respect to the combo board and then as -- with respect to the two board products.

In light of the fact that all testimony about the operation of the products with respect to the '404 is -- does not differentiate between the two board and the combo board, Plaintiff submits that judgment as a matter of law of representativeness should be granted.

THE COURT: All right. What do Defendants say on

this?

MR. HYDE: Thank you, Your Honor. We don't oppose. We agree, Your Honor, I think it's the position that we've maintained since last March that these products operate in the same way.

THE COURT: All right.

Let's turn to the issue of no willfulness as raised by the Defendants.

Let me hear from the Defendants on that.

MR. HYDE: Thank you again, Your Honor.

Defendants are entitled to a judgment as a matter of law that they did not commit willful infringement because Chamberlain has not presented sufficient evidence for the jury to find willfulness. During trial, Chamberlain presented no evidence that any purported infringement by Defendants was deliberate or intentional. Chamberlain only presented evidence that Defendants were aware of the patents, which falls far short of the willfulness standard.

First, Defendants' fact witness Mr. Rauscher testified that after Overhead Door received a letter from Chamberlain identifying the '404 Patent, he was asked to evaluate the patent and ensure that Overhead Door's products do not infringe.

Mr. Rauscher testified that Overhead Door's products did not use the '404 Patent and that they did not infringe the

claims of the '404 Patent because they did not determine to alarm and did not make a decision based on whether a signal was local or remote. Thus, Defendants reasonably believe they did not infringe the asserted claims.

Moreover, while Chamberlain infers willful infringement because Overhead Door cited the '404 Patent in its internal design specification, it was Chamberlain who told Overhead Door specifically to consider the '404 Patent when developing WiFi products.

And Overhead Door's fact witness, once again Mr. Rauscher, provided unrebutted testimony that he cited the '404 Patent in the specification specifically to ensure the products were designed not to infringe.

Similarly, while Chamberlain points to Overhead Door's evaluation of Chamberlain's product as some inference that Overhead copied Chamberlain's designs, Chamberlain's own fact witness Mr. Laird confirmed that both parties routinely review each other's products as they were released.

Second, Defendants' fact witness Mr. Krupke testified that upon reviewing the '404 Patent in the ordinary course of his work in product design and development at Overhead Door, he was surprised to have seen a patent on a work that was originally coming out of the DASMA subcommittee developing safety standards. Thus, Defendants reasonably believed that the asserted claims were invalid for improper inventorship.

During trial, Chamberlain presented no evidence that any purported infringement by Defendants was deliberate or intentional. Chamberlain only presented evidence again that Defendants were aware of the patent.

Defendants thus respectfully request that the Court enter judgment as a matter of law that there is no willful infringement.

THE COURT: All right. What's Plaintiff's response?

MR. FLANZ: Your Honor, Defendants' motion for judgment as a matter of law of no willfulness should be denied. Ample evidence was heard by the jury that could support willfulness.

Willfulness requires a specific intent to infringe. Here, we have awareness and also the specific intent that's required. Mr. Buescher, for example, testified that he used Chamberlain's products and he uses Chamberlain's products during development, looking at their architecture and determining what they're doing better.

One of the issues that came out during the case is that the Chamberlain moved from a two-board design to a single -- sorry -- Overhead Door moved from a two-board design to a single-board design, like Chamberlain does. The evidence shows that Overhead Door follows -- or Overhead Door looked at the architecture -- the hardware architecture from Chamberlain and then incorporated it into their own designs.

Mr. Rauscher also testified that he was aware of the patent and he was studying the patent as well as Chamberlain's products while he was creating the relevant source code that was at issue in this case.

The standard is that they knew or should have known that their actions constituted an unjustifiably risk of infringement. Here that's the case. The '404 Patent is cited in JTX 0004. It's used as a relevant reference, as Mr. Rauscher testified. It was a reference that he thinks people should be aware of. He knows that the product operates differently based on whether it receives one type of communication or another.

In light of the evidence, the testimony of both of the fact witnesses who have knowledge about how the products work, as well as Doctor Villasenor's analysis, there is ample evidence to support willfulness in this case, and judgment as a matter of law by Overhead Door of no willfulness should be denied.

THE COURT: All right. Thank you.

Let's take up the damages issues as raised by the Defendants with regard to no lost profits and no reasonable royalty.

Let me hear from Defendants on this.

MR. HYDE: Thank you, Your Honor.

I'll be handling lost profits. My colleague, Ms.

Neubauer, will be handling reasonable royalty.

With respect to lost profits, Defendants are entitled to judgment as a matter of law that Chamberlain is not entitled to any lost profits because Chamberlain has not presented sufficient evidence for a reasonable jury to find that Chamberlain's entitled to lost profits.

In order to make a claim for lost profits for the '404 Patent, CGI needs to prove that it met each of the *Panduit* factors. Chamberlain did not meet that burden at trial.

First, Chamberlain failed to present sufficient evidence for a reasonable jury to find that under *Panduit* factor 2, there is an absence of available and acceptable non-infringing alternatives. Mr. Tate, Defendants' damages expert, testified that Overhead Door's documentary evidence shows that the majority of customers do not even use WiFi operators.

Defendants' fact witness Mr. Janas testified that Overhead Door actually sells significantly more non-WiFi operators than WiFi operators, and Chamberlain's damages expert, Mr. Britven, admitted this fact as well.

Mr. Tate further presented testimony on a second non-acceptable, non-infringing alternative to a product practicing the alleged invention of the '404 Patent a garage door operator that always alarmed for both unattended and attended close such as the commercialized Ryobi product.

Second, Chamberlain failed to present sufficient evidence

for a reasonable jury to find that, under Panduit factor 3, chamberlain had the manufacturing capacity to make claimed lost sales.

Mr. Tate, Defendants' damages expert, testified that documentary evidence shows that Chamberlain experienced ongoing losses and capacity problems due to the impact of supply chain disruptions caused by COVID-19 pandemic. Chamberlain's corporate representative, Ms. Alexander, testified that Chamberlain continued to have intermittent backlogs and supply chain problems through at least the middle of 2022.

Defendants thus respectfully request that the Court enter judgment as a matter of law Chamberlain is not entitled to any lost profits.

Now, at this time, Your Honor, either my colleague, Ms. Neubauer, can come up and discuss reasonable royalty, or if you prefer, Your Honor, we can hear Chamberlain's rebuttal.

THE COURT: Let me hear from your side on both issues, and then I'll hear a response from the other side on both issues.

MR. HYDE: Thank you, Your Honor.

THE COURT: Mr. Smith, you have a new lawyer you want to introduce?

MR. SMITH: Yes, Your Honor. Michael Smith for Defendants.

At this time we would ask -- like to ask the Court for leave for a lawyer to be admitted pro hac vice for the limited purpose of presenting the Defendants' reasonable royalty argument on the motions for JMOL today.

The lawyer is Ms. Rebecca Neubauer. She has worked both trials in this case. She has been admitted to practice in the courts of the District of Columbia since 2019, and we would like to ask the Court to admit her pro hac vice for the limited purpose of handling this limited portion of our argument today.

THE COURT: Does she intend to file an application with the district for pro hac vice admission?

MR. SMITH: Yes, Your Honor. I will take care of that.

THE COURT: I gather Plaintiffs have no objection to this.

MR. ELACQUA: Absolutely not, Your Honor.

THE COURT: Good.

Ms. Neubauer, I'll be happy to hear from you.

MS. NEUBAUER: Good afternoon, Your Honor. Rebecca Neubauer on behalf of Overhead Door.

Defendants are entitled to judgment as a matter of law that Chamberlain is not entitled to any reasonable royalty because Chamberlain has not presented sufficient evidence for a reasonable jury to find that Chamberlain is entitled to a

reasonable royalty on the '404 Patent.

First, Chamberlain provided insufficient evidence from which a reasonable jury could find the claimed patented features are not the sole driving factor for customers' demand. Chamberlain's own expert, Mr. Britven, admitted that other features drive demand.

Additionally, Mr. Britven and Overhead Door's fact witnesses each confirmed that Overhead Door sells more non-WiFi garage door operators than WiFi operators.

Second, Mr. Tate, Defendants' expert on damages, testified that Mr. Britven's royalty calculations overinflated the reasonable royalty, including by improperly upwardly adjusting the comparable licensing rates and by not accounting for other features and functionality associated with WiFi connectivity of garage door operators that are not covered by the '404 Patent.

So thus Defendants respectfully request that the Court enter judgment as a matter of law that Chamberlain is not entitled to any reasonable royalty.

THE COURT: All right. Thank you.

Now let me hear from Plaintiffs in response on the Defendants' motion regarding judgment as a matter of law of no lost profits and no reasonable royalty.

MS. BENEDICT: Good afternoon, Your Honor. Bailey Benedict on behalf of Plaintiffs.

THE COURT: Please proceed, Ms. Benedict.

MS. BENEDICT: Plaintiffs have presented sufficient evidence to prove up their case for lost profits, and I will start there and continue with the reasonable royalty in a moment.

The Plaintiffs presented evidence on each of the four *Panduit* factors and including specifically the requirement for non-infringing alternatives or a discussion of the market share allocation.

The -- Mr. Britven presented multiple examples of evidence and analysis of the non-infringing alternatives that were presented by Overhead Door in this case. He analyzed the non-WiFi, non-infringing alternatives and found that they do not offer the same patented features and benefits and presented evidence on that.

He also analyzed the -- the Ryobi method which -- as we've been calling it today, and showed the jury evidence of customer dissatisfaction with that method. We heard about that at length, and JTX 13 was one example exhibit to that effect.

Additionally, Mr. Britven presented evidence based on Mor-Flo v. State Industries that an analysis of the non-infringing alternatives is not the only way to deal with that factor. It is also acceptable under the law to perform a market share analysis which then renders the analysis of

non-infringing alternatives unnecessary because they are taken into account in the market.

And Mr. Britven presented evidence to the jury at length of what the parties' market shares were and of how his calculations on that market share led to his decision on -- or his -- his number on the appropriate lost profits.

Mr. Britven also presented significant evidence as to the capacity for relevant time periods, and we heard evidence on that point as well from Ms. Alexander. During her examination, she testified regarding the capacity.

Mr. Britven referenced, for example, PTX Exhibit 38 and DTX 71 and DTX 74, in his discussion in explaining that Chamberlain did have the necessary manufacturing capacity during all time periods covered by the damages analysis in this case.

With respect to the motion for no reasonable royalty, Plaintiffs have put forth sufficient evidence on the issue of reasonable royalty as well. For example, they analyzed the comparable license with Nortek, which was related to again comparable technology, and Defendants agreed that the license -- that the -- the technology at issue there was comparable. Therefore, that particular analysis did not need to be apportioned for the patented features.

Additionally, Mr. Britven explained that he also analyzed using the income approach. And during his analysis of the

income approach, he explained that he used Chamberlain's sales information as well as Overhead Door's sales information, and he did apportion those profits down to the profits specifically attributable to the features of the '404 Patent.

To the extent that the motion to -- is for a judgment as a matter of law on Mr. Britven's alternative opinion in the event that there are no lost profits of a $9 million reasonable royalty, that evidence was elicited from Overhead Door's counsel on cross, and Mr. Britven's per-unit reasonable royalty of $7 supports the alternate reasonable royalty calculations at $9 million.

And I believe that covers it.

THE COURT: All right. Thank you.

Does either side believe there is a matter properly raised under Rule 50(a) that has not been heard by the Court this evening?

MR. ELACQUA: I think we've covered everything, Your Honor. One more?

MR. FLANZ: Just one, Your Honor.

THE COURT: Okay. What have we overlooked?

MR. FLANZ: Chamberlain practices the products. Chamberlain's products practicing the '404 Patent.

THE COURT: Let me hear from you on that.

MR. FLANZ: Thank you, Your Honor, and hopefully this will be a very quick one.

Both experts from the parties, Doctors Leeb and Villasenor, opined that Chamberlain's products practice the '404 Patent's claim. Since there is no dispute, Chamberlain believes it's appropriate to move for judgment as a matter of law.

I guess one more point is that there's no dispute here that the Chamberlain's products operate in accordance with the '404 Patent, which is to say, making a determination based on the source of the communication in order to determine whether to close with a moving barrier imminent motion notification or to close without such a notification.

THE COURT: What says the Defendants on this? What say the Defendants on this?

MR. HYDE: Thank you, Your Honor.

Our position here is that JMOL is not appropriate on this because this is just an element of a claim. We do not dispute that the products -- the Chamberlain products practice the patent, but don't believe this is an appropriate matter for JMOL.

THE COURT: All right. Thank you.

With regard to the matters raised by the parties pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, the Court regularly reminds itself and the parties that the rule provides if a party has been fully heard on an issue during a jury trial and the Court finds that a reasonable jury would

not have a legally sufficient evidentiary basis to find for the party on that issue, the Court may grant a motion for judgment as a matter of law.

In light of the parameters of the rule and considering the motions that have been urged and the argument that's been presented, the Court denies the competing motions between the parties on infringement.

The Court denies the competing motions between the parties on the issue of an earlier priority date.

The Court denies the competing issues between the parties on proper or improper inventorship as well as on the issue of derivation.

The Court denies the competing positions of the parties on the issue of obviousness.

Based on the agreement of the Plaintiff on the record, the Court finds that there is no live issue before the jury or the Court in this case on the defense of inequitable conduct or on the defense of anticipation under Section 102 of the Patent Act.

Though the parties seem to be in agreement that Chamberlain's products practice the claims of the '404 Patent, the Court finds that that is an element and not a complete theory of recovery or defense and, therefore, does not find it appropriate for approval or grant under Rule 50(a).

On the issue of representativeness of the dual and combo

boards, the Court notes the parties' agreement here, and the Court holds that the evidence related to the dual board product is representative of the accused products in the case.

I believe that covers all of the matters raised by the parties under Rule 50(a).  Is anyone aware of anything the Court's overlooked?

MR. HYDE:  Your Honor, I'm not sure if we heard a ruling on damages.

THE COURT:  Ah, thank you.  The Court denies the Defendants' motion with regard to no lost profits and no reasonable royalty as well as no willful infringement.

MR. HYDE:  Thank you, Your Honor.

THE COURT:  I'll ask again, anything else I might have overlooked?

MR. ELACQUA:  Nothing from Chamberlain, Your Honor.

MR. HYDE:  Nothing from Overhead Door, Your Honor.

THE COURT:  All right.  Thank you, counsel.

Counsel, we are at just about 4:30 in the afternoon.  I suggest we take a 15-minute break.  At 4:45, I will meet you in my chambers, and we'll proceed to conduct an informal charge conference off the record, informally, where I can hear freely from the parties as to the latest proposed version of the final jury instructions and verdict form.

After I have heard freely and fulsomely from both sides on any issues where you're not in agreement or any other

issues the Court wishes to take up and get input from you upon, I'll then consider and take into account your input, and I'll generate what I believe to be the final and appropriate versions of the final jury instruction and verdict form.

At this point I believe probably that is something that I will get to you overnight, and I will take up the formal charge conference first thing in the morning. If we do that tomorrow morning rather than this evening, which right now looks to me to be probable, we'll do it at 8:00 so that by 8:30, we should be able to bring in the jury.

Take 15 minutes, and I will see you in chambers. That completes the practice under Rule 50(a), and the Court stands in recess.

(The proceedings were concluded at 4:30 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                       01/26/2023

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER