IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

THE CHAMBERLAIN GROUP, INC.,    (  CAUSE NO. 2:21-CV-084-JRG
et al.,                         )
                                (
        Plaintiffs,             )
                                (
vs.                             )
                                (
OVERHEAD DOOR CORPORATION,      )
et al.,                         (  MARSHALL, TEXAS
                                )  JANUARY 27, 2023
        Defendants.             (  8:00 A.M.
_____


VOLUME 5

_____


TRIAL ON THE MERITS


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFFS:    FISH & RICHARDSON PC, DC
                       1000 MAINE AVENUE, SW
                       SUITE 1000
                       WASHINGTON, DC  20024
                       (202) 783-5070
                       BY: MR. RUFFIN CORDELL

                       FISH & RICHARDSON PC - HOUSTON
                       1221 McKINNEY ST., SUITE 2800
                       HOUSTON, TEXAS  77010
                       (713) 654-5300
                       BY:  MR. BENJAMIN ELACQUA
                            MS. BAILEY BENEDICT
                            MS. KATHRYN QUISENBERRY

                       FISH & RICHARDSON, PC - AUSTIN
                       111 CONGRESS AVENUE, SUITE 810
                       AUSTIN, TEXAS  78701-4061
                       (512) 472-5070
                       BY:  MS. BETTY CHEN

                       FISH & RICHARDSON, PC -
                       NEW YORK
                       7 TIMES SQUARE, 20TH FLOOR
                       NEW YORK, NEW YORK  10036
                       (212) 765-2305
                       BY:  MR. SCOTT FLANZ

                       GILLAM & SMITH, LLP
                       303 SOUTH WASHINGTON AVENUE
                       MARSHALL, TEXAS  75670
                       (903) 934-8450
                       BY:  MS. MELISSA SMITH

FOR THE DEFENDANTS:    LATHAM & WATKINS LLP - CHICAGO
                       330 N. WABASH AVE., SUITE 2800
                       CHICAGO, ILLINOIS  60611
                       (312) 862-2000
                       BY:  MR. DAVID CALLAHAN

                       CARTER ARNETT, PLLC
                       8150 N. CENTRAL EXPRESSWAY
                       SUITE 500
                       DALLAS, TEXAS  75206
                       (214) 550-8188

LATHAM & WATKINS, LLP - SAN FRANCISCO
505 MONTGOMERY STREET
SUITE 2000
SAN FRANCISCO, CA 94111-2562
(415) 395-8033
BY:  MR. BLAKE DAVIS

LATHAM & WATKINS, LLP - COSTA MESA
650 Town CENTER DR. SUITE 2000
COSTA MESA, CA 92626
(714) 540-1235
BY:  MR. BRADLEY HYDE

LATHAM & WATKINS, LLP - MENLO PARK
140 SCOTT DRIVE
MENLO PARK, CA 94025-1008
(650) 470-4851
BY:  MR. GIRI PATHMANABAN

LATHAM & WATKINS, LLP - D.C.
555 ELEVENTH STREET, NW
SUITE 1000
WASHINGTON, D.C. 20004
(202) 637-2200
BY:  MS. SUSAN TULL
     MS. REBECCA NEUBAUER

SCHEEF & STONE, LLP - MARSHALL
P.O. BOX 1556
MARSHALL, TEXAS  75671
(903) 938-8900
BY:  MR. MICHAEL SMITH

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                      100 E. HOUSTON STREET
                      MARSHALL, TEXAS  75670
                      (903) 923-8546

THE COURT: Be seated, please.

Counsel, before we proceed with the formal charge conference, I'd like to take up and get into the record any items from the list of pre-admitted exhibits that were used in yesterday's portion of the trial. If prepared, please come forward and read those into the record for us.

MS. QUISENBERRY: Good morning, Your Honor.

THE COURT: Good morning.

MS. QUISENBERRY: Plaintiffs admit into evidence JTX 0071, JTX 0074, JTX 0007, and JTX 0035.

THE COURT: Any objection from Defendants?

MR. SMITH: No, Your Honor.

THE COURT: Do Defendants have a similar rendition to read into the record?

MR. SMITH: Yes, Your Honor, we do. Defendants move into evidence JTX 9, 12, 53, 54, 55.1, 55.2, 55.3, 55.4, 55.5, 55.6, 55.7, 55.8, 57, 62, 63, and 73.

THE COURT: All right. Any objection from Plaintiffs as to that rendition?

MS. QUISENBERRY: No, Your Honor.

THE COURT: Thank you, counsel.

MR. SMITH: Thank you.

THE COURT: All right. We'll now proceed to conduct a formal charge conference on the record.

After the close of evidence yesterday and after the Court

heard arguments and considered and ruled on the issues raised by both parties or all parties pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, the Court thereafter conducted an informal charge conference in chambers with counsel for the parties where there was an open and fulsome opportunity to review the most current proposed versions of the final jury instructions and verdict form.

The Court had an opportunity to fully hear from all sides regarding areas where the parties were not in agreement as well as any areas that were otherwise appropriate for discussion. After a, as I say, fulsome discussion on all these issues, the Court concluded the informal charge conference and yesterday evening took into account the input from the parties and counsel and generated what it believes to be the appropriate and proper final jury instructions and verdict form.

Those have been transmitted to counsel with an opportunity to review and consider the same, and the Court will now proceed to conduct a formal charge conference on the record where the parties can raise any objections they feel are appropriate, proper, and necessary.

With that, counsel, I'd like to do this as is in my typical fashion, and that is, I'd like a single spokesperson for Plaintiff and a single spokesperson for Defendants to go to the podium, to stay there, and we will walk through both

the final jury instructions and then the verdict form on a page-by-page basis.

When I get to any particular page, if you have an objection to raise, either as to something that's been included or something that's been omitted, I'll hear from each side, as I say, on a page-by-page basis. And that way it's entirely -- it's much less likely that we will miss or overlook anything unintentionally.

Mr. Callahan, you're on feet. Do you have something for me?

MR. CALLAHAN: Just to say that Mr. Blake Davis will be our single person. He was with Your Honor yesterday, and he's going to bring it home for us.

THE COURT: That will be just fine. All right.

Whoever's going to speak for the respective parties, if they'll go to the podium, we'll begin the process. We'll start with the final jury instructions.

I see Mr. Davis and Mr. Elacqua at the podium. So with that, let's proceed. Let's begin, as I say, with the final jury instructions.

Are there any objections from either party to page 1, being the cover page, of the final jury instructions.

MR. ELACQUA: No from Chamberlain, Your Honor.

MR. DAVIS: No from Overhead Door.

THE COURT: Turning then to page 2 of the final jury

instructions, are there objections here from either party?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door.

THE COURT:  Turning to page 3, are there any objections?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door.

THE COURT:  Turning to page 4, are there any objections?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door, Your Honor.

THE COURT:  Turning to page 5, are there any objections?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door.

THE COURT:  Next is page 6.  Are there any objections here?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door.

THE COURT:  Turning to page 7, are there any objections?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door.

THE COURT:  Next is page 8.  Are there any objections?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door.

THE COURT:  Turning to page 9, are there any objections here?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door as well.

THE COURT:  Turning then to page 10 of the final jury instructions, are there any objections here?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning next to page 11, are there any objections?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door.

THE COURT:  Turning to page 12, are there any objections?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door as well.

THE COURT:  Next is page 13.  Are there any objections?

MR. ELACQUA:  No from Chamberlain, Your Honor.

MR. DAVIS:  No from Overhead Door.

THE COURT:  Turning to page 14, are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning then to page 15, are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door.

THE COURT:  Next is page 16.  Are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 17, are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door.

THE COURT:  Next is page 18.  Are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door.

THE COURT:  Next is page 19.  Are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door.

THE COURT:  Turning then to page 20, are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  Your Honor, Overhead Door objects to the

sentence -- it's in the second paragraph from the bottom which starts, One who merely suggests a result to be accomplished rather than the means of accomplishing it is not an inventor, as an incorrect statement of law.

THE COURT:  All right.  That objection is overruled. Anything further from either party on page 20?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door.

THE COURT:  Then we'll turn to page 21.  Any objections here?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door.

THE COURT:  Next is page 22.  Are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Next is page 23.  Are there any objections here?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door.

THE COURT:  Turning then to page 24, are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 25, are there any

objections here?

MR. ELACQUA:  Your Honor, Chamberlain objects to the bottom of page 25, and it goes on to the top of 26, the statement, a lump sum royalty is when the infringer pays a single price for a license covering both past and future infringing sales.  If you decide that a lump sum is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Chamberlain for Overhead Door's past and future infringement.

THE COURT:  What's the basis of that objection, Mr. Elacqua?

MR. ELACQUA:  Your Honor, we object to that as that instruction does not comport with the evidence in the case; that it would be confusing to the jury to hear an instruction and be instructed on future infringement, which would be a matter for the Court after a jury verdict; and that it would be prejudicial to Chamberlain to instruct them according to this statement.

There's been no evidence in the case about potential damages being awarded for future infringement or any discussion of the lump sum for future infringement.

THE COURT:  All right.  That objection's overruled. Anything further from either party on page 25?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT: Let me mention this to you, counsel.

In the middle of page 25 in the paragraph that begins, A royalty payment is made to a patentholder, about five or six lines down a sentence begins, Therefore, if you find Chamberlain is entitled to damages, I intend to modify that sentence to say, Therefore, if you find Chamberlain is entitled to damages in the form of a reasonable royalty, you must decide.

Any objections to that modification from either party?

MR. ELACQUA: Just so I'm clear, Your Honor, that would be the entirety of the sentence?

THE COURT: No. It would then continue just as it is now after the comma --

MR. ELACQUA: Okay.

THE COURT: -- you must decide whether the parties would have agreed, et cetera.

MR. ELACQUA: Yes, Your Honor. No objection here. And I just want to make sure for the record we do object to that fully paid-up lump sum sentence. I missed that from my prior statement. I only focused on the last paragraph of 25.

THE COURT: Okay. Any objection from Defendants?

MR. DAVIS: No objections from Defendants.

THE COURT: All right. Chamberlain's objections on page 25 and 26 as previously noted are overruled.

We'll turn now to page 26. Is there anything in the form

of an objection from either party on page 26, other than what's already been mentioned?

MR. ELACQUA:  Just on the next paragraph on 26, I covered the top of the -- top of the paragraph that went over, there's a statement fully paid-up lump sum.  For the same reasons, we object to that.

THE COURT:  Any objection here from Defendants?

MR. DAVIS:  No objection, Your Honor.

THE COURT:  All right.  Also, counsel, in the first full paragraph on page 26 that begins, If you find Chamberlain is entitled to damages, as with the earlier modification I mentioned, I intend to insert after the word 'damages', in the form of a reasonable royalty, then continue on with the remainder of the sentence as it is, which is, you must decide whether the parties would have agreed to a running royalty or a fully paid-up lump sum royalty at the time of the hypothetical negotiation.

Any objection from either party as to the addition of those words, quote, in the form of a reasonable royalty, as noted?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  All right.  Then without anything further on page 26, we'll turn to page 27.  Any objections to anything on or omitted from page 27?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  All right.  And as you are aware, counsel beginning on the bottom of page 26 and consuming the totality of page 27 and the first few lines at the top of page 28, the Court has included all 15 of the *Georgia-Pacific* factors.

It's my understanding that neither party objects to the Court charging this jury in this case on all 15 of those factors.  Is that correct?

MR. ELACQUA:  That's correct from Chamberlain, Your Honor.

MR. DAVIS:  That's correct for Overhead Door, Your Honor.

THE COURT:  All right.  Then we'll turn to page 28 of the final jury instructions.  Are there any objections here from either party?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door.

THE COURT:  Turning then to page 29, are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Then turning to page 30, the final page of the final jury instructions, are there any objections here?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  All right, counsel.  Let's now turn to the verdict form.  It's been prepared and furnished in the same manner as the charge or the final jury instructions, and we'll approach it in the same manner.

Beginning with the first page or the cover page of the verdict form, is there any objection here from either party?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 2 where definitions are included, are there any objections here from either party?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 3 where instructions to the jury are included, are there any objections here?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 4 where Question 1 is included, are there any objections here?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 5 where Questions 2A and 2B are included, are there any objections here?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 6 of the verdict form where Question 3 is found, are there any objections here?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 7 where Question 4A is found, are there any objections?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  Turning to page 8 where Questions 4B and 4C are found, are there any objections?

MR. ELACQUA:  Yes, Your Honor.  For the same reasons we discussed within the charge, we object to the lump sum question.

THE COURT:  All right.  That objection is overruled. Anything further from either party on page 8?

MR. DAVIS:  None from Overhead Door.

MR. ELACQUA:  None from Chamberlain, Your Honor.

THE COURT:  And turning then to page 9 of the verdict form which is the final page of this document, are there any objections here from either party?

MR. ELACQUA:  None from Chamberlain, Your Honor.

MR. DAVIS:  None from Overhead Door, Your Honor.

THE COURT:  All right.  That will complete the final charge conference, counsel.

I need a few minutes to make the very minor corrections we've noted or changes, rather, and I will, as I mentioned earlier in the case, print and provide to the jury eight individual copies of the final jury instructions for them to have when they retire to the jury room.  That will take just a few minutes.

As soon as that's complete, I will be back and we'll proceed with bringing in the jury, having the Court charge the jury, having counsel present their closing arguments, and at that point I intend to direct the jury to retire and deliberate on their verdict.

Is there anything further from either party at this point?

MR. ELACQUA:  Nothing from Chamberlain, Your Honor.

MR. CALLAHAN:  Nothing from Overhead Door, Your Honor.

THE COURT:  All right.  We stand in recess.

(Brief recess.)

THE COURT:  Be seated, please.

All right, counsel.  I'm about to bring in the jury and proceed to give them the Court's final instructions after which counsel will present their closing arguments.

I want to remind everybody present in the courtroom, including those behind the bar, that I don't want any disruptions of any kind.  I consider the Court's charge and

counsel's final arguments as the most serious part of a very serious proceedings.  So if you need to come and go or pass some papers or make some noise, do it now.  But once I bring the jury in, I expect the room to be quiet and respectful uniformly.

And if you have a device with you that would possibly make a noise, double-check it now and make sure it's either turned off or on silent.  Again, it's my view that what we're about to undertake is the most serious part of a very serious proceedings so I don't want any disruptions or interruptions of any kind.

All right.  Is there anything from either Plaintiff or Defendants before I bring in the jury?

MR. ELACQUA:  Nothing from Chamberlain, Your Honor.

MR. CALLAHAN:  Nothing from Overhead Door, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  Welcome back.  Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I will now instruct you on the law that you must apply.

I want you to each understand that you're going to have

your own individually printed copy of these final jury instructions that I'm about to give you orally, and you'll have those with you in the jury room when you retire.  So unless you just want to make or take notes, that's not necessary because you'll have your own printed copy of these to review in the jury room.  I would much prefer you listen carefully and focus on what I'm about to tell you.

It's your duty to follow the law as I give it to you.  On the other hand and as I've said, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or may make over the course of these instructions as an indication to you that I have any opinion about the facts in this case.

Now, you're about to hear closing arguments from the attorneys for the competing parties.  Statements and arguments of the attorneys are not evidence, ladies and gentlemen, and they are not instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you'll take this verdict form with you to the jury room.  And when you have reached a unanimous agreement as to the questions in the verdict form, you will have your foreperson fill in the appropriate blanks in the verdict form reflecting your unanimous agreements.  Your foreperson will then sign it and

date it.  And when that is complete, your foreperson should notify the Court security officer.

Answer the questions in the verdict form from the facts as you find them to be.  Do not decide, ladies and gentlemen, who you think should win this case and then answer the questions request to reach that result.  Your answers and your verdict must be unanimous.

Now, determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them; you may consider all the stipulations of the parties; and all the exhibits received and admitted into evidence, regardless of who may have introduced them.

You, the jury, are the sole judges of the credibility and believability of all the witnesses and the weight and effect, if any, to give to the evidence that's been presented.  In deciding the facts in this case, you'll have to decide which testimony to believe and which testimony not to believe.  You alone are to determine the questions of credibility or truthfulness of the witnesses.

And in weighing the testimony of the witnesses, you may consider a witness' manner and demeanor on the witness stand, any feelings or interest the witness may have in the case, any prejudice or bias about the case that the witness may have, and you may consider the consistency or inconsistency of their

testimony, considered in the light of the circumstances.

Has the witness been contradicted by other evidence?  Has he or she made statements at other times and in other places contrary to what they said on the witness stand?  Again, you must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind, ladies and gentlemen, that a simple mistake does not mean that a witness is not telling the truth.  You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

As I've told you previously, the attorneys in this case are acting as advocates for their competing parties -- the competing parties, their competing clients, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court.

When the Court sustained an objection to a question addressed to a witness, you must disregard that question entirely, and you may draw no inference from its wording or speculate about what the witness would have said if the Court would have permitted them to answer the question.

On the other hand, if the objection was overruled, then you must treat the question and the answer to that question just as if no objection had been made.  And by allowing the testimony or other evidence to be introduced over the

objection of an attorney, the Court did not indicate to you any opinion about the weight or effect of that evidence.

Now, at various times over the course of the trial, it's been necessary for the Court to talk with the lawyers outside of your hearing, either by calling them here to the bench or by talking to them while you were outside of the courtroom. This happens because in trials things arise that do not involve the jury. You should not speculate, ladies and gentlemen, about what was said during such discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or called circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts. As a general rule, the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you find the facts based on the evidence presented, both direct and circumstantial.

Now, it's possible that the parties may have stipulated or agreed to some facts in this case. And when the lawyers for both sides stipulate as to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence and regard the fact as proven.

These facts are not disputed between the parties in this case:

1. The Chamberlain Group, LLC, owns all the rights to the asserted patent.

2. The '404 Patent was filed on March the 24th, 2009, and the '404 Patent issued on November the 19th, 2013. The effective filing date of the '404 Patent is March the 24th, 2009.

3. The Chamberlain Group, LLC, is a limited liability company organized under the laws of the state of Delaware, with its principal place of business at 300 Windsor Drive, Oak Brook, Illinois.

4. Overhead Door is a corporation incorporated under the laws of the state of Indiana with its principal place of business at 2501 South State Highway 121, Suite 200, Lewisville, Texas.

5. Defendant GMI, doing business as the Genie Company, Genie Company, and/or simply Genie, is a corporation incorporated under the laws of the state of Delaware with its principal place of business at One Door Drive, Mount Hope, Ohio.

6. The inventions disclosed in the '404 Patent are not the only way to comply with the UL 325 standard.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences

from the testimony and exhibits as you feel are justified in the light of common experience.  Said another way, ladies and gentlemen, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case.  However, you should not base your decision on any evidence not presented by the parties during the trial of this case, including your own personal experiences with any products that are at issue in the case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all of the evidence you believe that single witness.

Also, when knowledge of a technical subject matter might be helpful to you, the jury, a person who has special training or experience in that technical field--called an expert witness--is permitted to state his or her opinions on those technical matters.  However, ladies and gentlemen, you are not required to accept those opinions.  As with any other witness, it is solely up to you to decide whether or not to accept or rely upon the testimony of all the witnesses.

Certain exhibits over the course of the trial have been shown to you that were illustrations.  We call these types of

exhibits demonstrative exhibits or simply demonstratives. Demonstrative exhibits are a party's description, picture, or model to describe something involved in the trial. If your recollection of the evidence differs from the demonstratives, you should rely upon your recollection of the evidence.

Demonstrative exhibits are sometimes called jury aids. Demonstratives themselves, ladies and gentlemen, are not evidence, but a witness' testimony concerning a demonstrative is evidence. Demonstrative exhibits will not be available to you to review or to consider during your deliberations in the jury room.

Now, in any legal action, facts must be proven by a required amount of evidence known as the burden of proof. The burden of proof in this case is on the Plaintiff for some issues and on the Defendants for other issues. And there are two burdens of proof that you will apply in this case. They are the preponderance of the evidence and clear and convincing evidence.

Now, the Plaintiff in this case, The Chamberlain Group, which you've heard referred to simply as the Plaintiff or as Chamberlain, has the burden of proving patent infringement by a preponderance of the evidence. Chamberlain also has the burden of proving willful patent infringement by a preponderance of the evidence. Chamberlain also has the burden of proving damages for any patent infringement by a

preponderance of the evidence.

As I've told you, a preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

The Defendants in this Case, Overhead Door Corporation and GMI Holdings, Inc., which you've heard throughout the trial simply as Defendants or as Overhead Door or perhaps OHD, they have the burden of proving invalidity of Chamberlain's patent claims by clear and convincing evidence.

Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.  Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard.

If proof establishes in your minds, ladies and gentlemen, an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

As I've previously told you, these two burdens of proof are not to be confused with a separate and different burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and has no application in a civil case such as this.  Beyond a reasonable doubt is a

higher standard than both the preponderance of the evidence and clear and convincing evidence.

As I did at the start of the case, I'll first give you a summary of each side's contentions in the case, and I'll then provide you with detailed instructions on what each side must prove in order to win on each of its contentions.

As I previously told you, this is an action for patent infringement. Chamberlain contends that Overhead Door infringes certain claims of the asserted patent. Remember, there is one asserted patent. It is United States Patent No. 8,587,404, which you've heard referred to throughout the trial as the '404 Patent.

Chamberlain contends that Overhead Door infringes claims 4 and 20 of the '404 Patent. These are the asserted claims. Chamberlain contends that Overhead Door has infringed these asserted claims by making, using, selling, importing, or offering for sale certain WiFi-integrated garage door operators in the United States. I'll refer to these products collectively as the accused products.

Chamberlain further alleges that Overhead Door's infringement of the asserted patent was willful. Chamberlain contends that it's entitled to money damages in the form of lost profits and in the form of a reasonable royalty for Overhead Door's infringement. Chamberlain has the burden to prove these issues by a preponderance of the evidence.

Overhead Door denies that it infringes any of the asserted claims.  Overhead Door denies that it makes, uses, offers for sale, sells, or imports any accused product that infringes any of the asserted claims.  Overhead Door also denies that any alleged infringement was willful.  Overhead Door also denies that it owes Chamberlain any money damages.

Overhead Door also contends that claims 4 and 20 of the '404 Patent are invalid as being obvious.  Overhead Door further contends that claims 4 and 20 of the '404 Patent are invalid for improper inventorship.  Invalidity, ladies and gentlemen, is a defense to infringement.  Overhead Door has the burden to prove invalidity by clear and convincing evidence.

Invalidity and infringement are separate and distinct issues.  Your job is to decide whether Overhead Door has infringed the asserted claims and whether those claims are invalid.  If you decide that any asserted claim has been infringed and is not invalid, you will then need to decide what amount of money damages, if any, should be awarded to Chamberlain to compensate it for that infringement.  If you decide that there was any infringement and it was willful, that decision should not affect any damages award you might make.  I will take willfulness into account, if you find it, later.

Now, before you can decide many of the issues in this

case, you will need to understand the role of the patent claims.  The patent claims are the numbered sentences at the end of the patent.  The claims are important because it is the words of the claims that define what a patent covers.

The figures and the text in the rest of the patent provide a description and/or examples of the invention and they provide a context for the claims, but it is the claims themselves, ladies and gentlemen, that define the breadth of the patent's coverage.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or cover less than another claim.  As a result, what a patent covers depends, in turn, upon what each of its claims covers.

Now, you'll first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.  Now, the law says it's my role to define the terms of the claims and it's your role to apply my definitions to the issues that you are asked to decide in this case.

Therefore, as I've explained to you at the beginning of the case, I have determined the meaning of the claims and I've provided you with my definitions of certain claim terms. These definitions, or constructions they're sometimes called, are found in your juror notebooks, and you must accept my definitions of these words in the claims as being correct. It's your job to take these definitions or constructions that

I've supplied and apply them to the issues that you are deciding, including the issues of infringement and the issues of invalidity.

Now, you should disregard any evidence presented at trial that contradicts or is inconsistent with these constructions or definitions that I have given you.  For claim language or limitations that I have not construed--that is, limitations or language that I have not interpreted or defined--you are to use and apply the plain and ordinary meaning of that language as understood by one of ordinary skill in the art, which is to say, in the field of the technology of the patent, at the time of the alleged invention.

Now, the meaning of the words of the patent claims must be the same when deciding both the issue of infringement and the issue of invalidity.  And you've been provided with a copy of the asserted patent, which is in your juror notebooks, along with these constructions I have given you, and you are entitled to review those as a part of your deliberations in the jury room.

Now, the claims of the patent, ladies and gentlemen, are intended to define in words the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description or the drawings or figures of a patent can be infringed.  Each claim must be considered individually.

Now, several times in these instructions I will refer to a person of ordinary skill in the art or a person of ordinary skill in the field of the invention.  In patent law, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art.

Prior art may include items that were publicly known or have been used or offered for sale or references such as publications or patents that disclose the claimed invention or elements of the claimed invention.

Prior art may be authored or created by anyone.  Someone with ordinary skill in the art is a hypothetical person who is presumed to know all of the pertinent prior art, not just what the inventor or another particular individual may actually have known in the field of the invention at the time the application for the patent was filed.

I'll now explain to you how a claim defines what it covers.

A claim sets forth in words a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a product satisfies each of these requirements, then it is covered by the claim.  There can be several claims in a patent, and each claim may be narrower or broader than another claim by setting forth more or fewer requirements.

The coverage of a patent is assessed on a claim-by-claim basis, and in patent law, the requirements of a claim are

often referred to as the claim elements or they're called sometimes the claim limitations.  When a product meets all of the requirements of a claim, the claim is said to cover that product, and that product is said to fall within the scope of that claim.

In other words, a claim covers a product where each of the claim elements or limitations is present in that product. If a product is missing even one limitation or element of a claim, the product is not covered by the claim, and if the product is not covered by the claim, that product cannot infringe that claim.

Now, the beginning portion, we call it the preamble, of a claim often uses the word 'comprising'.  The word 'comprising', when used in the preamble of a claim, means including but not limited to, or containing but not limited to.  When comprising is used in the preamble, if you decide that an accused product includes all of the requirements or limitations of that claim, the claim is infringed, and this is true even if the accused product contains additional elements.

For example, take a claim to a table comprising a table top, legs, and glue, which would be infringed by a table that includes a table top, legs, and glue, even if that table also contains other structures or features, such as leaves that would expand the size of the table top or wheels that would go on the ends of the legs.

Now, this claim involves only independent patent claims, and independent patent claims sets forth all the requirements that must be met in order to be covered by that claim. It's not necessary to look to any other claim within a patent to determine what an independent claim covers.

There are no dependent claims at issue in this case.

If a person or a corporation makes, uses, sells, or offers to sell within the United States or imports into the United States what is covered by a patent claim without the patentholder's permission, that person or corporation is said to infringe the patent.

In reaching your decision on infringement, keep in mind, ladies and gentlemen, that only the claims of a patent can be infringed, and you must compare the asserted claims as I have construed each of them to the accused products to determine whether or not there is infringement. A comparison of the asserted claims to the accused products is the only correct comparison.

You should not compare the accused products with any specific examples set out in the patent, with prior art, with Chamberlain's own products in reaching your decision on infringement. In deciding infringement, the only correct comparison is between the accused products and the limitations or elements of the asserted claims as the Court has construed them.

You must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the competing parties over the course of the trial.

I'll now instruct you on the specific rules that you must follow to determine whether Chamberlain has proven that Overhead Door has directly infringed one or more of the patent claims involved in this case.

A patent can be directly infringed even if the alleged direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringement of the patent. A patent may also be directly infringed even though the accused direct infringer believed in good faith that what it did was not infringement of the patent. Infringement does not require that a party copied its product from the claims of the patent being asserted.

You must determine separately for each of the two asserted claims whether or not there is infringement. To prove direct infringement of a patent claim, Chamberlain must show by a preponderance of the evidence that the accused product includes each and every element or limitation of the claim.

In determining whether the accused product directly infringes a patent claim in this case, you must compare the

accused product with each and every of the requirements or limitations of that claim to determine whether the accused product contains each and every requirement or limitation recited in that claim.  A product infringes a claim if it is reasonably capable of satisfying the claim elements, even though it may also be capable of non-infringing modes of operation.

A claim requirement is literally present if it existed in an accused product just as is described in the claim language, either as I have explained or defined that language to you or, if I did not explain or define it, as it would have been understood by its plain and ordinary meaning to one of ordinary skill in the art.

If an accused product omits any element recited in a claim, then you must find that the product in question does not literally infringe that claim.  So long as an accused product has each and every one of the claim requirements, infringement of that claim is shown, even if the product contains additional features or elements not required by the claim.

Now, in this case Chamberlain also contends that Overhead Door has willfully infringed the asserted patent.  If you decide that Overhead Door has infringed, you must go on and address the additional issue of whether or not that infringement was willful.

Chamberlain has the burden of proving willful infringement by a preponderance of the evidence.  You may not decide that infringement was willful just because Overhead Door knew of the asserted patent and infringed it.  You may find that Overhead Door willfully infringed if you find that Overhead Door deliberately or intentionally infringed the asserted patent.

You may find that Overhead Door's actions were willful if Overhead Door acted in reckless or callous disregard of, or with indifference to, the rights of Chamberlain.  A defendant is indifferent to the rights of another when it proceeds in disregard of a high or excessive danger of infringement that is known to it or was apparent to a reasonable person in its position.

To determine whether Overhead Door acted willfully, consider all the facts and assess Overhead Door's knowledge at the time of the challenged conduct.  Facts that may be considered include whether or not Overhead Door reasonably believed that it did not infringe or that the asserted patent was invalid.  You may find that Overhead Door's actions were deliberate or intentional if Overhead Door was willfully blind to Chamberlain's patent rights.

Your determination of willfulness, ladies and gentlemen, should incorporate the totality of the circumstances based on the evidence presented during this trial.  Willfulness can be

established by circumstantial evidence.  If you decide that any infringement was willful, that decision should not affect any damages award that you might give.  Again, the Court will take willfulness into account later if you find it.

I'll now instruct you on the rules you must follow in deciding whether or not Overhead Door has proven that any of the asserted claims of the asserted patent are invalid.

As I've told you, an issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to throughout the trial as the PTO or the Patent Office, acted correctly in issuing the patent. This presumption of validity extends to all issued United States patents.

In order to overcome this presumption, Overhead Door must establish by clear and convincing evidence that a claim is invalid.  Like infringement, invalidity is determined on a claim-by-claim basis.  You must determine separately for each asserted claim whether that claim is invalid.  If one claim of a patent is invalid, this does not mean that any other claim is necessarily invalid.

Claims are construed in the same way for determining infringement as for determining invalidity, and you must apply the claim language consistently and in the same manner for the issues of infringement and for the issues of invalidity.  In

making your determination as to invalidity, you should consider each claim separately.

Now, as I explained to you earlier, a previous device, system, method, publication or patent that predates the claimed invention is generally called prior art and may include items that were publicly known or that have been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.

In evaluating the prior art to determine whether an invalidity defense has been proved by clear and convincing evidence, you may consider whether that prior art was or was not before the PTO.

In this case, Overhead Door contends and must prove by clear and convincing evidence that the January 2009 revision of the UL 325 standard is prior art as to the '404 Patent. You must determine whether the January 2009 revision of the UL 325 standard is prior art that can be considered in determining whether claims 4 and 20 of the '404 Patent are obvious.

To determine whether the January 2009 revision of the UL 325 standard is prior art, you must first determine the date of the invention of the asserted claims of the '404 Patent. The law presumes that the date of invention of a patent claim is the date when the patent was filed. In this case the '404

Patent was filed on March the 24th, 2009.  To establish a date of invention prior to March 24, 2009, Chamberlain must prove that Mr. Laird invented the claimed subject matter of the '404 Patent earlier.

The date of invention is either when the invention was reduced to practice or when it was conceived, provided the inventor was diligent in reducing the invention to practice. Diligence means working continuously, though not necessarily every day.

Conception is the mental part of an invention or an inventive act, that is, the formation in the mind of an inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice even if the inventor did not know at the time the invention would work.

Conception of an invention is complete when the idea is so clearly defined in the inventor's mind that if the idea were communicated to a person having ordinary skill in the field of the technology, he or she would be able to reduce the invention to practice without undue research or undue experimentation.

This requirement does not mean that the inventor has to have a prototype built, or actually explained their invention to another person, but there must be some evidence beyond the inventor's own testimony that confirms the date on which the

inventor had the complete idea.

Conception may be proven when the invention is shown in its complete form by drawings, disclosure to another person, or other forms of evidence presented at trial.  A claimed invention is reduced to practice when it has been constructed, used, or tested sufficiently to show that it will work for its intended purpose, or when the inventor files a patent application that fully describes the invention.

Oral testimony alone is insufficient to prove invention -- prove prior invention, or that something is prior art.  A party seeking to prove prior invention or prior art must also provide evidence that corroborates any oral testimony, especially where the oral testimony comes from an interested witness, or from a witness testifying on behalf on an interested party.  This includes any individual or company testifying that their invention predates the filing date of the asserted patent.

Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that an inventor's testimony or an alleged prior art inventor's testimony has been corroborated. However, an inventor's own witnessed documentation alone does not corroborate an inventor's testimony about inventive facts.

For any oral testimony that a party has put forth alleging that a particular event or reference occurred before

the filing date of the '404 Patent, that party must also have provided some sort of corroborating evidence that agrees with that oral testimony.

If you find that a party has not corroborated the oral testimony with other evidence, you're not permitted to find that the subject of that oral testimony qualifies as prior art or supports a prior date of invention.  If evidence is presented for purposes of attempting to corroborate oral testimony, then you must determine whether this evidence does, in fact, properly corroborate the oral testimony.

In making this determination, you should consider the following factors:

1.  The relationship between the corroborating witness and the alleged prior user;

2.  The time period between the event and this trial;

3.  The interest of the corroborating witness in the subject matter of this suit;

4.  Contradiction or impeachment of the witness' testimony;

5.  The extent and detail of the corroborating witness' testimony;

6.  The witness' familiarity with the subject matter of the patented invention and the alleged prior use;

7.  The probability that a prior use could occur considering the state of the art at the time; and

8.  The impact of the invention on the industry and the commercial value of its practice.

Additionally, an invention loses its status as an invention if it was abandoned, suppressed, or concealed.  This occurs when an inventor either actively conceals the invention from the public, or unreasonably delayed in making the invention publicly known.  However, mere delay is not sufficient to establish suppression or concealment.

Now, Chamberlain must prove by a preponderance of the evidence that the '404 Patent has a date of invention prior to March 24, 2009.  That is the filing date.  So, again, Chamberlain must prove that the '404 Patent has a date of invention prior to its filing date on March the 24th, 2009.  Also, Overhead Door must prove by clear and convincing evidence that the January 2009 revision of the UL 325 standard is prior art.

I'll now instruct you on how to determine whether any of the asserted claims of the asserted patent are invalid as obvious.

Even though an invention may not have been identically disclosed or identically described in a single prior art reference before it was made by an inventor to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

In this case, Overhead Door contends that claims 4 and 20 of the '404 Patent are obvious in light of the January 2009 revision of the UL 325 standard in combination with the knowledge of a person of ordinary skill in the art.

Overhead Door also contends that claims 4 and 20 of the '404 Patent are obvious in light of the January 2009 revision of the UL 325 standard in combination with the Genie Pro Max operator manual.

Overhead Door further contends that claims 4 and 20 of the '404 Patent are obvious based on information derived from communications from working groups formed by the garage door opener industry organization called DASMA and UL 325 working group that Overhead Door contends were received by the named inventor of the '404 Patent.

Overhead Door has the burden, ladies and gentlemen, of establishing obviousness by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the technology of the patent.

Now, in determining whether a claimed invention was obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and the content of the prior art, and any differences between the prior art and the claimed invention.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.  The skill of the actual inventor is not necessarily relevant because inventors may possess something that distinguishes them from persons having ordinary skill in the art.

Now, several times in these instructions I've referred to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art.  As I've mentioned, a person of ordinary skill in the art is a hypothetical person who is presumed to have known all the relevant prior art at the time of the claimed invention.

The parties agree in this case that a person of ordinary skill in the art is a person who is familiar with radio frequency transmission and reception, particularly with respect to physical actuation of devices.  The parties also agree that a person of ordinary skill in the art would hold at least the equivalent of a Bachelor's degree in a technical field such as electrical engineering, computer engineering, or computer science, or the equivalent through relevant practical experience.  More work experience can compensate for less education, and vice versa.

In considering whether the claimed invention was obvious, you must first determine the scope and the content of the

prior art.  The scope and content of the prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that's addressed by the invention.

Further, teachings, suggestions, and motivations may be found within the knowledge of a person with ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together like a puzzle.  The person of ordinary skill in the art would have the capability of understanding the scientific and the engineering principles applicable to the pertinent art.

In considering whether a claimed invention is obvious, you may, but are not required, to find obviousness if you find at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field to combine the known elements in a way that the claimed invention does, taking into account such factors as:

1.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.  Whether the claimed invention provides an obvious

solution to a known problem in the relevant field;

3.   Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.   Whether the prior art teaches away from combining elements in the claimed invention;

5.   Whether it would have been obvious to try the combination of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions; and

6.   Whether the change resulted more from design incentives or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success.  Obvious to try is not sufficient in unpredictable technologies.  In making these determinations, a person of ordinary skill uses simple common sense, and can rely upon the inferences and creative steps that a person of ordinary skill in the art would employ.

Overhead Door does not need to show that one of ordinary skill would actually have combined the physical structures of two references; one need only combine the teachings. Remember, and as I've stated earlier, prior art is not limited to patents and published materials, but includes the general knowledge that would have been available at the time to one of

ordinary skill in the field of invention.

In determining whether the claimed invention was obvious, consider each claim separately.  Do not use hindsight; consider only what was known at the time of the invention.  In other words, ladies and gentlemen, you should not consider what a person of ordinary skill in the art would know now or what has been learned from the teachings of the asserted patent.

In making these assessments, you should take into account any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention and afterwards, that may shed light on the obviousness or not of the claimed invention.

Now, the following are possible secondary considerations, but it's up to you to decide whether secondary considerations of non-obviousness exist at all.  These are:

1.  Whether the invention was commercially successful as a result of the merits of the claimed inventions, rather than the result of design needs or market pressure, advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether the inventor proceeded contrary to accepted wisdom in the field;

4.  Whether others tried, but failed, to solve the problem solved by the claimed invention;

5.  Whether others invented the invention at roughly the same time;

6.  Whether others copied the claimed invention;

7.  Whether others accepted licenses under the asserted patent because of the merits of the claim invention;

8.  Whether the claimed invention achieved unexpected results;

9.  Whether others in the field praised the claimed invention;

10.  Whether there were changes or related technologies or market needs contemporaneous with the invention; and

11.  Whether persons having ordinary skill in the art at the time of the invention expressed surprise or disbelief regarding the invention.

These factors are relevant only if there is a connection or a nexus between the factors and what differentiates the claimed invention from the prior art.  Chamberlain has the burden to establish this connection or nexus.  Moreover, even if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all the other evidence in this case in determining whether Overhead Door has proven that the claimed invention would have been obvious.

Remember, and as I've stated earlier, that prior art is not limited to patents and published materials, but includes

the general knowledge that would have been available at the time to one of ordinary skill in the field of the invention. If you find that Overhead Door has proven the obviousness of an asserted claim by clear and convincing evidence, then you must find that claim is invalid.

A patent may also be proven to be invalid if Overhead Door proves, by clear and convincing evidence, that there is improper inventorship. An issued patent is presumed to name the true and only inventors.

In this case, Overhead Door contends that the '404 Patent is invalid because of improper inventorship. To prove this, Overhead Door must show that not all of the actual inventors of the '404 Patent were named on the patent as inventors. If Overhead Door proves improper inventorship for any of the '404 Patent claims, all of the '404 Patent claims are deemed to be invalid.

To be an inventor, a person must make a significant contribution to the conception of at least one or more specific claims of the patent. Whether the contribution is significant is measured against the scope of the full invention. If someone only explains to the actual inventors a well-known concept or the current state of the art, he or she is not an inventor. One who merely suggests a result to be accomplished, rather than the means of accomplishing it, is not an inventor. What is required is some significant

contribution to the invention that is claimed.

Persons may be inventors even if they do not make the same type or amount of contribution, and even if they do not contribute to the subject matter of each claim of the patent. Persons may be joint or co-inventors even though they do not physically work together, but they must have some open line of communication during or at approximately the time of their inventive effort.

In making the determination whether the '404 Patent is invalid for lack of proper inventorship, you must consider the patent in its entirety and any related evidence and testimony. However, testimony alone is insufficient to support a claim for improper inventorship.  A claim for improper inventorship must be supported by corroborating evidence.  This corroborating evidence includes physical, documentary, or circumstantial evidence or reliable testimony from individuals other than the interested party.

In this case, Overhead Door also contends that the '404 Patent is invalid because it would have been obvious to a person of ordinary skill in the art based on information derived from the DASMA/UL subcommittee.  In determining obviousness by derivation, communications of the conception of the invention to the inventor named in the '404 Patent may be relevant to whether the '404 Patent would have been obvious to a person of ordinary skill in the art at the time the

invention was made.

As to such communication, there is no requirement that the communication be sufficient to enable one of ordinary skill in the art to make the patented invention, but Overhead Door must show by clear and convincing evidence that the claimed inventions would have been obvious in view of such communication.

If you find that Overhead Door has infringed any valid claim of the asserted patent, you must then go on to consider what amount of damages, if any, to award to Chamberlain.

I will now instruct you, ladies and gentlemen, about the measure of damages.  But by instructing you on damages, I am not suggesting which party should win this case on any issue. If you find that Overhead Door has not infringed any valid claim of the patent, then Chamberlain is not entitled to any patent damages.

Chamberlain has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Chamberlain establishes that it more likely than not suffered as a result of Overhead Door's infringement.  While Chamberlain is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. Chamberlain is not entitled to damages that are remote or only speculative.

The damages that you award, if any, must be adequate to compensate Chamberlain for any infringement that you may find. You must not award Chamberlain more damages than are adequate to compensate it for the infringement.  And you must also not include any additional amount for the purpose of punishing Overhead Door or for the purpose of setting an example.

Now, there are different kinds of money damages that are available for patent infringement.  One kind of damages is lost profits.  Another kind of damages is a reasonable royalty, and I'll instruct you on both of these kinds of monetary damages.

Lost profits, ladies and gentlemen, consist of any actual reduction in business profits Chamberlain suffered as a result of Overhead Door's infringement.  A reasonable royalty is defined as the money amount Chamberlain and Overhead Door would have agreed upon as a fee for the use of the invention at the time prior to when infringement began.  Regardless of the type of damages you may choose to award, you must be careful to ensure the award is no more than is needed to fully compensate the party whose patent rights are infringed.

Chamberlain seeks lost profits for certain sales made by Overhead Door that Chamberlain contends it would have made if Overhead Door had not infringed.  You will have to determine whether Chamberlain is entitled to lost profits.

To recover lost profits, Chamberlain must show a causal

relationship between the infringement and Chamberlain's loss of profits.  In other words, Chamberlain must show that but for the infringement, there is a reasonable probability that Chamberlain would have earned higher profits.  To show this, Chamberlain must prove that if there had been no infringement, it would have made some portion of the sales that Overhead Door made by making, selling, using, or offering for sale the accused product.

Chamberlain is entitled to lost profits if it establishes each of the following:

1.  That there was a demand for the patented invention;

2.  That there were no available, acceptable, non-infringing substitute products;

3.  That Chamberlain had the manufacturing and marketing capacity to make any infringing sales actually made by Overhead Door and for which Chamberlain seeks an award of lost profits--in other words, that Chamberlain was capable of satisfying the demand; and

4.  The amount of profit that Chamberlain would have made if Overhead Door had not infringed.

You may have heard these factors referred to during the trial as the *Panduit* factors.

Demand for the patented product can be proven by significant sales of a patentholder's product or significant sales of an infringing product containing the patented

features.

To be an acceptable non-infringing substitute, a product must have had one or more of the advantages of the patented invention that were important to people who actually used an alleged infringer's product, not just the public in general. If users of an alleged infringer's product were motivated to use that product because of features available only from that product and a patentholder's patented product, then some other alternative product is not an acceptable substitute, even if it otherwise competed with a patentholder's and an alleged infringer's products.

An alternative product may be considered available as a potential substitute even if the product was not actually on sale during the infringement period.  Factors suggesting the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available at the time of infringement.

Factors suggesting the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether the alleged infringer had to design or invent around the patented technology to develop an alleged substitute.

Even if there were non-infringing substitutes available, a patentholder may be awarded a share of profits equal to its market share.  In this case, if Chamberlain establishes that

it would have made some but not all of Overhead Door's sales but for the infringement, the amount of sales that Chamberlain lost may be shown by proving Chamberlain's share of the relevant market, excluding infringing products.

In determining a patentholder's market share, the market must be established first, which requires determining what products are in that market.  Products are considered in the same market if they are considered sufficiently similar to compete against each other.  Two products are sufficiently similar if one does not have a significantly higher price than or possess characteristics significantly different from the other.

A patentholder is only entitled to lost profits for sales it could have actually made.  In other words, Chamberlain must show that it had the manufacturing and marketing capability to make the sales it said it lost.  This means Chamberlain must prove by a preponderance of the evidence that it could have made and sold, or could have had someone else make and sell for it, the additional products it says it could have sold but for the infringement.

A patentholder may calculate its lost profits on lost sales by computing the lost revenue for sales it claims it would have made but for the infringement and subtracting from that figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as the

cost of goods, sales costs, packaging costs, and shipping costs.  Certain fixed costs that do not vary with increases in production or scale, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from a patentholder's lost revenue.

Now, what I've just instructed you on is the method for determining whether Chamberlain is entitled to lost profits as a measure of damages for patent infringement.  Chamberlain seeks lost profits for certain sales made by Overhead Door.

For certain of Overhead Door's allegedly infringing products, Chamberlain seeks damages in the form of a reasonable royalty.  In patent law, damages for infringement may not be less than a reasonable royalty.  Therefore, if you find infringement of any valid claim, but you do not find that Chamberlain is entitled to lost profits, or you find that it is proven -- or you find that it has proven its claim for lost profits for only a portion of the infringing sales, Chamberlain is still entitled to a reasonable royalty for all acts of infringement by Overhead Door.

And I'll now instruct you on how to calculate reasonable royalty damages.

A royalty, ladies and gentlemen, is a payment made to a patentholder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patentholder and the alleged infringer

would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when infringement first began.

You must decide whether Chamberlain should be entitled to a running royalty or a lump-sum royalty when considering reasonable royalty damages.  Therefore, if you find that Chamberlain is entitled to damages in the form of a reasonable royalty, you must decide whether the parties would have agreed to a running royalty or to a fully paid-up lump-sum royalty at the time of the hypothetical negotiation.

A running royalty is a fee paid for the right to use the patent that is paid for each unit of the infringing products that have been sold.  If there are additional units sold in the future, any damages for these sales will not be addressed by you.  If you decide that a running royalty is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Chamberlain for Overhead Door's past infringement.

On the other hand, a lump-sum royalty is when the infringer pays a single price for a license covering both past and future infringing sales.  If you decide that a lump sum is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Chamberlain for Overhead Door's past and future infringement.

If you find that Chamberlain is entitled to damages in

the form of a reasonable royalty, you must decide whether the parties would have agreed to a running royalty or a fully paid-up lump-sum royalty at the time of the hypothetical negotiation.

In considering this hypothetical negotiation, you should focus on what the expectations of the patentholder and the alleged infringer would have been had they entered into an agreement at that time and had acted reasonably in their negotiations.

In determining this, you must assume that both parties believed that the asserted claims were valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty that you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred.

The law requires that any damages awarded to Chamberlain correspond to the value of the alleged inventions within the accused product, as distinct from other, unpatented features of the accused product, and other features such as marketing or advertising, or Overhead Door's size or market position. This is particularly true where the accused product has multiple features and multiple components not covered by the asserted patent or where the accused product works in conjunction with other non-patented items.  Therefore, the amount you find as damages must be based on the value

attributable to the patented technology alone.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.

Some of the kinds of factors that you may consider in making your determination are:

1.  The royalties received by the patentee for the licensing of the asserted patent, proving or tending to prove an established royalty;

2.  The rates paid by the licensee for the use of other patents comparable to the asserted patent.  Comparable license agreements include those covering the use of the claimed invention or similar technology;

3.  The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4.  The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.  The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business;

6.  The effect of selling the patented specialty in

promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7.  The duration of the patent and the term of the license;

8.  The established profitability of the product made under the asserted patent, its commercial success, and its current popularity;

9.  The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.  The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11.  The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12.  The portion of the profit or of the selling price that may have been customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13.  The portion of the realizable profits that should be credited to the invention as distinguished from non-patented

elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14.  The testimony and opinions of qualified experts; and

15.  The amount that a licensor, such as the patentee, and a licensee, such as the infringer, would have agreed upon at the time the infringement began if both had been trying reasonably and voluntarily to reach an agreement; that is, the amount which a prudent licensee who desired, as a business proposition, to obtain a license to the patented invention, would have been willing to pay as a royalty and yet be able to make a reasonable profit, and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors, ladies and gentlemen, referred to during the trial as the *Georgia-Pacific* factors. No one factor is dispositive, and you can and you should consider the evidence that's been presented to you in this case on each of these factors.  You may also consider any other factors which, in your mind, would have increased or decreased the reasonable royalty the alleged infringer would have been willing to pay and the patentholder would have been willing to accept acting as normally prudent business people.

You may not consider the entire value of a product containing non-patented elements in calculating a royalty unless you find (1) that the patented feature is fundamentally

integrated with the non-patented product and (2) that the patented feature is the basis for customer demand for the sale of the entire product.  Otherwise, you must apportion the value of the allegedly infringing features from the value of all other features.

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention.  An acceptable substitute must be a product that does not infringe the patent.

The damages period, ladies and gentlemen, in this case begins on May the 9th, 2017, and runs through March the 31st, 2022.  If you award damages, the amount you award must reflect damages for acts of infringement during this period of time only.

Now, with these instructions, we'll move forward to hear closing arguments for the attorneys in this case.

Mr. Cordell, you may present the Plaintiff's first closing argument.  Would you like a warning on your time?

MR. CORDELL:  I would, Your Honor.  Could you give me a warning after I've used 15 minutes?

THE COURT:  I'll warn you when you have used 15 minutes.

MR. CORDELL:  And may we take a moment and put demonstratives up?

THE COURT:  Let's do that right now.

MR. CORDELL:  May it please the Court.

THE COURT:  Let's let Mr. Elacqua get seated.

MR. ELACQUA:  Thank you, Your Honor.

THE COURT:  You may proceed with Plaintiff's first closing argument, counsel.

MR. CORDELL:  Thank you, Your Honor.

Good morning, ladies and gentlemen.  I am Ruffin Cordell, and I'm proud to stand before you again on behalf of our client Chamberlain.

And before I say anything, I have to reiterate the thanks that -- that we really feel for all of you and, on behalf of our client, for all the time and attention you've given us. We know you had busy lives, you had other plans for this week. And as His Honor pointed out, this is such an important part of public service in this country, and we really, really appreciate it.

Now, my job over the next 40 minutes is to summarize four days of evidence, and that's a lot.  And I apologize, I'm going to have to do it quickly.  I'm a grandson of a dairy farmer, and I used to go to the auction barns.  And I don't think I can talk that fast, but I'm going to have to move through this quickly.  So I apologize in advance.

Now, this case actually comes down a pretty simple set of principles.  We all -- you know, we've heard a lot about

technology. You've had to -- to learn a lot about garage door openers and WiFi communications. I hope some of that's been pretty interesting. But at the end of the day, what we have here is a pretty simple case. Chamberlain came up with a way to create a remote-enabled garage door opener that customers absolutely love.

And Overhead Door decided, you know, we're going to look at your patents, we're going to look at your products, and we're going to then make our own product to take sales away from Chamberlain. And, ladies and gentlemen, the law says, if you use somebody's patented technology to take away sales, you have to be held accountable, and that's really what this case is all about.

And you're going to hear from Overhead Door, they say, you know, this patent's no good, this invention's no good. You know, nobody really wants a remote-enabled garage door opener. When they say that, ladies and gentlemen, ask yourself one question: Then why are you using it? If it's no good, why did you build that into your products?

And they say, oh, you know, this is -- this is -- this is no big deal, we're -- we're doing it a different way. Well, ladies and gentlemen, you heard their expert, their damages expert, yesterday say if they wanted to do it differently, they could. They could have it alarm all the time. They could have it alarm when someone's there and when someone's

not there.  They haven't done that.  They haven't done that.

So, yeah, it could be -- there are other ways they could do it, but why haven't they done that.  So that excuse doesn't work.

They go, well, you know what, this patent never should have been issued; you know, that -- that -- you know, Mr. Laird never should have been given a patent in the first place because anybody looking at the standard would know this right away.  It's obvious, they say.

But you got to ask yourself, well, if that's true, why in 2007 when they were passing around the draft standard, why didn't Overhead Door come up with the solution?

In 2009, when the standard was finalized and published and everybody had it, why didn't Overhead Door come up with the solution?

It wasn't until Overhead Door saw Mr. Laird's patent, the '404 Patent, saw Chamberlain's product out on the market and could look at it and analyze it, only then did they come up with the same solution.

And then, finally, ladies and gentlemen, they say, you know, okay, maybe -- maybe we're using it and maybe the patent's valid, but it's just not worth anything.  We're going to give you a couple of million dollars and we want you to go away.  We've made hundreds of millions of dollars in selling these products, but we're just going to give you a little bit

and we want you to go away.

But that's not fair.  That's not fair.  They took sales away from Chamberlain.  They deprived Chamberlain of its right to use its own property, to use its own technology.  And once they did that, then they have to be held accountable and they have to make Chamberlain whole.  And that's what we're here for.

So, with that, I did prepare some slides, as we always do.  Remember Mr. Laird, Ed Laird who took the stand, and he's very proud of his -- of his invention, and you got to meet him and I've enjoyed meeting him as well.  He -- he, you know, is one of the most earnest people I've at least ever seen, and I think you may have seen that when he was on the stand; that when he testified, he testified from the heart.  He has some memory issues, he acknowledged that.  But when he says something, he makes sure it's the absolute truth, and I think you could see that in the way he testified.

But he's an engineer's engineer.  He loves solving problems.  He loves motors.  You don't meet a lot of people that love motors.  And he loves his job, and he loves the fact that he can make new and better things to make all of our lives better.  That simple, elegant solution that he talked about.  You know, seeing -- seeing the -- the answer, the pathway, that nobody else saw is what really drives him.

They take Mr. Laird to task, and they say, oh, you know,

you weren't in there working on the product after you made your invention.  But that's not his job.  His job is in that advanced group that comes up with new ideas.  He then hands it off to the product engineering people, and they make the product.

And they take him to task and they say, you didn't write your patent application, you didn't do your drawings.  But, again, that's not his job.  That's the intellectual property group's job.  And you can see the patent application if you want to for yourselves.  It's in JTX 18.  You can look at it. It's all there.

Now, UL 325 said, you must have an alarm.  Hopefully it's not too loud this time.  And we -- we know what the problem was.  The problem was if you're -- if you're going to have an alarm, how do we -- how do we not make it a nuisance for our customers.  We want our customers to use these products, we want them to value them.  How do we -- how do we solve this problem?

And Mr. Laird realized that problem back in June.  They don't like the fact that he had discussions that are documented in those meeting notes.  They don't like that.  But they have no contrary evidence.  Now, granted, Mr. Laird doesn't have a crisp recollection of what happened 15 years ago, you know, almost 16 years ago now, and that's understandable.

But we do have these documents from the Chamberlain document set that he had these meetings, and it culminated in his doing a source code revision that was final on June 7th.

There is this demonstration.  Remember, the demonstration was scheduled a couple of weeks before any of this actually happened.  It had been on the calendar for some time.

Later, the UL 325 revision comes out, and everybody in the world can see it.  Chamberlain files its patent on March 24, just a few weeks -- you know, they say, well, you know, that's kind of curious that the standard came out and then they filed the patent.  But, ladies and gentlemen, you can look at that patent application if you want to.  It is a very long and involved process.  It takes some time.  And it wasn't until the standard came out that it really became necessary to get that patent in.

That patent will go for 20 years, and what we're here to talk about their use of this technology during the patent's protection period.

So let's -- let's talk a little bit about Mr. Laird's invention.  And let me -- let me pause on the timeline for just one second, ladies and gentlemen, because we've had a lot of testimony and a lot of -- lot of evidence about what Mr. Laird did way back in 2007, and that's important.  It is important because that's when he made his invention, that's when he created his source code, and you've seen all of that.

But let's talk about what's at issue here.  What's at issue is whether his invention date would be in 2007, June of 2007, or would it be when he filed the patent application in March of 2009.  That's the issue that we're talking about here.  So I want to be real clear about that.

And it depends a lot on what Overhead Door says.  So if Overhead Door comes in and says, you know, we're going to put some prior art in that's in between those two dates, then suddenly the June 7th stuff really matters because we've got to figure out when the patent was first invented, when was it first conceived.  But if they don't do that, then the dates aren't as important because nobody can question the fact that that patent application went in March of -- of 2009.

But we have the source code.  We have Mr. Laird's source code where he's talking about -- you know, he took us through it a line at a time.  He showed us where the invention was in the source code.  They cannot challenge him on this.

He -- we had his reconstructed prototype where he put the source code in to show you that the source code actually works and did exactly what he said it did.

They make all kinds of allegations about that prototype, and they say, well, he took the serial numbers off of one of the plastic pieces.  But you heard -- you heard what Doctor Villasenor explained, that was to make sure nobody got the wrong idea, that this wasn't -- that this was something that

he never meant it to be, because the reason why he did the reconstructed prototype was for one reason and one reason only--to demonstrate that his software actually accomplished the invention.  The hardware really didn't matter.  It was just used to show that the software actually worked.  And that's what he showed all of us here in court.

Mr. Fitzgibbon tells us that, you know, he recognized that invention that Mr. Laird made is about making an intelligent decision, making a determination based on the transmitter ID or some signal characteristic coming from the little clicker or the phone that tells the system whether this is the time to alarm.  And that -- that was an important part of this.

We had a lot debate about source code in this case, ladies and gentlemen.  I've never seen one like this.  And they take Mr. Laird to task because they say, the source code that you had on your desk on your computer, you weren't writing your name in as you were going through it.  But it's his source code, and he explained that's not what he does.

And it turns out, it's not what anybody does.  He had that repository, you remember the PTX 88 repository that was assigned only to him, that had his name on it.  But nobody does this.  Nobody puts their name into source code on a regular basis.  We heard that from Doctor Villasenor, who said, it's not something that I typically do.  And then we

heard from Mr. Rauscher, the head software engineer for Overhead, who said, it would be silly to keep putting your name into your own source code, that you use other mechanisms to manage who did what and to document the code, I think is the way he said it.

So remember His Honor just instructed you on -- on burdens of proof.  You have to weigh the evidence.  You have to kind of put them on the scales of justice and see which way -- which way they tip.  And in this case for this issue, you know, is naming your source code something people normally do?  Well, you have Mr. Laird and Mr. Rauscher and Doctor Villasenor all saying no, and then you have Doctor Leeb kind of off by himself saying, yes, that's something that he would have expected.

So on that balance, ladies and gentlemen, I think you can -- you can see that we have the better of that argument.

Doctor Leeb, for his part, he only sort of understands that source code.  That was written in an assembly language, an old one that he really wasn't familiar with.  And he got a data sheet, he got, you know, something that the company puts out on it, but he didn't have a manual and he had to rely on other people to try to help him read that source code.

Importantly, ladies and gentlemen, at the end of the day, Mr. Laird put in a U.S. patent application to the United States Patent and Trademark Office in March of 2009.  There is

no dispute about that.  His declaration is what we lawyers called prima facie evidence of his inventorship.  And you heard His Honor say that the inventor recognized by the Patent Office is presumed to be the correct inventor.

He signed a sworn declaration, saying, this is my invention, he attached it to the patent application, the same words that you see in the patent before you in your binders, and that's what he filed with the Patent Office.  There is no question that that is the -- that is the overarching fact in this case and they have nothing to contradict this.

And we asked Mr. Laird, do you have a crisp recollection of -- of seeing that -- that declaration and signing it?  And he said, "No."  Again, he's a very truthful man because it's not really reasonable that you would remember signing something 15 years ago.  I find that hard to believe.  But he can recognize his own signature.

And what he does know is that he would not have signed it if it wasn't accurate, that he would not have signed it without reading it and making sure that was his invention.  And that's exactly what happened.

We also know that, you know, we told Overhead Door about this patent.  We tried to work this out.  We sent them a letter back in 2015 and warned them before they got too far down this development path.  We didn't want them to go and launch a product and then have to pull it off the market.

That's what good neighbors do for each other.

But what we know is internally now, we didn't know this at the time but in discovery we figured out, that Overhead was studying the '404 Patent.  We know Mr. Rauscher was studying the '404 Patent, and I'll get into this, and others were studying it as well.

We know that Mr. Rauscher put the '404 Patent into his software specification, and we heard him.  He said, well, you know, I cited a bunch of documents.  There was like the top two don't really matter, and then the next four really do.  He didn't say that in the document, ladies and gentlemen, and it just doesn't make a lot of sense.  It doesn't make a lot of sense.

Why would he cite that patent if it wasn't important to his design?  Why would he put it into a design specification?  He's not a lawyer.  He wasn't -- he wasn't trying to offer the company advice about how to infringe or not infringe the patent.  He's an engineer.  He was looking for concepts.  He was looking for the kinds of things that he needed to do to move his product forward.

And, notably, and I'll get back to this again, notably he doesn't cite the UL 325 standard.  He doesn't cite any of Overhead Door's patents.  He cites the Chamberlain patent.  He cites the '404 Patent.

So we're going to get into infringement, and the name of

the game is the claim.  That's what Judge Rich told us.  And I've got these boards made with the claims 4 and 20 on them.

THE COURT:  15 minutes have been used.

MR. CORDELL:  Thank you.

I'm going leave them up.  And every time somebody talks about the infringement case, I hope you look back at these claims.  If you don't have these, they're in your binder, pages 11 and 13 of the first tab, claim 4 and claim 20.  So every time somebody comes up and starts talking about infringement, look at the claim because that's what matters. That's what His Honor just instructed us all, that it's only a comparison to the claim that really matters.

Overhead Door tells us that the -- that you heard Doctor Leeb, the only thing he is quibbling about are these yellowed portions of the claim.  He admits all of the white portion is there.  He admits that the Overhead Door design uses all of the white portions of the claim.  And he says, it's just this determination about the signal characteristics of an inbound message that's at issue.

Remember the is-it-okay-to-move-the-door analysis that we went through where a phone issues a JSON message, the Overhead Door head unit or garage door opener picks that up, validates, and authenticates it, and that's what triggers the door to move with an alarm.  That's the determination that the accused products use.  That's the determination the claims require.

On the clicker side, the little -- little RF clicker that issues a message with a rolling code that the garage door opener then receives, validates and authenticates, and that results in the door moving without an alarm.

We had admission after admission that these systems do the claimed determinations. We had it from Mr. Buescher who is the hardware -- head hardware guy at Genie. He talked about the combo board making a determination that a WiFi signal was in the correct WiFi format, that the -- that the system also does a determination whether a received RF transmission is authenticated in a rolling code. Determination after determination.

Mr. Rauscher gave us a dozen of them. He sat up there, and if you recall, he talked about one determination after another. Mr. Elacqua made a board of it. I'll show you that in a minute.

Doctor Leeb, on the other hand, he's confused by determination. He doesn't like that word. He doesn't like that word. Well, ladies and gentlemen, I was listening to His Honor reading the -- reading the jury instructions, and I think he used the word 'determination' over 40 times. It's -- it's a word we all understand, and it's not reasonable for Doctor Leeb to say, you know, I don't really understand determination.

And there is the board from Mr. Rauscher where he told us

over and over again that the claimed determinations are in the accused system.

Doctor Villasenor summarized this for us, and he told us exactly what we needed to do.  He took us through one element at a time and he proved infringement.  And, remarkably, ladies and gentlemen, they did almost nothing, almost nothing, to cross examine Doctor Villasenor on these points.

So when you get to the verdict form, and I won't pause and show you on the elmo, we're going to ask that you find for Question No. 1 that claims 4 and claims 20 are, in fact, infringed and check yes there.

So remember the name of the game is the claim.  Don't be distracted by -- by technology and people trying to make this more complicated.  This case isn't about trains.  It's not about one board versus two board or wires that are plugged in or not plugged in or two antennas or six antennas or one antenna.  It's about a determination.

Don't let Overhead Door get up and say, well, you know, we've got this combo board and somehow that changes things or doesn't change things, because the claims don't say anything about one board or two.  They don't say anything about antennas.  And we have to stick to the claims.  That's what His Honor just told us.

We can't play games with the word GDO.  Doctor Leeb said, well, this little circuit board is actually the garage door

opener.  Well, ladies and gentlemen, you know that's not true. You saw the garage door opener.  It's the big chunky unit that sits at the end of the pole and opens and closes the garage. Mr. Rauscher admits that.  He admits that that -- what he calls the head unit or the movable barrier operator, that is the garage door opener, and we want them to stick to that.

So at the end of the day, again, we have this balance and does the head unit, does the garage door opener make a determination about the source of the signal, and the answer is yes.  We have Mr. Buescher, Mr. Rauscher, Doctor Villasenor all together saying that it does and only Doctor Leeb says no.

Invalidity.  Let me just touch on this briefly before -- I'm sure we'll hear from Overhead Door.  Patents are presumed to be valid.  This one was examined for over four years at the Patent and Trademark Office and so we give them a presumption of validity.  That's the way the law works.

They must show you by clear and convincing evidence.  If this was a football game, the score would have to be 35 to 7 in order for them to convince you that this patent is invalid.

Doctor Leeb, for his part, sees words that don't exist. Remember the DASMA subcommittee meeting slide that he showed us where he sees all kinds of things that are just not there in the black and white.  And he said, well, you know, I can see it and the rest of you can't.  But, ladies and gentlemen, that's not good enough.  To meet a clear and convincing

burden, he's got to show you how that can be.

And we have a lot in this case where people suggested that Mrs. Kelkhoff did something that she shouldn't have, that she shouldn't have been keeping people apprised of the role of the standard. But that's not true. We know that that's exactly what Overhead Door does as well. That's what the standard is there for. You're supposed to take it back to your company and then go build a system.

We know -- we heard from Gregory Matias, the head of regulatory at Genie, and he talked about that's exactly what you're supposed to do. There's nothing wrong with that. The rules don't preclude people from talking about what's -- what's happening at the standard because we want people to do that. It's not a violation.

Remember the DASMA doesn't tell you how, it just tells you what. It gives you requirements but doesn't tell you how to do it. We heard that from Mr. Krupke. He validated that. And, ladies and gentlemen, in order for them to prove this inventorship thing, they have to show that someone has to have come in with how to do it, not just suggested a goal. That's the law. This is directly from the instructions His Honor just read us.

UL 325 only gives us the what, it doesn't tell us how. And everyone had the what. All of these companies had the what, and they all had to go back and try to do the how.

So with that, ladies and gentlemen, I'll sit down and we'll hear from Overhead Door for a little bit and I'll come back and address the rest of the case.

THE COURT:  Defendants may now present their closing argument to the jury.

Mr. Callahan, would you like a warning on your time?

MR. CALLAHAN:  I would if you would, Your Honor.  I would like a warning when I have got five minutes left, if you wouldn't mind?

THE COURT:  I'll warn you when you have five minutes remaining.

MR. CALLAHAN:  Thank you, Your Honor.

THE COURT:  You may proceed when you're ready.

MR. CALLAHAN:  Your Honor.

Ladies and gentlemen of the jury, I'm back.  My name is David Callahan.  I'm back again to talk to you about Overhead Door's case.  What we saw, what we didn't see, and how we view the evidence as applying the law as Your Honor has just instructed you-all.

Now, you've seen and heard evidence that nobody else saw.  You've seen and heard evidence about who worked on this invention.  You've seen and heard evidence about DASMA, about UL 325, that nobody else saw.  Patent Office didn't see it.  You've heard and seen evidence about other people who were involved in this invention.  Patent Office didn't see this.

And our laws and the instruction of the Court, our system empowers you to make three decisions:  Did Mr. Laird, was he the sole inventor; is the '404 Patent new; does Overhead Door infringe the '404 Patent.  I'm going to walk you through what I see is the evidence and ask you to apply the law as Your Honor has given it to you to the facts of what you've seen and to do here what's right.

Before you do that, I want to thank you.  I know it's been a long week for you, and we want to thank you for your efforts and your continued efforts today.

I also want to say thank you to the Court and its staff, and most particularly to my staff and my colleagues who helped us put this case on for you today.

All right.  We see this, folks, as a tale of two cases.  On one side, our side of the case, we talked about documents, we talked about testimony, we talked about people's actions and what they did and did not do speaking much louder than the words they come into court and say after they filed the lawsuit.

You heard the Court say that lawyers are supposed to be zealous advocates.  They are supposed to push it as hard as they can possibly push it, and that's what you saw.  And they had some partners in that.  They had a couple of expert witnesses who said, we're going to push this with you as far as it can go.

What the attorneys say, the Court has said multiple times, is not evidence.  It's not evidence.

So let's talk about a couple of things there.  Mr. Laird, he's in a tough spot.  What you saw in the pre-period before the lawsuit was filed is very, very, very little.  Some code, he didn't exactly remember what it was.  And then what you heard after, after the attorneys and the experts and the teaching of witnesses and putting things in front of them and saying, isn't this the way it happened, doesn't it look like this corroborates what you said, then you heard a different story.

And this is what happens when that zealous advocacy gets with witnesses.  Ms. Alexander testified for them about the '404 Patent.  She didn't know anything about it before she got here to testify for them.  All that information came from their lawyers.

Same with Mr. Laird.  We asked him, your reconstructing this based on the documents the lawyers have put in front of you and the time they've spent with you, saying, isn't this so, doesn't this look right, those zealous advocates.  And he said yes.

What we told you the evidence would show is three things:

Chamberlain's claims that Mr. Laird alone invented the '404 Patent are wrong.  We don't have to prove that somebody else did it by themselves, just that Mr. Laird did not do it

by himself.  And you heard testimony from Mr. Laird, Mr. Krupke, Mrs. Kelkhoff, and Doctor Leeb on that point.

Second thing we told you we'd show you is that the '404 Patent doesn't claim anything new.  And you heard from Mr. Laird, Doctor Leeb, and Mr. Fitzgibbon at Chamberlain about that.

The third thing we told you is we do something differently.  There's only three ways to do this.  That was the indisputed way.  Chamberlain's way, our way, and a third way.  We show -- we said we'd show you our products work differently.

Let's take that first thing on first.  Inventorship. Your Honor just instructed you--and you will have this final jury instruction, it's at page 20--not all of the actual inventors were named.  If there is any other person who ought to have been or people who have ought to have been an inventor but are not, this valid is invalid.  That's the instruction from the Court on the law you must apply.

Mr. Laird did not do this by himself.

I don't -- sometimes my opponents would put up some slides, and I would turn them around because I don't want you looking at a slide he put up here.  Not these two.  I want you to look at these.  I want you to look at these because, as Mr. Cordell said multiple times, the name of the game is the claims.

And this is what Mr. Laird testified to under oath

You didn't have anything to do with drafting these claims, did you?

Nope, not a thing.

You didn't have anything to do with the wording or the input or any even input, even input, even telling the lawyers what they ought to do.

He didn't have anything to do with that.  He didn't have anything to do with the figures, and they take us to task, these are all specialized things.  True enough.  We don't expect them to write those figures himself.  There are particular rules.  But he didn't provide any input to them.

And we asked him, Any input whatsoever in -- in this background section or even approving?

No, none of that.

So who did invent?  Well, and what did they -- how did they write this thing up?  Mr. Laird didn't give his source code to anybody.  He didn't talk to anybody about his invention.  He didn't sit down -- he didn't sit down with the patent attorneys and say, here is what I did, or let me write something up for you, here's what will help you explain what I did.  None of that.

Where does the patent come from?  You'll see this at the end.  It came from the people in Mr. Fitzgibbon's office.  He's in charge of making sure they get their patents, and

you'll see why from his own testimony and their own documents. They get patents to create barriers to entry, to keep their competitors out of the market.

The law?  They point to Mr. Laird's declaration, and that's true, he signed that.  But Your Honor has just told you -- and these instructions go on for page after page after page, and the reason is they are super important in this case.

Your Honor's told you that if he's going to claim he invented this back in 2007, there must be corroborating evidence and it can't come from Mr. Laird.  It's got to come from another person.  And there was no person that stood up on that stand or that you saw testify on video who said, yep, Ed Laird did it, I saw him, I was there.  And there's not a document where he wrote something down and said, I did this at the time.

Why is this instruction so important?  It is, in my view, other than applying your common sense, the most important instruction in the case.  It's because 15 years ago -- we know Mr. Laird's memory is no good.  He testified to that.  He admitted it.

We don't want people to sit down with zealous advocates for two-and-a-half years and remember things a little bit differently.  You put a bunch of documents in somebody who works for the company who wants to be helpful, all of a sudden your memory starts to slide in that direction.

The law doesn't want that on something that is as important as this patent. So it says, we want to see corroboration. I, again, invite you to look at those instructions. They are lengthy and detailed.

So what is the evidence on corroboration? Mr. Laird says, no evidence, I didn't fill out an invention disclosure form, I don't remember specifically describing it to any individual.

Mrs. Kelkhoff, who worked -- who worked with Mr. Laird, shared information about the 325 standard. Mr. Laird ever tell you he was the inventor? No.

So what didn't happen? You saw the patent video. That's the inventor sitting down with the patent lawyer and helping him out, helping him draft this stuff. That didn't happen here. No evidence of that.

The last thing Mr. Laird said he did was complete that source code on June 7th. And nobody else, he says, at Chamberlain or elsewhere had access to that source code. So there's no corroboration.

Mr. Fitzgibbon said, as the representative of the Chamberlain, we said, look, if you guys as a company -- forget about Mr. Laird -- as a company if you've got some evidence that Mr. Laird did this, tell us any of the documentary evidence.

He says, I haven't reviewed the area and nothing new as

happened, I've got nothing to tell you.

You didn't hear anything from his testimony saying that the company, not just Mr. Laird, the whole company has a scrap of evidence to support the claim that he's the sole inventor.

Did you fill out an invention disclosure form?  Nope.

Well, we asked Mr. Fitzgibbon, what's the purpose of that invention disclosure form?  They made light of it, but they shouldn't because the reason, the only reason Mr. Fitzgibbon said, and there are probably others, you want to be able to pass on some information about what your patent is to your lawyers, but what Mr. Fitzgibbon said is crucial to this.  He said, We make people write this stuff down at the time they claim to have invented something because we want to make sure we have the proper person as the inventor.  The purpose of their internal requirement is to make sure they get the inventor right.

So how do other people do it?  Well, you heard from a bunch of other people, the experts and other people at our company, about how you do it.  And, not surprisingly, you sit down -- you do exactly what was shown in the video.  Mr. Rauscher testified, You sit down, you've got documents, and you show them to them, you work with the legal team to make sure it's in a proper format.

So no corroboration that Mr. Laird was the sole inventor. No way of understanding how we went from a few lines of secret

source code he didn't share with anybody inside or outside the company to this fully-formed patent application that he showed up one day and was asked to sign.

We do know other people wrote the source code.  Dilip Patel's name is on this.  We heard no evidence about what his role was other than that he had done a lot of work on that.

And we know there are ways of preserving this if you want to.  Right?  Everybody talked about it.  You have a little thing that tracks who's in the code, what changes did they make, what is Mr. Laird's, what is Mr. Patel's, what is somebody else's.  They didn't use that.  You didn't hear any evidence about that in this case.

Now, here is the zealous advocacy, and here is the challenge with Mr. Laird's memory.  When we deposed him in this case only six months ago, he could not tell us--this is his testimony in June, just six months ago--You couldn't tell us under oath what you wrote versus what was written by others.

Yes.

Six months' worth of pushing and pushing and pushing by his employers, and now he remembers just a couple of scraps of it.  It's not the full part that Doctor Villasenor went through.  You know, $900 an hour, Doctor Villasenor went through that thing for hours and hours and hours, and he pulled out every single thing.  You look at your notes, you

will see Mr. Laird having testified just about a couple of scraps of that.

All right.  Let's talk about the reconstructed prototype. We asked him, we said, Look, reconstructed prototype, you say you did it, but we don't see it.  You don't have it.

And he says, Yeah, I don't have it.

It's not the same transmitters.

Yep, not the same transmitters.

Not the same operator.

He doesn't know.

That's important for what we'll see in just a second.

And what we do know, again, is the zealous advocates, once 2021 came along, once they sued, once they needed to show that he was the sole inventor back in 2007, they sat down and they said, Let's -- let's have you put this together.  So their fingerprints -- the -- the zealous advocates, their lawyer fingerprints are all over this.

And his fingerprints are all over this, too, and not in a good way.  Right?  He says, This all comes from parts I made that -- that were vintage, is what the word was, vintage 2007.

And we heard from Ms. Alexander, You put labels on your products, Chamberlain does, all the time.  So -- for among other reasons, she talked about patent marking.  But it's also so that you know where it was made, 9/02/20, what

its serial number is.  Mr. Laird tore all that stuff off so we couldn't know for sure where those -- where that garage door opener came from, when it came from.

Most importantly, if he was the sole inventor of what was in the -- in the '404 Patent, why is it that, when Chamberlain was implementing this invention in its products, nobody came to Mr. Laird and said, Hey, you invented this.  Can we talk to you about it?  We'd like to understand what you did.

That didn't happen.  And it's not because he works in the advanced development and he's not a product engineer.  You heard Ms. Alexander, the company spokesperson, testify about this.  When advanced engineering is done with something, they sit down, they have what she called a hand-off meeting where Mr. Laird or other people in the advanced group sit down and explain what they've done so that that can be implemented.

That didn't happen.  He didn't share source code with his colleagues who somehow were able to make a -- a device that they say practices the '404 Patent and practices the UL 325 standard without a lick of help from the person they now say is the sole inventor.

Another really important jury instruction, if I'm putting them in order, this is number two that we'll talk about today. The Court's just instructed you, Furthermore, an invention loses its status as an invention if it was abandoned, suppressed, or concealed.  If we show you one of those three

things, Mr. Laird's invention loses its status as an invention.

Did he abandon it?  Yeah.

After June 7th, you did absolutely nothing regarding the '404 Patent.

Nothing I remember.

That's abandoned.

Suppressed.  Did you describe it to anyone else?  Did you talk to anybody?

Nope.

He suppressed it even from his own colleagues.  And concealed, we know about the source code; he didn't show that to anybody.

What we do know is DASMA.  DASMA sat down to look at this problem in January 2004.  We saw the documents from the meetings.  Mrs. Kelkhoff was there.  Mr. Krupke was there. And we know Mr. Laird was aware of that because Mrs. Kelkhoff said on the stand, she testified, part of her job was to solicit input, provide people like Mr. Laird, and in this instance specifically Mr. Laird, information about what they were doing and say, Can you guys look at this?  Can you comment on it?  Here's what we're doing with this standard.

And that happened.  Mr. Laird looked at the draft standard, and he gave comments back.  So we know he looked at it slightly before -- on or before June 5th.

We know that two days later, you remember this testimony: My boss was on my case; I had this meeting scheduled to do a demo.

Take a look at it.  It was scheduled back in May to take place on June 7th.  Two days before, and his boss is on his case, Come on, we got to get this thing done, we got to get this thing done, we got to get this thing done, the aha moment, as he described it, takes place two days after he received and reviewed the UL 325 proposal.

And we asked him about this.  We said, The idea about a prealert or an alarm for unattended, you didn't come up with that idea.  Right?  The concept of doing that.

And he says, no, the working group Mr. Krupke was in came up with that idea.

That's his understanding.  That's exactly what happened.

All right.  So do we show you where this came from?  Yes, we did.  We showed you the document that starts with the DASMA subcommittee meeting, it goes into the draft email from Mrs. Kelkhoff.  So we know Mr. Laird saw it and was exposed to it two days before he had his aha moment.  And he tracked that exactly as it goes into the entirety of claim 20 except for the determining element.

Now, the criticism here is going to be, oh, we just came up with an idea, DASMA just came up with an idea, they didn't really tell you how to do this.

No.  You heard from Doctor Leeb that they described the means to do this, and the means is alarm before every code, and this standard provides you with details on when to alarm, where to alarm, and how to alarm.  So they provided the specifics behind that.

And we know that this was otherwise secret information.  It was shared within the industry, but these DASMA bulletins, they would not -- they were not available to people outside that group.

All right.  So here's the development timeline, and this is one of the two really important timelines in this case.

I'm just checking time, folks.  I'm sorry.  Okay.

This is the DASMA timeline.  So Mr. Laird gets the DASMA proposal.  They've been talking about it for years.  It's pretty well developed by that time.  He gets it just two days before his aha moment, and then nothing, zero, no documents, no corroboration in the form of a document that didn't involve him.  None of these people he was supposedly at the meetings with.

Mr. Fitzgibbon, you'll remember said, yeah, I see my name on that, but I don't remember anything about the meeting at all.  That's what he said under oath.

And then we get to the patent.  How did we get there?  We don't know.  Somebody in Mr. Fitzgibbon's group must have written that up for Mr. Laird to come in and sign.  And in

January of 2009, the UL 325 standard gets published.  And Mr. Cordell told you that the publication of that standard was the reason--those are his words--the reason why they filed the patent a couple of weeks later.  We'll talk about that.  It is really important when we get to obviousness.  We'll talk about that in a minute.

So who are these unnamed co-inventors?  We know who they are.  It's those people who sat around at DASMA for three years before their draft proposal got shared with Mr. Laird and communicated it to him.  So Mr. Krupke and -- and all the other folks listed in the documents.

And this was unusual.  Mrs. Kelkhoff's been around this organization forever.  She wasn't aware of any other situation in which somebody got a patent and then sued another member of the working group.

So we get to the jury verdict form.  Did we prove by clear and convincing evidence that any of the claims are invalid due to improper inventorship?  That is, there's at least one other person that had a meaningful role in the development of those claims.  We'll ask you to answer yes.

Let's talk about obviousness.  We talked about this a lot.  Everybody, I think, agrees that reducing nuisance is an obvious problem to attack.  Mr. Laird said it a couple of times, and so Mr. Laird said it's not obvious to do this.

Mr. Laird also said -- told us about some of the things

he didn't invent.  He didn't invent the movable barrier operator, didn't invent movable code, rolling code, didn't invent the JSON language.  That's important because Mr. Cordell told you in opening, So what did Mr. Laird do?  And then it's JSON, JSON, JSON thereafter.

When Mr. Laird took the stand to testify under oath, we asked him, are you saying JSON language is a part of your invention?  He said no.

So reducing nuisance, we've talked about this.  They place great weight, folks, in the fact that it took the Patent Office four years to look at this before they came up with the invention.  I think Mr. Cordell is going to get up in the time he's got left and he's going to tell you that, boy, they were looking at this thing closely, carefully, for four years.

What I'm going to tell you is it wouldn't have mattered if they looked at it for four years or 40 years, they didn't have the right information in front of them.  PTO didn't know about all these other people that worked with DASMA.  PTO didn't know about the UL 325 standard.

Mr. Cordell just told you the UL 325 standard made the '404 Patent necessary.  But nobody at Chamberlain gave the Patent Office a copy of the standard that had made the invention necessary so that the Patent Office could, as you're going to get a chance to shortly, consider the impact of UL 325 for the first time with respect to the validity of this.

So the Patent Office can only do as good a job as the information they get. No evidence that, and in fact this is from Mr. Fitzgibbon, the UL 325 provision was not cited by Chamberlain, and he says, nope, not cited by Chamberlain.

What does that mean? Well, we know also Mr. Fitzgibbon is well aware of what it means when you don't send something to the Patent Office. It means obtaining a patent does not mean it is defensible when prior art was not mentioned in the patent application.

So we get to the jury verdict form Question No. 2b, have we proven to you that by clear and convincing evidence, a burden we embrace, that any of the following asserted claims are invalid as obvious? Yes, with respect to claim 4 of the '404 Patent and claim 20 of the '404 Patent.

All right. Let's talk about how Overhead Door's products work. We know there are -- we know the parties have agreed, the Court's instructed you, that there's not only one way to practice this patent, there are many.

You heard about from Doctor Leeb that there are only three ways of doing this: The '404 Patent way, which we have analogized to the train track that gets to a switch and has to make a determination; our way, which we've analogized to two parallel train tracks; and the Ryobi way, which is to just alarm all the time.

Doctor Villasenor said, oh, no, no, no, no, no. There's

millions of way to do it, but he didn't tell you about one other way. The indisputed evidence is that there are three and only three ways to do this.

The Court told you, to prove infringement, they have to prove each and every one of the limitations are present. If one limitation is missing, in this case the determining limitation, the claims are not infringed.

Now, in the slides that Mr. Cordell showed you, I'm not sure if he disagrees with this or is going to argue to the contrary, both claims require determining. One, claim 4, the word 'determining' is right in there. The other, claim 20, Your Honor has instructed you that you must interpret the phrase that we've highlighted as requiring determination.

So both claims require determination. If we don't do a determination of the type that's in the '404 Patent, there is no infringement.

So the experts agree on what that means. It means not any kind of determination but a very particular kind of determination. Doctor Villasenor told us determine whether to close the movable barrier in combination with the alert based in response to receiving a command based on the transmitter code.

So determining whether to close the garage door, that is the kind of determining we care about. Doctor Leeb said the same thing. And we see how it works in the '404 Patent. It's

this thing that we likened fairly -- we never said that there were little blue men or green men or train tracks that this case is about.  We're trying to help you understand the way we see this, and figure 4 shows that.

It shows that you get a communication, all the communications come into one place, somebody sits there and determines, is this a communication that's come from one place, in which case we operate the alarm; or does it come from the different place, the car clicker, in which case we don't.  And that's how we analogized it to help you understand how that works.  If it's coming from a wireless, we alarm; if it doesn't come from a wireless, we don't alarm.

Okay.  So here is the testimony that supports our two-track argument, and it comes from both Doctor Villasenor and Professor Leeb--we didn't put that up there--and Mr. Rauscher.

I asked Doctor Villasenor, Is it accurate that the communication, this is WiFi communication, comes in on a pre-established WiFi communication?

He says, Yes, that's right.  That's that one single track.

And I said, If you use the RF clicker, does that come in along the other track?

He says, Yes, that's true.

Mr. Rauscher says the same thing, there's no

determination, as did Doctor Leeb.

So we asked again, Doctor Villasenor, is it accurate the communication comes along a pre-established WiFi communication pathway?

Yes, that's pre-established, no determination needed.

And does it come in if it's from an RF unit on a pre-established RF communication pathway?

And he admitted it.  He said, yes, as did Doctor Leeb.

So for Question No. 1, has Chamberlain proved, their burden of proof, by a preponderance of the evidence that Defendants assert the claims 4 and 20, we'd ask you to answer that question no.

What are their excuses or distractions?  I call them distractions, not excuses.  The distractions are the thing that you saw Mr. Elacqua create with a couple of witnesses, took maybe 45 minutes to an hour and some change of time, all these other different kinds of determinations.

And we asked Mr. Rauscher about that, got right back up with both witnesses and cleaned that up.  All these other things, valid JSON, IP address, rolling code, Intellicode, do any of those have to do with the '404 Patent's determination, which is whether to alarm or not alarm?  Absolutely not.

Doctor Leeb said the same thing.  Are any of these so-called determinations, do any of them have anything to do with the claims of the '404 Patent in this case?  And he said,

no, sir.

To be clear, we asked Doctor Villasenor this, Just want to make sure, the determination that we care about in this case is whether to close the movable barrier operator, and he said yes.  For the determination claim, which appears in both claim 4 and claim 20, he said, absolutely yes.

So this is very much -- this is another analogy.  I'm not pretending this stuff is in the courtroom.  I don't want to get jumped on for that.  If the claim said, a game played with a soccer ball and players on the field, they would say, well, you've got a football out there and you've got a beach ball and a baseball and a tennis ball and a golf ball.  So what? The claim says a soccer ball.

Just so here.  The claim says determination for opening or closing the door.  None of the other things make any difference.  Those are all distractions.

Next thing is they looked at our patent.  Yeah, we looked at their patent.  They told us to look at their patent.  They sent us a letter in 2004 [sic], and they said, look at our patent.  And that's what we did.  You sent us a letter, you told us to look at your patent.  Mr. Rauscher testified, we looked at the patent.

Now, this is before we had a product out there.  And you see this language.  Ms. Alexander had been, I think, instructed about all the information she had about this letter

came from their lawyers.  But they say, the '404 Patent may relate; we don't know because you don't have a product out there.  Right?  We're putting it out there--as opposed to all the other patents in that letter that appear to be covered. So we did that.

And you just heard from Mr. Cordell about what it is they have to say with respect to, oh, you put '404 right in your document.

Yeah, we did.  You told us we should look at it, we looked at it, I wanted to make my engineers know.

Now, does that mean that's part of the specification? No.  He explained that.  All those other things he went through methodically one by one, and he showed you exactly where those were in the specification.  And they had the opportunity to say, no, no, the '404 Patent is somewhere.  And they didn't because it's not.  Each one of those other things are elsewhere in that document.  The thing they're pointing at is not.

Is this a common thing to do?  Does everybody look at everybody else's products in this industry?  Yeah, they do, we do, there's nothing wrong with that.  You heard Doctor Villasenor and others talk about that.

Now, they say, they UL 325 doesn't tell you how to build a product, but Mr. Krupke says, we don't need all the sort of nitty-gritty details.  It tells us enough.  It provides a

person of ordinary skill in this art with plenty of information on the where and the what and the how.  How loud, where does it sound, how long does it sound, all that information is provided in detail.

We wanted -- we just wanted to protect our patent rights. Ms. Alexander, working with her zealous advocates comes up here, turns to you folks and says, oh, our engineers are working to problem solve.  We develop innovations that we then patent.

But the people who do this work at Chamberlain, Mr. Fitzgibbon's group says, nope, not about technology.  It is about prevention of commoditization through barriers to entry. They describe using patents as barriers to entry as an intellectual property best practice.  It's what they do.

The timelines, folks, in our view tell the story.  This first one shows everything we think you need to know about whether Mr. Laird can prove or Chamberlain can prove that Mr. Laird is the sole inventor of the '404 Patent.  Comes up with it in 2007, doesn't file anything, Chamberlain doesn't file anything until 2009, and there is no activity.

You talk about abandonment.  And this abandoned, suppressed, and concealed?  That's abandoned.  He sat it down on June 7th, and he didn't do another thing until somebody called him with a fully written-up patent application and said, here, sign here, which he did.

All right.  What's the other thing that -- that tells the real tale?  This is how people act in the real world versus what they say in court.  My mom used to tell myself and my two younger brothers, Actions speak louder than words.  So don't tell me about something; act the way you want to see me behave.  And that's the case here.

We asked Ms. Alexander, if it is true that you lost $84 million or $82 million in profits, how much would that have been in sales?

She said $400 million.

Is that a lot of money?

That's an awful lot of money.

THE COURT:  Five minutes remaining.

MR. CALLAHAN:  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. CALLAHAN:  And I asked, if 400 million bucks was missing, I know you guys sell way, way more than that, $400 million is missing over a four-year period, somebody would have noticed it.  Yes.  But nobody did.  No.  Why?  They weren't harmed.  Their actions of doing nothing and raising -- not raising their hand and doing nothing are not consistent with the words they've said here in court.

Now, they brought in the expert to try to clean that up.  She says, We lost $400 million.  That's how much in sales it takes us to make 80 million in profit.  Mr. Britven comes in

and says, Uhhh, he's -- he's worked for a couple of days and has been sort of worked with those zealous advocates, and he says, no, it's really not $400 million, it's 155.

You got to decide who's right on this, folks.  Is it Ms. Alexander, the corporate representative, who works with these things every single day, or is it Mr. Britven, the expert who made, you know, hundreds of thousands of dollars on this.

What else do we know?  When they really do have a problem, they keep detailed notes of it.  Ms. Alexander testified at length in direct and cross examination about all of the work they did to track down every single customer, how many sales they lost, how much profit they lost, is that profit coming -- is that customer coming back or not coming back, how backlogged we are, how long it's taking us to get stuff.  They looked at that stuff in tremendous detail and they presented it to the board of directors.  This is on the order of 10, 15, 20 million bucks.  Not chicken change for sure, but not $400 million.

So that's what they told the board during this time period about the COVID losses.  Here is a slide that shows all the -- all the things they told the board of directors or all the things they did internally about what they say was our infringement of the '404 Patent, costing them $400 million, a hundred million dollars a year in each of the years--nothing.

So when they come in now and they say, we've been hurt to

the tune of 400 million, you ought to ask yourself a question, why didn't anybody know about that?  It wasn't happening in secret.  Right?  We know and it's -- we know it's not about protecting their patent rights.  The '404 Patent is about a barrier and entry.  They've got 83.4 percent of the market.  This is their slide, not ours, and they want the rest.

So they sent us a letter.  We designed our products so that we don't infringe, and we let it out.  And the next day or right after, one of the very first people to sign up to look at this product was Mr. Fitzgibbon of Chamberlain.  So he looked at it right in 2017, one of the first people.

What did he conclude?  You are entitled to and should conclude he looked at it carefully and he said, they don't infringe.  And the people at Chamberlain thought about it and said, well, we're not losing any sales, we're certainly not losing hundreds of millions of dollars of sales over this, and they did nothing because they knew we didn't infringe.

All right.  My time is almost up, and Chamberlain gets to go second.  They're the Plaintiff.  Mr. Cordell reserved almost half of his time to talk to you after I have to sit down.  And, boy, do I hate that, because now I got to sit there for 20 minutes and listen to him say things that he's been thinking about, I want to tell this jury all week long because I know nobody from Overhead Door can get back up and respond to it.  That's a rough thing for a lawyer.

But these two timelines that I've put out there, these two sets of facts are going to be me.  When you go back in that room, those are going to be my response to, I bet, everything Mr. Cordell has to say coming up here.

And it's if he's really the sole inventor, why didn't he do anything?  Why isn't there any documentation?  Why did they only file for the patent after the UL 325 standard came out?  Why didn't they tell the Patent Office about the UL 325 standard or any of the DASMA people?

And if we really infringed and stole $400 million in sales from them and $84 million worth of profit, why isn't there one single speck of evidence, contemporaneous evidence, from people who were -- knew about this and did it at the time to suggest that that is the case.

I'm at my time, folks.  I thank you again for your attention and for your diligence in this matter.  It means a lot to us, and we appreciate it.

Your Honor?

THE COURT:  All right.  Plaintiff may now present its final closing argument.

You have 17 minutes and 48 seconds, Mr. Cordell.  Would you like a warning?

MR. CORDELL:  Yes, Your Honor.  Could I have a five-minute warning?

THE COURT:  I'll warn you when you have five minutes

remaining.

Please proceed when you're ready.

MR. CORDELL:  Thank you.

So, ladies and gentlemen, who thinks it's a good idea to sue your customers?  You remember the evidence that, in fact, Overhead Door used to be a pretty good Chamberlain customer.  They would buy tens of millions of dollars of products a year because they make doors and we make door openers.  So that explains pretty much everything that counsel said about this timing business.

But I want to -- I want to jump in right back into where we left.  And they take Mr. Laird to task, and they say, you know, he should have remembered those meetings, he should have remembered, you know, telling people about his invention.  He didn't say it didn't happen.  He said he didn't remember.  And it's not unreasonable; it's 15 years ago.

But, you know what, you get to decide who was credible in this case, and I'm going -- I'm going to invite you to do one thing.  I want you to compare the way Mr. Laird testified with the way Doctor Leeb testified, because Mr. Laird had a hard time remembering 15 years ago.  Doctor Leeb couldn't remember the day before.  Doctor Leeb couldn't remember what Mr. Rauscher said.  I had to refresh him over and over and over again.  Time and again we had -- we had, you know, one example after the next.  It took forever.  And you get to take that

into account.

His Honor just instructed you that one of the ways you decide who is giving us the straight -- the straight dope here is the way they testify.  Remember how Doctor Leeb hedged everything.  He couldn't -- he couldn't answer the most basic questions.  He couldn't read text from the claims without -- without having to be refreshed and -- and -- and requalified, over and over and over again.

I asked him, Do you recall your prior testimony about determination risking confusion?

I had to refresh.  Everything I asked him, I had to refresh him.

So what do they tell us?  They say, well, there were some other inventors, that they contributed to this patent.  Ladies and gentlemen, you know what the law says is they're supposed to point to someone who comes forward and says, Hey, that's my invention.  And what have they shown us here?  Nothing.  Not single person.

I asked Doctor Leeb, Who is it out of that list of people that you identified from DASMA and UL, which one of those made a contribution?

He said he didn't know.

I said, well -- and I picked one out.  I forget the fellow's name -- Mr. Davis or something.  What did he do?

I don't know.

That's what the law requires. They can't simply say, well, you know, there could have been some other people involved. They need to carry their clear and convincing burden that there was somebody else who came up with this first.

We know that the actual witnesses that we talked about, Mrs. Kelkhoff, she says she wasn't an inventor. We know Mr. Krupke said he wasn't an inventor. And notably, ladies and gentlemen, nobody ever said that Mr. Laird wasn't the true inventor until they came along in this lawsuit.

So his pre-litigation statements, he never said anything at any committee meeting. He never said -- you didn't hear any evidence that they ever wrote a letter or made a complaint or even called and said, wait a minute, maybe we should be included in this.

Counsel said actions speak louder than words, and their actions tell you what they really feel about inventorship.

I'm going to skip this because I didn't hear this in counsel's arguments.

And here, again, I want to stress, you know, Mr. Leeb's testified he's made over a half million dollars in this case, Doctor Leeb. And -- but you can remember the way he testified. You can remember his demeanor. And when you're weighing all of the issues in this case--validity, infringement, all of it--they put pretty much their entire

case into Doctor Leeb's hands.  And I hope you take that into account when you're weighing those burdens that His Honor talked about.

Now, with respect to willfulness, we not only -- well, so let me just pause quickly.  So on the verdict form when it comes to invalidity on page 2, sorry, Questions 2a and 2b, we're going to ask that you answer no, that the patent was not proven invalid by clear and convincing evidence by Overhead Door.

But now let's talk about willfulness because the infringement in this case isn't just accidental.  That can happen.  You can have someone who doesn't really mean to infringe and they do.  That's not what happened in this case. We believe that, in fact, this was intentional.  They kind of did it on purpose, and that's what the willfulness analysis is all about.

Now, counsel said that, of course, they looked at their patents -- they looked at our patent because we sent them a letter.  But, ladies and gentlemen, we didn't send them a letter until 2015 because, remember, we didn't send the letter until we heard they were making this product.  And it was before 2015 that they started to look at the patent.  So it couldn't have been in response to our letter.  Let's look at that.

So we know they had lots of options.  They could have

made this -- this -- this particular -- they could have complied with the standard in different ways.  They didn't have to use our technology.  Everybody agrees about that.  And Doctor Leeb said that was true, that you could comply with UL 325 without -- without complying -- without copying or, I'm sorry, using the '404 technology.

So Mr. Krupke said he looked at the '404 Patent shortly after it issued.  It issued in 2013, ladies and gentlemen, before the 2015 letter.

Mr. Rauscher said he studied the '404 Patent, and he thought it was in the 2015 time frame.

We know that the head of hardware engineering, Mr. Buescher, also studied the '404 Patent a number of times since 2014.

But it wasn't just the patents they looked at.  They looked at the products.  Mr. Krupke admitted that he studied the Chamberlain product.  Mr. Rauscher talked about studying Chamberlain's products often.  And then Mr. Buescher said he regularly looks at Chamberlain's products.  And we had some testimony that's what people do in the industry and whatnot, and that may be.

But, ladies and gentlemen, when you get caught with your hand in the cookie jar, you have to -- you have to stand and be held accountable.  And that's what happened here.  They looked at the patent, they looked at the products, and they

then created their own product using that technology.  And that's just not right.

Mr. Rauscher cited the '404 Patent in his specification. He cannot deny that.  He cannot deny that.

So what did we hear in court?  Well, I asked Doctor Leeb, Have you ever heard Mr. Rauscher talk about, you know, his reference before?

And he said he couldn't remember that.  Couldn't remember the explanation that Mr. Rauscher offered.

But what do we know?  We know that he cited the '404 Patent, but he didn't cite UL 325.  We've heard over and over again that UL 325 tells you all you need to know, and yet he didn't cite it in his document.  He did cite the '404 Patent. He didn't cite any of Overhead Door's patents.  He did cite the '404 Patent.

His management-made-me-do-it story just doesn't add up. So let's look at the timeline.  He said, Well, I knew about it at least of the date of that letter back in 2015.

Well, ladies and gentlemen, the revision when he put the '404 Patent into his technical specification was five years later.  Now, does that make sense to you?  And we didn't see a shred of evidence from anybody, from Mr. Krupke or anybody else in management, that they asked Mr. Rauscher to do that. It just doesn't make sense.

And Doctor Leeb, when I asked him, he read all of Mr.

Rauscher's depositions, he doesn't remember Mr. Rauscher ever telling us this management-made-me-do-it excuse.

So at the end of the day, ladies and gentlemen, we're going to ask that you check yes on the verdict form as to willfulness because we believe that this wasn't accidental. They had other options. They could have used other designs, and they chose instead to use the Chamberlain '404 Patent.

So now let's talk about damages. Now, I listened carefully to counsel's statement. He didn't mention Mr. Tate, once his damages expert. So I think they're kind of conceding, at least in my mind, that maybe Mr. Britven, our damages expert, had the right analysis. But let's go through that quickly.

Mr. Tate only said, look, you know, $2.6 million, that's plenty. That's all you get. It's a reasonable royalty. Ignore the hundreds of millions of dollars that -- that we made.

Mr. Tate admitted that the *Panduit* factors, the things that we have to satisfy for a lost profits analysis, were all there.

And he talked about demand for these WiFi GDOs. He admitted that that was there. We have to show that -- that people wanted the product. We looked at Overhead Door's own documents. Their vision 2025 document is an important one. And you see there that they wanted a hundred percent of their

products to be wireless and connected by 2025.

And, importantly, ladies and gentlemen, they wanted to put Chamberlain on its heels.  They not only took the technology and used it to make a competing product that took away sales, they wanted to put Chamberlain down.  And they can't deny that.

We know that by 2030, Mr. Krupke tells us, they're not going to sell any product except these WiFi-enabled GDOs, these remotely-controllable garage door openers.  They're giving up everything else; it's only going to be those.  It's no question that there is a commitment here.

We had a little bit of dispute about manufacturing capacity.  But, again, counsel didn't mention it and I think that the evidence is undisputed that Chamberlain could have made the garage door openers to make up for the sales that were taken by Overhead Door.

So what you're left with, ladies and gentlemen, is really Mr. Britven's number is the only calculation for lost profits. Mr. Tate did not give us a competing number.  And so at the end of the day, we have the lost profits analysis of $81.4 million.  Remember that doesn't include the COVID period.  He took that out.  And so for the COVID period, there's a $2.8 million royalty.  And it comes to 84.2.  So on Question No. 4a on the verdict form, we're going to ask that you fill in $84.2 million.

Now, there's an issue that came up as part of the parties getting together and talking about the jury instructions and the verdict form that you've got to fill out. And it's complicated, and I apologize, but it's there.

And so if we look at the verdict form, if I can have the elmo.

So Question 4a is the -- is the total number that we would like to, again, write in $84.2 million. But we can't stop there. So when we get to Question 4b, the question is, how much of that is reasonable royalty? And remember I just showed you that. That's 2.8 million. That's for the COVID period where we aren't claiming lost profits.

But this is where it gets complicated. There's a Question 4c, and it says this: If you awarded any amount of money in Question 4b, is it a lump sum or a running royalty? Choose only one.

And that's -- you think, well, that's -- that's not that big of a deal. Right? We're just going to, you know, pick a -- a number.

Well, it has profound implications, ladies and gentlemen, because what you'll see is, if we go back to the jury instructions, His Honor has defined for us what a lump-sum royalty is.

And if I can go back to my slides, please.

The net effect of a lump sum is that Overhead Door would

pay Chamberlain one -- one amount, and they would get to infringe for the rest of time.  So instead of paying 84 point, you know, $82.4 million, whatever the number was, for the past infringement, the lump sum would include not only the past but future infringement, and that would allow Overhead to then continue to infringe until the patent expires in 2032.

And so if you take Mr. Tate at his word, he wants to pay 2.6 million not only for the period they've already infringed but for the next nine years.  And you see that if you look at the lump-sum definition that's in the jury instructions.  The lump-sum royalty is when an infringer pays a single price for a license covering both past and future infringing sales.

THE COURT:  Five minutes remaining.

MR. CORDELL:  Thank you, Your Honor.

If you decide that a lump sum is appropriate, then damages you award, if any, should reflect the total amount necessary to compensate Chamberlain for Overhead Door's past and future infringement.

Now, ladies and gentlemen, I apologize because we really haven't put in a lot of, you know, supporting argument to help you with that analysis.  And to his credit, I did not hear Mr. Callahan ask for a lump sum.  He didn't get before you and say, check the lump-sum box.  And if you don't check the lump-sum box, we don't have to worry about any of this.

But if you do, if you check the lump-sum box, then we

have to go back and we have to account for these future infringing sales, because it's just not fair that they are allowed to infringe in the past and then infringe in the future for free.  That's just not fair.

So if you check the lump-sum box, and I'm going to be the first to say, please don't, that -- that the evidence in this case doesn't support it, they didn't put in anything requesting a lump-sum award or a lump-sum verdict.  But if you do, then we have to account for those future sales.  We have to account for everything from today or actually from March 2022, which was the end of the damages period in this case, we have to account for that all the way until the patent expires in 2032.

And the way you do that is you have to figure out what a -- what a per-unit damages amount would be, figure out how many units there are, and you multiply it out to get a number.  And I'm going to warn you:  It's a big number.  It's a really big number.

So we know from the vision 2030 document, this is from PTX 32, that Overhead Door expects over the coming years to begin selling -- they're going to increase Aladdin users from 150K to 300 million [sic] by 2023.  So Overhead Door will be selling 300 million units every year from here on out.  That's their number, not mine.  And if you take those 3 million units and you multiply it times the per unit royalty that

Mr. Britven came up with, which is $7, you end up with an enormous number.  So it's 3 million units times the nine years left on the patent is 27 million units, times $7, is $189 million.

Now my client's not going to like me saying this, but I don't want you to award us $189 million.  I want you to check the running royalty box on that verdict form.  But if you do -- if you decide a lump sum is appropriate, then that is the right number.

So I'm -- like Mr. Callahan, I'm down to my last two minutes.  I want to thank you for your time and attention and I'd like you to focus on a couple of things.  Big companies sometimes need a little reminder.  They need a little reminder to do your own work; that you're not supposed to look at other people's papers, you're not supposed to use other people's technology, and we need a little bit of reminder about that.

But as you're going back through this, keep in mind that they kind of put all their eggs into that UL 325 basket.  And ladies and gentlemen, everybody in the industry had that standard, that single page, those few lines telling you how loud and how long to alarm for.  Everybody had it.  And Overhead didn't come up with the solution; chamberlain did.  Everybody in the industry understood that, you know, that nuisance that they say is obvious was going to be a problem for consumers, but they didn't figure out how to solve it.

Mr. Laird and Chamberlain did.

They don't like the fact that Mr. Laird filed a patent application. We heard for the first time this suppression argument or concealment argument. But ladies and gentlemen, he didn't do that. Look at JTX 18, if you'd like to ask, and we'll give you the exhibit. You'll see the patent application that Mr. Laird and Chamberlain filed. It's a big, thick document. It takes some time to put that together, but there's nothing that says that you can't take the time to write up your patent application. The fact that Mr. Laird doesn't remember the meetings he had to make that happen doesn't mean it didn't happen. What it means is that he can't remember. And it obviously happened because the patent application was filed in March of 2009.

With that, ladies and gentlemen, I'm going to thank you again for your time and attention and tell you it's been a privilege to be with you, and we look forward to your verdict. Thank you.

THE COURT: All right, ladies and gentlemen, I need to give you a few final instructions before you begin your deliberations. You must perform your duty as jurors without bias or prejudice as to any party. And the law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as I

have given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions that the Court has given you on the law.  Again, do not decide who you think should win the case and answer the questions accordingly.  Remember, your answers to the questions in the verdict form must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar positions and stations in life.  This is true in patent cases between corporations, partnerships, or individuals.  A patent owner is entitled to protect their rights under the laws of the United States, and this includes bringing a lawsuit in a United States District Court for patent infringement, and that's what we have in this case.  The law recognizes no distinction among the types of parties, and all corporations, partnerships, and other business organizations stand equal before the law, regardless of their size and regardless of who owns them, and you are to treat them as equals.

Now, when you retire to the jury room in just a minute to deliberate on your verdict, as I've told you, you're each going to have your own printed copy of these instructions that I've given you this morning.  If during your deliberations you

desire to review any of the exhibits which the Court has admitted into evidence and have been shown to you during the trial, you should advise me by a written note identifying the exhibit or exhibits signed by your foreperson and given to the Court Security Officer who will bring the note to me.  I will then send that exhibit or those exhibits to you.  Once you retire, you should first select your foreperson and then conduct your deliberations.  If you should recess at any time during your deliberations, follow all the instructions the Court has given you about your conduct during the trial.

After you have reached your verdict, your foreperson is to fill in the verdict form reflecting your unanimous answers to those questions.  Do not reveal your answers until such time as you're discharged, unless otherwise directed by me, and you must never disclose to anyone, not even to me, your numerical division on any question.

Remember, any notes that you've taken over the course of the trial are aids to your memory.  If your memory should differ from your notes, then you should rely on your memory and not your notes.  The notes are not evidence.  And a juror who has not taken notes should rely on his or her own independent recollection of the evidence and not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Now, if you want to communicate with me at any time during your deliberations, you should give a message or a question written by your foreperson to the Court Security Officer, who will then bring it to me, and I will then respond to you as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  I will always first disclose to the attorneys in the case your question and my response before I answer any question.

After you have reached a unanimous verdict and I have discharged you as jurors in this case, I want you to understand you are not required to speak with anyone about your service in this case.  But by the same token, at that time you will be completely free to discuss your service in this case with anyone of your choosing.  It will be your choice and your choice alone.

I'll now hand eight copies of these final jury instructions and one clean copy of the verdict form to the Court Security Officer who will deliver them to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to deliberate on your verdict.  We await your verdict.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, you are welcome to wait here in the courtroom or have a representative wait here in the

courtroom.  If you choose to wait somewhere off the premises, make sure that we have good cell phone numbers where we can call you and get you back here if we get a note or when the jury returns their verdict.

Awaiting either a note from the jury or a return of their unanimous verdict, the Court stands in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury. I'll read it into the record and then I will mark it for identification and hand it to the Courtroom Deputy.

The note reads as follows:  "May we use the big boards for claims 4 and 20?  The claims in the book are hard to see." Signed by Ms. Nichols, Juror No. 6 as the foreperson.

I'm assuming she's talking about the demonstrative boards of the two claims that Mr. Cordell put up in closing and Mr. Callahan embraced in his closing.  They're obviously demonstratives, but they are the claims at issue.

Are they available and is there any objection to them being sent back to the jury?  I would not ordinarily send back a demonstrative, but since they are the claims at issue, if both sides agree I'm willing to do it.

What's the position of the parties?

MR. ELACQUA:  No objection, Your Honor.

MR. CALLAHAN:  Your Honor, our concern with that,

and I think this has something to do with the way it was argued is, or might have been argued or might be construed by the jury, sending something big back there without the Court's claim construction invites them to say 'determining' isn't part of claim 20.  So that's our concern.  And on that basis, in addition to the fact that they are demonstratives and not evidence, we'd object.

THE COURT:  All right.  Well, without a consensus of agreement between the parties, I will not send them back.

Let me prepare a written response telling them that they are demonstratives and are not appropriate to send back to the jury, and I'll direct them to focus on the written claims in the patent-in-suit that's in their juror notebooks.

Let me work on a written response and I'll present it to you for your comments in just a moment.  In the meantime, I'm going to hand the original note to Ms. Brunson.

And counsel, if you want a copy of the note, I have made one for each of you for your files.

MR. ELACQUA:  One suggestion maybe.  Is it possible, because I know, for example, one of my own daughters can't smaller than 18 font, and the patent font is way below 18.  And maybe we could take the actual patent claims that are in there and blow that up?  I say this because I have a child who literally has a vision issue and she can't read that small font she's looked at my patents she can't even read them.  So

if there happens to be a juror who can't read that small of a font then that seems we should help one or more of them out. I think they're asking because the font is so small.

THE COURT:  I'm assuming Mr. Elacqua since Mr. Accurately can objected he's going to object to either the blow-up boards or an alleged copy of claims themselves but let me just ask.  Mr. Callahan how do you feel about that.

MR. CALLAHAN:  Our con oh concern remains the same I wouldn't object if they want to magnify them themselves.

THE COURT:  I don't have a magnifying glass or I'd send that back to them.  So at this point the only thing I know to do is tell them they're demonstratives and they just need to squint and read them as they are.

MR. ELACQUA:  Understood.

THE COURT:  All right.  Let me work on this written response.

(Pause in proceedings.)

THE COURT:  All right, counsel.  I'm going to read you what I have written in response to the jury's note and I'll take comments from you after I've done that.

"Members of the jury in response to jury note No. 1 the 'big boards' you requested are demonstratives and not exhibits.  As such, I cannot send them to you.  I refer you to the asserted claims within the '404 Patent which are inside your juror notebooks."

Does Plaintiff object to anything in that note?

MR. ELACQUA:  No, Your Honor.

THE COURT:  Do Defendants?

MR. CALLAHAN:  We do not, Your Honor.

THE COURT:  All right.  Without objection, I'll execute the written version of this response.  I'll give it to the Court Security Officer and direct him to deliver it to the jury.

I'll also hand a signed duplicate of that response to the Courtroom Deputy, and I have unsigned copies, one for each side, if counsel if you would like to have them.

With that, we will stand in recess pending either another note or a return of a verdict.  Thank you.

(deliberations continue.)

THE COURT:  Be seated, please.

Counsel, we received another note from the jury.  I'll read it to you then I'll mark it for identification and hand it to the Courtroom Deputy.  The note reads as follows:  "May we have the transcript of Brent Rauscher's testimony, examination and cross examination."  This is signed by Ms. Nichols as foreperson of the jury dated today's date.

I'll mark it with a '2' in the upper right-hand corner signifying this is the second note we received from the jury. I'll hand it to the Courtroom Deputy.  I also have a Xerox copy of the note for counsel which you can have in just a

minute.

Let me tell you what I prepared as a response and then I'll get your comments. "Members of the jury, in response to Jury Note No. 2, as I told you during my instructions, the transcript of the testimony is not available to you to consider during your deliberations. The transcript is prepared in case there is an appeal from this Court. This is why you have to rely on your memory of the evidence and testimony."

Any objection to that response from the Plaintiff?

MR. ELACQUA:  None, Your Honor.

THE COURT:  Any from the Defendants?

MR. CALLAHAN:  No objection, Your Honor.

THE COURT:  All right.  Then I'll hand a signed copy of this written response to the Courtroom Deputy [sic] and direct him to deliver it to the jury.  I'll also hand a signed copy of it to the Courtroom Deputy, and I have unsigned copies of it for counsel if you'd like it for your records.

All right.  Awaiting either another note from the jury or a return of their verdict, we stand in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

I've received the following message from the jury.  It reads as follows:  "We have a verdict."  It's signed by Ms. Nichols, juror 6, who is the jury foreperson, and it's

dated with today's date.

I'll hand it to the Courtroom Deputy and we'll bring in the jury and receive their verdict.

I know I don't need to say this.  Whatever the result is, I don't expect there to be any outwardly noticeable reactions from anybody.  Again, I don't feel like I need to say that, but just out of an abundance of caution I will.

Okay.  Mr. Barnet, please bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

Ms. Nichols, I understand you're the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  We have.

THE COURT:  Will you hand the completed verdict form to the Court Security Officer who will bring it to me?

Ladies and gentlemen of the jury, I'm about to announce the verdict into the record.  I'd like to ask each of you to listen particularly carefully as I read the results of your decision and the verdict into the record because after I have announced the verdict into the record, I'm going to poll the jury to make sure that this is the unanimous verdict of each of the eight members of our jury.

Turning to the verdict form and beginning on page 4 of

the verdict where Question No. 1 is found, Question 1 being, "Did Chamberlain, the Plaintiff, prove by a preponderance of the evidence that Defendants infringed the asserted claims of the '404 Patent?" the jury's answer as to claim 4 is "yes." The jury's answer as to claim 20 is "Yes."

Turning to page 5 of the verdict form and finding thereon Question 2a, "Did Defendants prove by clear and convincing evidence that any of the asserted claims are invalid due to improper inventorship?" the jury's answer is "No."

Also on page 5 of the verdict form I find Question 2b. It reads, "Did Defendants prove by clear and convincing evidence that any of the following asserted claims are invalid as obvious?"  Claim 4 of the '404 Patent, the jury's answer is "No."  Claim 20 of the '404 Patent, the jury's answer is "No."

Turning to page 6 of the verdict form where Question 3 is found, that question is as follows:  "Did Chamberlain, the Plaintiff, prove by a preponderance of the evidence that Defendants willfully infringed any of the asserted claims that you have found were infringed?"  The jury's answer to Question 3 is "No."

Turning to page 7 where Question 4a is found, "What sum of money if paid now in cash has Chamberlain, the Plaintiff, proven by a preponderance of the evidence would compensate it for its damages for infringement from May the 9th, 2017, through March the 31st, 2022, for the sale of Overhead Door's

products?" the jury's answer is $43,400,000; "$43.4 million."

Turning to Question 4b on page 8, "If you awarded any amount of money in Question 4a, what amount of that sum, if any, represents a reasonable royalty?" the jury's answer is $2,700,000; "$2.7 million."

Also on page 8 is Question 4c.  "If you awarded any amount of money in Question 4b, is it a lump sum or a running royalty?" the jury's answer is "Running Royalty."

Turning to page 9, which is the final page of the verdict form I find that it is signed by Ms. Nichols as the foreperson of our jury and it's dated with today's date, the 27th of January, 2023.

Ladies and gentlemen of the jury, let me poll you to make sure that this verdict as I've read into the record unanimously reflects the decision of all eight members of the jury.  If this is your verdict as I have read it, would you please stand up?

Thank you, ladies and gentlemen.  Please be seated.  Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury.  This confirms to the Court that this is the unanimous verdict of all eight members of the jury.

Having polled the jury, the Court accepts the jury's verdict, and I will hand and deliver the original verdict form to the Courtroom Deputy.

Ladies and gentlemen, this completes the trial of this case.  From the very beginning I have given you many, many instructions about your conduct throughout this trial.  You've heard me remind you over and over and over again not to discuss or communicate about the case with anyone.  I am releasing you from all those instructions and I am discharging you as jurors in this case.  That means, ladies and gentlemen, you're free to talk with anyone you'd like to talk to about your service in this case.  It also means you're not obligated in any way to talk to anyone about your service in this case.

Let me share with you a long-standing tradition and practice in this court, because it was this way when I got here in the 1980s.  It's been this way ever since.  We have one way in this courthouse and we have one way out, and you should not be surprised when you leave this courthouse and go down those front steps to find lawyers from this case standing on the sidewalk at the bottom of the steps.  They're there because they hope you will stop and initiate a conversation with them.  They want to hear from you about what they did well and what they did not so well and all kinds of other things about your experience as jurors in this case.

They cannot initiate a conversation with you, but they can make themselves readily available if you want to initiate a conversation with them, and that's the way it's always worked, at least for the last 30 to 40 years that I know

about.

If you want to have a discussion with anybody about the case, pick whoever you'd like to talk to and initiate a conversation. I promise you they will stay as long as you want to talk. If you don't want to initiate a conversation, don't feel obligated to and just don't do it. As the alleged lyrics of the song say, "Just walk on by." It's up to you.

I will tell you that in the last three or four or five years I have implemented an additional product or process to help address this situation. In advance of the trial I ask each side to give me a name and a cell phone number for a member of their respective trial teams, and I have those names and phone numbers with me, and I'm going to make them available to you. If want one, take one. If you might want to call one or the other side and talk about your service in a few days, in a few weeks, in a few months, or in a few years, I promise you they'll want to talk to you, and they'll pick up and take your call. If you don't want to call them, don't call them. If you don't want their phone numbers, don't take their phone numbers. But if you would like to have the phone number so you don't feel like you either have to decide this evening to either stop and have a conversation or never have a conversation, you'll have those numbers, if you want them, that you can use or not use in the future. It gives you another option. But I want you to be aware of that. And I'll

make those available to you before you leave.

Also, ladies and gentlemen, I want to ask a personal favor of you.  Throughout the trial I have been precluded from speaking to any of you except from the bench in open court and on the record.  I think that what you've done by making the personal tangible sacrifice that each of you have made to serve on this jury, I think that deserves special thanks, and now that the trial is complete and I've discharged you as jurors there is absolutely nothing wrong with me talking to you.  And so before you leave I would ask as a personal favor to me that when you leave the jury box you go back in the jury room and let me come in and let me shake each hand let me look each one of you in the eye and let me tell you thank you for your service, because it is very real and important public service and it warrants a special recognition and thanks.  At least it does in my view.

And I promise you, I know it's Friday I know it's been a long week, and it will not take but a few minutes and I will not keep you, but if you would afford me that personal privilege before you leave, I would very much appreciate it.

As I say, this completes the trial of this case.  I've accepted the jury's verdict and discharged them.  That means, counsel, you are released.  And the Court stands in recess.

Ladies and gentlemen if you'll meet me, I'll meet you in the jury room.

(The proceedings were concluded at 4:22 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                01/27/2023

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER