## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

THE CHAMBERLAIN GROUP LLC,  §
§
*Plaintiff*,  §
§
§
v.  §   CIVIL ACTION NO. 2:21-CV-00084-JRG
§
OVERHEAD DOOR CORPORATION, GMI  §
HOLDINGS INC.,  §
§
§
*Defendants*.  §

## MEMORANDUM ORDER AND OPINION

Before the Court is the Renewed Motion for Judgment as a Matter of Law Pursuant to Rule

50(b), or in the Alternative, for a New Trial Under Rule 59 (the "Motion") filed by Defendants

Overhead Door Corporation and GMI Holdings Inc. (collectively, "Defendants" or "OHD"). (Dkt.

No. 618.) Having considered the Motion, and for the reasons stated herein, the Court finds that it

should be **DENIED**.

### I.    BACKGROUND

Plaintiff The Chamberlain Group LLC ("Plaintiff" or "Chamberlain") filed a Complaint on

March 10, 2021, alleging infringement by Defendants of U.S. Patent Nos. 8,587,404 (the "'404

patent"); 9,644,416 (the "'416 patent"); 7,852,212 (the "'212 patent"); and 8,144,011 (the "'011

patent") (collectively, the "Original Asserted Patents"). (Dkt. No. 1.) Chamberlain accused of

infringement certain garage door openers sold by Defendants (the "Original Accused Products").

(*See generally id*.)

As part of pre-trial motion practice, the Court heard argument on Defendants' Motion for

Summary Judgment of Non-Infringement of the '404 patent (the "'404 MSJ") (Dkt. No. 164) on

February 14, 2022. (*See* Dkt. Nos. 322, 323.) The '404 patent teaches selectively providing a

notification that a movable barrier (*e.g.*, a garage door) is about to move. (Dkt. No. 164 at 1.) Since this decision may depend on where the signal to open or close the garage door originated from—*i.e.*, whether the operation is "attended" or "unattended"—the '404 patent further teaches providing a notification for unattended closes (*e.g.*, where the command comes from a user closing the door using her smart phone out of sight of the barrier) while not providing a notification for attended closes (*e.g.*, where the command comes from a "clicker" typically kept in a car). (*Id.*) Each asserted claim, either expressly or in view of the Court's Claim Construction Order, requires "determining" whether to close a movable barrier in combination with operating an "imminent motion notification" (*i.e.*, an alarm), based on some aspect of a transmitted signal. (*Id.* at 2–3.) The Original Accused Products can be operated by a wall console, a radio frequency ("RF") remote, or a mobile device application. (*Id.* at 3–4.) The overhead unit of the Original Accused Products contains a motor and motor control circuit board (together, the garage door opener, or "GDO") and an integrated door control module (the "iDCM"). (*Id.*)

In connection with its '404 Motion for Summary Judgment ("'404 MSJ"), Defendants argued that the GDO and the iDCM of the Original Accused Products are separate and independent—both structurally and functionally—and thus the Original Accused Products do not contain a *single* "processor" which performs all the functions recited in the claims of the '404 patent. (*See* Dkt. No. 164 at 6 n.3 ("[T]he GDO and iDCM are separate printed circuit boards and function independently.").) Defendants represented that all the Original Accused Products are configured and operate in this manner. (*Id.* at 8–9.)

The Court granted the '404 MSJ with respect to Claims 4, 6–9, and 16–20 of the '404 patent, finding Chamberlain had failed to identify a factual dispute as to whether the Original Accused Products make any determination regarding whether to alarm or not alarm in combination

with opening the garage door. (Dkt. No. 331 at 3.) The Court denied the '404 MSJ with respect to Claim 11, however, finding that Chamberlain's infringement theory presented a genuine issue of material fact appropriately decided by a jury. (*Id.*) Specifically, the Court found that Claim 11's recitation of a "processor"—which was not construed by the Court and was governed by its plain and ordinary meaning—created a material question of fact as to whether some processing or logic in the head unit of the Original Accused Products performs the "determining" step. (Dkt. No. 322 at 107:5–108:5.) As a result of its ruling, the Court instructed the parties that, of the claims asserted in the '404 patent, only Claim 11 would be tried to the jury. (*Id.* at 107:25–108:5.)

The jury trial proceeded on March 7, 2022 (the "2022 Trial"), and on March 11, 2022, the jury returned a verdict finding that Defendants did not infringe any claim of the Original Asserted Patents and that Claim 11 of the '404 patent and Claim 1 of the '011 patent were invalid. (Dkt. No. 354.) Following the completion of the 2022 Trial, the Court vacated the '404 MSJ and verdict against Chamberlain in the 2022 Trial as to the '404 patent (as to both infringement and invalidity) and as to invalidity of Claim 1 of the '011 patent. (Dkt. No. 386 at 15.) Chamberlain was permitted to re-try all its previously asserted claims stemming from the '404 patent—not just Claim 11. (*Id.*)

A new trial on the '404 patent commenced on January 23, 2023 (the "2023 Trial").[1, 2] (*See, e.g.*, Dkt. Nos. 595, 596, 597, 598, 602, 610, 611, 612, 614, 615, 616.) On January 27, 2023, the jury returned a verdict finding that Defendants infringed Claims 4 and 20 of the '404 patent, that Defendants' infringement was not willful, and that the Asserted Claims are not invalid as obvious

---

[1] On January 18, 2023, Chamberlain notified the Court via email that it intended to proceed to trial only on Claims 4 and 20 of the '404 patent (the "Asserted Claims") at the 2023 Trial. Defendants narrowed their invalidity theories accordingly on January 21, 2023, which was also communicated to the Court via email.
[2] The products accused in the 2023 Trial were identified in Chamberlain's Supplemental Practicing Products Disclosure for the '404 patent (Dkt. No. 401-4), which included products that were not accused in the 2022 Trial, *i.e.*, "the 'combo' board and two-board accused WiFi-integrated GDO products." (Dkt. No. 401 at 1; *see also* Dkt. No. 452 at 41:3–5; Dkt. No. 529) (the "Accused Products").

or for improper inventorship. (Dkt. No. 599.) The jury awarded $43.4 million in damages, $2.7 million of which represents a running royalty. (*Id.*)

Defendants filed the instant Motion on March 2, 2023, urging the Court to overturn the jury's verdict on several grounds pursuant to Fed. R. Civ. P. 50(b) or, in the alternative, to grant a new trial. (Dkt. No. 618.)

## II.   LEGAL STANDARD

### a.   Judgment as a Matter of Law

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Daig. Div. Inc.*, 442 F.3d 919, 937–38 (5th Cir. 2006).

### b.   New Trial

Rule 59 provides that a new trial may be granted on all or part of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Notwithstanding the broad sweep of Rule 59, "courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Metaswitch Networks Ltd. v. Genband US LLC*, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence."). Furthermore "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial . . . the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.

## III.    DISCUSSION

Under Federal Rule of Civil Procedure 50(b), Defendants file this Motion seeking judgment as a matter of law that Chamberlain failed to present sufficient evidence to support the verdict. (Dkt. No. 618.) Namely, Defendants contend that "[i]f, on March 7, 2022, or at any subsequent time while it was seeking a new trial, Chamberlain would have admitted what is and has always been true—the dual and combo board products are identical for purposes of the '404

patent—Chamberlain could not have credibly sought, let alone obtained, a new trial." (*Id.* at 2.) Defendants alternatively move for a new trial on substantially the same grounds. (*Id.* at 27.)

Chamberlain opposes the Motion, arguing that the jury was presented at trial with "voluminous evidence" establishing that the named inventor, Mr. Laird, invented a "non-obvious solution for safely commercializing residential garage door openers that can be operated both locally and remotely" and that Defendants sold products "infringing his patented solution." (Dkt. No. 632 at 1.) According to Chamberlain, "[t]he jury redressed that wrong—unanimously." (*Id.*) Chamberlain contends that OHD merely seeks to "reach back to the prior, vacated verdict that was based on a demonstrably incomplete record" and urges the Court not to be "persuaded by OHD's re-argument of the same issues that the Court rejected before trial." (*Id.* at 3–4.) In light of the jury's findings, Chamberlain similarly argues that a new trial is inappropriate. (*Id.* at 27.)

The Court finds that substantial evidence exists supporting the jury's verdict on each of the grounds raised by Defendants, and none of those grounds compel setting aside the jury's verdict or granting a new trial.

### a. Infringement

The Asserted Claims require a "movable barrier operator that is configured to 'determine' whether to operate an imminent motion notification (*e.g.*, an alarm) in combination with closing a movable barrier (*e.g.*, a garage door) depending on the type of signal received." (Dkt. No. 618 at 3.) According to Defendants, "[n]o reasonable jury could conclude that the Accused Products make that type of determination, as even Chamberlain's expert admitted that the Accused Products use two separate *pre-determined* communication paths: one for remote (WiFi) signals that *always* triggers an alarm before moving the garage door, and one for local (wired/RF remote) signals that *never* triggers an alarm before moving the garage door." (*Id.* at 3–4) (emphasis in original).

Defendants contend that the Court recognized the same "when previously granting summary judgment of non-infringement on these claims" because the "use of these predetermined paths is fundamentally incompatible with the determination limitations of the claims." (*Id.* at 4.) Such "determination" is "based at least in part on the transmitter identification code." (*Id.*)

Defendants argue that the Court's Claim Construction Order "requires Chamberlain to show that the [A]ccused [P]roducts make a decision about whether to alarm" by construing Claim 20 to "require 'determining an operation of the moving-barrier imminent motion notification based on the first communication and its method of communication.'" (Dkt. No. 618 at 4 (citing Dkt. No. 120 at 26).) In its analysis, the Court noted that the "prosecution history shows the applicant considered the disputed language to require 'making a decision.'" (Dkt. No. 618 at 4–5 (citing Dkt. No. 120 at 15).)

According to Defendants, the Court's construction is consistent with arguments that Chamberlain itself has made in other contexts. (Dkt. No. 618 at 5.) When "attempting to distinguish prior art during litigation against a different defendant," OHD contends that Chamberlain argued that the "'determination' limitations…require the system to consider information about the source of a transmission and make a decision to alarm or not." (*Id.*) In the instant case, Defendants contend that Chamberlain rebutted OHD's § 101 arguments by stating that the "claims do not cover 'the broad result of selective notification itself,' but rather 'claim a system that makes a decision of whether to activate the imminent motion notification based on specific sets of communication connections.'" (*Id.*) (citations and alternations omitted).

Defendants also argue that Chamberlain's witnesses bolstered such arguments. (Dkt. No. 618 at 5.) Chamberlain's expert, Dr. Villaseñor, "admitted that 'the determination limitations require the system to consider information about the source of a transmission and make a decision

to alarm or not alarm.'" (*Id.* (citing Dkt. No. 379 at 53:7–11).[3]) Chamberlain's head of IP, Mr. Fitzgibbon, likewise testified that the "'404 Patent has to make an intelligent decision as to whether or not to operate the pre-alert." (Dkt. No. 618 at 5 (citing Dkt. No. 613 at 319:9–17).) According to Defendants, even the named inventor, Mr. Laird, "conceded that the 'transmitter ID' referred to in the [A]sserted [C]laims 'is what is recognized to differentiate [between the two signals], to decide whether to warn or not." (Dkt. No. 618 at 5–6 (citing Dkt. No. 611 at 76:16–77:21).) Defendants' expert, Dr. Leeb, also testified that the plain meaning of the disputed limitations reflects a decision-making requirement. (Dkt. No. 618 at 6 (citing Dkt. No. 615 at 110:6–12).) Defendants therefore contend that "merely making some sort of determination does not satisfy the [A]sserted [C]laims; in Chamberlain's own words, the claims require the 'specific determination' described above about the nature of the signal and whether (or not) to alarm." (Dkt. No. 618 at 6.)

According to Defendants, Chamberlain's infringement claims fail because the "Accused Products include no piece of hardware or software that performs the type of decision required by the claims" since the products "include two distinct paths, each dedicated to handling only one type of signal—and each reflexively acting, unconditionally, every time that type of signal is received." (Dkt. No. 618 at 7.) One such path is the iDCM, which "has its own dedicated WiFi antenna, its own dedicated microprocessors, and its own dedicated software" to "exclusively receive[] and process[] WiFi signals." (*Id.*) Defendants contend that Chamberlain's expert, Dr. Villaseñor, "admitted that when a command to close a garage door is sent from a smartphone, the communication is received via the pre-established WiFi communication pathway." (*Id.* (citing Dkt. No. 613 at 94:20-95:4).) When the iDCM receives a signal to open or close the garage door, Defendants contend it will "always alarm before moving the garage door without needing to

---

[3] The Court notes that this "admission" from Dr. Villasenor came from the 2022 Trial.

'determine' whether it should." (Dkt. No. 618 at 7.) A complementary "path" exists to receive and process RF signals—the "GDO." (*Id*. at 7–8.) Defendants argue that "no evidence or testimony identifies any component in the Accused Products that considers information about the source of a transmission and makes a decision to alarm or not alarm, which is what Chamberlain has repeatedly argued is required by the '404 Patent claims." (Dkt. No. 618 at 8; *see also id*. (citing Dkt. No. 613 at 338:23–340:8; 345:2–347:13 (discussing "railroad switch" analogy)).)

At trial, OHD contends that Chamberlain "resorted to presenting the jury with evidence about logic in the products that make unrelated 'determinations' (*i.e*., the same types of infringement theories that…the Court already rejected when previously granting summary judgment on claims 4 and 20)." (Dkt. No. 618 at 9.) Such "determinations" include "functionality that verifies whether the format of a message 'is a valid JSON format'; functionality that confirms 'it's a valid, authentic message'; a 'check' for whether a message is 'at the right frequency and right modulation'; and logic that 'uses the IP address as part of…determining…what to do when there's a potential received communication.'" (*Id*. (citing Dkt. No. 613 at 57:25–60:8)) (alternations omitted). According to Defendants, such explanation is flawed because it "lacked any connection between the functionality discussed and a determination about whether to alarm." (Dkt. No. 618 at 9–10.) Defendants also contend that the "JSON validation theory" was the "very same" theory previously rejected at the summary judgment stage in the 2022 Trial. (*Id*. at 10.)

Finally, Defendants argue that Dr. Villaseñor's reference to the "IsItOkayToMoveDoor" function was also misplaced. (*See* Dkt. No. 618 at 10–11 (citing Dkt. No. 613 at 56:16–57:71).) Defendants contend that OHD employee Brent Rauscher explained that such function "'verifies that the door is ready to move' by performing a 'safety check' and validating other conditions—but

does not determine 'whether to alarm or not.'" (Dkt. No. 618 at 10 (citing Dkt. No. 611 at 182:21–183:19).)

According to Defendants, because Dr. Villaseñor's testimony "exclusively concern[ed] irrelevant evaluations of whether a communication is valid or whether it is safe to move the garage door," such "cannot support the jury's verdict of infringement because the claims specifically require determining whether to alarm." (Dkt. No. 618 at 10.) Defendants contend that Dr. Villaseñor's opinions and testimony fail[ed] to satisfy the plain language of the 'determine' limitations" and that such conclusion is bolstered by inventor testimony that "such validation and safety checks are not what the '404 patent claims." (*Id.* at 11 (citing Dkt. No. 611 at 33:24–34:20).)

In response, Chamberlain first contends that the jury "heard and saw evidence that, as recited by the [A]sserted [C]laims, the accused products are movable barrier operators, they are designed to receive signals from both RF and WiFi communications, and that they operate differently in response to these communications—operating an imminent motion notification prior to closing only in response to a WiFi signal." (Dkt. No. 632 at 5.) As an example, Chamberlain contends that:

> The jury observed Dr. Villaseñor operate the infringing products using both RF and WiFi transmitters. During this demonstration, they observed an infringing product make determinations so that, in response to WiFi communications, it closed after alerting, and in response to RF, it closed without alerting. Dr. Villaseñor testified that this operation practiced each limitation of the asserted claims. None of OHD's witnesses testified that this mischaracterized the functionality of the accused products. OHD's expert Dr. Leeb raised no objection when presented with the same operation during his cross examination.

(*Id.* at 5 (citing Dkt. No 632-2 at 48:3–49:19, 51:23–61:10; Dkt. No. 632-3 at 77:23–81:8).) According to Chamberlain, Dr. Villaseñor's testimony was confirmed by Defendants' "top engineers," Mr. Buescher and Mr. Rauscher, who "testified that the products operate in the manner that Dr. Villaseñor described." (Dkt. No. 632 at 5 (citing Dkt. No. 632-6 at 125:15–21, 150:7–16,

153:11–15, 154:12–156:23; Dkt. No. 632-8 at 13:13–15:2).) Chamberlain also contends that technical documents from Defendants confirmed such operation, including the user manual for the accused products and internal OHD documentation detailing the operation of the accused products. (Dkt. No. 632 at 5 (citing Dkt. No. 632-17, 632-18, 632-22, 632-23).)

Chamberlain next argues that the jury heard evidence, consistent with the asserted claims, that the "differing operation in response to RF and WiFi signals is the result of determinations, made by the accused products, about the source of those communications, *i.e.*, from WiFi or RF sources and related to imminent motion notifications." (Dkt. No. 632 at 6.) Chamberlain contends that Defendants' chief software engineer, Mr. Rauscher, "admitted to the jury that the accused products make numerous determinations regarding the source of the communications as part of the process of determining whether to close the garage door with an imminent motion notification," which was confirmed when the jury was presented with the software that Mr. Rauscher and his team "personally developed." (*Id.* (citing Dkt. No. 632-6 at 135:2–9, 136:20–23, 142:11–15, 143:16–23, 145:9–15, 146:3–10, 146:18–22, 150:7–10, 150:14–16, 150:25–151:4, 153:3–7, 153:11–15, 157:23–158:5, 158:17–20).) According to Chamberlain, Defendants' chief hardware engineer, Mr. Buescher, "agreed with Mr. Rauscher that the accused products make numerous determinations regarding the source of the communications," as did Dr. Leeb, Defendants' hired expert. (Dkt. No. 632 at 6 (citing Dkt. No. 632-8 at 9:5–8, 13:17–23, 13:24–14:5, 14:11–18; Dkt. No. 632-3 at 59:5–7, 60:13–20, 60:24–61:7, 66:2–4, 65:10–12).)

Chamberlain also argues that Defendants presented evidence that "links the relevant functionality of the accused products directly to the claimed limitations of the '404 patent," including by referencing the '404 patent in the Specification. (Dkt. No. 632 at 7 (citing Dkt. No. 632-6 at 123:19–124:7, 124:12–14, 162:2–9, 199:10–200:2, 200:16–202:7; Dkt. No. 632-8 at

8:16–18, 13:11–12; Dkt. No. 632-9 at 290:4–292:10, 295:25–299:8; Dkt. No. 632-3 at 24:25–25:6, 26:5–8; Dkt. No. 632-17 at 2; Dkt No. 632-7 at 170:5–16; Dkt. No. 632:15; JTX-75).) Chamberlain contends this evidence and testimony was confirmed by Dr. Villaseñor, who testified to his inspection of the source code, testing of OHD's products, and review of technical documents. (Dkt. No. 632 at 7 (citing Dkt. No. 632-2 at 51:23–52:7).)

Chamberlain criticizes Defendants challenge of the jury's finding based on the same reasoning that was rejected at summary judgment. (Dkt. No. 632 at 7 (citing Dkt. No. 386 at 15; Dkt. No. 554).) Specifically, Chamberlain argues that Defendants' "repeated reliance on the vacated noninfringement finding…is particularly improper given that the chief argument OHD advanced to originally secure noninfringement—that the operation of the infringing products were incompatible with the patent because they functioned using two separate circuit boards—was proven demonstrably false by the evidence OHD withheld." (Dkt. No. 637 at 7–8, n.2) (citations omitted). In sum, Chamberlain argues that both the Court and the jury have rejected Defendants' argument that the accused products use "two distinct paths" such that there is no "piece of hardware or software that performs the type of decision required by the claims" and that Rule 50(b) does not permit OHD to raise the argument for a fourth time. (*Id*. at 8.)

Claims 4 and 20 of the '404 patent recite, respectively, a "movable barrier system" and a "movable barrier operator," which was construed to have its plain and ordinary meaning and is distinct from the claimed transmitter. (Dkt. No. 632 at 8 (citing Dkt. No. 120 at 10).) Chamberlain contends that "[n]o portion of these claims recite that the claimed determinations must be made by specific componentry in the accused products" and contends that based on testimony from both parties' experts, including Dr. Villaseñor, the jury "reasonably rejected OHD's theory that there is no infringement because no single component in the 'paths' inside those movable barrier operators

make the claimed determination." (Dkt. No. 632 at 8, 9 (citing Dkt. No. 632-2 at 50:1–25, 100:5–101:8, 101:16–102:18, 103:1–104:9, 104:13–105:10).)

Indeed, Chamberlain contends that Dr. Leeb and other OHD witnesses testified consistently with Chamberlain's infringement theory that the claims are satisfied when the head unit—*i.e.*, the movable barrier operator—as a whole makes the claimed determinations. (Dkt. No. 632 at 8 (citing Dkt. No. 632-3 at 76:18–24, 76:25–77:13, 45:2–25, 47:7–13, 47:18–20; Dkt. No. 632-6 at 132:4–25; Dkt. No. 632-8 at 9:5–8, 13:17–14:5, 14:11–18).) The same is also consistent with Defendants' internal documentation "that show[s] the componentry inside the movable barrier operator working collectively." (Dkt. No. 632 at 9 (citing Dkt. No. 632-18; Dkt. No. 632-22).)

Chamberlain argues that OHD's "follow-on argument, that the determinations made by the accused products are not the claimed determinations, also fails" because it "relies on the theory that the determinations must be made individually by subcomponents inside the movable barrier operator." (Dkt. No. 632 at 10.)[4] According to Chamberlain, the jury appropriately "rejected that the products somehow alarm for WiFi and not for RF without making a determination about the communication's source" and "reasonably concluded that the determinations made by the movable barrier operator are, in fact, the determinations of the asserted claims." (*Id.* at 11.) Chamberlain contends that the jury's finding is supported by testimony from Dr. Villaseñor, Mr. Buescher, and Dr. Leeb. (*Id.* at 12 (citing Dkt. No. 632-2 at 35:25–37:1, 34:18–35:24; Dkt. No. 632-8 at 14:23–15:2; Dkt. No. 632-3 at 66:5–9).)

### b. Inventorship

---

[4] Chamberlain contends that Defendants' arguments that the determinations related to "format of a message," "frequency" and "modulation" of a message, and the "IP address" are "irrelevant" to the "determination about whether to alarm" is belied by the claim language and the fact that such determinations are claimed. (Dkt. No. 632 at 12.)

Defendants contend that the trial record established "conclusively" that Mr. Laird, despite being the only inventor named on the '404 patent, "was not the sole inventor of claim 20, and that not all of the actual inventors of the '404 patent were named as inventors." (Dkt. No. 618 at 11.) Defendants argue that "Mr. Laird conceded in his trial testimony that he did not invent most of the concepts present in the claims" and that the "unrebutted testimonial and documentary evidence shows that those concepts came from other inventors: the members of the Door & Access Systems Manufacturers Association ('DASMA') Subcommittee on Remote Operation of Door Operators." (*Id.*)

Defendants urge that what the '404 patent "purports to invent" is the concept of closing a movable barrier in combination with operating a moving-barrier imminent motion notification, "but doing so under only certain circumstances." (Dkt. No. 618 at 12.)[5] According to Defendants, Mr. Laird conceded at trial that he did not invent such concept:

> Q. You didn't invent an alarm when a garage door is instructed to close over the internet, did you, sir?
>
> A. No, I did not.
>
> Q. You didn't invent the concept of using an alert before closing a garage door when the user is not within the sight of a garage door, did you, sir?
>
> A. No.
>
> ***
>
> Q. You also didn't invent the concept of not using an alert before closing a movable barrier operator when the user is within the line of sight of the barrier, an attended close. You didn't invent that, either, did you?
>
> A. I did not.

---

[5] Defendants contend that Mr. Laird admitted that "nearly all the other concepts reflected in the [A]sserted [C]laims were well known in the prior art." (*Id*. (citing Dkt. No. 611 at 28:11–15; 28:18–22; 28:23–25; 31:12–14; 31:25–32:4; 32:7–11; 32:12–15; 33:2–4; 33:17–20; 33:24–34:2; 34:3–16).)

> Q. And you didn't invent closing a garage door in combination with not operating an imminent motion notification based on a communication from a car transmitter, did you?
>
> A. Not my inventions. Right. Sorry.

(Dkt. No. 618 at 12–13 (citing Dkt. No. 611 at 31:12–32:18).)

Rather than Mr. Laird, Defendants contend that "it was the DASMA Subcommittee members who conceived of the idea of alarming for unattended operations and not for attended operations, as reflected in unrebutted testimony and documentation of the committee's work." (Dkt. No. 618 at 13 (citing Dkt. No. 613 at 214:5–215:12; 271:23–275:2; 361:12–362:15); *see also* JTX-0059.) Defendants argue that a "summary" of a May 26, 2005 conference call among the committee members evidences a proposed addition to the UL 325 standard for garage door products ("UL 325") requiring that the "operator should provide a warning, audible and visual, for a minimum of 5 seconds before any unattended door movement." (*Id.*) Dr. Leeb, Defendants' expert, testified that the UL 325 call summary disclosed the alarm concept to a person of ordinary skill in the art, as well as "nearly every concept reflected in" the Asserted Claims. (Dkt. No. 618 at 13.) Defendants contend that Chamberlain's expert, Dr. Villaseñor, "offered no analysis" disputing that Mr. Laird did not conceive of certain concepts reflected in Claim 20 or that DASMA members *did* so conceive. (*Id.* at 14.)

Dr. Villaseñor pointed to source code that Mr. Laird testified to writing and "which purportedly implements the subject matter of claims 4 and 20." (Dkt. No. 618 at 14 (citing Dkt. No. 615 at 192:7–193:10).) However, Defendants contend that "[w]hether Mr. Laird supposedly created a physical embodiment that practiced the alleged invention of the '404 patent claims is legally irrelevant to the question of whether others were uncredited joint inventors of whatever that later-written source code enables." (Dkt. No. 618 at 14.)

Finally, Defendants urge that the ideas conceived by the DASMA Subcommittee members "were conveyed to Mr. Laird prior to the filing of the '404 patent in March of 2009—two days before Chamberlain's alleged conception date[.]" (Dkt. No. 618 at 14–15.) Ms. Kelkhoff, a Chamberlain employee, testified that she attended the DASMA Subcommittee meeting and "had been sharing the DASMA committee's work on UL 325 with Chamberlain engineers, including Mr. Laird." (*Id*. at 15 (citing Dkt. No. 613 at 242:14–19); *see also* Dkt. No. 610 at 254:7–12; JTX-43; DTX-1083.) Defendants contend that Dr. Villaseñor also admitted that such DASMA bulletins "were not in the public domain" and therefore not well known to a person of skill in the art. (Dkt. No. 618 at 15–16 (citing Dkt. No. 615 at 207:20–23).)

The jury was instructed that Defendants need only prove that "not all of the actual inventors of the '404 Patent were named on the patent as inventors. (Dkt. No. 618 at 16.) However, Defendants argue that in closing, Chamberlain argued that the law required OHD to "point to someone" that Defendants allege is an unnamed inventor, and which Defendants contend "plainly contradicted the jury instructions and tainted the jury verdict." (*Id*. (citing Dkt. No. 616 at 107:13–108:10).) Defendants argue that they "did not have to pick specific individuals of the DASMA Subcommittee as inventors of the '404 Patent" in order to succeed on its inventorship claim and therefore that the "evidence submitted to the jury indisputably showed that the DASMA Subcommittee satisfied the requirements for joint inventorship." (Dkt. No. 618 at 16 (citing *Plastipak Packaging, Inc. v. Premium Waters, Inc*., 55 F.4th 1332, 1340 (Fed. Cir. 2022)).)

Chamberlain argues that the jury heard "direct testimony from Mr. Laird, contemporaneous documentary and source code evidence of his complete conception, and direct testimony from members of the purported contributing committee" which provided support for the jury's verdict on inventorship. (Dkt. No. 632 at 13.) Mr. Laird's testimony was supported by a "sworn

16

declaration" and his statements were credited by the jury despite rigorous cross-examination. (*Id*.) The jury also "examined Mr. Laird's 2007 source code…and heard testimony that it discloses key aspects of the '404 patent," that "he alone wrote the portions that disclose his invention," and that "no one else had access to this source code." (*Id*. at 14 (citing Dkt. No. 632-21; Dkt. No. 632-4 at 262:5–21, 263:6–8, 263:21–22, 264:9–10, 264:25–265:1, 265:4–19, 298:9–13).) Chamberlain contends that Dr. Villaseñor identified Mr. Laird's code and identified disclosure of each asserted limitation, which was further supported by the demonstration to the jury of the reconstructed operator which showed that the code "ma[d]e the claimed determinations regarding the source of the transmission and whether to close with an alert." (Dkt. No. 632 at 14 (citing Dkt. No. 632-2 at 31:4–37:1, 23:18–20, 37:2–5, 38:1–5; 29:1–30:5).) According to Chamberlain, OHD's expert Dr. Leeb "did not analyze Mr. Laird's code or the operation of the reconstructed operator" and testified that "he only 'sort of' understood" the code. (Dkt. No. 632 at 14 (citing Dkt. No. 632-3 at 33:13–16, 81:13–16).)

As to the members of the DASMA committee that Defendants allege are the actual inventors of the '404 patent, Chamberlain contends they testified that "they were not inventors," including Ms. Kelkhoff. (Dkt. No. 632 at 14 (citing Dkt. No. 632-5 at 251:7–9).) In fact, Chamberlain contends that Ms. Kelkhoff was "not aware of any committee members that were inventors of the '404 patent and has never heard anyone other than Mr. Laird claim inventorship," which was further confirmed by Defendants' witness, Mr. Krupke, who testified that he was "unaware of members contacting Chamberlain to indicate inventorship," even after seeing Chamberlain's 2015 letter to OHD regarding the '404 patent. (Dkt. No. 632 at 14 (citing Dkt. No. 632-5 at 251:10–12, 251:24–252:5; Dkt. No. 632-9 at 287:30–288:2, 298:8–15, 291:14–17).)

Chamberlain also faults Defendants' inventorship argument for "hing[ing] on a list of individual, paraphrased elements within claim 20" rather than analyzing the claims of the '404 patent "as a whole." (Dkt. No. 632 at 15.) Specifically, Chamberlain contends that Defendants argue that the "DASMA subcommittee's significant contribution to the claims was inventing 'closing a movable barrier (*i.e.*, a garage door) in combination with operating a moving-barrier imminent motion notification (*i.e.*, alarming), but doing so only under certain circumstances." (*Id.* at 15 (citing Dkt. No. 618 at 12).) Chamberlain argues that such "paraphrased claim element improperly reflects the scope of the invention" by "deliberately omitting the 'determination' limitation." (Dkt. No. 632 at 15, n.10.) Chamberlain contends that "OHD did not present the jury with any evidence of who originated the alleged contribution" or "what exactly was contributed to Mr. Laird." (*Id.* at 16.)

Finally, Chamberlain argues that the purported contribution made by the DASMA subcommittee is "not significant because it merely suggests a result to be accomplished rather than the means of accomplishing it." (Dkt. No. 632 at 16–17; *see also id.* at 17, n.12 (citing *Nartron Corp. v. Schukra U.S.A. Inc*., 558 F.3d 1352, 1359 (Fed. Cir. 2009) (finding party not a joint inventor by 'simply posing the result and leaving it to [others] to figure out how to accomplish it.'")).)

### c.  Priority Date

At trial, Chamberlain argued that the '404 Claims were entitled to a priority date of June 2007, approximately two years before the March 24, 2009 filing date. (Dkt. No. 618 at 17.) Defendants contend that "Chamberlain failed to provide substantial evidence from which a jury could conclude that the asserted claims were entitled to any priority date earlier than the filing date." (*Id.*) Specifically, Defendants argue that Chamberlain's only evidence—testimony of the

named inventor, Mr. Laird, and "corroborating" source code—was insufficient as a matter of law to establish conception and reduction to practice. (*Id*.)

Defendants argue that the "source code relied on by Chamberlain and its expert failed to provide legally adequate corroboration because, at best, it is the inventor's own 'unwitnessed documentation'" and no witness "besides Mr. Laird testified about the provenance or timing of the source code" or even that "anyone else had reviewed it contemporaneously to his alleged conception." (Dkt. No. 618 at 17–18 (citing *Brown v. Barbacid*, 276 F.3d 1327, 1336 (Fed. Cir. 2002)).) Accordingly, not only was such source code "indisputably unwitnessed," but "no evidence indicated that Mr. Laird wrote it." (Dkt. No. 618 at 18 (citing Dkt. No. 611 at 295:16–296:8).) Indeed, the "only ostensible documentary link Mr. Laird could identify between himself and the source code was that he supposedly possessed a copy of the code, allegedly stored in a digital directory with his name on it…[.] But possessing a copy of that source code does nothing to establish the possessor's authorship[.]" (Dkt. No. 618 at 18 (citing Dkt. No. 610 at 296:9–14).)

Defendants contend that the only testimony regarding the source code was about "an alleged 2007 demonstration of a prototype running the code" but Mr. Laird could not identify any person at such demonstration. (Dkt. No. 618 at 18 (citing Dkt. No. 610 at 289:11–14).) Chamberlain identified various calendar entries referencing a "demo," which Chamberlain "contends to be associated with the demonstration" of the prototype. (Dkt. No. 618 at 18 (citing Dkt. No. 610 at 266:5–14; 268:11–270:2).) However, "Mr. Laird could not confirm that these calendar entries even corresponded to the alleged demonstration" or "identify any of the alleged attendees at these meetings." (Dkt. No. 618 at 18–19 (citing Dkt. No. 610 at 290:2–8).)

To prove entitlement to a priority date earlier than the patent's filing date, the patentee "may not rely on 'oral testimony of a putative inventor' alone, without 'evidence corroborating

that testimony.'" (Dkt. No. 618 at 17 (citing *Singh v. Brake*, 317 F.3d 1334, 1340–41 (Fed. Cir. 2003)).) Such corroborating evidence cannot solely come from the inventor's "unwitnessed documentation." (Dkt. No. 618 at 17 (citing *Brown*, 276 F.3d at 1335).) Accordingly, Defendants contend that Chamberlain failed as a matter of law to show that the '404 patent was entitled to a priority date earlier than its filing date, and because of Chamberlain's failure, UL 325 and the Genie Operator's Manual are prior art to the '404 patent. (Dkt. No. 618 at 19.)

Chamberlain contends that the jury's finding of a priority date of June 7, 2007 is supported by "substantial evidence beyond Mr. Laird's testimony." (Dkt. No. 632 at 17.) First, Chamberlain argues that the jury heard "significant evidence" that Mr. Laird's source code independently corroborates his conception because it "fully demonstrates the claims in this case." (*Id*. (citing Dkt. No. 632-4 at 298:9–13, 115:2–6; Dkt. No. 632-21; Dkt. No. 632-31).) Second, Chamberlain contends that the date of the code is "corroborated by contemporaneous communications between Mr. Laird and other Chamberlain employees," including in the form of meeting invitations and the testimony explaining the same. (Dkt. No. 632 at 17 (citing Dkt. No. 632-28; Dkt. No. 632-29; Dkt. No. 632-30; Dkt. No. 632-4 at 290:2–8, 116:22–23, 273:9–11, 269:14–270:4, 271:24–272:20, 272:19–273:8).) Dr. Villaseñor also testified that the code bearing the June 7, 2007 date contained Mr. Laird's invention of "all parts of claims 4 and 20." (Dkt. No. 632 at 18 (citing Dkt. No. 632-2 at 37:2–5, 38:1–5).)

Chamberlain faults Defendants for "recycl[ing]" pretrial arguments that have already been rejected by the Court at summary judgment and subsequently resolved by the jury in Chamberlain's favor. (Dkt. No. 632 at 18.) Chamberlain contends that Mr. Laird's "source code and meeting records were admitted into evidence as physical exhibits, and accordingly, the jury could conclude for itself what they show, aided by the testimony of witnesses such as Mr. Laird

himself and Dr. Villaseñor." (*Id.* (citing *NFC Tech., LLC v. Matal*, 871 F.3d 1367, 1372 (Fed. Cir. 2017) (finding an inventor's conception can be corroborated even if "no one piece of evidence in and of itself establishes that fact, and even though circumstantial evidence."); *Mahurkar v. C.R. Bard, Inc*., 79 F.3d 1572, 1577–78 (Fed. Cir. 1996) (The Federal Circuit "does not require corroboration where a party seeks to prove conception through the use of physical exhibits.")).)

### d.  Obviousness

#### i.  UL 325

As discussed *supra* in Section III.c., Defendants contend that UL 325 is prior art to the '404 patent by virtue of Chamberlain's failure to prove entitlement to an earlier priority date. (S*ee generally* Dkt. No. 618 at 19.) UL 325 is "a safety standard for the garage door industry published by Underwriters Laboratories, Inc." (*Id*.; *see also* JTX-44.) Defendants urge that the Asserted Claims are obvious in view of UL 325. (Dkt. No. 618 at 19.)

Defendants argue that it is "undisputed" that "nearly all elements" of the Asserted Claims were well known in the prior art, which is "acknowledge[d]" in the '404 patent itself. (Dkt. No. 618 at 19 (citing '404 patent at 1:14–52).) The only element not disclosed in the prior art, according to Defendants, is the "determine" requirement of the Asserted Claims. (Dkt. No. 618 at 19.) Defendants contend that such requirement "is one of only three predictable ways that one could comply with the requirements set out in UL 325, as demonstrated by unrebutted expert testimony submitted to the jury." (*Id*.) Accordingly, Defendants urge that the "sole purported addition over the prior art reflected in the asserted claims was one of 'a finite number of identified, predictable solutions' that was 'the product…of ordinary skill and common sense,' rendering the claims obvious." (*Id*. (citing *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 421 (2007)).)

The UL 325 standard "disclosed a movable barrier operator, the use of transmitters, a movable barrier operator closing the movable barrier with an alarm for remote operations, and a movable barrier operator closing the movable barrier without an alarm for local operations." (Dkt. No. 618 at 19–20 (citing Dkt. No. 615 at 10:4–16:8).) According to Defendants, "Chamberlain conceded that UL 325 discloses—and requires—issuing an alarm during unattended close operations[.]" (Dkt. No. 618 at 20 (citing Dkt. No. 610 at 153:12–15).) "Chamberlain's only argument that the asserted claims are not obvious in view of UL 325 was that, although UL 325 admittedly discloses the concept of alarming for unattended closes, the standard 'doesn't tell you how to do it.'" (Dkt. No. 618 at 20 (citing Dkt. No. 610 at 153:19–25).)

In response, Defendants argue that Dr. Leeb provided "unrebutted" testimony that:

> [T]here are only three ways to comply with UL 325's requirement for alarming in connection with unattended closes: (1) alarming every time a garage door closes (*i.e.*, unattended and attended); (2) alarming for only unattended close operations *without* the 'determination' required by claims 4 and 20 of the '404 patent (as Overhead Door's products do); and (3) alarming only for unattended close operations, by 'determining' whether to alarm based on the signal received (*i.e.*, the manner claimed in the '404 patent).

(Dkt. No. 618 at 20 (citing Dkt. No. 615 at 13:20–14:10)) (emphasis in original). "That these are the only options—and that selecting the third option among them is obvious—is bolstered by the testimony of Mr. Laird," who identified "reduc[ing] nuisance" as the "only problem solved by his purported invention" and testified that "reducing nuisance" is obvious. (Dkt. No. 618 at 20–21 (citing Dkt. No. 611 at 12:4–16; 68:21; *see also* Dkt. No. 615 at 199:14–24.) Defendants also contend that Chamberlain's head of intellectual property "admitted that 'for residential garage doors that existed before Chamberlain applied for the '404 Patent, it was known to issue a noise or a light before closure if the closure was unattended, and if the closure was attended, to do nothing." (Dkt. No. 618 at 21 (citing Dkt. No. 613 at 327:13–18).) Defendants argue that Dr. Villaseñor "offered no meaningful rebuttal" to Dr. Leeb's opinion other than a "conclusory"

disagreement with Dr. Leeb's conclusion, and Defendants further contend that Dr. Villaseñor "never identified for the jury what other options supposedly exist" for complying with UL 325 beyond what Dr. Leeb suggested. (Dkt. No. 618 at 21 (citing Dkt. No. 615 at 194:16–22; 206:2–24).)

Defendants conclude that, "based on the undisputed facts," it follows that "it would have been obvious for a skilled artisan to implement the third option described [by Dr. Leeb]" such that no reasonable jury could find that the claims were not obvious. (Dkt. No. 618 at 22.)

In response, Chamberlain first contends that, notwithstanding its argument that UL 325 cannot be prior art, the jury correctly decided that the evidence did not support a finding of obviousness. (Dkt. No. 632 at 19.) Chamberlain credits Defendants' expert, Dr. Leeb, who testified that the "scope of UL 325 relevant to the '404 patent is limited." (*Id.* (citing Dkt. No. 632-3 at 99:16–23; Dkt. No. 632-35 at 85).) Indeed, Chamberlain contends that multiple witnesses confirmed that "UL 325 focuses on *what* to do (arm for unattended closing), where the '404 patent claims recite *how* to do it." (Dkt. No. 632 at 19 (citing Dkt. No. 632-6 at 128:22–129:5, 210:18–24; Dkt. No. 632-5 at 246:7–247:8; Dkt. No. 632-9 at 293:2–7, 294:11–14, 295:7–12)) (emphasis in original).

Second, Chamberlain argues that the jury heard that UL 325 "contains no discussion regarding key elements of the '404 patent's claims" including "making a determination regarding whether to close with an alarm" or "determinations concerning the source of the communication." (Dkt. No. 632 at 19–20 (citing Dkt. No. 632-6 at 131:15–17; Dkt. No. 632-3 at 103:7–9, 101:20–102:1; Dkt. No. 632-9 at 294:15–17).)

Third, Chamberlain contends that the jury heard testimony that "UL 325's slim disclosure would leave a multitude of non-obvious ways to implement the standard," which the jury believed

over Dr. Leeb's theory that "there are only three ways to implement UL 325," rendering the '404 patent obvious. (Dkt. No. 632 at 20.) Indeed, Chamberlain argues that Dr. Leeb's obviousness theory "impermissibly relies on hindsight bias to redact the ways of implementing UL 325 in terms of Mr. Laird's inventive determination." (*Id*. at n.13.) According to Chamberlain, the jury credited the testimony of Defendants' employees, Mr. Matias and Mr. Rauscher, Defendants' expert, Dr. Leeb, as well as Chamberlain's expert Dr. Villaseñor, to find that there are multiple implementation methods for UL 325 that preclude a finding of obviousness. (*Id*. at 20 (citing Dkt. No. 632-10 at 185:15–20; Dkt. No. 632-6 at 131:15–17; Dkt. No. 632-3 at 103:7–9, 103:13–20; Dkt. No. 632-2 at 194:16–18).)

Finally, Chamberlain contends that objective indicia from Defendants' actions and internal documentation demonstrate non-obviousness of the '404 patent over the UL 325 standard. (Dkt. No. 632 at 21.) Specifically, Chamberlain contends that the jury relied on OHD's "copying" of the '404 patent into its Specification and testimony from Defendants' witnesses that "[r]ather than relying on UL 325, OHD witnesses … relied on the '404 patent and Chamberlain's products during development of the infringing products." (*Id*. (citing Dkt. No. 632-17; Dkt. No. 632-6 at 128:4–11; Dkt. No. 632-6 at 124:5–7, 124:12–14, 123:19–124:4; Dkt. No. 632-8 at 8:16–18, 13:11–12; Dkt. No. 632-9 at 292:3–10; 291:25–292:2).)

### ii.   UL 325 and Genie Operator's Manual

As discussed *supra* in Section III.c., Defendants contend that the operator's manual associated with Genie's ProMax garage door opener (the "Genie Operator's Manual") is prior art to the '404 patent by virtue of Chamberlain's failure to prove entitlement to an earlier priority date. (S*ee generally* Dkt. No. 618 at 22–23; *see also* JTX-62.) Defendants reiterate that the "undisputed facts at trial proved that a person of ordinary skill in the art contemplating ways to comply with

UL 325 would have been presented with only three options." (Dkt. No. 618 at 23 (citing Dkt. No. 615 at 13:20–14:10).)

Defendants argue that choosing to alarm "only for unattended close operations" would have been obvious from UL 325 alone, but also contends that the Genie Operator's Manual "discloses explicitly the teaching that would steer a person of ordinary skill, with UL 325 in hand, toward the concept of alarming only for unattended close operations[.]" (Dkt. No. 618 at 23; *see also id.* ("Specifically, the Genie Operator's Manual describes local door close operations without alarming (*i.e.*, the standard way that many garage doors would have operated, prior to the introduction of an unattended-close feature.")).) Dr. Leeb opined at trial that "given the [Genie Operator's Manual], the most obvious thing to do [with] UL now bringing in the possibility of unattended closures is to just add just what you need to satisfy that, which would be [to] leave everything the way it is so it works like it used to"—*i.e.*, that "it doesn't do an alarm for local[] [close operations], and then you would add for the unattended control an alarming function." (Dkt. No. 618 at 23 (citing Dkt. No. 615 at 17:2–10).) Defendants contend that Dr. Villaseñor did not rebut Dr. Leeb's conclusion. (Dkt. No. 618 at 23.)

Chamberlain contends that "[b]oth parties' experts confirmed that the manual adds nothing meaningful, let alone the missing 'determination' limitation," to UL 325. (Dkt. No. 632 at 21.) Indeed, Chamberlain contends that Dr. Villaseñor pointed out that Dr. Leeb "did not show evidence of the Pro Max operator's operation (*e.g.*, source code) or show any pages of the manual other than the front cover." (*Id.* at 21–22 (citing Dkt. No. 632-2 at 195:1–6, 196:18–21).) Chamberlain further argues that Dr. Leeb "admitted that critical claim limitations were missing," including that the manual "doesn't say anything about an alarm." (Dkt. No. 632 at 22 (citing Dkt.

No. 632-3 at 16:9–13, 16:20–21).) According to Chamberlain, the jury reasonably credited Dr. Villaseñor over Dr. Leeb. (Dkt. No. 632 at 22.)

### iii.  DASMA

As discussed *supra* in Section III.b., Defendants contend that the "DASMA [S]ubcommittee conceived of virtually all of the ideas underlying the purported invention of the '404 patent, and it is undisputed that these ideas were communicated directly to Mr. Laird by Ms. Kelkhoff two days before Chamberlain's alleged conception date[.]" (Dkt. No. 618 at 24; *see also id*. ("The body of this email from Ms. Kelkhoff discloses the concept of alarming for unattended closes and not alarming for attended closes, and Mr. Laird admitted having received from Ms. Kelkhoff what is reflected in her email.").) Accordingly, Defendants argue that the Asserted Claims would have been obvious in view of the information derived from the DASMA and UL [S]ubcommittee. (Dkt. No. 618 at 25.)

Chamberlain contends that Defendants are precluded from moving for judgment on this issue because they failed to do so at the conclusion of trial. (Dkt. No. 632 at 22.)[6] Notwithstanding the apparent waiver, Chamberlain contends that "abundant" evidence demonstrates that Mr. Laird is the sole inventor of the '404 patent for the same reasons as in Section III.b, *supra*. (*Id*. at 23.)

### e.  Damages

#### i.  Lost Profits

"To succeed on its lost profits claim for the '404 Patent, Chamberlain needed to 'show causation in fact, establishing that but for the infringement, [it] would have made additional

---

[6] The Court notes that when arguing its 50(a) motion on obviousness, Defendants only moved on UL 325 and/or UL 325 in combination with the Genie manual. (*See* Dkt. No. 615 at 229:7–16.) In opposition to Chamberlain's countermotion of no obviousness, Defendants referenced their DASMA derivation argument. (*Id*. at 247:23–249:9.) Defendants only affirmatively raised the argument of derivation of the '404 patent from DASMA when arguing in support of its 50(a) motion on improper inventorship. (*Id*. at 243:8–249:9.) It was not affirmatively argued by Defendants in their motion on obviousness.

profits.'" (*Id.* (quoting *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011)).) OHD contends that Chamberlain failed to present sufficient evidence for the jury to find that Chamberlain was entitled to lost profits. (Dkt. No. 618 at 25.) Specifically, Defendants urge that Chamberlain presented insufficient evidence of the first two *Panduit* factors, *i.e.*, that there was a demand for the patented product and that there were no acceptable non-infringing substitutes. (*Id.* (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).)

Relevant to the second *Panduit* factor, Defendants contend that their damages expert, Mr. Tate, "testified that Overhead Door documentary evidence shows that the majority of customers do not use WiFi features—*i.e.*, the features that include the accused functionalities." (Dkt. No. 618 at 25 (citing Dkt. No. 615 at 130:9–132:2).) Defendants contend that the "evidence showed that Overhead Door actually sells far more non-WiFi garage door openers—*i.e.*, an alternative that is indisputably non-infringing—than openers with WiFi capability." (Dkt. No. 618 at 25 (citing Dkt. No. 613 at 115:24–116:14).)

According to Defendants, even Chamberlain's own expert "admitted that roughly seventy percent of Overhead Door's sales were for non-WiFi garage door operators that were not accused of infringement" and that for the thirty percent of customers who purchased WiFi garage door operators, "only roughly one-third enabled WiFi operation by downloading the Overhead Door Genie app." (Dkt. No. 618 at 25–26 (citing Dkt. No. 613 at 177:4–7; 178:2–12); *see also* Dkt. No. 618 at 26 ("That is, for every ten customers, only one even downloaded the Genie app; seven purchased a non-WiFi operator and two purchased a WiFi operator but never used the WiFi functionality.").) Therefore, Defendants contend because the evidence showed that the "vast

majority of customers" were "ambivalent" about WiFi functionality, "Chamberlain failed to satisfy the first *Panduit* factor as a matter of law." (Dkt. No. 618 at 26.)

In response, Chamberlain first argues that Defendants did not preserve the argument that Chamberlain failed to meet the first *Panduit* factor during the 50(a) stage. (Dkt. No. 632 at 24.)[7] Despite such waiver, Chamberlain contends that OHD's arguments related to the *Panduit* factors are belied by OHD's documents, testimony, and underlying precedent. (*Id*. at 25.) First, "OHD appears to be arguing that because many of OHD's sales are of non-WiFi garage door openers and some users do not utilize the WiFi feature, Chamberlain failed to show there is an absence of acceptable non-infringing substitutes." (*Id*.) Chamberlain contends that Defendants' witnesses, Mr. Janas and Mr. Krupke, disprove that argument by testifying that it is "OHD's vision for one hundred percent of its sales to be WiFi operators within the decade." (*Id*. (citing Dkt. No. 632-11 at 113:1–4; Dkt. No. 632-9 at 300:1–6, 306:19–24).) The same is corroborated by internal OHD documents, supporting the jury's conclusion that "OHD itself did not view non-WiFi operators as alternatives, as it was making every effort to convert sales to WiFi operators." (Dkt. No. 632 at 25.) Chamberlain similarly argues that there was substantial evidence for the jury to reject OHD's argument related to the first *Panduit* factor, *i.e*., that because customers were "ambivalent" about WiFi functionality, "Chamberlain did not show demand for the patented product." (*Id*. at 26.) According to Chamberlain, the "commercial success and substantial sales of the infringing product is compelling evidence of demand" that belies Defendants' argument. (*Id*. (citing Dkt. No. 632-12 at 143:14–25; Dkt. No. 632-13 at 180:24–181:3).)

### ii.  Reasonable Royalty

---

[7] The Court notes that during 50(a) practice, Defendants stated that Chamberlain "needs to prove that it met each of the *Panduit* factors. Chamberlain did not do that at trial." (Dkt. No. 615 at 255:7–9.) However, in their argument, Defendants only specifically referred to *Panduit* factors 2 and 3, not factor 1. (*See, e.g., id*. at 255:10–256:14.)

OHD contends that Chamberlain is not entitled to reasonable royalty damages as a matter of law because "Chamberlain's damages expert never provided anything other than conclusory testimony as to how he accounted for any features or functionalities in the accused products that were not alleged to be covered by the '404 patent." (Dkt. No. 618 at 26.) "[A]fter having divided Overhead Door's revenues between WiFi products (*i.e.*, accused products) and non-WiFi products (*i.e.*, unaccused products), Chamberlain's expert stated without explanation that he 'further apportioned that down to the portion attributable to the '404 patent specifically,' and that 'resulted in a royalty of $6 to $8,' without ever explaining how that apportionment was done." (*Id.* (citing Dkt. No. 613 at 165:9–19).) Defendants urge that such conclusory testimony cannot sustain the jury's verdict. (Dkt. No. 618 at 26 (citing *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1269 (Fed. Cir. 2012)).)

Chamberlain disputes Defendants' assertion that Mr. Britven's reasonable royalty analysis was "conclusory," and points to "multiple data points" that he testified to that supported his proposed royalty, including an analysis of Chamberlain's income, OHD's financial information, and Chamberlain's comparable license with Nortek. (Dkt. No. 632 at 26 (citing Dkt. No. 632-12 at 165:9–25; 166:9–19; Dkt. No. 632-20).) Mr. Britven obtained a "range of potential royalties" from such evidence and applied the *Georgia-Pacific* factors to arrive at his final proposal. (Dkt. No. 632 at 26 (citing Dkt. No. 632-12 at 167:3–25).) Relevant factors included the relationship between Chamberlain and OHD, follow-on accessory sales, commercial success, and the extend of Defendants' commercial use. (Dkt. No. 632 at 26 (citing Dkt. No. 632-12 at 131:25–164:4).)

## IV. ANALYSIS

### a. Infringement

The Court finds that the theory behind Defendants' attack on the jury's infringement finding was already rejected by the Court at the summary judgment stage. (Dkt. No. 554 at 1.) Further, Defendants' reliance on this Court's summary judgment ruling related to the 2022 Trial is unpersuasive and improper given the Court's *vacatur* of such ruling. (Dkt. No. 386.)

The Court also finds that the jury's verdict on infringement was supported by substantial evidence from both parties at trial. Specifically, the jury heard that the Accused Products are movable barrier operators, they are designed to receive signals from both RF and WiFi communications, and that they operate differently in response to these communications. Each party put on fact and expert witnesses to describe the operation of the Accused Products, including a demonstration of the same, using both RF and WiFi transmitters. Dr. Villaseñor testified that the operation practiced each limitation of the asserted claims, and Defendants' experts did not dispute that the Accused Products receive different types of signals and that the door either moves or does not move based on those signals. (*See, e.g.*, Dkt. No. 611 at 125:15–21; Dkt. No. 613 at 29:1–5.) The jury was also presented with internal OHD documentation and user manuals detailing the operation of the Accused Products. (*See* JTX-4; JTX-8; JTX-35; JTX-43.)

The jury was entitled to weigh all the evidence presented at trial and decide which evidence it found to be most credible. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010). After such evaluation, the jury found for Chamberlain. The Court does not find that no reasonable jury could have credited Chamberlain's infringement position over Defendants' non-infringement theory. Where a jury is presented with two conflicting positions at trial and there is reasonable evidence and argument to support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL and does not support granting a new trial. Making such factual decisions is, in fact, the essence of the American jury trial system.

### b.  Inventorship

The Court finds that sufficient evidence exists pursuant to which the jury could have found that Mr. Laird is the sole inventor of the '404 patent. At trial, the jury heard testimony from Mr. Laird, including about his creation and demonstration of the source code and other contemporaneous documentary evidence, as well as expert analysis of Mr. Laird's source code and testimony from members of the DASMA Subcommittee. (Dkt. No. 610 at 262:5–21, 263:6–8, 263:21–22, 264:9–10, 264:25–265:1, 265:4–19, 298:9–13.) Mr. Laird's testimony was supported by a "sworn declaration" and his statements were credited by the jury despite rigorous cross-examination. (*Id*. at 280:18–271:9.) The jury also examined Mr. Laird's 2007 source code and heard testimony that it discloses key aspects of the '404 patent, that he alone wrote the portions that disclose his invention, and that no one else had access to this source code. (*See, e.g*., JTX-18.) Dr. Villaseñor also reviewed the source code and identified disclosure of each asserted limitation within the code. (Dkt. No. 613 at 31:4–37:1, 23:18–20, 37:2–5, 38:1–5; 29:1–30:5.) OHD's expert Dr. Leeb testified that "he only 'sort of' understood" the code. (Dkt. No. 615 at 33:13–16, 81:13–16.)

Accordingly, the Court finds that substantial evidence existed from which the jury could properly conclude that Mr. Laird was the sole inventor of the '404 patent. Defendants' arguments do not warrant JMOL or a new trial.

### c.  Priority Date

The Court finds that there was sufficient evidence and explanation for the jury to find that the '404 patent was entitled to an earlier priority date than the filing date. Mr. Laird testified extensively about his independent creation of the source code in 2007. (*See* Dkt. No. 613 at 298:9–13, 115:2–6.) The jury also saw the source code itself and heard testimony from both Mr.

Laird and Dr. Villaseñor that the code contains "all parts" of the asserted claims. (JTX-18; *see also* Dkt. No. 613 at 37:2–5, 38:1–5.) Mr. Laird also testified regarding corroborating details, including meeting invitations and details of the contents of those meetings, during which he demonstrated his source code to others. (Dkt. No. 610 at 290:2–8, 116:22–23, 273:9–11, 269:14–270:4, 271:24–272:20, 272:19–273:8; *see also* PTX-53; PTX-54; PTX-72.)

The jury heard evidence from Chamberlain's witnesses regarding the 2007 source code, and the jury also heard the testimony elicited by OHD's cross examination of the same witnesses. Accordingly, the jury was free to credit whichever testimony it found to be most credible and believable. The jury chose to believe Mr. Laird, and the fact that the jury ultimately sided with one party over the other does not support entry of JMOL and does not support granting a new trial.

### d.  Obviousness

The Court finds that the jury's verdict of no invalidity is supported by substantial evidence. With regard to UL 325, the jury heard testimony from multiple witnesses that UL 325 focuses on *what* to do (arm for unattended closing) whereas the '404 patent claims recite *how* to do it. (Dkt. No. 611 at 128:22–129:5, 210:18–24; Dkt. No. 613 at 246:7–247:8, 293:2–7, 294:11–14, 295:7–12.) The jury also heard that UL 325 "contains no discussion regarding key elements of the '404 patent's claims" including "making a determination regarding whether to close with an alarm" or "determinations concerning the source of the communication." (Dkt. No. 632 at 19–20 (citing Dkt. No. 611 at 131:15–17; Dkt. No. 613 at 103:7–9, 101:20–102:1, 294:15–17).) The jury was entitled to believe, as Chamberlain contends, that "UL 325's slim disclosure would leave a multitude of non-obvious ways to implement the standard," over Dr. Leeb's theory that "there are only three ways to implement UL 325," rendering the '404 patent obvious. (Dkt. No. 632 at 20.)

The jury was also entitled to find that the Genie Pro Max operator's manual in combination with UL 325 did not render the asserted claims obvious. As with the UL 325 evidence, where the jury heard competing testimony from expert witnesses and credited the testimony of one over the other, so too did the jury find that the testimony of Chamberlain's witnesses regarding the Pro Max operator's manual was most credible. Such finding is supported by substantial evidence. (*See* Dkt. No. 613 at 16:9–13, 16:20–21, 195:1–6, 196:18–21.)

Finally, as to Defendants' argument that Mr. Laird derived the invention of the '404 patent from DASMA, the Court finds that substantial evidence supports the jury's finding that the asserted claims are not invalid as derived. Chamberlain contends that Defendants are precluded from moving for judgment on this issue because they failed to do so at the conclusion of trial. (Dkt. No. 632 at 22.) The Court finds that, for the same reasons the jury's verdict on inventorship was supported by substantial evidence, so too is the jury's implicit finding of no derivation. (*See supra*, Section IV.b.) Accordingly, the Court need not reach Chamberlain's waiver argument.

### e.  Damages

The jury heard damages evidence and testimony from both parties and was entitled to weigh such evidence in coming to its final damages decision. To the extent Defendants disparage the methodology of any experts, such is a late *Daubert* attack which is now rejected. Moreover, the jury heard evidence from both Mr. Tate and Mr. Britven on the issue of damages. Having considered all the record evidence, the Court concludes that the jury reached a reasoned and supportable decision and declines to disturb the jury's verdict.

### V.    CONCLUSION

For the reasons stated above, Defendants' Motion (Dkt. No. 618) should be **DENIED**.

**So ORDERED and SIGNED this 4th day of April, 2023.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE